1  **MARTIN D. SINGER (BAR NO. 78166)**
   **EVAN N. SPIEGEL (BAR NO. 198071)**
2  **ANDREW B. BRETTLER (BAR NO. 262928)**
   **LAVELY & SINGER**
3  **PROFESSIONAL CORPORATION**
   2049 Century Park East, Suite 2400
4  Los Angeles, California 90067-2906
   Telephone: (310) 556-3501
5  Facsimile: (310) 556-3615
   E-mail:    mdsinger@lavelysinger.com
6  E-mail:    espiegel@lavelysinger.com
   E-mail:    abrettler@lavelysinger.com
7
   Attorneys for Plaintiffs
8  THREE-SEVEN ENTERTAINMENT, INC., and
   ADRIEN BRODY
9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                        **CV10-7705** DSF ((Wx)

13  THREE-SEVEN                    ) CASE NO.
    ENTERTAINMENT, INC., a         )
14  Nevada corporation; and ADRIEN ) **COMPLAINT FOR DAMAGES**
    BRODY, an individual,          ) **AND INJUNCTIVE RELIEF BASED**
15                                 ) **ON:**
              Plaintiffs,          )
16                                 ) (1)  **BREACH OF CONTRACT**
          vs.                      ) (2)  **BREACH OF COVENANT OF**
17                                 )      **GOOD FAITH & FAIR**
    GIALLO PRODUCTIONS, LTD., a    )      **DEALING**
18  United Kingdom limited company;) (3)  **FRAUD - INTENTIONAL**
    HANNIBAL PICTURES, INC., a     )      **MISREPRESENTATION**
19  California corporation; RICHARD) (4)  **MISAPPROPRIATION OF**
    RIONDA DEL CASTRO, an          )      **RIGHT OF PUBLICITY**
20  individual; RAFAEL PRIMORAC,   ) (5)  **TORTIOUS INTERFERENCE**
    an individual; MAYA            )      **WITH CONTRACT**
21  ENTERTAINMENT GROUP, INC.,     ) (6)  **DECLARATORY RELIEF**
    a Delaware corporation; and DOES) (7) **INJUNCTIVE RELIEF**
22  1-10, inclusive,               )
                                   )
23            Defendants.          ) **[JURY TRIAL DEMANDED]**
                                   )
24  ────────────────────────────────

25  / / /

26  / / /

27  / / /

28  / / /

Plaintiffs Three-Seven Entertainment, Inc. and Adrien Brody (collectively "Plaintiffs") allege as follows:

## THE NATURE OF THIS ACTION

1.      This is an action to enjoin and obtain redress for Defendants' marketing, distribution, exploitation and sale of the motion picture *Giallo* (the "Picture") with the unauthorized use and inclusion of the likeness of Academy Award winning actor Adrien Brody ("Brody").

2.      This action is necessitated by defendant producers Richard Rionda del Castro's ("Rionda"), Rafael Primorac's ("Primorac"), and their related entities' and co-conspirator's fraudulent scheme, breach of contract, and misappropriation of Brody's right of publicity, along with other blatant deceit and calculated wrongful and tortious conduct in violation of Brody's rights.

3.      Brody agreed, pursuant to an Acting Services Agreement ("ASA") to render acting services in the starring roll of the Picture in exchange for, among other consideration, a guaranteed fixed sum of money on a "pay-or-play" basis. The full amount of the fixed compensation was required to be placed in escrow by the producers prior to Brody's departure to the overseas filming location and prior to commencement of acting services, and was to be paid over the course of principal photography of the Picture.  After about a week of rendering services, Brody learned that the production was actually underfunded and that the producers had failed to place the required funds into escrow.

4.      In order to induce Brody not to walk off the set, as was his contractual right, Rionda and Primorac represented to Brody that they had new guaranteed funding lined-up, and requested Brody to enter into a new superseding agreement. Rionda and Primorac conspired with an Italian film producer to falsely value and represent the Italian distribution rights to the Picture at more than $2,000,000.  In actuality, Rionda and Primorac knew that they were only able to and would only be able to sell the Italian distribution rights to the Picture for a few hundred thousand

**COMPLAINT**

1   dollars at most.  Based on their fraudulent misrepresentations to Brody that the

2   production would be adequately funded, in large part due to this phony $2,000,000

3   sale of the Italian distribution rights, Brody agreed to continue to render services

4   and, at the same time, temporarily defer $640,000 of his guaranteed "pay-or-play"

5   fixed compensation.

6       5.     As material consideration in exchange for his agreement to continue to

7   render acting services and to temporarily defer this portion of his guaranteed fixed

8   compensation, Brody was induced to enter into a new agreement that amended and

9   superseded the ASA with new rights and obligations, pursuant to which Brody was

10  expressly granted the <u>absolute right to withhold consent to the use of his likeness in</u>

11  <u>the Picture until he was paid the full amount of the $640,000 that he deferred</u>.

12      6.     When Brody did not receive the deferred money he was owed, and after

13  repeated and on-going efforts to resolve the matter were rebuffed with excuse after

14  excuse by the producers, Brody exercised his express right to withhold consent to

15  the use of his likeness in the Picture.  The producers, however, disregarded Brody's

16  demands that they not use his image or likeness to advertise, promote or sell the

17  Picture, and that his valuable image and likeness in the Picture be deleted until such

18  time as they are able to satisfy their contractual obligation to pay Brody the

19  compensation he is guaranteed and owed.  Instead, ***after having been placed on***

20  ***notice that Brody exercised his express right to withhold consent to the use of his***

21  ***likeness in the Picture***, Defendants have increased their efforts to and continue to

22  exploit, market, distribute and sell the Picture containing Brody's image and

23  likeness therein.  In fact, Defendants now plan a broad DVD release of the Picture

24  for October 19, 2010, including selling these DVDs on popular retailer websites

25  such as Amazon.com.  Defendants have been so bold as to state that they will never

26  pay Brody.  Upon confirmation that Defendants indeed intended to go forward with

27  the October 19, 2010 DVD release of the Picture containing Brody's image and

28  likeness, Brody was left withno alternative but to initiated these legal proceedings.

**COMPLAINT**

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Jurisdiction and Venue

7.     This action is brought and jurisdiction lies within this Court pursuant to 28 U.S.C § 1332(a) in that it is a civil action between citizens of different states and/or citizens of a state and citizens or subjects of a foreign state, and the matter in controversy exceeds the sum of seventy-five thousand dollars ($75,000), exclusive of interests and costs.

8.     Venue lies within and is proper in this District and Court pursuant to 28 U.S.C. § 1391(a) because one or more Defendants reside in or are subject to personal jurisdiction in this District.

### Parties

9.     Plaintiff THREE-SEVEN ENTERTAINMENT, INC. ("TSE") is, and at all times relevant hereto has been, a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Las Vegas, Nevada.  Brody is an officer and principal of TSE, which operates as a production and loan-out entity for Brody's services in the entertainment industry.

10.     Plaintiff ADRIEN BRODY ("Brody") is, and at all times relevant hereto has been, an individual residing in the State of Nevada.  Brody is a world-famous and respected Academy Award winning actor, having won the coveted award in 2003 for his leading performance in *The Pianist*.  Plaintiffs TSE and Brody will sometimes herein be referred to collectively as "Plaintiffs."

11.     Plaintiffs are informed and believe and based thereon allege that defendant GIALLO PRODUCTIONS, LTD, ("GPL") is, and at all times relevant hereto has been, a limited corporation or other form of entity organized and existing under the laws of the United Kingdom.  GPL is operated as, among other things, a production company engaged in the business of producing the Picture.

12.     Plaintiffs are informed and believe and based thereon allege that defendant HANNIBAL PICTURES, INC. ("Hannibal") is, and at all times relevant

4

**COMPLAINT**

hereto has been, a corporation or some other form of entity organized and existing under the laws of the State of California, located and with its principal place of business in the County of Los Angeles, State of California. Hannibal is operated or functions as, among other things, a company engaged in the business of international co-productions of English language motion pictures, including this Picture. Hannibal has offices located in West Hollywood, California, at the same address and offices of defendant GPL, and under the same control.

13. Plaintiffs are informed and believe and based thereon allege that defendant Hannibal is the alter ego of defendant GPL and that defendant Hannibal is liable for the acts and omissions of defendant GPL. Defendant Hannibal is the U.S.-based production company operating on behalf of GPL, shares the same officers and directors, and controls GPL. Moreover, when GPL registered to conduct business in the State of California, GPL listed the same business address in West Hollywood, California that Hannibal uses, and GPL is under the same control as Hannibal.

14. Plaintiffs are informed and believe and based thereon allege that defendant RICHARD RIONDA DEL CASTRO ("Rionda") is, and at all times relevant hereto has been, an individual residing in the County of Los Angeles, State of California. Rionda is the founder, Chairman and Chief Executive Officer of Hannibal and is a producer of the Picture.

15. Plaintiffs are informed and believe and based thereon allege that defendant RAFAEL PRIMORAC ("Primorac") is, and at all times relevant hereto has been, an individual residing in the County of Los Angeles, State of California. Primorac is a business partner of Rionda and is also a producer of the Picture.

16. Plaintiffs are informed and believe and based thereon allege that defendants Rionda and Primorac are the alter egos of defendants GPL and Hannibal and that defendants Rionda and Primorac are liable for the acts and omissions of defendants GPL and Hannibal. Defendants Rionda and Primorac are the managing

members of defendant GPL and have control over that business entity, and, as alleged in Paragraph 12, *supra*, defendant Hannibal is the alter ego corporation of defendant GPL.  Moreover, Plaintiffs allege based on information and belief that defendants GPL and Hannibal failed to adhere to corporate formalities and are mere shell corporations designed to insulate defendants Rionda and Primorac from liability for acts done under the auspices of those corporate shells.  Defendants Rionda, Primorac, Hannibal and GPL will sometimes herein be referred to collectively as "Producer Defendants."

17.   Plaintiffs are informed and believe and based thereon allege that defendant MAYA ENTERTAINMENT GROUP, INC.("Maya") is, and at all times relevant hereto has been, a corporation or some other form of entity organized and existing under the laws of the State of Delaware, located and with its principal place of business in the County of Los Angeles, State of California.  Maya is operated or functions as, among other things, a company engaged in the business of distribution of motion pictures, including this Picture, in various markets.

18.   Plaintiffs are informed and believe and based thereon allege that non-party co-conspirator of Producer Defendants CLAUDIO ARGENTO ("Argento") is, and at all times relevant hereto has been, an individual residing in Italy.  Argento is an Italian film producer and screenwriter who allegedly agreed with Rionda and Primorac to distribute the Picture in Italy.

19.   Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, and therefore sue said defendants by such fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities of such fictitiously named defendants when the same have been ascertained.  Plaintiffs are informed and believe and based thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences, acts and omissions herein alleged and that Plaintiffs' damages were proximately caused by their conduct.

COMPLAINT

20.     All defendants including GPL, Hannibal, Rionda, Primorac, Maya, and Does 1 through 10, will sometimes herein be referred to collectively as "Defendants."

21.     Plaintiffs are informed and believe and based thereon allege that at all material times Defendants, and each of them, were the agents, employees, partners, joint venturers, co-conspirators, owners, principals, and employers of the remaining Defendants, and each of them, and are, and at all times herein mentioned were, acting within the course and scope of that agency, employment, partnership, conspiracy, ownership or joint venture.  Plaintiffs are further informed and believe and based thereon allege that the acts and conduct alleged herein were known to, and authorized, directed, and/or ratified by, the officers, directors, and managing agents of Defendants corporations or business entities, and each of them.

## Background

22.     In or about March 2008, in exchange for certain consideration, Brody agreed to star in and provide services as an executive producer for the Picture.  In order to secure Brody's acting services on the Picture, TSE, on the one hand, and GPL, on the other hand, entered into an Acting Services Agreement, dated March 26, 2008 ("ASA").  A true and correct (redacted) copy of the ASA signed by both Brody, on behalf of TSE, and defendant Rionda, on behalf of GPL, is attached hereto as Exhibit "A" and incorporated by reference herein.  The ASA provides, among other things, that defendant GPL would pay Brody a guaranteed fixed sum of money on a "pay-or-play" basis payable over the course of principal photography of the Picture.  The ASA also provides that Brody is entitled to certain contingent compensation based on gross receipts from the sale of the Picture. *See* Ex. A ¶ 4.

23.     Paragraph 4 of the ASA further provides that defendant GPL, as producer of the Picture, had to place in escrow the full amount of Brody's fixed compensation.  Twenty percent (20%) of that amount had to be placed into escrow

**COMPLAINT**

within forty-eight (48) hours of GPL's receipt of the executed ASA, and the remaining eighty percent (80%) had to be placed in escrow at least one (1) week prior to Brody's required departure to Italy, the location where the Picture would be shot.  Brody was then to be paid from this guaranteed escrow account in relatively equal weekly installments over the course of principal photography of the Picture until he received the entire fixed compensation component set forth in the ASA.  *See* Ex. A ¶¶ 3–4.

24.   Pursuant to the ASA, Brody had the absolute and express right under the terms of his guaranteed "pay-or-play" contract to cease rendering acting services if the full amount of his fixed compensation was not timely placed in escrow, or if he was not paid weekly and on a timely basis.  *See* Ex. A ¶ 4.

25.   After receiving his first weekly installment payment (for week ending May 16, 2008), Brody learned that the production, for various reasons, was underfunded, that his fixed compensation monies had not been placed into escrow as required, and that there was not enough money in the production account to satisfy the producers' financial obligations, including their obligation to pay Brody the full amount of his guaranteed fixed compensation.

