**MARTIN D. SINGER (BAR NO. 78166)**
**EVAN N. SPIEGEL (BAR NO. 198071)**
**ANDREW B. BRETTLER (BAR NO. 262928)**
**LAVELY & SINGER**
**PROFESSIONAL CORPORATION**
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone: (310) 556-3501
Facsimile: (310) 556-3615
E-mail:    mdsinger@lavelysinger.com
E-mail:    espiegel@lavelysinger.com
E-mail:    abrettler@lavelysinger.com

Attorneys for Plaintiffs
THREE-SEVEN ENTERTAINMENT, INC., and
ADRIEN BRODY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THREE-SEVEN ENTERTAINMENT, INC., a Nevada corporation; and ADRIEN BRODY, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> GIALLO PRODUCTIONS, LTD., a United Kingdom limited company; HANNIBAL PICTURES, INC., a California corporation; RICHARD RIONDA DEL CASTRO, an individual; RAFAEL PRIMORAC, an individual; MAYA ENTERTAINMENT GROUP, INC., a Delaware corporation; and DOES 1-10, inclusive, <br><br> Defendants. | CASE NO. CV 10-7705 DSF (CWx) <br> HON. DALE S. FISCHER <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> [Filed Concurrently With: Notice of Motion for Preliminary Injunction; Declarations of Adrien Brody, Jere Douglass and Evan N. Spiegel, in Support Thereof; Request for Judicial Notice; and [Proposed] Preliminary Injunction] <br><br> DATE:       November 22, 2010 <br> TIME:       1:30 p.m. <br> PLACE:     Courtroom 840 <br>                  Royal Building <br>                  Hon. Dale S. Fischer <br><br> Disc. Cut-Off:      N/A <br> Motion Cut-Off:   N/A <br> Trial Date:            N/A |

/ / /

# **<u>TABLE OF CONTENTS</u>**

Page No.

MEMORANDUM OF POINTS & AUTHORITIES . . . . . . . . . . . . . . . . . 1

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   The Acting Services Agreement and Initial Breach. . . . . . . . . 3

    B.   The Deferral Payment Agreement. . . . . . . . . . . . . . . . . . 4

    C.   Brody Exercised the Right To
        Withhold Consent to Use His Likeness. . . . . . . . . . . . . . . . 5

    D.   Defendants' Continued Unauthorized Efforts
        To Exploit the Picture. . . . . . . . . . . . . . . . . . . . . . . 6

    E.   Producer Defendants Conspired To Defraud Brody. . . . . . . . . 9

    F.   GPL and Hannibal Have Also Been Sued by Their Financier. . . . 9

III.  PLAINTIFFS   ARE   ENTITLED   TO   A   PRELIMINARY
     INJUNCTION TO PROTECT BRODY'S RIGHTS UNDER THE
     DPA AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.   Plaintiffs Have a Strong Probability of Success on the
        Merits of Their Claims. . . . . . . . . . . . . . . . . . . . . . . 11

        1.   Producer Defendants Breached Their Contract with Brody. 11

        2.   Defendants Have Violated Brody's Right of Publicity.. . . . 13

    B.   Plaintiffs Have No Adequate Remedy at Law and Will Suffer
        Irreparable Harm Absent the Issuance of an Injunction. . . . . . . 15

        1.   The Law Provides That Specific Performance of a
            Contractual Obligation May Be Compelled . . . . . . . . . . . 16

        2.   Defendants' Anticipated Opposition Argument that
            Plaintiffs' Purportedly Waived the Right To Seek
            Injunctive Relief Is Without Merit and Is Fatally Flawed.. . 19

    C.   The Balance of Hardships Tips Overwhelmingly
        in Plaintiffs' Favor. . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.   THE COURT HAS THE AUTHORITY TO RECALL THE
     PICTURE CONTAINING BRODY'S LIKENESS PENDING TRIAL. . 23

V.    PLAINTIFFS SHOULD BE REQUIRED TO POST NO, OR ONLY
     A MINIMAL, BOND IN LIGHT OF DEFENDANTS' CONDUCT .. . 24

VI.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

# TABLE OF AUTHORITIES

2

## FEDERAL CASES                    Page No.

3

4
Dominguez v. Schwarzenegger
596 F.3d 1087, 1092 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . 10

5

6
Caterpillar v. Nationwide Equip.,
877 F. Supp. 611, 617 (M.D. Fla. 1994).. . . . . . . . . . . . . . . . . . . . . . 22

7

8
Clairol, Inc. v. Shapiro,
158 U.S.P.Q. 427, 427 (C.D. Cal. 1968). . . . . . . . . . . . . . . . . . . . . . 23

9

10
Ferguson v. Tabah,
288 F.2d 665, 675 (2d Cir. 1961). . . . . . . . . . . . . . . . . . . . . . . . . . 24

11
GoTo.com, Inc. v. Walt Disney Co.,
202 F.3d 1199 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

12

13
Iconix, Inc. v. Tokuda,
457 F. Supp. 2d 969, 975 (N.D. Cal. 2006).. . . . . . . . . . . . . . . . . 10, 22

14

15
Int'l Controls Corp. v. Vesco,
490 F.2d 1334, 1356 (2d Cir 1974). . . . . . . . . . . . . . . . . . . . . . . . . 24

16

17
Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,
4 F.3d 819, 822 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18

19
Michaels v. Internet Entm't Group, Inc.,
5 F. Supp. 2d 823, 830 (C.D. Cal. 1998). . . . . . . . . . . . . . . . . . . 10, 22

20
Ocean Garden, Inc. v. Marktrade Co.,
953 F.2d 500, 508 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . 23

21

22
Topanga Press, Inc. v. City of Los Angeles,
989 F.2d 1524, 1528 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . 10

23

24
Winter v. Natural Res. Def. Council,
129 S.Ct. 365, 374-76 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

25

## STATE CASES                    Page No.

26

27
Associated Cal. Loggers, Inc. v. Kinder,
79 Cal. App. 3d 34, 144 Cal. Rptr. 786 (1978) . . . . . . . . . . . . . . . . . 19

28

*(Continued On Next Page)*

# TABLE OF AUTHORITIES (CONTINUED)

## STATE CASES (CONT.)                                    Page No.

Brinkley v. Casablancas,
80 A.D.2d 428, 438 N.Y.S.2d 1004 (1981). . . . . . . . . . . . . . . . . . . 14

Eastwood v. Superior Court,
149 Cal.App.3d 409, 417, 198 Cal. Rptr. 342 (1983). . . . . . . . . . . . . . . 13

Ellis v. Am. Fed. of Labor.,
48 Cal. App. 2d 440, 446, 120 P. 2d 79, 81 (1941). . . . . . . . . . . . . . . 11

Fleet v. CBS, Inc.,
50 Cal.App.4th 1911, 1918, 58 Cal.Rptr. 2d 645 (1996). . . . . . . . . . . . . 13

IT Corp. v. Cnty. of Imperial,
35 Cal. 3d 63, 73, 196 Cal. Rptr. 715 (1983). . . . . . . . . . . . . . . . . 10

Leavy v. Cooney,
214 Cal. App. 2d 496, 29 Cal. Rptr. 580 (1963). . . . . . . . . . . . 17, 18, 19

Lugosi v. Universal Pictures,
25 Cal. 3d 813, 818–19, 160 Cal. Rptr. 323 (1979). . . . . . . . . . . . 13, 14

Montana v. San Jose Mercury News, Inc.,
34 Cal. App. 4th 790, 793, 40 Cal. Rptr. 2d 639 (1995). . . . . . . . . . . . 13

Robbins v. Superior Court,
38 Cal. 3d 199, 205, 211 Cal. Rptr. 398 (1985). . . . . . . . . . . . . . . . 11

Tamarind Lithography Workshop, Inc. v. Sanders,
143 Cal. App. 3d 571, 193 Cal. Rptr. 409 (1983). . . . . . . . . . . . . 17, 18

## FEDERAL STATUTES / RULES

Fed. R.Civ.Proc., Rule 65(c). . . . . . . . . . . . . . . . . . . . . . . . 24

## STATE STATUTES / RULES

California Civil Code, Section 3384. . . . . . . . . . . . . . . . . . . . . 16

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Defendants had a bargained-for choice, either pay Adrien Brody in full for his acting services, or they could not use his likeness.  Since he was not paid, Brody exercised his express bargained-for right to withhold consent to use of his likeness.  Nevertheless, Defendants are, without consent, using Brody's likeness.