26.   Rionda and Primorac assured and represented to Brody that they had the necessary financing lined-up and guaranteed to complete the production of the Picture and pay Brody his guaranteed fixed compensation pursuant to the ASA.  The producers specifically represented to Brody that they had arranged and were able to sell the Italian distribution rights to the Picture for more than two million dollars ($2,000,000), enabling them to satisfy their financial obligations related to the production of the Picture.  As set forth in further detail below, the represented sale of the Italian distribution rights to the Picture was actually a fraud to induce Brody and others to continue to render services and not hold the producers in breach.

/ / /

/ / /

**COMPLAINT**

27.    Although Brody had the right to walk away from the production once the producers breached their contract with Brody by failing to escrow the full amount of his fixed compensation and/or by failing to continue to pay him weekly, the producers nevertheless were able to induce Brody not to walk off the Picture. In order to convince Brody not to walk off the production, as was his contractual right, Rionda and Primorac represented to Brody that they had new guaranteed funding lined-up from the of the Italian distribution rights for more than $2,000,000, and requested Brody to enter into a new superseding agreement to defer $640,000 of his guaranteed fixed compensation.

28.    As further described herein below, as material consideration in exchange for his agreement to continue to render acting services and to temporarily defer this portion of his guaranteed fixed compensation, Brody was induced to enter into a new agreement that amended and superseded the ASA with new rights and obligations, pursuant to which Brody was expressly granted the <u>absolute right and ability to withhold consent to the use of his likeness in the Picture until he was paid the full amount of the $640,000 that he deferred</u>.

### The Deferral Payment Agreement

29.    On or about May 28, 2008, Brody entered into a Deferral Payment Agreement ("DPA") with Rionda and Primorac on behalf of GPL.  A true and correct copy of the DPA is attached hereto as <u>Exhibit "B"</u> and incorporated by reference herein.  The DPA provided, in pertinent part, that Brody would receive additional installment payments by May 30, 2008 (to cover the unpaid second and third shoot weeks), but he would agree to temporarily defer payment of the final $640,000 due to Brody under his guaranteed "pay-or-play" contract. *See* Ex. B ¶ 1. The DPA refers to this $640,000 deferral as the "Brody Holdback." *Id.*

30.    Defendants Rionda and Primorac represented to Brody that he would be paid the full amount of the Brody Holdback, if not otherwise, upon the producers planned receipt of a deposit in the amount of two million six thousand dollars

1  ($2,006,000) from the sale of the Italian distribution rights to the Picture.

2  Specifically, the DPA provides that "the Brody Holdback shall be paid to Brody

3  upon a deposit into the Production Account . . . in the amount of US$2,006,000,

4  which amount represents the value of the Italian Letter of Credit less bank charges

5  to be issued in respect of the Film . . . ."  Ex. B ¶2.

6       31.   Further, the express terms of the new DPA agreement provides, in

7  pertinent part, that: "**Brody will have the right to withhold consent to the use of**

8  **his likeness in the picture until the Brody Holdback ($640,000) is paid**."

9  Ex. B ¶ 2 (emphasis added).  The sole material consideration for Brody's agreement

10 to temporarily defer $640,000 of his guaranteed fixed compensation and continue

11 to render acting services, and the only way he could assure he would be paid, was

12 the right he was granted to withhold consent to the use of his likeness in the Picture

13 if he was not paid, *i.e.*, prevent the release and exploitation of the Picture containing

14 Brody's image, unless he received full payment of the rest of his guaranteed fixed

15 compensation in the amount of the Brody Holdback.

16      32.   The Producer Defendants convinced and induced Brody to continue

17 working on the Picture by repeatedly assuring him that the funds from the sale of

18 the Italian distribution rights to the Picture were all set and arranged and would be

19 deposited into the production account in short order.  Based on their assurances and

20 various inducements, Brody agreed to resume work on the Picture, and, in fact,

21 completed photography on the Picture as scheduled believing that Rionda and

22 Primorac would honor their obligations under the DPA.

23      33.   The rights conferred by the DPA, including Brody's right to withhold

24 consent to the use of his likeness in the Picture supersede any and all previously

25 conferred rights or limitation of rights under the ASA to the extent such rights

26 conflict with those conferred by the DPA.  Specifically, the DPA references the

27 ASA and indicates in the preamble that the ASA and accompanying documents

28 "shall be and are amended for the benefit to each of the undersigned . . . ."  Ex. B

1   at 1.  And, in pertinent part, Paragraph 4 of the DPA expressly provides and states
2   that the new agreement "**represents the entire agreement of the parties with**
3   **respect to the subject matter set forth [t]herein**" and expressly "**supersedes all**
4   **prior written and/or oral agreements with regard to such subject matter** ," *i.e.*,
5   Brody's right to withhold consent to the use of his likeness and any and all rights
6   and remedies or limitations in support and enforcement thereto if he is not paid.  *See*
7   Ex. B. ¶4 (emphasis added).   The subject matter of Brody's right to withhold
8   consent to the use of his likeness has no limitations or exclusions, as any limitations
9   or exclusions would have made the consideration set forth in the DPA of no value
10  and completely illusory.

11  <u>**Defendants' Wrongful Conduct**</u>

12        34.   Despite Rionda's repeated assurances that Producer Defendants secured
13  more than $2,000,000 from the sale of the Italian distribution rights to the Picture
14  and, consequently, would be able to pay Brody the full amount of the Brody
15  Holdback, Brody never received the remaining $640,000 of his guaranteed fixed
16  compensation.  Nevertheless, Rionda and Primorac continued with the production,
17  and have displayed, exhibited, promoted, advertised and exploited the Picture using
18  and incorporating Brody's likeness for their benefit in various territories around the
19  world, including at the Cannes Film Festival.

20        35.   Plaintiffs allege based on information and belief that Producer
21  Defendants, conspired with Argento to inflate the value of the Italian distribution
22  rights to the Picture in order to obtain a letter of credit in the amount of $2,006,000
23  for deposit into the production account.

24        36.   Producer Defendants were never able to sell the Italian distribution
25  rights to the Picture for any amount close to $2,000,000.  In fact, Rionda, Primorac
26  and Argento knew and were fully aware prior to their calculated scheme and fraud
27  whereby they induced Brody to continue to render acting services and agree to the
28  / / /

**COMPLAINT**

Brody Holdback, that the Italian distribution rights to the Picture could be sold for no more than a few hundred thousand dollars at most.

37.    Through his representatives, and for an extended period of time, Brody repeatedly requested and attempted to obtain the monies owing to him.  After it became clear that Rionda and Primorac and the production would not pay the monies owed, the producers were informed that if Brody was not paid, he would have no choice but to exercise his contractual right to withhold consent to the use of his likeness in the Picture.

38.    It is now apparent that Rionda, Primorac and the production never intended to pay Brody his full guaranteed fixed compensation and/or the $640,000 Brody Holdback that they asked and induced him to defer based on their assurances that the Italian distribution sale was a set deal.  Defendants Rionda and Primorac, as well as non-party conspirator Argento, colluded together to repeatedly lie to Brody by assuring him that he would be paid the entire amount of the $640,000 Brody Holdback.

39.    Defendants Rionda, Primorac and the production ignored Brody's requests and efforts to be paid, failed to pay him the monies owed, and yet continued to exhibit, display, promote, distribute, sell and exploit the Picture containing Brody's image and likeness.

40.    Once Brody learned of and confirmed that Defendants intended to release DVDs of the Picture in various markets containing Brody's image and likeness, Brody, through his counsel, formally put Defendants on notice that Brody was exercising his contractual right pursuant to the DPA to withhold consent to the use of his likeness in the Picture until he was paid the full amount of the Brody Holdback.

41.    Despite the exercise of his express right to withhold consent to the use of his likeness in the Picture, Defendants continued efforts to market, promote, distribute, release and exploit the Picture containing Brody's likeness.  For instance,

representatives of defendant Hannibal attended the Cannes Film Festival in May 2010 in order to promote and sell the distribution rights to the Picture. Additionally, Producer Defendants, along with defendant Maya, who is now the Picture's U.S. distributor, is planning a broad DVD release of the Picture for October 19, 2010. Trailers for the Picture, which include Brody's image and his likeness, have been running on websites owned and operated by Maya.

42.    Defendant Maya failed to respond to Plaintiffs' notice and demand letters and, instead, expanded its marketing and distribution efforts.

43.    The Picture has already been shown at certain film festivals and it is believed that DVD copies have been sold or distributed on a limited basis. The portions of the Picture that have been screened as well as the DVD of the Picture incorporate Brody's image and likeness in violation of the DPA and Brody's exercise of his consent rights therein.

44.    As set forth hereinabove, Plaintiffs have learned that a wide distribution and release of the Picture is advertised and scheduled for October 19, 2010. This broad release will include selling DVDs of the Picture on retail websites such as Amazon.com. The advertisements and other promotional materials for the Picture's DVD release also incorporate and prominently feature and utilize Brody's image and likeness in violation of the DPA.

45.    To date, Defendants have refused to pay Brody the Brody Holdback and have refused to either cease exploitation, distribution, sale and release of the Picture, or remove Brody's image and likeness from the Picture prior to any exploitation, distribution, sale or release of the Picture.

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT

# FIRST CLAIM FOR RELIEF

## Breach of Written Contract

### (Against Defendants GPL, Hannibal, Rionda and Primorac)

46.     Plaintiffs reallege, adopt and incorporate by reference paragraphs 1 through 45, inclusive, as though fully set forth herein.

47.     As alleged herein, defendants GPL, Hannibal, Rionda and Primorac (collectively, "Producer Defendants"), have materially breached the DPA entered into with Brody by doing, among other things, as set forth hereinabove, the following:

       (a)    Failing to pay Brody the $640,000 Brody Holdback;

       (b)    Absent paying Brody the $640,000 Brody Holdback, refusing to honor Brody's absolute right pursuant to the DPA to withhold consent to the use of his likeness in the Picture until the Brody Holdback is paid in full;

       (c)    Refusing to remove Brody's likeness from the Picture after Brody exercised his right to withhold consent to the use of his likeness in the Picture; and

       (d)    Publicly screening, presenting, promoting, marketing, advertising and distributing the Picture with the inclusion of Brody's likeness, in violation of the DPA.

48.     Plaintiffs have performed all duties and obligations on their part required to be performed under the ASA and DPA, except to the extent such performance was waived, excused, or prevented by reason of the acts and omissions of Producer Defendants.

49.     The harms caused to Plaintiffs are of a direct and foreseeable nature, and Plaintiffs reasonably should have expected the harms to occur, as a result of the breaches set forth herein.

/ / /

COMPLAINT

50.     As a direct and proximate result of the material breaches, Plaintiffs have been damaged in the amount of six hundred forty thousand dollars ($640,000).

51.     By reason of the foregoing, Plaintiffs are entitled to specific performance ordering Producer Defendants, and each of them, and their agents, employees, to comply with the terms of the DPA and either cease distribution, release and sale of the Picture containing Brody's likeness or immediately pay Brody the $640,000 Brody Holdback.  Accordingly, Plaintiffs seek the issuance of and order of specific performance and a preliminary injunction enjoining Defendants, and each of them, and their agents and employees, from publishing, distributing, exhibiting, selling, licensing, marketing and/or otherwise publicly displaying and/or disseminating the Picture so long as it contains Brody's likeness.

## SECOND CLAIM FOR RELIEF

### Breach of Covenant of Good Faith and Fair Dealing

### (Against Defendants GPL, Hannibal, Rionda and Primorac)

52.     Plaintiffs re-allege, adopt and incorporate by reference paragraphs 1 through 45, and 47 through 50, inclusive, as though fully set forth herein.

53.     The DPA contained an implied covenant that each party will conduct itself in good faith and will fairly deal with the others and, further, that neither party will interfere with or deprive the other of the benefits of the DPA.  Pursuant to the implied covenant, Producer Defendants have a duty to conduct themselves in accordance with the terms and conditions of the parties' agreement, and to otherwise not engage in any acts which would impair or harm Plaintiffs' rights under the DPA and to otherwise receive the expected consideration, benefits and rights thereunder. Pursuant to the implied covenant, Producer Defendants further accepted a duty to honor the contractual obligations of the DPA and not to withhold consideration, benefits or rights under that agreement.

/ / /

54.     By virtue of the relationship between Plaintiffs, on the one hand, and Producer Defendants, on the other hand, Plaintiffs placed their trust and confidence in Producer Defendants to perform all of their duties and obligations pursuant to the terms and conditions of the DPA, and to honor the implied covenant to act in good faith and deal with Plaintiffs, and to not take any action which would impair or harm Plaintiffs' rights.

55.     As alleged herein, Producer Defendants systematically engaged in a series of actions in bad faith and in an unreasonable manner to deprive Plaintiffs their benefits under the DPA.  Such actions include, but are not limited to, the following:

(a)     Failing to pay Brody the $640,000 Brody Holdback;

(b)     Absent paying Brody the $640,000 Brody Holdback, refusing to honor Brody's absolute right pursuant to the DPA to withhold consent to the use of his likeness in the Picture until the Brody Holdback is paid in full;

(c)     Refusing to remove Brody's likeness from the Picture after Brody exercised his right to withhold consent to the use of his likeness in the Picture; and

(d)     Publicly screening, presenting, promoting and distributing the Picture with the inclusion of Brody's likeness, in violation of the DPA.

56.     Plaintiffs are informed and believe and based thereon allege that, by engaging in the conduct herein alleged, Producer Defendants have breached the covenant of good faith and fair dealing owed to Plaintiffs by virtue of the terms and conditions of the DPA, have acted in bad faith, and have prevented Plaintiffs from receiving the full benefits and consideration and rights under the DPA for which Plaintiffs bargained.

/ / /

COMPLAINT

57.     Plaintiffs are informed and believe and based thereon allege that Producer Defendants pursued this course of conduct in bad faith with the intent to interfere with, injure and frustrate Plaintiffs' enjoyment of the benefits and rights conferred pursuant to the terms of the DPA.