Plaintiffs Three-Seven Entertainment, Inc. ("TSE") and Adrien Brody ("Brody"), an Academy Award winning actor (collectively, "Plaintiffs"), seek a preliminary and permanent injunction to prevent Defendants Giallo Productions, Ltd., ("GPL"), Hannibal Pictures, Inc. ("Hannibal"), Richard Rionda Del Castro ("Rionda"), Rafael Primorac ("Primorac"), Maya Entertainment Group, Inc. ("Maya"), and Does 1–10 ("Does") (collectively, "Defendants"), and each of them, from disseminating, publishing, distributing, exhibiting, marketing, promoting, selling and/or otherwise making use of or exploiting or making available, the motion picture entitled *Giallo* (the "Picture") with or containing the unauthorized and non-consensual use of Brody's image and likeness.[1]

In 2008, Brody agreed to star in the Picture in exchange for a guaranteed fixed sum of money due on a "pay-or-play" basis.  Under the terms of Brody's Acting Services Agreement ("ASA"), the producers of the Picture were required to place the full amount of Brody's acting services fee into escrow prior to the commencement of principal photography on the Picture.  The fees were then to be paid-out in relatively equal weekly installments over the course of principal filming.  Upon the producers' breach of the ASA by either (i) failing to place Brody's acting services fee into escrow; or (ii) failing to timely pay Brody his weekly fee, Brody would have the absolute right to cease rendering services and walk off the Picture.

---

[1]  Although the Court previously did not find "sufficient basis for proceeding on an emergency, ex parte basis," the Court did recognize in its 9/15/10 Order that "this matter may be appropriate for preliminary injunctive relief."  [Dkt. No. 8]

After completing approximately one week of principal photography on the Picture, Brody learned that the production was grossly underfunded and that the producers (i) failed to place Brody's acting services fee into escrow; and (ii) would be unable to continue making timely payment to Brody to satisfy their obligations under the terms of the ASA. At that point, Brody had the right to walk off the set and sue the producers for the unpaid portion of his "pay-or-play" fixed compensation. However, at the urging of defendants Rionda and Primorac, Brody agreed to a new, superseding contract (the "Deferral Payment Agreement" or "DPA") whereby Brody agreed to continue to act and defer $640,000 of his fixed compensation (the "Brody Holdback") *specifically in exchange for the right to withhold his consent to the use of his likeness in the Picture if he was not paid the full Brody Holdback*. Under the DPA, defendants are not necessarily required to ever pay Brody the Brody Holdback, but the parties' bargain is that if Brody did not get paid in full for his acting services, he had the right to withhold consent to the use of his likeness in the Picture.

To date, Brody has not been paid the Brody Holdback, and despite Brody's exercise of his express right to withhold consent to the use of his likeness in the Picture, Defendants have begun the first steps, of a dozen or more step multi-year plan, to release, distribute and sell the Picture containing Brody's likeness in direct violation of the DPA. Since Brody does not necessarily have the right to be paid, he has no available remedy at law other than to enforce specific performance of the DPA to prevent the unauthorized use of his likeness. As such, Brody has been and will continue to be irreparably harmed by the unauthorized use of his likeness in the Picture absent the issuance of a preliminary and permanent injunction against Defendants preventing the distribution and exploitation of the Picture until such time, if ever, Brody is paid the Brody Holdback. Defendants are not precluded from removing Brody's likeness from the Picture and exploiting a version of the Picture that does not contain his likeness. Rather, ***Plaintiffs only seek to prevent***

1 *the distribution and exploitation of the Picture containing the unauthorized use*

2 *of Brody's likeness so long as Brody has not been paid the full Brody Holdback*.

3       Brody's right to enforce this contractual provision is even more critical in

4 light of the fact that the Picture's financier, Steelbridge Fianance, LLC, recently

5 obtained a Right To Attach Order against defendant Hannibal in the amount of

6 $1,623,431. Any future monies that Hannibal and GPL might earn from the Picture

7 are likely subject to attachment, thus leaving no money available to pay Brody the

8 Brody Holdback. Injunctive relief preventing further distribution of the Picture is

9 Plaintiffs' sole remaining remedy, and the remedy bargained for in the DPA.

10                                    **II.**

11                          **FACTUAL BACKGROUND**

12 **A.    The Acting Services Agreement and Initial Breach**

13       In 2008, Plaintiffs entered into an Acting Services Agreement ("ASA") with

14 defendant GPL. (Brody Decl. ¶4; Douglass Decl. ¶5). The ASA provided, among

15 other things, that Brody would render his acting services as the star of the Picture

16 in exchange for certain guaranteed fixed compensation payable in equal weekly

17 installments over the course of principal photography of the Picture, plus certain

18 other contingent compensation. (Brody Decl., Ex. B ¶¶4–5). Under the terms of

19 the ASA, the producers of the Picture, GPL, Hannibal, Rionda and Primorac

20 ("Producer Defendants"), were required to escrow the full amount of Brody's

21 guaranteed fixed compensation: with 20% within 48 hours of executing the ASA

22 and the remaining 80% at least one week prior to Brody's departure for Italy, the

23 location of filming. (Brody Decl, ¶5, Ex. B ¶4; Douglass Decl. ¶5).

24       In early May 2008, unaware that fixed compensation had not been placed into

25 escrow -- the escrow agent was Producer Defendants's own attorney, who failed to

26 disclose the breach -- Brody traveled to Italy to begin filming the Picture. After

27 receiving his first weekly installment payment for the week ending May 16, 2008,

28 Brody and his representatives learned that the production, for various reasons, was

1  underfunded, that the Brody fixed compensation had not been placed into escrow as

2  required, and that there was not enough money in the production account to satisfy

3  Producer Defendants' financial obligations, including their obligation to pay Brody

4  his guaranteed fixed compensation. (Brody Decl. ¶7; Douglass Decl. ¶7).