58.     Plaintiffs have performed all conditions, covenants and promises required under the DPA, except those conditions, covenants, and promises which have been prevented or otherwise excused by the conduct of the breaching defendants.

59.     As a direct and proximate result of the breach of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged in the amount of six hundred forty thousand dollars ($640,000).

60.     Plaintiffs are informed and believe and based thereon allege that Producer Defendants, in   doing the things herein alleged, acted willfully, maliciously, oppressively and with full knowledge of the adverse effects of its actions on Plaintiffs, and all of them, and with willful and deliberate disregard to the consequences to Plaintiffs, and that such actions were authorized, ratified and adopted by officers, directors and/or managing agents of each entity of the breaching defendants.  As a direct result of the fraudulent, willful and malicious conduct of Producer Defendants, Plaintiffs are entitled to exemplary and punitive damages in an amount to be determined as appropriate to the Court.

### **THIRD CLAIM FOR RELIEF**

**Fraud - Intentional Misrepresentation**

**(Against Defendants GPL, Hannibal, Rionda and Primorac)**

61.     Plaintiffs re-allege, adopt and incorporate by reference paragraphs 1 through 45, 47 through 50 and 53 through 59, inclusive, as though fully set forth herein.

/ / /

**COMPLAINT**

62.     As a material inducement for Brody to forego his guaranteed "pay-or-play" fixed compensation and agree to temporarily defer a portion of said fixed compensation, defendants Rionda and Primorac on behalf of themselves and defendants GPL and Hannibal, specifically represented and promised Brody, as memorialized in the DPA, that a certain Italian film producer, non-party conspirator Claudio Argento, agreed to purchase the Italian distribution rights to the Picture for more than $2,000,000.

63.     Defendants Rionda and Primorac further represented and promised Brody, as memorialized in the DPA, that Brody would be paid the $640,000 Brody Holdback upon a deposit into the production account in the amount of $2,006,000, representing the value of the Italian Letter of Credit less bank charges to be issued in respect of the Picture.

64.     Beginning in or about May 2008 and continuing for nearly two years thereafter, defendants Rionda and Primorac conspired with Argento to inflate the value of the sale of the Italian distribution rights to the Picture in order to fraudulently secure a letter of credit for more than $2,000,000 and represent to Brody that the production would be adequately funded.

65.     At the time Rionda and Primorac made the foregoing representations to Brody, those representations were false and Rionda and Primorac knew they were false.   Rionda and Primorac were aware that the could not sell the Italian distribution rights to the Picture for anywhere near $2,000,000.   At most, they thought they could sell those rights for a few hundred thousand dollars.

66.     Rionda and Primorac (along with Argento) intended to, and had devised a scheme or schemes to obtain Brody's acting services on the Picture by falsely promising Brody that the production would be adequately financed and that Brody would receive the remainder of the fixed compensation owed to him under the terms of the ASA and the DPA as soon as the production account was adequately funded.
/ / /

COMPLAINT

67.     Rionda and Primorac made said false and fraudulent representations and promises with no intention of ever honoring them.

68.     At the time said misrepresentations were made, Brody was unaware of the true facts and reasonably and justifiably relied on Rionda and Primorac and their misrepresentations.  Had Brody known the true facts, he would not have, among other things, agreed to defer a portion of his fixed compensation, pursuant to the DPA.

69.     By reason of the foregoing, Plaintiffs have been injured in an amount which has yet fully ascertainable but which is believed to be in excess of two million dollars ($2,000,000).  When Plaintiffs have ascertained the full amount of the damages, they will seek leave of the Court to amend this Complaint accordingly.

70.     Plaintiffs are informed and believe and based thereon allege that Producer Defendants, in doing the things herein alleged, acted willfully, maliciously, oppressively and with full knowledge of the adverse effects of its actions on Plaintiffs, and each of them, and with willful and deliberate disregard to the consequences to Plaintiffs, and that such actions were authorized, ratified and adopted by officers, directors and/or managing agents of Producer Defendants.  As a direct result of the fraudulent, willful and malicious conduct of these defendants, Plaintiffs are entitled to exemplary and punitive damages in an amount to be determined as appropriate to the Court.

## FOURTH CLAIM FOR RELIEF
### Common Law Misappropriation of Right of Publicity,
### Including Damages, Profits and Unjust Enrichment
### (Against All Defendants)

71.     Plaintiffs re-allege, adopt and incorporate by reference paragraphs 1 through 45, 47 through 50, 53 through 59, and 62 through 68 inclusive, as though fully set forth herein.

**COMPLAINT**

72.    Brody has been a professional actor in motion pictures and television since the 1980s and has spent considerable time, energy and money honing his talent and developing his career.   In 2003, he became the youngest actor to win the Academy Award for best actor in a leading role for his portrayal of the main character in *The Pianist*.   Brody has developed sufficient skill, reputation and virtues to create substantial commercial value in his image and identity, which have become vested with considerable good will in the eyes of the public and with employers. The marketable product of Brody's labor is the ability of his name or likeness to attract attention and evoke a desired response in a particular consumer audience. The commercial value of Brody's identity permits him to receive an economic return through some medium of commercial promotion.   The commercial value of Brody's identity can be diminished by an unauthorized use of his image and persona.

73.    Pursuant to the express terms of the DPA, Brody has "the right to withhold consent to the use of his likeness in the [P]icture until the Brody Holdback ($640,000) is paid."   Ex. B ¶ 2.

74.    The Brody Holdback was never paid.   Accordingly, Brody exercised his right under the DPA to withhold consent to the use of his likeness in the Picture.

75.    Through his representatives, Brody placed Defendants and other known distributors and sub-distributors on notice that they had no right to use his likeness or any results or proceeds of his services in the Picture until the Brody Holdback was paid.

76.    Defendants have refused to either pay Brody the $640,000 Brody Holdback, or remove Brody's likeness from the Picture prior to its wide release scheduled for October 19, 2010.   Rather, Defendants have continued to display, promote, distribute, sell and release the Picture containing Brody's likeness despite the fact that Producer Defendants have breached their contractual obligation to Brody by failing to honor his right to withhold consent to the use of his likeness unless he is paid the $640,000 Brody Holdback.

77.    At the time of the exploitation of the Picture containing Brody's likeness, Brody's publicity and property rights in his own likeness had considerable commercial value.

78.    Defendants intend to exploit this value by selling and distributing the Picture containing Brody's likeness without first obtaining his consent to do so. Defendants' conduct manifests an outright disregard for Brody's rights under the DPA as well as Brody's common law right to prohibit and prevent the commercial use of his likeness without his express consent.

79.    Defendants' unauthorized sale, exploitation and distribution of the Picture constitutes a violation and misappropriation of Brody's right of publicity, in that Defendants misappropriated Brody's likeness by using his image throughout the Picture for the purpose of commercial gain by publishing, exhibiting, licensing or selling the Picture and/or by promoting and advertising the Picture by using Brody's likeness all without his consent.  Defendants' appropriation of Brody's likeness was for Defendants' own pecuniary gain and profit.

80.    Defendants have threatened to continue using Brody's likeness in the Picture without his consent and intend to further exhibit, sell, and distribute the picture widely beginning on October 19, 2010.  Defendants' continued acts will cause Brody severe and irreparable injury, which cannot adequately be compensated by money damages.  By reason of the foregoing, Brody is entitled to temporary, preliminary and permanent injunctive relief, enjoining the distribution of the Picture so long as it contains Brody's image without his consent.

81.    As a direct and proximate result of the aforementioned acts by Defendants, and each of them, Brody has been damaged in an amount not yet fully ascertainable but which is believed to be in excess of two million dollars ($2,000,000), including damage to the value of Brody's name, likeness and goodwill, the loss of the monetary consideration that would customarily be paid by said Defendants to Brody for his consent to the use of Brody's likeness in the

**COMPLAINT**

1 Picture. When Plaintiffs have ascertained the full amount of the damages, they will

2 seek leave of the Court to amend this Complaint accordingly.

3    82.   As a direct and proximate result of the aforementioned acts by

4 Defendants, and each of them, Defendants have earned and/or will earn profits from

5 the sale, exploitation and distribution of the Picture in an amount which has yet to

6 be ascertained, and have thereby been unjustly enriched.  Plaintiffs are entitled to

7 recover all said unjust enrichments, including all profits earned by Defendants as a

8 result of their unauthorized use of Brody's likeness in the Picture for commercial

9 purposes.

10    83.   Brody is informed and believes, and on that basis alleges, that the

11 aforementioned acts of Defendants were done intentionally or with a conscious

12 disregard of Brody's rights, and with the intent to vex, injure and/or annoy Brody,

13 such as to constitute oppression, fraud or malice, thus entitling Plaintiffs to

14 exemplary and punitive damages in an amount appropriate to punish or set an

15 example of Defendants, and each of them, and to deter such conduct in the future,

16 which amount will be proved at trial.

17    84.   Brody is informed and believes, and on that basis alleges, that the

18 officers, directors and/or managing agents of any entity defendants authorized,

19 directed and/or ratified the wrongful acts of Defendants and are consequently liable

20 to Plaintiffs.

21

22        **FIFTH CLAIM FOR RELIEF**

23        **Tortious Interference with Contract**

24        **(Against Defendants Maya and Hannibal)**

25    85.   Plaintiffs re-allege, adopt and incorporate by reference paragraphs 1

26 through 45, 47 through 50, 53 through 59, 62 through 68 and 72 through 80

27 inclusive, as though fully set forth herein.

28 / / /

86.     Through his representatives, Brody placed Defendants on notice that he withholds consent to the use of his likeness in the Picture until he is paid the full amount of the Brody Holdback.

87.     In addition to providing such notice to Defendants, Plaintiffs, through their representatives, sent cease and desist letters to all known distributors of the Picture, including to defendants Maya and Hannibal.

88.     Defendants Maya and Hannibal ignored Plaintiffs' demands to cease exploitation, distribution, release and sale of the Picture.  In fact, Defendants Maya and Hannibal have increased their efforts to exploit, distribute and release the Picture including Brody's image and likeness and have scheduled a wide DVD release of the Picture for October 19, 2010.  This broad release includes making DVDs available for sale on such popular websites as Amazon.com.

89.     Defendants Maya and Hannibal are aware of Brody's right under the DPA to withhold consent to the use of his likeness in the Picture until he is paid the full amount of the Brody Holdback.

90.     Nonetheless, defendants Maya and Hannibal have intentionally interfered with that existing right by continuing to exploit, sell, and/or distribute the Picture despite the fact that Brody has informed them, through his attorneys, that he has exercised his right to withhold consent to the use of his likeness in the Picture.

91.     Such contractual interference with Brody's express right to withhold consent to the use of his likeness in the Picture has actually and proximately damaged Plaintiffs in the amount of six hundred forty thousands dollars ($640,000) -- the portion of the guaranteed fixed compensation that Brody is still owed under the terms of his contracts with Producer Defendants.

92.     Brody is informed and believes, and on that basis alleges, that the aforementioned acts of defendants Maya and Hannibal were done intentionally or with a conscious disregard of Brody's rights under the DPA, and with the intent to

**COMPLAINT**

1   vex, injure and/or annoy Brody, such as to constitute oppression, fraud or malic

2   thus entitling Plaintiffs to exemplary and punitive damages in an amount appropriate

3   to punish or set an example of defendants Maya and Hannibal, and each of them,

4   and to deter such conduct in the future, which amount will be proved at trial.

5       93.    Brody is informed and believes, and on that basis alleges, that the

6   officers, directors and/or managing agents of defendants Maya and Hannibal

7   authorized, directed and/or ratified the wrongful acts of defendants Maya and

8   Hannibal and are consequently liable to Plaintiffs.

9

10              **SIXTH CLAIM FOR RELIEF**

11                **Declaratory Relief**

12              **(Against All Defendants)**

13      94.    Plaintiffs re-allege, adopt and incorporate by reference paragraphs 1

14  through 45, 47 through 50, 53 through 59, 62 through 68, 72 through 80 and 86

15  through 93 inclusive, as though fully set forth herein.

16      95.    A dispute in controversy now exists between Plaintiffs and Defendants.

17      96.    Based upon information and belief, Producer Defendants contend that

18  section N of the Standard Terms and Conditions ("STC") rider to the ASA

19  somehow controls Plaintiffs' enforcement rights with respect to Brody withholding

20  consent to the use of his likeness in the Picture as provided for by the separate and

21  superseding DPA.   Producer Defendants further contend that Plaintiffs have

22  somehow waived the remedies of injunctive and equitable relief against Producer

23  Defendants as a means of enforcing Brody's right to withhold consent to use his

24  likeness in the Picture.

25      97.    However, the DPA expressly by its terms superseded the APA and the

26  STC attached thereto.  The DPA provided additional rights and remedies to Brody

27  and modified any existing rights that Brody had under the APA.  The lead-in two

28  paragraphs of the DPA state, in pertinent part, as follows: "Reference is hereby

1    made to that certain [ASA] dated effective March 26, 2008, and accompanying

2    documents, by and between the [parties] in connection with the [Picture].  [¶]  The

3    parties hereto agree that said Agreements shall be and are amended and, for the

4    benefit to each of the undersigned . . . ."  Ex. B at 1.  And, Paragraph 4 of the

5    DPA states, "This letter agreement . . . represents the entire agreement of the

6    parties with respect to the subject matter set forth herein, supersedes all prior

7    written and/or oral agreements with regard to such subject matter, and may not be

8    amended except by a written instrument executed by all parties thereto . . . ."