5       Under the express terms of Brody's guaranteed "pay-or-play" contract, Brody

6  had the absolute right to cease rendering acting services if Producer Defendants

7  breached the ASA by either (i) failing to escrow Brody's fixed compensation; or (ii)

8  failing to timely pay Brody his guaranteed weekly installment. (Brody Decl. ¶6,

9  Ex. B ¶4; Douglass Decl. ¶6).  Brody had the contractual right to walk off the set

10  of the Picture and sue Producer Defendants for the outstanding portion of his

11  guaranteed "pay-or-play" fixed compensation. (Brody Decl. ¶8).  However, in a

12  desperate attempt to keep Brody working on the Picture and avoid a shut-down,

13  defendants Rionda and Primorac falsely represented to Brody and Brody's manager

14  that Producer Defendants had secured the sale of the Italian distribution rights to the

15  Picture, fetching more than $2,000,000. (Brody Decl. ¶8; Douglass Decl. ¶8).

16  These proceeds, according to Rionda and Primorac, would enable Producer

17  Defendants to satisfy their financial obligations on the Picture, including to Brody.

18       Their pleas to Brody worked, and on May 28, 2008, Brody signed the

19  Deferral Payment Agreement, which superseded the ASA, and provided that Brody

20  would temporarily defer payment of $640,000 (the "Brody Holdback") due under

21  his guaranteed "pay-or-play" contract. (Brody Decl. ¶9; Douglass Decl. ¶8).  As

22  the consideration for new agreement, Producer Defendants granted Brody the

23  express new right to ***withhold consent to the use of his likeness*** in the Picture if he

24  was not paid the full Brody Holdback. (Brody Decl. ¶8; Douglass Decl. ¶8).

25  **B.**    **The Deferral Payment Agreement**

26       Under the DPA, Brody was entitled to receive certain additional installment

27  payments by May 30, 2008, but he agreed to defer $640,000 of his guaranteed fixed

28  compensation until a deposit of funds, in the amount of $2,006,000 (representing

1  "the value of the Italian Letter of Credit" pursuant to the sale of the Italian

2  distribution rights to the Picture) was paid into the production account.  (Brody

3  Decl. ¶9, Ex. A ¶2).  In exchange for giving up his right to immediately cease

4  rendering acting services and suing Production Defendants for all monies

5  outstanding, and to guarantee that Brody would be paid or his valuable likeness and

6  services would not be used, Brody negotiated for the following express right:

7  "***Brody will have the right to withhold consent to the use of his likeness in the***

8  ***[P]icture until the Brody Holdback ($640,000) is paid.***" (Brody Decl. ¶¶9–10, Ex.

9  A ¶2 (emphasis added); Douglass Decl. ¶8).  Producer Defendants are not

10  necessarily required to pay the Brody Holdback -- they had a specific bargained-for

11  choice:  either pay Brody the holdback or stop using Brody's likeness in the Picture.

12      Despite Defendants' argument that the DPA did not alter Brody's rights or

13  remedies under the ASA, the plain terms of the DPA indicate otherwise.

14  Paragraph 4 of the DPA provides: "This letter agreement . . . represents the entire

15  agreement of the parties with respect to the subject matter set forth herein [*i.e.*, the

16  Brody Holdback and the right to withhold consent to use of Brody's likeness and

17  remedies thereof], ***supersedes all prior written and/or oral agreements with regard***

18  ***to such subject matter***, and may not be amended except by a written instrument

19  executed by all parties hereto . . . ." (Brody Decl. Ex. A ¶4) (emphasis added).

20  Based on Producer Defendants' assurances and various inducements, including

21  Brody's negotiated express right to withhold his consent to the use of his likeness

22  in the Picture if he was not paid the full amount of the Brody Holdback, Brody

23  agreed to resume work on the Picture and, in fact, completed photography on the

24  Picture as scheduled believing (perhaps naively) that Producer Defendants would,

25  this time, honor their obligations. (Brody Decl. ¶11; Douglass Decl. ¶9).

26  **C.    Brody Exercised the Right To Withhold Consent To Use His Likeness**

27      Throughout the remainder of the time Brody worked on the Picture after he

28  entered into the DPA and for well over a year after Brody completed photography

on the Picture, Brody's manager repeatedly asked Rionda about the status of the Brody Holdback payment. (Douglass Decl. ¶10).  Time after time, Rionda told Brody's manager that the monies from the sale of the Italian distribution rights to the Picture would be deposited into the production account allowing Producer Defendants to pay Brody "soon." (Douglass Decl. ¶11).  Despite Rionda and Primorac's repeated assurances that Brody would be paid the full amount of the Brody Holdback "soon," Brody never received the Brody Holdback payment of $640,000. (Brody Decl. ¶ 12; Douglass Decl. ¶¶ 10–11).

As a result of Producer Defendants' failure to uphold their end of the bargain and pay Brody the full amount of the Brody Holdback in exchange for use of Brody's likeness, Brody's manager notified Rionda that Producer Defendants were leaving Brody no other option but to exercise his right under the DPA to withhold consent to the use of his likeness in the Picture until such time as he was paid the full Brody Holdback. (Brody Decl. ¶13; Douglass Decl. ¶12).  Although Producer Defendants were on notice that Brody would exercise that right if he was not paid, they continued to seek to exhibit, promote and market the Picture for their benefit in various territories around the world.  Accordingly, Plaintiffs were forced to retain the undersigned counsel to assist them in enforcing Brody's rights under the DPA. (Brody Decl. ¶¶12, 13; Douglass Decl. ¶¶13, 14; Spiegel Decl. ¶3).

**D.** **Defendants' Continued Unauthorized Efforts To Exploit the Picture**

After it became clear that Producer Defendants would not pay Brody the monies of the Brody Holdback nor would they honor the terms of the DPA, the undersigned counsel wrote to Producer Defendants on March 15, 2010, stating that "as a result of [Producer Defendants'] material breach of our clients' agreements . . . [they] had no right to use [Mr. Brody's] likeness in the Picture," and that any use of Brody's likeness was, among other violations, a breach of contract and a violation of Brody's right of publicity. (Speigel Decl. ¶5, Ex. A).  The March 15th Letter stated, among other things, that ***Brody was exercising the right, pursuant to***

1  *the DPA, to withhold consent to the use of his likeness in the Picture until he was*

2  *paid the full Brody Holdback amount*. (Spiegel Decl. ¶ 5, Ex. A).

3      Because counsel for Producer Defendants failed to adequately respond to

4  Plaintiffs' March 15th Letter (*see* Spiegel Decl. ¶6 , Ex. B), Plaintiffs counsel again

5  informed Producer Defendants in writing on April 2, 2010 that Producer Defendants

6  "*may not use [Brody's] likeness in the Picture until such time as the Brody*

7  *Holdback is paid*." (Id. ¶7, Ex. C).   Producer Defendants apparently ignored

8  Plaintiffs' demands because in mid-May 2010, Producer Defendants attended the

9  Cannes Film Festival to exhibit the Picture and seek to sell the distribution rights to

10  it. (Brody Decl. ¶12; Spiegel Decl. ¶10).   As a result of Producer Defendants'

11  actions, Plaintiffs' counsel again wrote to Producer Defendants, and, also, sent

12  cease and desist letters to all known distributors of the Picture, informing the

13  recipients that "any further actions by [them] to attempt to and/or distribute the

14  Picture shall constitute a misappropriation of [Brody's] right of publicity, by the

15  unauthorized use of his likeness …, and an intentional interference with our Clients'

16  contract with [GPL] relating to the Picture." (Spiegel Decl. ¶¶ 11–12, Exs. F–G).

17      Producer Defendants stubbornly dug in their heels and went so far as to write

18  to Brody's talent agent, Andrew Ruf, on May 20, 2010 stating that *"Brody will not*

19  *get a dime out of us*," and threatening that if "Brody causes problems with

20  distribution," Producer Defendants would sue him. (Spiegel Decl. ¶13, Ex. H)

21  (emphasis added).   Shortly thereafter, Plaintiffs learned that certain distribution

22  companies, including defendant Maya, continued to promote and exhibit the Picture,

23  specifically in connection with the Maya Indie Film Series (a traveling multi-city

24  film festival in the United States), all without Plaintiffs' authorization and in

25  violation of Brody's rights under the DPA. (Brody Decl. ¶15; Spiegel Decl. ¶15).