9    Ex. B ¶ 4.

10        98.    The "subject matter" at issue in the DPA is the $640,000 Brody

11   Holdback and Brody's right to withhold consent to the use of his likeness in the

12   Picture if he is not paid the Brody Holdback.  That right necessarily includes,

13   without any limit in the language as to said subject matter, all remedies to enforce

14   that right.  Any purported intent and scope of the language to limit that right would

15   be contrary to all well-established contract law, as it would make the bargained for

16   DPA completely illusory, without any consideration or purpose.  The clear language

17   of the DPA is that it supersedes the ASA, and paragraph N and other paragraphs of

18   the STC rider to the ASA, as relates to the subject matter of the DPA and

19   enforcement of the rights and remedies conferred upon Brody by the DPA.

20        99.    An actual controversy has arisen and now exists between Plaintiffs and

21   Defendants concerning the enforceability and validity of the DPA, in that Plaintiffs

22   contend that the DPA affords Brody new rights and remedies that did not exist under

23   the ASA, and Defendants contend that Brody does not have a remedy to enforce his

24   right to withhold consent to the use of his likeness in the Picture.

25        100.   Plaintiffs, therefore, seek a judicial declaration that:

26            a.    The DPA supersedes and amends the ASA and the STC rider

27                  attached thereto;

28            b.    Pursuant to the terms of the DPA, Brody has the right to

**COMPLAINT**

1                withhold consent to the use of his likeness unless he is paid the

2                full amount of the Brody Holdback;

3        c.     Defendants have no legal or contractual right to public display,

4                disseminate, license, sell, publish, distribute, release or

5                otherwise commercially exploit the Picture until Brody is paid

6                the full amount of the Brody Holdback unless Brody's image and

7                likeness is removed from the Picture; and

8        c.     Plaintiffs have the right to enjoin the DVD release of the Picture

9                if Brody is not paid the full amount of the Brody Holdback and

10                the Picture contains Brody's image or likeness

11     101.  Plaintiffs are informed and believe and based thereon allege that

12 Defendants deny and dispute Plaintiffs' contentions as alleged herein.

13     102.  As a result, Plaintiffs desire a judicial determination of the respective

14 rights and available remedies of Plaintiffs and Defendants.  A judicial declaration

15 is necessary and appropriate at this time so that the parties may ascertain their

16 respective rights, remedies and obligations.

17

18                     **SEVENTH CLAIM FOR RELIEF**

19                     **For Injunctive Relief**

20                   **(Against All Defendants)**

21     103.  Plaintiffs re-allege, adopt and incorporate by reference paragraphs 1

22 through 45, 47 through 50, 53 through 59, 62 through 68, 72 through 80, 86

23 through 93 and 95 through 102 inclusive, as though fully set forth herein.

24     104.  Plaintiffs are informed and believe and based thereon allege that as a

25 result of the conduct of Defendants described herein, Plaintiffs have and will suffer

26 great and irreparable harm and damage.  Plaintiffs are informed and believe and

27 based thereon allege that as a result of the conduct of Defendants described herein,

28 / / /

COMPLAINT

Plaintiffs have sustained and will sustain actual damages that may be difficult to ascertain with certainty.

105.   Plaintiffs allege on information and belief that they have no adequate remedy at law for the injuries which they have suffered and will continue to suffer in the future unless the wrongful conduct of Defendants, and each of them, is restrained and enjoined, because it is and will be impossible for Plaintiffs to determine the precise amount of damage, and no amount of money can restore the potential harm to Plaintiffs caused by Defendants, and each of them, as a result of the conduct alleged herein.

106.   Plaintiffs are informed and believe and based thereon allege that there is a serious risk that they will suffer irreparable harm absent the injunctive relief sought herein, in that the wrongs that have been and will in the future be performed by Defendants, and each of them, are of a continuing character, and will expose Plaintiffs to a continuing injury.  Plaintiffs are further informed and believe and based thereon allege that there is a serious risk that they will suffer irreparable harm absent the injunctive relief sought herein, in that the wrongs that have been and will in the future be done by Defendants, and each of them, will give rise to a multiplicity of judicial proceedings absent the injunctive relief sought herein.

107.   Accordingly, Plaintiffs seek the issuance of a preliminary injunction and, upon a final hearing, a permanent injunction, to prevent and enjoin Defendants, and each of them, and all of their officers, directors, stockholders, owners, partners, agents, servants, employees, representatives, distributors and attorneys, and all those in active concert or participation with Defendants, and each of them, all whether directly or indirectly, from publicly displaying, disseminating, posting, publishing, distributing, selling and/or otherwise making use of, exploiting or making available, the Picture containing Brody's image and likeness, all until such time as Defendants satisfy judgment in this Action and pay Brody the full amount of the Brody Holdback and present satisfactory proof of the same to this Court.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

**AS TO THE FIRST CLAIM FOR RELIEF:**

1. For specific performance ordering Producer Defendants, and their agents, employees, to comply with the terms and provisions of the DPA and either pay Plaintiffs the full amount of the Brody Holdback, or enforce the contractual provision allowing Brody to withhold consent to the use of his likeness in the Picture absent his receipt of the Brody Holdback monies and prevent the unauthorized exploitation, distribution, sale and/or release of the Picture.

**AS TO THE SECOND CLAIM FOR RELIEF:**

2. For specific performance ordering Producer Defendants, and their agents, employees, to comply with the terms and provisions of the DPA and either pay Plaintiffs the full amount of the Brody Holdback, or enforce the contractual provision allowing Brody to withhold consent to the use of his likeness in the Picture absent his receipt of the Brody Holdback monies and prevent the unauthorized exploitation, distribution, sale and/or release of the Picture.

**AS TO THE THIRD CLAIM FOR RELIEF:**

3. General and special damages in an amount not less than two million dollars ($2,000,000), in accordance with proof at trial, together with interest thereon at the legal rate;

4. Exemplary and punitive damages in an amount sufficient to punish and deter Defendants, the exact sum in an amount to be determined as appropriate to the Court; and

5. Rescission and restitution.

**AS TO THE FOURTH CLAIM FOR RELIEF:**

6. General and special damages in an amount not less than two million dollars ($2,000,000), in accordance with proof at trial, together with interest thereon at the legal rate;

COMPLAINT

7.    Exemplary and punitive damages in an amount sufficient to punish and deter Defendants, the exact sum  in an amount to be determined as appropriate to the Court;

8.    For an Order of the Court requiring Defendants to disgorge to Plaintiffs all monies received by Defendants, directly or indirectly, as a result of their wrongful conduct regarding the unauthorized distribution and sale of the Picture, including all amounts by which Defendants have been unjustly enriched, and pending said disgorgement, an order imposing a constructive trust on all such monies;

9.    For an order declaring that Defendants hold such profits in trust for Plaintiffs;

10.    For an injunction to prevent Defendants, and each of them, and their agents and employees, from publicly displaying, disseminating, publishing, distributing, selling, and/or otherwise exploiting the Picture containing Brody's image and likeness for commercial purposes.

**AS TO THE FIFTH CLAIM FOR RELIEF:**

11.    General and special damages in an amount not less than six hundred forty thousand dollars ($640,000), in accordance with proof at trial, together with interest thereon at the legal rate; and

12.    Exemplary and punitive damages in an amount sufficient to punish and deter Defendants, the exact sum in an amount to be determined as appropriate to the Court.

**AS TO THE SIXTH CLAIM FOR RELIEF:**

13.    For a judicial declaration as against Defendants, and each of them, in accordance with the requests set forth in the Sixth Cause of Action.

/ / /

/ / /

/ / /

**AS TO THE SEVENTH CLAIM FOR RELIEF:**

14.   That a preliminary injunction issue, as set forth in detail hereinabove and accompanying application, to prevent and enjoin Defendants, and each of them, and all of their officers, directors, stockholders, owners, partners, agents, servants, employees, representatives, distributors and attorneys, and all those in active concert or participation with Defendants, and each of them, and all others, including any distributors, wholesalers, retailers, websites and exhibitors, who receive notice of this order, from publicly displaying, disseminating, posting, publishing, distributing, selling and/or otherwise making use of, exploiting or making available, the Picture containing Brody's image and likeness until such time as Defendants pay Brody the full amount of the Brody Holdback and present satisfactory proof of the same to this Court.

15.   That, upon a final hearing, a permanent injunction issue, as set forth in detail hereinabove, to prevent and enjoin Defendants, and each of them, and all of their officers, directors, stockholders, owners, partners, agents, servants, employees, representatives, distributors and attorneys, and all those in active concert or participation with Defendants, and each of them, and all others, including any distributors, wholesalers, retailers, websites and exhibitors, who receive notice of this order, from publicly displaying, disseminating, posting, publishing, distributing, selling and/or otherwise making use of, exploiting or making available, the Picture containing Brody's image and likeness, all until such time as Defendants satisfy judgment in this Action and pay Brody the full amount of the Brody Holdback and present satisfactory proof of the same to this Court.

/ / /

/ / /

/ / /

/ / /

/ / /

COMPLAINT

**AS TO ALL CLAIMS FOR RELIEF:**

16.   For all costs of suit incurred herein;

17.   For attorneys' fees as may be provided by contract and/or law;

18.   For interest as may be provided by law; and

19.   For such other and further relief as the Court may deem to be just and appropriate.

Respectfully submitted,

DATE: October 14, 2010

LAVELY & SINGER
PROFESSIONAL CORPORATION
MARTIN D. SINGER
EVAN N. SPIEGEL
ANDREW B. BRETTLER

By: _____
     MARTIN D. SINGER
Attorneys for Plaintiffs
THREE-SEVEN ENTERTAINMENT,
INC. and ADRIEN BRODY

## REQUEST FOR JURY TRIAL

Plaintiff hereby demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

DATE: October 14, 2010

LAVELY & SINGER
PROFESSIONAL CORPORATION
MARTIN D. SINGER
EVAN N. SPIEGEL
ANDREW B. BRETTLER

By: _____
     MARTIN D. SINGER
Attorneys for Plaintiffs
THREE-SEVEN ENTERTAINMENT,
INC. and ADRIEN BRODY

EXHIBIT A

### ACTING SERVICES AGREEMENT
### "GIALLO"
### ADRIEN BRODY

The following agreement ("Agreement"), dated to be effective as of March 26, 2008, shall constitute the terms and conditions of the agreement between GIALLO PRODUCTIONS LIMITED, a United Kingdom limited company, ("Producer") and THREE-SEVEN ENTERTAINMENT, INC., a Nevada, USA, corporation, ("Lender") for the services of ADRIEN BRODY ("Artist") with respect to Artist's services as an actor in the motion picture tentatively entitled "GIALLO" (the "Picture").

1.    CONDITIONS PRECEDENT:  This Agreement shall be subject to and expressly conditioned upon Producer's receipt of this Agreement originally executed by Lender and Artist and of all documents which may be required by any governmental agency or otherwise for Artist to render services hereunder, including, without limitation, visas, work permits and/or other documents or instruments required to establish Artist's employment eligibility in all jurisdictions in which Artist shall be required to perform services hereunder; it being agreed that Producer will use good faith efforts to secure such documents on Artist's behalf and will pay all actual costs in connection therewith (the "Conditions Precedent").

2.    ENGAGEMENT:  Subject to fulfillment of the Conditions Precedent, Producer engages the services of Artist from Lender and Lender hereby agrees to furnish Artist to perform in the Picture on such basis as the actor in both the roles presently referred to as "INSPECTOR ENZO LAVIA" and "FLAVIO VOLPE" (aka "YELLOW") and as otherwise as provided in this Agreement.  Artist's services hereunder shall be exclusive during the consecutive period of principal photography, as defined below, and shall be rendered at such locations, presently scheduled for the Torino, Italy area ("Location") as may be reasonably designated by Producer from time to time.

3.    TERM OF ENGAGEMENT:  Artist's principal photography services hereunder are to commence at the Location approximately May 12, 2008, or within two weeks thereof, to be designated by Producer; Artist's services shall consist of at least three free pre-production days for rehearsal/wardrobe fittings/acclimation immediately prior thereto and five six day principal photography weeks, plus up to three free days for post production activities such as re-shoots, ADR, pick-ups, dubbing and/or looping services (which days may or may not be consecutive to one another or to Artist's services in connection with principal photography, but which shall be subject to Artist's professional availability if not so consecutive to principal photography) plus free travel days to and from the Locations plus reasonable non-consecutive days for publicity subject to Artist's professional availability ("Guaranteed Period").  It is understood that Artist tentatively may need time off to attend the Cannes Film Festival for unrelated events during the dates of May 19-May 21, 2008: Producer and Lender and Artist will work together in good faith to schedule such dates and accommodate Artist's schedule so that it does not unduly effect such events and/or the production of the Picture.  Artist is performing services with regard to a different motion picture and may be available earlier than set forth herein and in which case, Artist will work in good faith to make himself available earlier than set forth herein.

4.    FIXED COMPENSATION:  Provided additionally that neither Lender nor Artist is in default of any material obligations hereunder, as full and complete consideration for Lender's and Artist's services and all other obligations and promises from Lender and Artist, Producer shall pay to Lender the following fixed compensation: US$ REDACTED on a pay or play basis, for all services rendered during the Guaranteed Period to be paid weekly in relatively equal installments over the course of principal photography, less appropriate withholdings ("Fixed Compensation").  The Fixed Compensation payable to Lender pursuant to this paragraph shall be "pay or play" pursuant to the terms hereof.  The Fixed Compensation shall be deliverable to a mutually agreed escrow account as follows: 20% within 48 hours after Producer's receipt of this Agreement executed by Lender and Artist and the remaining amount at least one week prior to Artist's required departure for the Location.