26      After sending additional cease and desist letters to Defendants in July 2010

27  (*see* Spiegel Decl. ¶¶16, 20, Exs. J, M), *Plaintiffs learned for the first time by*

28  *discovering an online blog in August 2010* that defendant Maya planned to release

1   and sell the DVD of the Picture beginning on October 19, 2010. (Brody Decl. ¶15;
2   Douglass Decl. ¶13; Spiegel Decl. ¶21, Ex. N).   In response to learning about
3   Defendants' planned DVD release of the Picture, the undersigned counsel sent a
4   cease and desist letter to Maya on August 6, 2010 stating:

5               You are already on notice of our demands that you immediately
6               cease and desist in your efforts to exploit and/or license and/or
7               distribute and/or exhibit the [Picture], whether theatrically or by
8               DVD release, or otherwise . . .   Any further actions by you to
9               attempt to and/or distribute the Picture shall constitute a blatant
10              and knowing misappropriation of [Brody's] right of publicity, by
11              the unauthorized use of his likeness . . . .

12  (Spiegel Decl. ¶ 22, Ex. O).

13      In spite of Plaintiffs' repeated, ongoing and active efforts to enforce their
14  rights under the DPA and halt distribution and sale of the Picture until Brody is paid
15  the full amount of the Brody Holdback, by mid-September 2010, Defendants
16  apparently had ramped up their efforts to widely release the Picture on DVD.
17  (Spiegel Decl. ¶23).   On September 3, 2010, Maya registered the domain name
18  <GialloTheMovie.com> and thereafter began to operate the "official" website for
19  the Picture, <http://giallothemove.com>. (Id.,¶24, Ex. Q).   Maya's own company
20  website, <maya-entertainment.com>, includes URL links to the Picture's official
21  website and displays advertisements for the Picture featuring Brody's image and
22  likeness in violation of the DPA. (Id., ¶24, Ex. P).   Trailers for the Picture, which
23  include Brody's image and likeness also are running on websites owned and
24  operated by Maya to promote DVD sales of the Picture. (Id., ¶27, Ex. R).

25      Upon learning of Defendants' increased efforts to promote and distribute the
26  Picture, Plaintiffs' counsel telephoned counsel for certain Producer Defendants on
27  September 15, 2010 in a final attempt to resolve the parties' dispute without the
28  need for Court intervention. (Spiegel Decl. ¶25). Instead of seeking to settle the

1   matter, opposing counsel responded, "*take your shot . . . go ahead and sue*
2   *everyone . . . go and do it*," and he indicated that Producer Defendants had no
3   money. (Spiegel Decl. ¶ 25). Defendants continued their efforts to widely distribute
4   and sell the DVD beginning on October 19, 2010, including by making the DVD
5   available for sale on the website Amazon.com, and, without Brody's authorization,
6   released the DVD of the Picture on October 19. *The DVD release, and any video*
7   *rental, is only one step of a dozen or so multi-step intended future exploitation,*
8   *with future planned premium pay-cable, on-demand, cable and television*
9   *exploitation*, among other distribution. (Spiegel Decl. ¶26–29, Exs. P, R–S).

10   **E.   Producer Defendants Conspired To Defraud Brody**

11          Plaintiffs have learned and now do not believe that Producer Defendants were
12   ever able to sell the Italian distribution rights to the Picture for anywhere close to
13   $2,000,000, and that they knew prior to inducing Brody to continue rendering acting
14   services on the Picture and agreeing to the Brody Holdback, that Producer
15   Defendants could not sell the Italian distribution rights for more than a few hundred
16   thousand dollars at most -- not nearly enough to satisfy their financial obligations.
17   Consequently, Plaintiffs do not believe that Producer Defendants ever intended to
18   pay Brody any portion of the monies they asked Brody to defer based on their phony
19   assurances. (Brody Decl. ¶16; Spiegel Decl. ¶30).   It is now understood that
20   defendants Rionda and Primorac admitted that they conspired with Italian film
21   producer Claudio Argento to inflate the value of the Italian distribution rights in
22   order to induce Brody to defer part of his compensation. (Spiegel Decl. ¶30-31).

23   **F.   GPL and Hannibal Have also Been Sued by Their Financier**

24          On or about November 20, 2009, Steelbridge Finance, LLC ("Steelbridge"),
25   the financier of the Picture, filed a lawsuit against defendants GPL and Hannibal,
26   LASC, Case No. BC 426636. (Spiegel Decl. ¶31).   Steelbridge alleges, among
27   other things, that GPL and Hannibal breached their 2008 Finance Agreement by
28   failing to repay a $1,300,000 loan from Steelbridge to finance the Picture. (Spiegel

1   Decl. ¶31).  As a result of GPL and Hannibal's breach with respect to Steelbridge,
2   on or about February 1, 2010, the LASC issued a Right To Attach Order and Order
3   for Issuance of Writ of Attachment against Hannibal, later amended and reduced in
4   part on April 22, 2010.  Steelbridge has a Writ of Attachment against Hannibal in
5   the amount of $1,623,431. (Spiegel Decl. ¶32-33, Exs. T-U). Any monies Hannibal
6   may have already earned or might earn in the future from the continued distribution
7   and sale of the Picture is subject to attachment by Steelbridge. (Spiegel Decl.  ¶34).

8                                                   **III.**

9   **PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION TO**
10                  **PROTECT BRODY'S RIGHTS UNDER THE DPA**

11           A party seeking a preliminary injunction must show either (1) a combination
12   of probable success on the merits and that he is likely to suffer irreparable harm if
13   relief is not granted; or (2) the existence of serious questions governing the merits
14   and that the balance of hardships tips in its favor. *Winter v. Natural Res. Def.*
15   *Council,* 129 S.Ct. 365, 374-76 (2008); *Dominguez v. Schwarzenegger*, 596 F.3d
16   1087, 1092 (9th Cir. 2010) (applying the *Winter* standard and affirming district
17   court's grant of preliminary injunction).  These standards "are not separate tests but
18   the outer reaches of a single continuum." *Michaels v. Internet Entm't Group, Inc.*,
19   5 F. Supp. 2d 823, 830 (C.D. Cal. 1998) (enjoining uses of plaintiffs' name to
20   promote, market and advertise videotape, and enjoining distribution of videotape
21   violating plaintiffs' privacy rights) (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A.,*
22   *Inc.*, 4 F.3d 819, 822 (9th Cir. 1993)).  "Under the sliding scale theory, a party
23   seeking an injunction 'need not demonstrate that he will succeed on the merits, but
24   must show that his cause presents serious questions of law worthy of litigation.'"
25   *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 975 (N.D. Cal. 2006) (quoting
26   *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993)).

27           The goal of a preliminary injunction is to minimize the harm which an
28   erroneous interim decision may cause. *IT Corp. v. Cnty. of Imperial*, 35 Cal. 3d

63, 73, 196 Cal. Rptr. 715 (1983).  "If the denial of an injunction would result in great harm to the plaintiff, and the defendants would suffer little harm if it were granted, then it is an abuse of discretion to fail to grant the preliminary injunction." *Robbins v. Superior Court*, 38 Cal. 3d 199, 205, 211 Cal. Rptr. 398 (1985); *Ellis v. Am. Fed. of Labor.*, 48 Cal. App. 2d 440, 446, 120 P. 2d 79, 81 (1941).