ACTOR INITIALS: AB Bar

EXHIBIT A PAGE 32

5.     CONTINGENT BONUS:  Provided Lender and Artist executes this Agreement and appears recognizably in the finished Picture and is entitled to receive Lender's Fixed Compensation for Artist's acting services with regard to the Picture, Lender shall also be entitled to receive contingent compensation as follows:

5.1 Box Office Bonus: At such time, if ever, that the United States gross box office receipts of the Picture ("DBO") reach US$25,000,000, as reported in US Daily Variety, Lender shall be entitled to receive a "Box Office Bonus" equal to five percent (5%) of the DBO in excess of US$25,000,000, which shall be an advance against Lender's/Artist's Participation (as such term is defined below).

5.2 Gross Performance Profit Participation: An amount equal to 25% of the "Adjusted Gross Receipts" of the Gross Receipts, if any, derived from exploitation of the Picture, commencing at "Cash Breakeven" ("Lender's/Artist's Participation") which shall be applicable against any SAG residuals paid to Lender or Artist and Producer shall be permitted to deduct any SAG residuals paid to Lender or Artist from Lender's/Artist's Participation.

"Gross Receipts," for purposes herein, means amounts actually and indefeasibly received by Producer due to distribution and exploitation of the Picture (after any third party distribution and/or sales agent fees, costs, and expenses are deducted if not previously deducted or retained) from licenses of distribution rights to third parties, including advances, minimum guarantees, and overages.

"Cash Breakeven," for purposes herein, means the first point at which Gross Receipts equal the total of the distribution and/or sales fees and distribution and marketing/sales costs relating to the Picture (if not previously deducted prior to Producer's receipt) (with sales expenses (but not distribution costs/expenses) capped at US$500,000, exclusive of delivery costs), all residuals paid/accrued pursuant to union/guild labor agreements, collection fees and costs, taxes levied on gross receipts (other than corporate or other net income taxes with respect to the Producer or its successors, assigns or licensees), box office bonuses and deferments, other payments to Lender/Artist, the production and negative cost of the Picture (including overhead charges to the extent included in the budget), interest and financing fees and costs (including any so called "premium" on investment or financing if applicable), and costs of creation and delivery of all items to effect delivery of the Picture to distributors, exhibitors or sales agents.

"Adjusted Gross Receipts," for purposes herein, means Gross Receipts in excess of the level of Gross Receipts necessary to reach Cash Breakeven, less on an ongoing basis the distribution/sales agency fees and distribution and marketing/sales costs.

5.4  Audit/accounting Rights:  Producer shall report, in the English language, to Lender in connection with any contingent compensation due Lender under this Paragraph hereunder on a quarterly basis for the first three (3) years commencing with the quarter in which the Picture is first released anywhere; semi-annually for two years thereafter; and then annually.  Producer shall have no obligation to report if there is no activity to report.  Accountings shall be rendered within 90 days after the end of the applicable accounting period.  Lender shall have the right to audit the books and records of Producer only insofar as they pertain to the Picture only, in connection with Lender's share of Compensation, as set forth above.  Any such audit shall be conducted at Producer's regular place of business during normal business hours and shall be conducted by a Certified Public Accountant nominated by Lender or Artist.  No such audit shall be allowed more frequently than once in any twelve (12) month period. All of the records and reports shall be considered Producer's confidential records and trade secrets and shall be treated as such by Lender and Artist and their representative(s).  Statements not objected to in writing within 36 months after rendition shall be deemed final and shall not be subject to later objection or audit, i.e., there shall be no right to audit statements more than 36 months after tendering same to Lender or Artist.

6.     WORK CONDITIONS:  The work week shall be six days with a standard work day of 12 hours.

No increased or additional compensation shall accrue or be payable to Lender or Artist by reason of the fact that any of Artist's services are rendered at night or on weekends or holidays. The Fixed Compensation shall be inclusive of, without limitation, fees due to Artist for Artist's pre-production, production, and post-production services, and payments for travel days, rehearsals, overtime, and vacation, holiday, and any other applicable SAG premiums to the extent permitted under the SAG Codified Basic Agreement. Producer shall have the benefit of the maximum waivers obtainable under Schedule "F" of the SAG Basic Agreement.

7.      CREDIT:  On condition that Artist appears recognizably in the Picture as released, Producer shall accord to Artist credit as follows:

(a)     On Screen:  On prints, Artist will receive credit in first position of cast on a separate card, in the main titles, on-screen in a size of type which is not less than fifty percent (50%) of the average size of type used to display the "Title" of the Picture but in no event smaller than the average size of type used to display the name of any other individual. All other remaining terms shall be in Producer's discretion (including whether main title credits shall be at the beginning or end of the Picture) provided that Producer will consult with Artist with regard to the actual credit provided Artist's two roles.

(b)     Paid Advertising:  In Paid Advertising, except for ads where no individual is given credit and subject to customary exclusions (but in excluded uses, including teaser ads, on the terms set forth herein, in which any individual is accorded credit other than nomination, award or congratulatory advertising relating to the person nominated, awarded or congratulated in which only such person is credited): Artist's billing block credit shall be first position of cast, not less than the size of the regular (i.e. billing block) title and any other individual receiving credit thereon; Producer shall also have the right use Artist's name above or in the artwork for the Picture, in Producer's discretion, except that in the event that any other individual is accorded an artwork credit, Artist shall also receive credit where artwork is used, in first position above the artwork title in a size of type not less than 35% of the size of type used to set forth the artwork title and 100% of the size of any other individual receiving credit thereon. Producer shall also have the right to utilize Artist's approved likeness in connection with any advertising/promotion for the Picture; it being understood that Producer shall have no obligation to do so, except that if another cast member's likeness is shown in paid advertisements, including excluded advertising, issued or controlled by Producer, then Artist shall have likeness parity with such other actor and no other cast member likeness is to be larger or more prominent therein. As used herein, size includes height, duration, prominence, thickness and width. All other remaining terms shall be in Producer's discretion.

Producer shall also have the right to utilize Artist's name above or before the Picture title on screen or in the billing block for the Picture; it being understood that Producer shall have no obligation to do so, except that if another cast member credit is above or before the title, then Artist's credit shall also be above or before the title.

No casual or inadvertent failure to comply with the provisions of the paragraph shall constitute a breach of the Agreement; provided that upon receipt of written notice from Lender specifying a failure to accord Artist credit properly in accordance with the Agreement, Producer shall use best efforts as practicable to promptly cure prospectively such material failure with regard to ads issued and/or prints created after the date of such notice and, to the extent possible, versions of any other medium whose masters were not created prior to the receipt of such notice. Producer's obligation hereunder is to provide the distributor with the credit obligations as set forth herein and cause distributor to assume said obligations in writing and failure by distributor to so accord credit shall not be deemed to be a breach of this Agreement by Producer if Producer has so obtained such written assumption from the distributor. In the event of a failure or omission by Producer or any third party constituting a breach of the obligations of Producer under this Agreement, including, without limitation, under this paragraph, Lender and Artist recognize that the damage caused Lender or Artist by Producer by such breach is not irreparable or sufficient to

entitle Lender or Artist to injunctive or other equitable relief and Lender and Artist therefore agree that Lender and Artist's rights and remedies hereunder shall be limited to the right, if any, to obtain damages at law. Consequently, Lender and Artist shall have no right in such event to injunctive relief or to terminate or rescind the Agreement or any of the rights granted or assigned to Producer hereunder.

8.     TRAILER: While on Location, Artist shall be provided with a single stand alone first-class "star" trailer if available [Luxury Tricamper] for Artist's exclusive use with the following first-class amenities if available: air conditioning, satellite TV, heating, kitchen (equipped with stove, microwave and refrigerator), private bathroom (with sink, toilet and shower), separate bedroom containing a bed, living room with couch, make-up area, stereo with CD player, VHS or DVD player and access to phone/fax and computer with internet (if desired by Artist). In any event, Artist's dressing facilities are to be no less favorable than those accorded to any other actor.

9.     APPROVALS / CONSULTATION: Artist shall have the following approval or consultation rights (i.e., consultation means meaningful consultation but Producer's decision shall be final and controlling):

9.1 Co-star: Approval of the performer to play the roles of "Linda" (Emmanuelle Seigner is pre-approved) and "Celine" (Elsa Pataky is pre-approved) and replacements therefor provided that such personnel approval right shall change to a consultation right on a date four weeks prior to scheduled start of principal photography and the Producer and/or completion guarantor for the Picture shall have the sole discretion to cast the role with a performer appropriate to the as determined in its reasonable good faith business judgment following such consultation with Artist and such other persons as may be consulted.

9.2 Director: Approval of the director (Dario Argento is pre-approved) and replacement therefor provided that such personnel approval right shall change to a consultation right on a date four weeks prior to scheduled start of principal photography and the Producer and/or completion guarantor for the Picture shall have the sole discretion to cast the role with a performer appropriate to the as determined in its reasonable good faith business judgment following such consultation with Artist and such other persons as may be consulted.

9.3 Script Changes: The parties recognize and agree that modifications may need to be made to the script; Artist shall have meaningful consultation over material changes in the script and approval over changes materially affecting Artist's role, in conjunction with the Producer and director, not to be unreasonably withheld or delayed, and shall be exercised in good faith in accordance with the screenplay requirements, production schedule and budget for the Picture.

9.4 Other Personnel: Approval over the hairdresser, makeup person rendering services to Artist, Artist's stand-in (it is acknowledged that Artist has requested that Patrick Oldani be his stand-in and is pre-approved) and stunt double, it is acknowledged that any replacement of the named foregoing personnel and any others: (a) will be Italian resident or Italian nationals or landed immigrants; and (b) must be available to work at the budgeted rates, plus crew per diem plus local hotel, provided that all of the foregoing personnel approval rights shall change to a consultation right instead with respect to any of these positions that remain unfilled by an approved person on or after seven (7) days before the scheduled start of principal photography of the Picture or in respect of any replacements of the foregoing personnel.

9.5 Security: In the event that Artist believes such to be a concern once arriving at the Location, Artist shall have approval within reason of general on set security. Artist's approval and discussion regarding same is not to be unreasonably withheld or delayed, and shall be exercised in good faith in accordance with the production requirements and budget for the Picture.

9.6 Still Photographs: Artist shall have the right to approve publicity stills of Artist issued by or under

the control of Producer in connection with the advertising, publicizing and exploitation of the Picture; provided, however, that Artist shall be required to approve no less than fifty percent (50%) of the total number of stills submitted by Producer in which Artist appears alone or with actors who do not have approval rights or fifty percent (50%) in which Artist appears with any other actor who has approval rights. Artist shall have re-approval (with 50% limit on disapproval) with respect to any and all photos intended for use on magazine covers, key art or key sets. Stills shall be submitted in batches in a reasonable number and may be in the form of so-called contact sheets. Artist shall be given seven (7) business days to respond which time period shall be reducible to five (5) business days upon written notice or shorter in the event of distribution exigencies. In the event of any failure by Artist to approve the requisite percentage of Stills within the Approval Period, Producer shall have the right to deem the appropriate number of Stills in the batch submitted as approved and in order to make up the requisite percentage. If Artist is unavailable, Artist's personal manager shall have the right to exercise these approval rights on Artist's behalf.  Producer will not grant the photographer for stills ownership or the right to retain any negative or print or any syndication rights with any photographs containing Artist's likeness. Negatives and copies of disapproved stills are to be destroyed or rendered unusable. Producer will not provide stills to tabloids.

9.7 <u>Non-Photographic Likeness</u>:  Artist shall have the right to approve all non-photographic likenesses to be utilized by Producer in connection with advertising, publicity and exploitation of the Picture or otherwise. Artist shall have three (3) passes for comments on likenesses submitted. Artist shall respond to each submittal within five (5) business days from Artist's receipt of a particular submittal, reducible to three (3) business days or shorter in the event of distribution exigencies, provided Producer notifies Artist in writing of such need at the time of the request. Artist shall cooperate in good faith in connection with the redrawing of any likeness disapproved by Artist, and all likenesses submitted for Artist's approval shall be deemed approved if not disapproved during the required period. If Artist is unavailable, Artist's personal manager shall have the right to exercise these approval rights on Artist's behalf. When any likeness (and/or constituent elements thereof) has been redrawn to meet Artist's objections after the third submission of such likeness to Artist, such likeness shall be deemed approved by Artist. Artist shall have the separate right of absolute approval for non-photographic caricatures, models and statues.

9.8 <u>Biography</u>:  Approval over Artist's biography (Artist to provide or approve at least one up-to-date biography to Producer at all times).

9.9 <u>Artist's Publicity Services</u>:  Subject to Artist's approval, not to be unreasonably withheld, and professional availability, Artist shall perform reasonable publicity, interviews and personal appearances upon first release in each territory as may be requested by Producer and/or the Picture's distributor(s). If requested by the Producer, the Producer shall provide the following and if requested by the Picture's distributor(s), the Producer shall apply best efforts to procure that the distributor shall provide the following:  In the event Artist is required to travel in connection with the rendition of publicity services, Artist will be provided first-class round-trip airfare for Artist plus, both on an if used and required basis, one (1) additional first-class round-trip airfare for Artist's companion and one (1) additional business class ticket for Artist's publicist, plus first-class hotel accommodations, expenses and ground transportation. In the event that publicity services are for Artist's personal appearance, Producer will exert good faith efforts to provide a reasonable budget for clothes, stylist, make-up and hair. Immediately after execution hereof, the parties agree to issue a press release regarding Artist's involvement in the Picture and shall work together in good faith to mutually prepare such press release.