Application of these principles to the present facts establishes that preliminary injunctive relief is necessary and appropriate in light of Brody's probable success on the merits and the irreparable injury to him if relief is not granted, thereby tipping the balance of hardships strongly in Brody's favor.

**A.      Plaintiffs Have a Strong Probability of Success on the Merits of Their Claims**

Courts have consistently granted injunctive relief in cases, such as this one, where there has been a breach of contract in which specific performance of a contractual obligation is compelled in order to prevent the misappropriation of an individual's name or likeness.  As set forth more fully below, Plaintiffs have a strong likelihood of succeeding on the merits of their claims.

**1.      Producer Defendants Breached Their Contract with Brody**

Producer Defendants have materially breached the DPA entered into with Brody by (i) failing to pay Brody the Brody Holdback; and, nonetheless (ii) refusing to honor Brody's express and absolute right to withhold  consent to use his likeness in the Picture until paid.  In no uncertain terms, the DPA provides:  "***Brody will have the right to withold consent to the use of his likeness in the [P]icture until the Brody Holdback ($640,000) is paid***." (Brody Decl. Ex. A ¶2 (emphasis added).

Producer Defendants do not dispute that Brody was never paid the $640,000 Brody Holdback.  Rather, Producer Defendants argue that Brody is not entitled to be paid unless Producer Defendants obtain money from the sale of the Italian distribution rights to the Picture. (Spiegel Decl. Ex. B).  Regardless of whether that is a correct interpretation of the DPA (it is not), and regardless of whether Producer

Defendants are obligated to pay the Brody Holdback from proceeds from the Picture in *any* territory, ***Brody never received the $640,000 Brody Holdback***, and Producer Defendants do not contend otherwise. (Brody Decl. ¶12; Douglass Decl. ¶10). Accordingly, Brody exercised his right pursuant to Paragraph 2 of the DPA to withhold consent to the use of his likeness in the Picture until such time that he is paid the full Brody Holdback. (Brody Decl. ¶¶13–14; Douglass Decl. ¶¶12–14; Spiegel Decl. ¶¶5, 7, 11–12, 14, 16, 20, 22, Exs. A, C, F–G, I–J, M, O).

For the purposes of this Motion, Producer Defendants' breach is not that they failed to pay Brody the full amount of the Brody Holdback.  Instead, their breach is that Producer Defendants failed to honor the terms of the contract (*i.e.*, the DPA) that they negotiated with Brody in order to convince Brody to remain on set and continue rendering acting services on the Picture.  After Brody exercised his right to withhold consent to the use of his likeness in the Picture, Producer Defendants were obligated to respect that right and either (i) pay Brody the full amount of the Brody Holdback; or (ii) remove Brody's likeness from the Picture if they still intended to release, distribute, exploit and/or sell the Picture.  Producer Defendants did not do either.  Instead, they ignored Brody's demands, and with defendant Maya, continued with the production, release, distribution, exploitation and sale of the Picture containing Brody's likeness without Brody's authorization.

Producer Defendants claim that they have "no money" with which to pay Brody the Brody Holdback. (Spiegel Decl. ¶25).  If that is the case, Brody has no remedy other than to enforce his right under the DPA to withhold consent to the use of his likeness in the Picture.  Because Defendants have ignored Brody's repeated demands to cease distribution and sale of the Picture containing his likeness, and have repudiated their obligations under the DPA and indicated that they have no intention of honoring Plaintiffs' contractual right to withhold consent to use Brody's likeness in the Picture until he is paid in full, Plaintiffs seek injunctive relief from this Court to prevent Defendants from further harming Plaintiffs by using Brody's

image and likeness without Brody's consent.  Plaintiffs merely seek what they are entitled to under the contract they negotiated with Producer Defendants -- *i.e.*, no use of Brody's likeness in the Picture until such time as Brody is paid in full.

Based on the overwhelming evidence of Defendants' repeated breaches of contract and ongoing refusal to honor Plaintiffs' contractual consent rights, Plaintiffs have more than met their burden of establishing a reasonable probability of prevailing on the merits of their breach of contract claim.  Plaintiffs have certainly presented sufficient evidence to warrant the issuance of a preliminary injunction.

### 2.   Defendants Have Violated Brody's Right of Publicity

Both common law and the state legislature have recognized that a person's name or likeness is a valuable property interest.  *Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 818–19, 160 Cal. Rptr. 323 (1979) (superseded by statute) (stating "[o]nce protected by the law, the right of a person to the use of his name and likeness is a right of value upon which Plaintiff can capitalize by selling licenses") (quoting William L. Prosser, *Law of Torts* 807 (4th ed. 1971)).

The tort of violation of the common law right of publicity is proven when a plaintiff establishes: (1) the defendant's used the plaintiff's identity; (2) the defendant appropriated the plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury. *Fleet v. CBS, Inc.*, 50 Cal.App.4th 1911, 1918, 58 Cal.Rptr.2d 645 (1996); *see also Montana v. San Jose Mercury News, Inc.*, 34 Cal.App.4th 790, 793, 40 Cal.Rptr.2d 639 (1995); *Eastwood v. Superior Crt*, 149 Cal.App.3d 409, 417, 198 Cal.Rptr. 342 (1983).  The right of publicity in the name and likeness of a celebrity is a valuable property right, entitled to the same type of protection afforded other property rights, and statutory and common rights of publicity may be protected by injunctive relief. *Lugosi*, 25 Cal.3d at 818–19; *Eastwood*, 149 Cal. App.3d at 416.

In *Lugosi*, the heirs of Bella Lugosi sought to recover profits made by Universal Pictures for use of Lugosi's likeness in violation of his right of publicity.

1    The court held, "Lugosi in his lifetime had a right to create in his name and/or

2    likeness . . . a right of value, which could have been transmuted into things of value

3    or Lugosi could, if he elected not to exercise such right, protect it from invasion by

4    others by a suit for injunction and/or damages." 25 Cal.3d at 819.

5        The facts of this case weigh heavily in Brody's favor. The first, second and

6    third elements, use of Brody's likeness without consent for commercial advantage,

7    are satisfied by overwhelming evidence that Defendants did and continue to use

8    Brody's likeness in the exploitation, sale and distribution of the Picture despite the

9    fact that Brody contractually withheld consent to the use of his likeness in the

10   Picture. (Brody Decl. ¶¶12–14, Ex. A ¶2; Douglass Decl. ¶¶ 4, 10–15; Spiegel

11   Decl. ¶¶ 5, 7, 11–12, 14, 16, 20, 22, 24-29, Exs. A, C, F–G, I–J, M, O, P, S).

12   And, as set forth above, on October 19, 2010, Defendants stepped up their scheme

13   to unlawfully exploit and sell the Picture containing the unauthorized use of Brody's

14   image and likeness by widely releasing for sale the DVD of the Picture.

15       Brody did not consent to the commercial exploitation or release of the Picture

16   containing his likeness absent full payment of his fixed compensation. It is well

17   established that simply because someone consents to appear in a film or consents to

18   the use of his image for one purpose, does not mean that he has consented to the

19   sale or exploitation of that film without condition. *See, e.g., Brinkley v.*

20   *Casablancas*, 80 A.D.2d 428, 438 N.Y.S.2d 1004 (1981) (issuing permanent

21   injunction regarding sale of poster for a use beyond consent).