9.10 <u>Merchandising/Commercial Tie-Ins</u>:  No merchandising or commercial tie-ins utilizing Artist's name, voice or likeness, and no use of a look-alike or sound-alike, without Artist's prior written consent and will be subject to the following royalty if such use is not for promotional, purposes and generates income in excess of the costs incurred in connection therewith. The royalty for any such use shall be a sum equal to seven and one half percent (7.5%) of Producer's net receipts (gross receipts actually received by Producer

less a distribution fee of thirty-five percent (35%) and less merchandising expenses) directly derived from such merchandising reducible by the amount of royalty payable to any other person whose name or likeness is used in connection with such merchandising who is entitled to a royalty to a floor of five percent (5%) of Producer's net receipts therefrom. Any use with regard to soundtrack shall be governed by separate agreement. For clarification, Producer shall always have the right to use Artist's name, voice and/or likeness (subject to the likeness approval paragraphs herein) in connection with the marketing, distribution, and other exploitation of the Picture without payment of a merchandising royalty, including but not limited to the following uses and the following shall not be deemed merchandising or a commercial tie-in: (a) items for promotional purposes of the Picture (e.g., customary promotional items such as one sheets, lobby cards, posters, photos, lobby stand ups, as well as hats, pins, T-shirts, mugs and other customary promotional trinkets), (b) Artist's name as part of the Picture's publicity and billing block.

9.11 Specific Product Uses: In addition to other paragraphs herein, Artist has approval of use of his name, voice and/or likeness in an interactive game making reference to or utilizing elements from the Picture. Artist will be provided a seven (7) business day approval period after receipt by Artist or Artist's representative. Further, Artist shall have approval with respect to Artist appearing in a scene containing a prominent commercial product (if such was specially arranged and does not appear as part of normal shooting environment) or product placement. Any proceeds paid for any commercial product placement involving Artist directly shall be paid to Artist exclusively.

Producer agrees not to enable downloading any clips or stills containing Artist's likeness except in connection with internet usage in connection with the marketing, distribution, and other exploitation of the Picture or its marketing materials. Notwithstanding same, Producer agrees that it will not have the Picture's website enabled to download screen "wall-paper" containing Artist's likeness. There shall be no use, including sale of any items (e.g., Ebay, etc.) of screen or make-up tests, or molds, models or other replications of Artist's face or body without Artist's prior written approval.

9.11 On Set Press: Artist is to be provided at least twenty-four (24) hours prior notice of Artist's meeting with any press on set. Artist shall have the right to approve any interview and if Artist consents to a magazine interview intended for cover treatment, he shall have the right to approve the cover photo.

9.12 Reasonableness of consents: Notwithstanding any other provision, all of Artist's approvals and consultations as provided in this Agreement shall be administered and provided by Artist reasonably, in good faith and expeditiously in order not to delay, frustrate, infringe, or interfere with production and/or distribution, or any aspect, of the Picture. Unless otherwise provided herein, if Lender or Artist, as applicable, does not disapprove any item within five (5) days, then such will be deemed approved.

10.    NAME AND LIKENESS USAGE; MAKING OF FILMS, ETC: In the event that Artist's commentary is requested for the DVD, Artist agrees to reasonably cooperate with providing same, subject to Artist's professional availability.

Artist will have the right to prior approval and consultation (included in the Fixed Compensation) over the use of behind the scenes footage, bloopers and outtakes (however Artist agrees to approve a reasonable amount of behind the scenes footage and such material (not including bloopers or embarrassing outtakes) for said uses commensurate with his role as the lead actor. There shall be no behind the scenes photography, publicity interviews or other publicity activities involving Artist on set without Artist's approval.

Artist shall be consulted with respect to any film clips from the Picture containing his performance intended for use in connection with music videos of a song from the Picture.

11.    DUBBING: Subject to Artist's availability, Artist shall have the first opportunity to "dub" Artist's voice in the English language as long as Lender makes Artist available for the dubbing dates. Producer will make good faith best efforts to schedule dubbing in accordance with Artist's availability provided Artist so informs Producer and shall give at least ten (10) business days prior written notice of such dubbing, unless the exigencies are such that a shorter notice period is necessary, but not less than seven business days prior notice. Producer and any applicable distributor shall not be required to travel Player unless dubbing can be arranged at a location within a reasonable distance to where Artist is at the time in which case Artist and Producer will work together in good faith for such travel, or otherwise incur any additional expense, in order for Player to exercise these first opportunity rights.

12.    TRAVEL EXPENSES, ETC: While on location, Artist will be afforded a suite at a first class hotel (with a gym work out area) approved by Artist plus a non-accountable per diem of Euro100 per day, to be used by Artist to defray Artist's living expenses (including without limitation all expenses incurred by Artist and Artist's invitees, all of which expenses are Artist's sole responsibility, although Producer and Artist will cooperate with regard to reasonable and minor incidental/food expenses for a limited number of invitees such as Artist's parents). Artist shall be furnished with one (1) first-class round-trip, plus one business class round trip on an if used basis, air transportation to the Location. While required to be on Location, Artist shall be provided with a first class rental sport utility vehicle (or other full-size vehicle as available). Artist shall be provided an exclusive car and driver to and from the set and to and from airports (including for departure and arrival from domestic US airport). All travel and related arrangements will be made by Producer in its sole discretion.

13.    ASSISTANT/FITNESS CENTER/TRAINER: While required to be on Location, upon Artist's request, Producer will provide Artist with a local-hire exclusive assistant subject to Artist's reasonable approval (Simona Politi is pre-approved). While required to be on Location, Producer shall provide Artist with a membership to a local fitness center (if there is not a gym at Artist's hotel) and, if requested, a personal trainer (as needed) (if the fitness center is at Artist's hotel then trainer must come to the hotel).

14.    PREMIERES/FESTIVALS: Artist shall be invited with his companion, plus his publicist, to any celebrity premiere held for the Picture, or major film festival (such as Cannes, Venice, New York, London) in which the Picture is in official competition, if any, occurring within two years from the start of principal photography of the Picture, along with being provided no less than ten (10) additional invitations/seats if Artist attends. In the event that Producer is in control of the premiere, if such services are performed outside of where Artist is located at the time, Producer shall provide the following: In the event Artist is required to travel, Artist will be provided first-class round-trip airfare for Artist plus, both on an if used and required basis, one (1) additional first-class round-trip airfare for Artist's companion and one (1) additional business class ticket for Artist's publicist, plus first-class hotel accommodations, expenses and ground transportation. Producer shall use best efforts to arrange for Artist's similar travel, accommodation and per diem for non-controlled premieres or festivals. In any event, no other actor shall be provided with more favorable terms with respect to premiere(s)/film festivals.

15.    DVD/CD: Artist shall be provided with one free DVD and CD copy of the soundtrack, if any, upon the applicable DVD CD commercial availability date of the in the United States, but failure to do shall not be deemed a breach of this Agreement.

16.    WARDROBE: Following delivery of the answer print of the Picture, Artist shall have the right to retain, free of charge, any costumes or apparel purchased by Producer worn by Artist in the portrayal of Artist's role (except for costumes or apparel which are so unique as to be required be retained by Producer).

17.    NUDITY/HEATH CONCERNS: Artist shall not be required to perform any nudity or simulated sex scenes. In the event Artist is scheduled to appear in any scene that involves physical intimacy with

another Performer, who at the time exhibits, in Artist's good faith opinion, symptoms indicative of one or more health issues of a contagious nature (such as, for illustrative purposes only, flu symptoms), Artist reserves the right to postpone his performance in such scene until Performer is healthy.

18.    **FURTHER REPRESENTATIONS AND WARRANTIES:** Lender hereby represents and warrants that neither Lender nor Artist is under any obligations or disability, created by law or otherwise, which would in any manner or to any extent prevent or restrict Lender or Artist from entering in to and fully performing this Agreement; that Lender nor Artist has entered into any agreement or commitment that would prevent Artist's fulfilling Artist's commitments with Producer hereunder and that Lender and Artist will not enter into any such agreement or commitment without Producer's specific approval; and Lender and Artist hereby accept the obligations hereunder and agree that Artist shall, during the period of Artist's exclusive services hereunder, devote Artist's entire time and attention and best talents and abilities exclusively to Producer as specified herein, and to observe and to be governed by the reasonable rules of conduct established by Producer for the conduct of its employees.

19.    **ENTIRE AGREEMENT:** This Agreement, plus the Inducement and Standard Terms and Conditions attached hereto, constitutes the entire agreement between the parties and supersedes any and all prior written or oral agreements relating to the subject matter hereof and all previous agreements if any, are merged herein and cannot be modified or amended except by written instrument signed by Lender and by Producer.  Lender and Artist acknowledges that Lender and Artist have not executed the Agreement in reliance on any representation or promise made by Producer or any of its representatives other than those expressly contained in the Agreement.  Lender/Artist may not make any representations or agreements on the behalf of Producer.  Producer shall have ten business days to cure any alleged breach hereof after Lender provides written notice of such to Producer.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement to be effective the day and year first above written.

"PRODUCER"                               "Lender"

GIALLO PRODUCTIONS LIMITED               THREE-SEVEN ENTERTAINMENT, INC.
a United Kingdom limited company         a Nevada, USA, corporation

By: _____              BY: ADRIEN BRODY
Its Authorized Signatory                 Its: Authorized Signatory

ACTOR INITIALS: _____

EXHIBIT __A__ PAGE _39_

## INDUCEMENT ATTACHMENT TO ACTING AGREEMENT

As a material inducement to Company to enter into the Acting Service Agreement between GIALLO PRODUCTIONS LIMITED, a United Kingdom limited company, ("Company") and THREE-SEVEN ENTERTAINMENT, INC., a Nevada, USA, corporation, ("Lender") for the services of the undersigned as the Artist referred to therein, and as a material part of the consideration to Company for so doing, the undersigned hereby represents, warrants and agrees as follows:

I have read and am familiar with the above Agreement. I represent and warrant that Lender has entered into an employment agreement with me and is authorized to furnish my services as aforesaid and to grant all rights as set forth above. I agree to be bound to the foregoing as if I were a party thereto and I agree that the Lender stated above has the right to enter into the above Agreement and provide my exclusive services for the time period stated and grant rights in the product of my services as provided in the above Agreement.

In the event that Lender is unwilling or unable to fulfill its obligations pursuant to the Agreement, the undersigned will agree to be and will be bound by and will duly observe, perform and comply with each and all of the terms, covenants and conditions of the Agreement on the part of the Lender or the Artist to be performed or complied with, even if the Agreement should expire, be terminated or in any manner suspended; and shall render to Company all of the services and grant all of the rights which are to be rendered and/or granted by Lender or Artist pursuant to the Agreement even if Lender shall be dissolved, suspended or should otherwise cease to exist. The undersigned is under no known obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Agreement on the part of the Lender or the undersigned to be performed or complied with.

Provided the compensation is paid by Company to Lender, I agree to look solely to Lender for any compensation and other remuneration for any and all services and rights due to me in connection with the Picture. I further agree that Company shall be entitled to seek equitable relief against the undersigned by injunction or otherwise to restrain, enjoin and/or prevent the violation or breach by the undersigned of any material obligation of the undersigned to be performed as provided in the Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument, without bond. If Lender fails to fulfill its obligations under the Agreement, Company shall have all rights and remedies against the undersigned which Company would have if the undersigned were Company's direct employee under the Agreement and Company shall not be required to first resort to or exhaust any rights or remedies which Company may have against the Lender before exercising Company's rights and remedies against the undersigned.

The undersigned will indemnify and hold Company, Company's officers, employees, representatives and assigns harmless from and against any and all taxes which Company may have to pay and any and all liabilities (including judgments, penalties, interest, damages, costs and expenses, including reasonable outside attorneys' fees, whether or not litigation is commenced) which may be obtained against, imposed or suffered by Company or which Company may incur by reason of Company's failure to deduct and withhold from the compensation payable under the Agreement any amounts required to be deducted and withheld from the compensation of an employee under the provisions of any income tax laws of any local, state or nation and any other statutes or regulations heretofore or hereafter enacted requiring the withholding of any amount from the compensation of an employee and any similar statutes or regulations of any territories and countries.

EXHIBIT A PAGE 40

I further agree that under no circumstances shall I be entitled to amend, modify or terminate the Agreement (except for Lender's rights to amend, modify or terminate as provided in such Agreement), rescind any rights granted, or act in any manner to prevent or interfere with the performance of the undersigned's services or the use and ownership of the results and proceeds thereof, or to obtain or seek any form of equitable or injunctive relief, specific performance or otherwise, or to seek to enjoin or otherwise interfere with the development, production, distribution or exploitation of the Picture or any element thereof, any and all rights to which I expressly waive. These agreements by me and indemnifications shall survive termination of said Agreement.

_____
ADRIEN BRODY

## STANDARD TERMS AND CONDITIONS

Following are the Standard Terms and Conditions of this Agreement between Producer and Lender for Artist's services in connection with the Picture. All defined terms set forth in these Standard Terms and Conditions shall be deemed to be defined as set forth in the main portion of this Agreement. In the event of any conflict between the Standard Terms and Conditions and the main portion of this Agreement, the provisions of the main portion of this Agreement shall control.

A. **CONFIDENTIALITY:** Lender and Artist shall keep confidential all matters relating to the Picture (including, without limitation, the script, the plot, or any elements thereof, any set design, props or effects, or activities of the cast and crew) and Producer's business or production activities, and shall not furnish or authorize any dissemination of any information or publicity of any form relating to the Picture, Lender's engagement, Artist's services or Producer (or its operations or personnel); provided that incidental non-derogatory references to Artist's engagement hereunder shall not be deemed a breach of this provision.