22       Because Defendants clearly have violated Brody's right of publicity by

23   exploiting, distributing and selling the Picture containing Brody's likeness even

24   though Brody withheld his consent to do so, Plaintiffs have demonstrated that they

25   are likely to succeed on the merits of this claim at trial. Accordingly, Plaintiffs

26   have met their burden under the test for a preliminary injunction.

27   / / /

28   / / /

**B.**   <u>Plaintiffs Have No Adequate Remedy at Law and Will Suffer Irreparable Harm Absent the Issuance of an Injunction</u>

The sole material consideration for Brody's agreement to temporarily defer $640,000 of his fixed compensation provided for by the ASA and continue rendering acting services on the Picture, and the only way he could assure he would ever be paid, was the right he was granted to withhold consent to the use of his likeness in the Picture, *i.e.*, prevent the release and exploitation of the Picture containing Brody's likeness, unless he received payment of the rest of his compensation in the amount of the Brody Holdback. (Brody Decl. ¶10; Douglass Decl. ¶8).

There is a genuine risk that if Defendants are permitted to continue promoting, distributing and selling the Picture containing the unauthorized use of Brody's likeness without paying Brody the full amount of the Brody Holdback, Defendants will never pay Brody. *See, e.g.*, Spiegel Decl. ¶13, Ex. H (Rionda stated, "<u>Brody will not get a dime</u> out of us."); Spiegel Decl. ¶25 (Producer Defendants' counsel stated, "take your shot . . . go ahead and sue everyone … go and do it," and indicated that Producer Defendants had no money.).   This is especially the case since Steelbridge has sued the Producer Defendants and obtained a Writ of Attachment in the amount of $1,623,431, allowing Steelbridge to attach, among other assets, any future revenue Hannibal might earn from the continued exploitation, distribution and sale of the Picture. (Spiegel Decl. ¶¶31–34, Exs. T–U).   It was precisely for this reason – to provide Brody some insurance in case Producer Defendants failed to pay him the full amount of the Brody Holdback after continuing to render services – that Brody specifically negotiated for the right to withhold consent to the use of his likeness in the Picture. (Spiegel Decl. ¶34).

In addition, the unauthorized use and/or uncompensated use of Brody's likeness or performance diminishes the value of Brody's brand, and consequently, damages Brody's professional reputation and the monetary value he can command in the future for his services and use of his name and likeness. (Douglass Decl. ¶4).

1   The continued distribution and sale of the Picture, currently on DVD and, in the

2   future via premium cable, on demand, cable, or other media, has irreparably

3   harmed Brody, who was stripped of his bargained for consideration under the DPA.

4   Despite having never been paid the $640,000 Brody Holdback, to date, Brody has

5   not been able to effectively enforce his right to withhold consent to the use of his

6   likeness in the Picture.  Any continued distribution and sale of the Picture absent

7   Brody's consent will further irreparably harm Brody. (Douglass Decl. ¶15).

8       It was precisely because of these risks that Brody bargained for the express

9   material consideration and right in the DPA -- after the producers breached their

10  agreement to initially place the guaranteed compensation into escrow prior to Brody

11  rendering services -- to "withhold consent to the use of his likeness in the picture

12  until the Brody Holdback ($640,000) is paid." (Brody Decl. ¶10, Ex. A ¶2;

13  Douglass Decl. ¶8).  Without these consent withholding rights, Brody never would

14  have agreed to enter into the DPA, defer $640,000 of his fixed compensation, and

15  give up the right to immediately demand payment under the ASA.  Unless Brody

16  were granted some additional consideration (such as the right to withhold consent

17  to the use of his likeness until he was paid in full), Brody never would have agreed

18  to continue rendering acting services once Producer Defendants breached the ASA

19  by failing to escrow and timely pay Brody's guaranteed fixed compensation.

20      **1.**    **The Law Provides That Specific Performance of a**

21              **Contractual Obligation May Be Compelled**

22      California Civil Code section 3384 provides that specific performance of a

23  contractual obligation may be compelled.  And California courts have also

24  consistently held that <u>injunctive relief is available to enjoin the release of a motion</u>

25  <u>picture in order to compel specific performance of a party's contractual rights</u> in

26  connection with the production and distribution of the picture.  By way of example,

27  a party may obtain injunctive relief restraining the release of a motion picture in

28  order to compel specific performance of the plaintiff's contractual right to screen

1   credit.  *See, e.g., Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal.App.

2   3d 571, 193 Cal. Rptr. 409 (1983).  Similarly, an injunction is available to enjoin

3   the theatrical release of a motion picture to enforce a party's contractual right to

4   limit the film's release to television only.  *Leavy v. Cooney*, 214 Cal. App. 2d 496,

5   29 Cal. Rptr. 580 (1963).  Here, however, as bargained for and agreed among the

6   parties in the DPA, Plaintiffs do not seek to enjoin the further distribution and sale

7   of the Picture entirely, only so far as the Picture contains and includes the

8   unauthorized use of Brody's likeness until such time as Brody is paid the full amount

9   of the Brody Holdback.  Defendants are not precluded from removing Brody's

10  likeness from the Picture and marketing, distributing or exploiting a version of the

11  Picture that does not contain or include Brody's likeness and uncompensated-for

12  services, nor are Defendants precluded from simply paying Brody the full amount

13  of the Brody Holdback and then doing as they please with the Picture.

14         Specific performance may be obtained where the plaintiff shows (1)

15  inadequacy of his legal remedy; (2) an underlying contract that is both reasonable

16  and supported by adequate consideration; (3) the existence of a mutuality of

17  remedies; (4) contractual terms which are sufficiently definite to enable the court to

18  know what it is to enforce; and (5) a substantial similarity of the requested

19  performance to that promised in the contract.  *Tamarind*, 143 Cal.App.3d at 575.

20  In *Tamarind*, Terry Sanders agreed to write, direct and produce a motion picture,

21  provided that he receive the following screen credit: "A Film by Terry Sanders."

22  Tamarind failed to comply with its express obligation to give Sanders screen credits

23  in prints of the film it distributed.  The appellate court determined that Sanders was

24  entitled to the remedy of specific performance to be given screen credit and

25  injunctive relief to prevent any *further* release of the prints absent Sanders' screen

26  credit.  The instant matter is analogous to *Tamarind*, where, like in *Tamarind*, the

27  producers failed to comply with their express obligation only to release and

28  distribute a film in the form consented to.

1        The *Tamarind* court engaged in a scholarly analysis of the reason injunctive
2   relief is available for breach of a promise to provide screen credits:

3        It is manifest that the legal remedies available to Sanders for harm
4        resulting from the <u>future exhibition</u> of the film are inadequate as a
5        matter of law.  The primary reasons are twofold: (1) that an accurate
6        assessment of damages would be far too difficult and require much
7        speculation, and (2) that any future exhibitions might be deemed to be
8        a continuous breach of contract and thereby create the danger of an
9        untold number of lawsuits. . . .

10   *Id.* at 575–76.  By its holding, the Court found that the release, coupled with any
11   anticipated future exhibition and exploitation, of a film in violation of the parties
12   express contractual rights would constitute irreparable injury.