B. **RIGHTS:**
(1) **Results and Proceeds.**

All results and proceeds of Artist's services hereunder, including, without limitation, all literary and musical material, designs and inventions of Artist, shall be deemed a work made for hire for Producer within the meaning of the copyright laws of the U.S. or any similar or analogous law or statute of any other jurisdiction. With regard to copyright law, the parties agree that the copyright laws of the United States shall govern this Agreement, without regard to conflict of laws. Accordingly, Producer shall be the sole and exclusive owner thereof for all purposes, including, without limitation, in connection with the distribution, exhibition, advertising and exploitation of the Picture and any part thereof and the allied and ancillary rights therein, in each case, in all media and by all means now known or hereafter devised and in all languages, throughout the universe in perpetuity. Any services including, without limitation, writing and/or acting services, rendered by Artist in connection with the Picture shall be covered by the preceding sentences, and sums otherwise payable under this Agreement shall be deemed full payment for such services. If for any reason Artist's services are not deemed a work-for-hire for Producer, then Lender and Artist hereby irrevocably assign, grant and set over unto

Producer, in perpetuity and throughout the Universe, all of Lender's and Artist's rights of every kind and nature, including all rights of copyright, in and to the Picture and all of the results and proceeds of Lender's engagement and Artist's services hereunder. Lender and Artist acknowledge and agree that (i) Producer will be the sole and exclusive owner of all rights in the Role or character portrayed by Artist, including the name, voice, likeness and/or distinctive characterizations thereof, and the right to merchandise, enter into commercial tie-ins and exploit such Role or character and the right to use Artist's name, voice and likeness in connection therewith, and (ii) neither Lender nor Artist shall have the right at any time to portray, exploit, merchandise or make any use of such Role or character portrayed by Artist.

(2) **Droit Moral; EC Rental and Lending Rights.**
Lender and Artist hereby waive the benefit of any provision of law known as "droit moral" or moral rights of authors or any similar or analogous law or decision in any country of the world. Lender and Artist, on Lender's and Artist's own behalf and on behalf of Lender's and Artist's successors in interest, heirs, executors, administrators and assigns hereby assign to Producer in perpetuity all rental and lending rights under national laws (whether implemented pursuant to the EC Rental and Lending Rights Directive or otherwise) to which Lender or Artist may now be or hereafter may become entitled therefrom. Lender and Artist agree, on Lender's and Artist's own behalf and on behalf of Lender's and Artist's successors-in-interest, heirs, executors, administrators and assigns, not to institute, support, maintain or permit directly or indirectly any litigation or proceedings instituted or maintained on the ground that Producer's (or its designee's) exercise of the right granted to Producer in the Picture in any way constitutes an infringement or violation of any such rental or lending right as aforesaid. Lender and Artist hereby acknowledge that the Fixed Consideration to which Lender and/or Artist are entitled pursuant to this

ACTOR INITIALS: AB ꝑ

EXHIBIT __A__ PAGE __42__

Agreement includes consideration for the assignment of rental and lending rights provided for in this Paragraph and that the said consideration is an equitable and adequate part of the revenues derived or to be derived by Producer from the said rights. Lender and Artist hereby waive pursuant to Section 87 of the Copyright Designs and Patents Act 1988 ("the Act") (or any statutory modification or re-enactment thereof for the time being in force), unconditionally, irrevocably and in perpetuity, in favor of the Producer, all rights under Sections 77 to 85 inclusive of the Act in respect of the products and all other moral and author's rights and rights of a similar nature whether now existing or hereafter conferred under the laws of any jurisdiction. Lender and Artist hereby grant to Producer throughout the world all necessary consents whether under the Act or otherwise to enable the Producer to make the fullest use of the Artist's services in all media whether now known or hereafter invented.

(3) Vesting. All rights granted or agreed to be granted to Producer under this Agreement shall vest in Producer immediately and shall remain vested whether this Agreement expires in normal course or is terminated for any cause or reason.

C.    NAME AND LIKENESS: Producer shall have the right to use and permit others to use Artist's name, photograph, likeness, voice and biography in connection with the production, exhibition, advertising, publicity, merchandising, commercial tie-ins, promotion and/or other exploitation of the Picture, and/or subsidiary, allied and ancillary rights of any nature relating to the Picture or the results and proceeds of Artist's services hereunder, in perpetuity throughout the Universe in any and all media and means now known or hereafter devised (including, without limitation, on web sites); provided that Producer shall not use Artist's name, voice or likeness as an endorsement of any product without Lender's or Artist's prior written approval (provided that the Picture, soundtrack albums, commercial tie ups, novelizations, printed or souvenir programs and other publications relating to the Picture and the exhibition of a "trailer" or promotional film for the Picture on a sponsored television program shall not be deemed to constitute an endorsement). Producer shall have the right to use and to authorize others to use, in perpetuity throughout the Universe in any and all media and means now known or hereafter devised, film clips

and excerpts from the results and proceeds of Artist's services hereunder, the Picture and behind the scenes footage in which Artist appears recognizably without any additional consideration to Lender or Artist. Producer contemplates filming and/or exploiting films, including, without limitation, music videos relating to the Picture, "behind the scenes" or "making of" productions about the Picture or similar documentary-type promotional films, in each case, in connection with advertising, publicizing and exploiting the Picture (each, a "Promotional Film"). Lender and Artist hereby agree and consent to such filming and exploitation (including, without limitation, use of any film clip footage from the Picture and behind the scenes photography and filmed interviews with Artist) and hereby grant to Producer the right to use and authorize others to use Artist's name, voice and likeness in connection with such Promotional Films (and the exploitation thereof in perpetuity throughout the universe via any and all media, now known or hereafter devised) for no additional consideration. For the avoidance of doubt, Lender and Artist hereby agree and consent to the use and exploitation by Producer and its licensees and assigns (in each case, for no additional consideration) of outtakes and behind the scenes photography in which Artist appears in connection with (i) the end credits of the Picture; (ii) any "compilations" or "special editions" of the Picture or so-called "bonus materials" relating to the Picture for inclusion on DVD's and/or other devices now known or hereafter devised, or in connection with VOD or other "on-demand" exploitation; and (iii) any "compilation or "special edition" types of motion pictures issued or controlled by Producer. For sake of clarification, exhibition, advertising, publicizing or exploiting the Picture by or in any media, even though a part of or in connection with a product or a commercially sponsored program, shall be deemed in connection with the Picture and this paragraph includes use of footage, or scenes not otherwise part of the final cut, in uses related to the Picture, such as dvds, a program regarding the Picture or the underlying material or promotional material. Artist agrees to perform customary EPK interviews and activities services. Artist agrees to perform such activities and approve such footage, including "behind the scenes" footage, as reasonably necessary for Producer to create electronic publicity kits and/or DVD extras, without further compensation hereunder.

D.    NO OBLIGATION TO USE:   Producer shall have no obligation actually to use Artist's services or use any of the results and proceeds thereof, or to exercise any of the rights granted to Producer hereunder, or to produce, or exploit the Picture, or to continue production, or exploitation, if commenced.   If Producer elects not to utilize Artist's services hereunder, Producer shall have no further obligation to Lender or Artist hereunder; provided, however, that if Lender has been made "pay-or-play" for the Fixed Compensation, all of Producer's obligations to Lender and Artist hereunder shall be satisfied by payment to Lender of the Fixed Compensation (subject to Producer's rights of suspension and termination).

E.    PUBLICITY AND PROMOTIONAL SERVICES:   Artist agrees to render promotional and publicity services, as, where and if reasonably required by Producer, in connection with the publicity and promotion of the Picture (including the home entertainment release thereof), including, without limitation, attending domestic and international press junket(s) and premiere(s) of the Picture, appearing on late night and daytime television talk shows, and being available for radio and magazine interviews, subject only to Artist's then prior professional contractual commitments (provided that Artist shall use reasonable good faith efforts to be available to render such services as and when reasonably required by Producer).

F.    W A R R A N T I E S    A N D   INDEMNIFICATION:

(1) Lender's and Artist's Warranties: Lender and Artist represent and warrant that: (i) it and he/she have the full right and authority to enter into this Agreement and to grant the rights herein granted; (ii) Lender and Artist have not entered into nor will Lender or Artist enter into any commitment which will conflict in any way with the rendition of services hereunder or conflict in any way with Lender's and Artist's contractual obligations under any of the provisions hereunder; (iii) except to the extent that it is based upon material provided to Artist by Producer to be used as the basis therefor, all material created by Artist hereunder or otherwise in connection with the Picture is or shall be original with Artist or in the public domain and does not and shall not violate the copyright or any other right of

any third party and is not the subject of any litigation or of any claim that might give rise to litigation; and (iv) Artist is for the purposes of this Picture a member in good standing of the Screen Actors Guild of America.

(2) Lender's and Artist's Indemnification: Lender and Artist agree to indemnify Producer, and all distributor(s) and broadcaster(s) of the Picture, and each of their officers, employees, directors, successors, agents, licensees and assigns (the "Producer Indemnitees") against and hold the Producer Indemnitees harmless from any damages, liabilities, losses, actual costs, actual expenses, obligations or claims (including, without limitation, reasonable outside attorneys' fees and costs) (collectively "Claims") arising out of the breach of Lender's and/or Artist's agreements, obligations, representations and warranties hereunder.

(3) Producer's Representations and Warranties: Producer represents and warrants that it is or will become for the purposes of this Picture a signatory to the applicable SAG agreement.

(4) Producer's Indemnification:   Producer agrees that Producer shall indemnify and defend Lender and Artist and hold Lender and Artist harmless from any Claims arising with respect to the development, production or exploitation of the Picture, except to the extent arising out of Lender's and/or Artist's breach, negligence and/or intentional misconduct; provided, however, that the foregoing indemnity is conditioned upon and subject to the following: (i) Lender and Artist shall cooperate fully with Producer and follow Producer's reasonable instructions in the defense of any such Claim at no cost or charge to Producer other than the reimbursement to Lender and/or Artist of reasonable out-of-pocket costs and expenses incurred in connection with the defense of any such Claim excluding legal fees; (ii) Producer shall have the right to select and retain any legal counsel in connection with the defense of any such Claim and shall pay the attorneys' fees associated therewith; and (iii) Producer, in its sole discretion, shall have the right to defend, compromise and/or settle any such Claim.

G.    SUSPENSION AND TERMINATION: Producer shall have the right to suspend Artist's employment and Lender's compensation hereunder

during all periods: (i) that Artist does not render services hereunder because of illness, incapacity, default or similar matters, or that Lender and/or Artist are in breach hereof; (ii) that development and/or production of the Picture is prevented or interrupted or delayed because of an event of force majeure or any other event which so prevents or interferes with the development and/or production of the Picture, including, without limitation, any labor dispute or strike, fire, war or governmental action, or any disruptive event beyond Producer's control; or (iii) that production of the Picture is prevented, interrupted or delayed by reason of the death, illness or incapacity of the Director, Director of Photography or a principal member of the cast. Unless this Agreement is terminated, the Guaranteed Period shall be deemed extended by a period equivalent to all such periods of suspension. If any matter referred to in (i) above, other than default, continues for longer than five (5) consecutive days or an aggregate of eight (8) days, or if any matter referred to in (ii) above continues for more than eight (8) weeks, or if any matter referred to in (iii) above continues for more than two (2) weeks, or in the event of any material default on the part of Artist, Producer may terminate this Agreement. If Lender does not receive compensation for a consecutive period of eight (8) weeks as a result of suspension under (ii) above or for a consecutive period of two (2) weeks as a result of suspension under (iii) above, Lender may terminate this Agreement unless compensation is resumed within one (1) week after Lender gives Producer written notice requiring such resumption.

**H.    LOANOUT:** Lender shall furnish the services of Artist to Producer in accordance with all of the terms of this Agreement. Lender is, and has been for more than thirty (30) days prior to the date hereof, a corporation duly organized and existing under the laws of Lender's state or country of incorporation. Lender is a bona fide corporation business entity established for a valid business purpose within the meaning of the tax laws of the United States and not a mere sham, conduit, or agent for Artist. Artist is under a written contract of employment with Lender for a term extending at least until the completion of all services required of Artist hereunder, which contract gives Lender the exclusive right to direct Artist as to when and how Artist performs Artist's services and to lend or furnish the services of Artist to Producer, as herein

provided.    As Artist's employer, Lender shall discharge all obligations of an employer including, but not limited to, the withholding and reporting of contributions, insurance deductions and applicable taxes required by law, including payroll taxes and unemployment insurance.

**I.    SCREEN AND ADVERTISING CREDIT.** Artist shall be accorded credit in accordance with the provisions of Credit paragraph above only if Artist has performed substantially all services called for hereunder and appears recognizably in the role in the Picture. The obligation to accord Artist credit in advertisements shall apply only to paid advertisements issued by Producer or under its direct control relating primarily to the Picture and shall in no event apply to so-called "teaser" and "special" advertising, publicity and/or exploitation relating to the Picture or screenplay upon which the Picture is based, any members of the cast, the authors, directors, producers or similar matters; to so-called "trailers" or other advertising (including promotional films), on the screen or by radio or television; to institutional, group or list advertising; to other advertising not relating primarily to the Picture; to narrative form; to credits on the screen at the end of the Picture; to newspaper or other periodical advertisements of 1200 lines or less; to by-products, record album jackets and similar packaging, merchandising productions or commercial tie-ups; or to advertising of such nature that Artist has not granted consent to the use of Artist's name in connection therewith. With respect to any obligation to accord credit in paid advertising, if the title of the Picture or the title and the name(s) of one or more other persons is used more than once in such paid advertising i.e., a so-called "regular" use and a so-called "artwork" use (such as, for example, the weaving of the title and/or the name(s) of any person as part of the background of the advertisement, or a display use or a fanciful use), the references herein to the title of the Picture and/or the names(s) of any person shall be to the so-called "regular" use of the title or the name(s) of such person(s) as distinguished from the "artwork" use of the title or the name(s) of such person(s); and with respect to any obligation to accord screen credit, in the event of an "artwork" use of the title or the name(s) of any person(s), Artist shall receive credit in accordance with such obligation, if any, as to size, subject to reasonable adjustment if such size of credit is not feasible. All

ACTOR INITIALS: _AB RBr_

EXHIBIT _A_ PAGE _45_

references to "size" however stated, whether as a percentage or otherwise, shall mean height. Except as specified in the Credit paragraph, all matters relating to Artist's credit, such as size, style of type, placement, color, etc., shall be at Producer's sole discretion and notwithstanding anything to the contrary in said Paragraph or elsewhere in this Agreement, there shall be no obligation whatsoever to accord Artist credit of any kind in any so-called "Award Ads" (including consideration, nominations or congratulations for an award) relating to any other person involved with the Picture. No casual or inadvertent failure to comply with the provisions of this Paragraph and/or the Credit Paragraph of this Agreement shall constitute a breach of this Agreement. Upon receipt of written notice from Lender specifying a failure to accord Artist credit properly in accordance with the Agreement, Company shall use best efforts as practicable to promptly cure prospectively such material failure with regard to ads issued and/or prints created after the date of such notice and, to the extent possible, versions of any other medium whose masters were not created prior to the receipt of such notice. In the event of a failure or omission by Company or any third party constituting a breach of the obligations of Company under this Agreement, including without limitation under this Paragraph, Lender and Artist recognize that the damage caused Lender and/or Artist by Company by such breach is not irreparable or sufficient to entitle Lender or Artist to injunctive or other equitable relief and Lender and Artist therefore agree that Lender's and Artist's rights and remedies hereunder shall be limited to the right, if any, to obtain damages at law. Consequently, neither Lender or Artist shall have any right to injunctive relief or to terminate or rescind the Agreement or any of the rights granted or assigned to Company hereunder.