13        In *Leavy*, a prosecutor who had prosecuted a high-profile criminal case agreed
14   to appear in and narrate a motion picture based on the case on the express condition
15   that the picture would not be released theatrically and would only be shown on
16   television, because he did not want to be perceived as profiting from the crime he
17   had prosecuted. 214 Cal. App. 2d at 499.  In breach of the agreement not to
18   theatrically release the picture, the defendant exhibited the film in approximately
19   500–750 theaters over plaintiff's protests.  In the ensuing lawsuit, the court awarded
20   damages to plaintiff for defendant's breach of the agreement, and issued a
21   <u>permanent injunction enjoining defendant from *further* exhibiting the picture in</u>
22   <u>theaters, unless the scenes depicting plaintiff were deleted.</u>  *Id.* at 504.  In affirming
23   the trial court's issuance of the injunction, the appellate court observed:

24        The contract between Leavy and Cooney related only to the exhibition
25        on television, and the wrong of defendants consists not only in the breach
26        of an agreement not to exhibit the film in theaters, but also in the fact
27        that it could not, under any circumstances, be so exhibited without the
28        consent of Leavy, which he had not given.  Defendants had no more

1       right to show the pictures in theaters than they would have had if Leavy

2       had refused to permit it to be shown publicly at all.

3 *Id*. at 501.  Similarly here, Defendants have no right to further exhibit or in any

4 manner exploit the Picture containing Brody's likeness.  Brody's agreement to

5 render services was expressly conditioned on Brody's absolute right to withhold his

6 consent to use and include his likeness in the Picture until he is paid in full for his

7 services, *i.e.*, the Brody Holdback.  Plaintiffs have repeatedly communicated their

8 objection to the inclusion of Brody's likeness in the Picture.

9      If a film is exploited without compensation to an actor who otherwise

10 commands significant monies for his services, no amount of compensation would

11 be adequate for the immeasurable harm caused by the further exhibition of the

12 Picture.  The uncompensated use of Brody's name, likeness or performance

13 diminishes the value of Brody's brand, and consequently, damages Brody's

14 professional reputation and the monetary value he can command in the future for his

15 services and use of his name and likeness. (Douglass Decl. ¶¶4, 15).  Moreover,

16 any future exhibitions of the Picture would be deemed a continuous breach of the

17 DPA, which would require an untold number of separate lawsuits.  Thus, absent

18 Plaintiffs' consent, Defendants have no right to continue distribution and sale of the

19 Picture.  The only way to prevent irreparable harm to Plaintiffs is to issue the

20 requested relief and enjoin any further harm to Plaintiffs. *See Associated Cal.*

21 *Loggers, Inc. v. Kinder*, 79 Cal. App.3d 34, 144 Cal.Rptr. 786 (1978) (injunction

22 issued to prevent termination of agreement that would result in cessation of certain

23 safety programs in order to prevent irreparable injury).

24     **2.**     **Defendants' Anticipated Opposition Argument that Plaintiffs'**

25                 **Purportedly Waived the Right To Seek Injunctive Relief Is**

26                 **Without Merit and Is Fatally Flawed**

27      Plaintiffs did not sit silently by as Defendants sought to exploit the Picture,

28 and did not thereby cause any false reliance.  Plaintiffs' attorneys sent numerous

1  demand and notice letters that Brody had withheld his consent to use his likeness

2  until such time as he is paid his guaranteed compensation, and that Plaintiffs would

3  advance appropriate legal action to enforce their rights and remedies, including, but

4  not limited to, seeking an injunction if Defendants and their distributors continued

5  to seek to sell and exploit the Picture with Brody's likeness without his consent.  In

6  response, in support and furtherance of their scheme to cheat Brody, Defendants

7  have continually mis-characterized and ignored the applicable provisions of the

8  relevant DPA agreement. (Spiegel Decl. ¶¶ 5–28, Exs. A–S).

9      Defendants also incorrectly and illogically contend that section N of the

10  Standard Terms and Conditions ("STC") rider to the *superseded* ASA somehow

11  controls Plaintiffs' enforcement rights with respect to Brody withholding consent to

12  the use of his likeness in the Picture as provided for by the superseding DPA.

13  (Brody Decl., Ex. B).  Defendants further incorrectly contend that Plaintiffs have

14  somehow waived the remedies of injunctive and equitable relief against Defendants

15  as a means of enforcing Brody's right to withhold consent to use his likeness.

16  However, the DPA expressly by its terms superseded the APA and the STC attached

17  thereto.  The DPA provided new and additional rights and remedies to Brody and

18  modified any existing or non-existing rights that Brody had under the APA.

19  Paragraph 4 of the DPA expressly states, in pertinent part, as follows:

20      *This letter agreement . . . represents the entire agreement of*

21      *the parties with respect to the subject matter set forth herein,*

22      *supersedes all prior written and/or oral agreements with regard*

23      *to such subject matter . . . .*

24  (Brody Decl. Ex. A ¶ 4(b) (emphasis added); and *see above*, Section II(B), p.5).

25      The "subject matter" at issue in the DPA is the temporarily hold back of

26  Brody's fixed compensation of $640,000 (*i.e.*, the Brody Holdback), *and* if Brody

27  is not paid, his express enumerated *right to withhold consent to use his likeness in*

28  *the Picture until the Brody Holdback amount is paid* (the "Brody Consent

1    Rights"). That right necessarily includes, without any limit in the language as to

2    said subject matter, any and all possible remedies to enforce that right.

3         Even though Producer Defendants were in breach of the ASA by not properly

4    funding the production account, escrowing the full amount of Brody's fixed

5    compensation and paying Brody on a timely basis, and even though, as a result of

6    their breach, Brody had a right to walk away from the production and sue for his

7    guaranteed "pay-or-play" compensation, Brody agreed to sign the DPA and continue

8    rendering acting services on the Picture and temporarily defer a portion of his

9    guaranteed fixed compensation *because* he was granted the right to prevent the use

10   of his likeness in the Picture if he was not paid in full. Plaintiffs specifically

11   negotiated for the inclusion of the provisions in Paragraphs 2 and 4 of the DPA

12   whereby, to assure Brody's likeness would not be used in the Picture absent

13   payment of the Brody Holdback, the DPA would supersede the ASA (and any rider

14   attached thereto), and Brody would have the express right to withhold consent to the

15   use of his likeness in the Picture if necessary. (Brody Decl. Ex. A ¶¶2, 4(b)).

16        The clear language of the DPA is that it supersedes the ASA, and any

17   paragraphs of the STC rider to the ASA, as relates to the subject matter of the DPA

18   and enforcement of the rights conferred upon Brody by the DPA, *i.e.*, the Brody

19   Consent Rights subject matter. Any purported intent and scope of the language

20   contrary to the foregoing, as Defendants' counsel spuriously seek to advance to

21   justify Defendants' breach and fraudulent scheme, would be inconsistent to all well-

22   established contract law, as it would make the entire basis of the bargained for DPA

23   and consent rights completely illusory, without consideration or purpose.

24   **C.   The Balance of Hardships Tips Overwhelmingly in Plaintiffs' Favor**

25        The balance of hardships tips in Plaintiffs' favor. If an injunction is granted,

26   Defendants will merely be required to do what they are already legally obligated to

27   do -- not use, display, disseminate or exploit Brody's likeness in the Picture unless

28   or until they pay Brody the full amount of the Brody Holdback. To be prohibited

1  from wrongdoing is not a hardship.  *See Caterpillar v. Nationwide Equip.*, 877 F.
2  Supp. 611, 617 (M.D. Fla. 1994).  On the other hand, the continued dissemination
3  of the Picture would continue to harm Plaintiffs. (Douglass Decl. ¶¶4, 15).