**J.    DOUBLING.** Producer shall have the right to simulate Artist's voice and/or appearance in and in connection with the Picture or any part thereof or in any advertising, publicizing or exploitation thereof: (i) when necessary to expeditiously meet the requirements of exhibition; or (ii) when necessary to expeditiously meet censorship requirements, both foreign and domestic; or (iii) when, in the opinion of Producer, the failure to use a double for the performance of hazardous acts might result in physical injury to Artist; or (iv) when Artist is not available; or (v) when Artist fails

or is unable to meet certain requirements of the role, such as, singing or the rendition of instrumental music or other similar services requiring special talent or ability other than that possessed by Artist.

**K.    ASSIGNMENT:** Producer shall have the right to assign this Agreement and all or any part of Producer's rights hereunder, provided that no such assignments shall relieve Producer of its obligations hereunder unless such an assignment is in writing to a U.S. television network or a major motion picture studio, or any entity acquiring all or substantially all of Producer's assets, which studio, network or entity assumes all of Producer's executory obligations hereunder in writing. Lender and Artist shall not have the right to assign their rights and/or obligations hereunder and any purported assignment shall be null and void.

**L.    INSURANCE:**

(1)    E & O and Liability Insurance. Lender and Artist shall be covered under the errors and omissions and general liability insurance policies with respect to the Picture, if any, subject to the terms and conditions and restrictions of said policies, including any deductible or policy limits; provided, however, that the inclusion of Lender and Artist on such policies will not relieve Lender or Artist in any way whatsoever from Lender's and Artist's representations, warranties and indemnities contained herein and no such policy will cover any claims or demands to which Lender's and Artist's indemnification of Producer applies.

(2)    Other Coverage: Producer may (in Producer's sole discretion) secure in Producer's own name or otherwise at Producer's own expense, life, accident, health, cast, pre-production and other insurance covering Artist independently or together with others, and Artist shall not have any right, title or interest in and to such insurance. It is acknowledged and agreed that Artist's insurability pursuant to customary essential element cast insurance subject to a customary deductible with no material exclusion shall be a condition to Producer's obligations hereunder. Artist shall assist Producer in procuring such insurance by timely submitting to the usual and customary medical examinations and by signing such applications and other instruments in writing as may be required by the insurance company involved. Artist may have Artist's own

ACTOR INITIALS: _AB_ _Don_

EXHIBIT _A_ PAGE _46_

physician or other person present at any examination or test required pursuant to this Paragraph at Artist's own expense. If Producer is unable to obtain such insurance on Artist at ordinary rates, with not more than usual deductions, subject only to the usual exclusions and without requirement of compliance with extraordinary conditions, Producer shall have the right to terminate this Agreement without liability by giving Lender or Artist written notice of termination.

M.     WORKERS' COMPENSATION: Lender and Artist acknowledge that Lender shall provide all insurance coverage for Artist required by any workers' compensation statutes, laws, or regulations ("Workers' Compensation") and that Lender shall maintain such insurance coverage throughout the term of my services under this Agreement. For purposes of any and all Workers' Compensation, an employment relationship exists between Producer and Artist, Producer being Artist's "special employer" under this Agreement. Accordingly, in the event of Artist's injury, illness, disability, or death falling within the purview of Workers' Compensation, Artist's rights and remedies (and those of Artist's heirs, executors, administrators, successors, and assigns) against Producer or Producer's affiliates and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Producer's or any affiliate of Producer the services of any such other special employee) shall be governed by and limited to those provided by Workers' Compensation.

N.     REMEDIES: The rights and remedies of Lender and Artist in the event of a breach of this Agreement by Producer shall be limited to Lender's and Artist's right to recover damages, if any, in an action at law and in no event shall Lender or Artist be entitled to terminate or rescind this Agreement or any of the rights granted hereunder or enjoin or restrain the distribution or other exploitation of the Picture and the rights therein, or the use, publication or dissemination of any advertising issued in connection therewith, and Lender and Artist irrevocably waive any right to equitable or injunctive relief.

O.     SERVICES UNIQUE. It is mutually agreed that Artist's services are special, unique, unusual, extraordinary, and of an intellectual character giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law and that Producer, in the event of any breach by Lender or Artist, shall be entitled to equitable relief by injunction or otherwise.

P.     NOTICES: All notices which one party is required or may desire to serve upon the other under or in connection with the Agreement may be served personally or in lieu of delivering them personally to such party by mail or telegraph or facsimile addressed to the last address or facsimile number provided by said party in writing from time to time. Notice shall be deemed served upon personal delivery or upon the second day after sending via mail or facsimile. Courtesy copies of notices to Lender/Artist shall be sent to Lender's designated representatives (agent, manager and attorney) at their facsimile number last provided.

Q.     MORALS. If Artist should, prior to or during the term hereof or thereafter, fail, refuse or neglect to govern Artist's conduct with due regard to social conventions and public morals and decency, or commit any act which brings Artist into public disrepute, scandal, contempt or ridicule or which shocks, insults or offends a substantial portion or group of the community or reflects unfavorably on Artist or Producer, then Producer may, in addition to and without prejudice to any other remedy of any kind or nature set forth herein, terminate this Agreement at any time after the occurrence of any such event, and, further, Producer may, with or without terminating this Agreement, delete any credit theretofore given Artist in connection with the Picture and may thereafter disregard any credit obligations of this Agreement.

R.     ADDITIONAL DOCUMENTS: Lender and Artist shall execute any documents and do any other acts consistent herewith as may be reasonably required by Producer or its assignees or licensees to further evidence or effectuate Producer's rights as set forth in this Agreement. Upon Lender's and/or Artist's failure promptly to do so after reasonable notice, Lender and Artist hereby appoint Producer as Lender's and Artist's attorney-in-fact for such purposes (it being acknowledged that such appointment is irrevocable and coupled with interest) with full power of substitution and delegation. Copies of all such documents executed

EXHIBIT __A__ PAGE _47_

by Producer pursuant to Producer's rights hereunder shall be sent Lender or Artist, provided that failure to do so shall not constitute a breach hereunder.

S.     MISCELLANEOUS: THIS AGREEMENT IS GOVERNED BY THE LAWS OF THE UNITED STATES AND OF THE STATE OF CALIFORNIA, AND BOTH PARTIES CONSENT TO THE JURISDICTION OF THE STATE AND FEDERAL COURTS RESIDING IN THE COUNTY OF LOS ANGELES TO ADJUDICATE ANY DISPUTES WITH RESPECT HERETO.

ACTOR INITIALS: AB _Don_

EXHIBIT _A_ PAGE _48_

EXHIBIT B

GIALLO PRODUCTIONS LIMITED

May 28, 2008

Three-Seven Entertainment, Inc.
fso Adrien Brody
("Brody")

      Re:    "*Giallo*" (the "Film")

Dear Sir:

      Reference is hereby made to that certain ACTING SERVICE AGREEMENT dated effective March 26, 2008, and accompanying documents, by and between Three Seven Entertainment, Inc. fso Adrien Brody and Giallo Productions Limited in connection with the Film.

      The parties hereto agree that said Agreements shall be and are amended and, for the benefit to each of the undersigned and, in consideration thereof, agree as follows:

1.     The parties acknowledge that the first payment due to Brody has been paid and received. The parties agree that the second and third payments equaling US$640,000 of the Fixed Compensation to Brody shall be paid to Brody on or before Friday, May 30, 2008. In the event the wire transfer in said amount is not sent by end of business Friday, May 30, 2008, it is acknowledged that Brody will not return to the production set the following business day. Brody hereby acknowledges and agrees that US$640,000 of the Fixed Compensation to Brody payable on June 6 and June 13, 2008 shall be held in accordance with Paragraph 2 below (the "Brody Holdback");

2.     Brody agrees that the Brody Holdback shall be paid to Brody upon a deposit into the Production Account (as defined in the Completion Guaranty) in the amount of US$2,006,000, which amount represents the value of the Italian Letter of Credit less bank charges to be issued in respect of the Film between June 15, 2008 and July 15, 2008 but in no case no later than July 15, 2008. Brody is accorded the right, which he may exercise at any time prior to final cut of the picture, to exchange his executive producer credit for a producer credit (the compensation structure in terms of which fees fall under his acting services agreement and his exec producer/producer agreement will remain as-is) (such would be shared with the other producers Primorac and Rionda), subject to GPL and the Picture still qualifying for treatment as an "European" film; in the event that Brody exercises this option, GPL will exert all best efforts and good faith to provide same. Brody will have the right to withhold consent to the use of his likeness in the picture until the Brody Holdback (S640,000) is paid. Furthermore, in the event that the Letter of Credit is issued by the dates specified in this Paragraph 2, but the production nonetheless fails to release to Brody the Brody Holdback, in addition to

Brody-GPL Deferral Payment Agmt

*R.P.*

Brody's other rights and remedies that may be available, the $640,000 will accrue 5% per annum rate of interest from July 15, 2008 until payment.

3.    In the event that the event in paragraph 2 does not occur, then Brody shall be paid the full amount of the Brody Holdback from the proceeds from any distribution transaction with regard to the territory of Italy in first position on a simultaneous, pari passu and proportional basis (Brody receiving 32% thereof) with other Holdback accorded to collectively Steel Bridge Finance LLC, Rafael Primorac and Richard Rionda del Castro (68%).   Such parties shall hold the percentages stated in the rights and proceeds from the territory of Italy in perpetuity and the parties will be have approval over any subsequent Italian distribution arrangement such approval not to be unreasonably withheld.

4.    This letter agreement (a) shall be governed by the laws of the state of California, without regard to its conflict of laws principles, (b) represents the entire agreement of the parties with respect to the subject matter set forth herein, supersedes all prior written and/or oral agreements with regard to such subject matter, and may not be amended except by a written instrument executed by all parties hereto, and (c) may be executed in any number of counterparts, each such counterpart shall constitute an original and all such counterparts, taken together shall constitute one and the same instrument.  The facsimile signatures of the parties shall be accepted and shall be as effective as original signatures.

5.    Notwithstanding anything to the contrary contained herein, the parties agree to enter into such further documents consistent herewith as are reasonably necessary to effectuate the intent of this Letter.


Sincerely,

GIALLO PRODUCTIONS LIMITED


By: Richard Rionda del Castro


By:  Rafael Primorac


ACCEPTED AND AGREED:


Three-Seven Entertainment, Inc. fso Adrien Brody
By:  Adrien Brody


Brody-GPL Deferral Payment Agmt

Brody's other rights and remedies that may be available, the $640,000 will accrue 5% per annum rate of interest from July 15, 2008 until payment.

3.  In the event that the event in paragraph 2 does not occur, then Brody shall be paid the full amount of the Brody Holdback from the proceeds from any distribution transaction with regard to the territory of Italy in first position on a simultaneous, pari passu and proportional basis (Brody receiving 32% thereof) with other Holdback accorded to collectively Steel Bridge Finance LLC, Rafael Primorac and Richard Rionda del Castro (68%).   Such parties shall hold the percentages stated in the rights and proceeds from the territory of Italy in perpetuity and the parties will be have approval over any subsequent Italian distribution arrangement such approval not to be unreasonably withheld.

4.  This letter agreement (a) shall be governed by the laws of the state of California, without regard to its conflict of laws principles, (b) represents the entire agreement of the parties with respect to the subject matter set forth herein, supersedes all prior written and/or oral agreements with regard to such subject matter, and may not be amended except by a written instrument executed by all parties hereto, and (c) may be executed in any number of counterparts, each such counterpart shall constitute an original and all such counterparts, taken together shall constitute one and the same instrument.  The facsimile signatures of the parties shall be accepted and shall be as effective as original signatures.

5.  Notwithstanding anything to the contrary contained herein, the parties agree to enter into such further documents consistent herewith as are reasonably necessary to effectuate the intent of this Letter.

Sincerely,

GIALLO PRODUCTIONS LIMITED

By:  Richard Rionda del Castro

By:  Rafael Primorac

ACCEPTED AND AGREED:

Three-Seven Entertainment, Inc. fso Adrien Brody
By:  Adrien Brody

Brody-GPL Deferral Payment Agmt

EXHIBIT B PAGE 51