4      In addition, Plaintiffs are merely required to make a showing that the
5  hardships would tip in favor of the moving party.  *Caterpillar*, 877 F. Supp. at 617;
6  *Michaels*, 5 F. Supp. 2d at 838; *Iconix,* 457 F. Supp. 2d at 975 ("Under the sliding
7  scale theory, a party seeking an injunction 'need not demonstrate that he will
8  succeed on the merits, but must show that his cause presents serious questions of
9  law worthy of litigation.'").  There is little doubt that if Defendants are permitted
10  to continue exploiting, distributing and selling the Picture containing the
11  unauthorized use of Brody's likeness, then Brody would be left without any remedy
12  to enforce his bargained for and absolute contractual right under the DPA.  The only
13  leverage Brody has, or has ever had, to ensure payment of the Brody Holdback is
14  to enforce his right to withhold consent to the use of his likeness in the Picture.

15      In contrast, Defendants will suffer little harm, if any, should they be enjoined
16  from continuing to distribute the Picture in its current form.  Defendants have two
17  choices pursuant to the express terms of the DPA: (1)  Defendants can remove
18  Brody's likeness from the Picture and release a version without the unauthorized
19  non-consented to use of Brody's likeness; or (2) Defendants can refrain from
20  releasing the Picture with Brody's likeness until Brody is paid the Brody Holdback.
21  Defendants will suffer little hardship as they are fully entitled to resume distribution
22  and sale of the Picture as soon as Brody is paid the full amount of the Brody
23  Holdback.   Certainly any hardship Defendants might suffer by halting their
24  distribution and sale of the DVDs and various other planned distribution pales in
25  comparison to the hardship Plaintiffs face.  Brody, an Academy Award winning
26  actor, was effectively stripped of his bargained for right to withhold consent to the
27  use of his likeness in the Picture until he was compensated for his acting services.
28  / / /

Based on the above, Plaintiffs are entitled to a preliminary injunction to prevent the further exploitation, distribution and sale of the Picture pending trial. Further, Defendants' calculated schemes of fraudulent conduct and violation of Plaintiffs' rights renders injunctive relief all the more appropriate. *See Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 508 (9th Cir. 1991) (balance of hardships favors plaintiff where there is "substantial evidence" of defendant's "bad faith," by intentional infringement). Here, Defendants' continued exploitation, distribution and sale of a film comprised of the unauthorized use of Brody's likeness, in violation of the parties' express written agreement and in violation of Brody's right of publicity, has resulted in and shall result in further irreparable harm to Plaintiff. The injunctive relief requested is therefore necessary and appropriate.

## IV.

### THE COURT HAS THE AUTHORITY TO RECALL THE PICTURE CONTAINING BRODY'S LIKENESS PENDING TRIAL

A court sitting in equity has broad authority to issue a preliminary injunction remedying wrongful conduct, including a court-ordered return of unauthorized or unlawful products in the hands of third parties. In *Clairol, Inc. v. Shapiro*, 158 U.S.P.Q. 427, 427 (C.D.Cal. 1968), this Court issued an order for preliminary injunction requiring defendants "[t]o deliver to plaintiff for destruction any and all materials in their possession or under their control which [infringe on Plaintiff's trademark] . . . and to mail a notice to each person" who had received an offer from Defendants with regard to one of the products which unlawfully infringed upon Plaintiff's trademark, and also providing full and unconditional refunds to those third parties who actually purchased Defendants' products. *Id.*

As such, the Court has the broad authority to order Defendants and anyone acting in concert with Defendants, to refrain from any dissemination or exploitation of the Picture containing Brody's likeness, until such time as Brody is paid the full amount of the Brody Holdback, and to retrieve all copies of the Picture from any

1   distributors, wholesalers, retailers and other outlets, to be held to prevent their sale

2   or exploitation pending the trial of this action.   Furthermore, the Court has broad

3   authority to require Defendants to give notice to any and all persons and entities who

4   have copies of the Picture containing Brody's likeness, that they are likewise

5   enjoined by court order from any dissemination and/or exploitation of the Picture

6   in any way pending further order of this Court.   If the Court does not issue an order

7   requiring the recall of the Picture, there will remain a strong likelihood that the

8   distributors, wholesalers, retailers and other outlets in possession and stock of the

9   Picture, including DVD copies thereof, will  continue to attempt to sell, disseminate

10   and/or exploit copies of the Picture, and Brody will suffer irreparable harm.

11   <center>**V.**</center>

12   <center>**PLAINTIFFS SHOULD BE REQUIRED TO POST NO, OR ONLY**</center>

13   <center>**A MINIMAL, BOND IN LIGHT OF DEFENDANTS' CONDUCT**</center>

14   In construing the language of Rule 65(c) of the Federal Rules of Civil

15   Procedure, courts have stated that, "especially in view of the phrase – 'as the court

16   deems proper' – the district court may dispense with security" where it determines

17   that the risk of harm is remote, or that the circumstances otherwise warrant it, or

18   that there has been no proof of likelihood of harm to the party enjoined.   The Court

19   has the discretion to require only a nominal bond, or even no bond at all.   See, *e.g.,*

20   *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir 1974) (approving fixing

21   ***bond at zero*** in the absence of evidence regarding likelihood of harm) (citing

22   *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir. 1961)); *see also GoTo.com, Inc. v.*

23   *Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) ($25,000 bond required to enjoin

24   use of defendant's logo and commercial website).

25   Contractually, Defendants are not authorized to distribute or exploit the

26   Picture containing Brody's likeness.   Prior to Defendants' engaging in any conduct

27   and efforts to seek to sell and exploit the Picture, including on DVD in the US,

28   Plaintiffs placed Defendants on express notice that if they did so, Plaintiffs would

1  seek to enjoin their unauthorized use of Brody's likeness, and their conduct in

2  violation thereof would be to their own detriment and any losses as a result thereof

3  would be of their own doing.  In fact, prior to filing this motion Plaintiffs filed an

4  application seeking a TRO to enjoin the DVD release of the Picture.  Defendants

5  were undeterred and proceeded to release, distribute and sell the Picture knowing

6  full well of Plaintiffs' contractual rights to prevent such activity.

7  　　　Moreover, Defendants are not precluded from removing Brody's likeness

8  from the Picture and marketing, distributing and selling a version of the Picture

9  without Brody's likeness.  Brody does not seek to prevent the release of the Picture,

10  only the release of any version with the unauthorized use and inclusion of Brody's

11  likeness until such time as he is paid the deferred money of the Brody Holdback.

12  　　　Based on the above, it is respectfully requested that the Court require that

13  Plaintiffs post no bond, or, at most, only a nominal bond.

14  　　　　　　　　　　　　　　**VI.**

15  　　　　　　　　　　　**CONCLUSION**

16  　　　Based on the foregoing, Plaintiffs respectfully request that this Motion be

17  granted, that the Court enter an order for the issuance of a Preliminary Injunction

18  in the form requested and set forth in the proposed order submitted herewith, for

19  such other alternative and further relief as the Court may deem just and appropriate.

20  DATE: October 25, 2010　　　　　LAVELY & SINGER

21  　　　　　　　　　　　　　　　　PROFESSIONAL CORPORATION
   　　　　　　　　　　　　　　　　MARTIN D. SINGER

22  　　　　　　　　　　　　　　　　EVAN N. SPIEGEL
   　　　　　　　　　　　　　　　　ANDREW B. BRETTLER

23

24  　　　　　　　　　　　　　　　　By: _____

25  　　　　　　　　　　　　　　　　　　　　MARTIN D. SINGER

26  　　　　　　　　　　　　　　　　Attorneys for Plaintiffs
   　　　　　　　　　　　　　　　　THREE-SEVEN ENTERTAINMENT, INC.
   　　　　　　　　　　　　　　　　and ADRIEN BRODY

27

28