A. Raymond Hamrick, III (State Bar No. 93821)
Martin J. Barab (State Bar No. 47419)
Kenneth A. Kotarski (State Bar No. 100954)
HAMRICK & EVANS, LLP
111 Universal Hollywood Drive, Suite 2200
Universal City, California 91608
Telephone No.: (818) 763-5292
Fax No.: (818) 763-2308

Attorneys for Defendants
GIALLO PRODUCTIONS LIMITED, HANNIBAL
PICTURES, INC., RICHARD RIONDA DEL CASTRO
and MAYA ENTERTAINMENT GROUP, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THREE-SEVEN ENTERTAINMENT, INC., a Nevada corporation; and ADRIEN BRODY, and individual,<br><br>       Plaintiffs,<br><br>v.<br><br>GIALLO PRODUCTIONS, LTD., a United Kingdom limited company; HANNIBAL PICTURES, INC., a California corporation; RICHARD RIONDA DEL CASTRO, an individual; RAFAEL PRIMORAC, and individual; MAYA ENTERTAINMENT GROUP, INC., a Delaware corporation; and DOES 1-10, inclusive,<br><br>       Defendants. | Case No.: CV10-7705 DSF (CWx)<br><br>(Case assigned to Hon. Dale S. Fischer)<br><br>**DECLARATION OF RICHARD RIONDA DEL CASTRO IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Complaint Filed:  October 14, 2010<br><br>Date:    November 22, 2010<br>Time:    1:30 p.m.<br>Place:   Edward R. Roybal Federal<br>         Building<br>         255 E. Temple Street, Room 840<br>         Los Angeles, CA 90012<br><br>Trial Date:     Not Set |

I, Richard Rionda Del Castro, declare as follows:

1.   I am an individual and a Defendant in the above-entitled action.  I make this declaration in support of the Opposition by Defendants GIALLO PRODUCTIONS LIMITED ("GPL"), HANNIBAL PICTURES, INC. ("Hannibal Pictures"), RICHARD RIONDA DEL CASTRO and MAYA ENTERTAINMENT

-- 1 --

**DECLARATION OF RICHARD RIONDA DEL CASTRO IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1  GROUP, INC. ("Maya Entertainment") to Plaintiffs' Motion for Preliminary

2  Injunction.  I have personal knowledge of the facts set forth herein, and if called

3  upon to testify thereto, I could and would competently do so under oath.

4     2.   I am the Chairman and CEO of Hannibal Inc. dba Hannibal Pictures.

5  Hannibal Pictures is a domestic and foreign sales agent on behalf of producers of

6  motion pictures.  As its principal business, Hannibal Pictures is retained by

7  producers for purposes of the sale and/or licensure of motion pictures to foreign

8  and domestic distribution and sub-distribution companies.  On occasion, Hannibal

9  Pictures also assists in helping producers obtain financing for the production of

10  motion pictures.

11     3.   GPL was formed as a special purpose vehicle to acquire to rights to,

12  and to produce and exploit, the feature length motion picture entitled *Giallo* (the

13  "Picture") with an estimated budget of $6,700,000.  At all times relevant, GPL was

14  and is a corporation organized and existing under the laws of England and

15  authorized to do and doing business in Los Angeles County, California.  At all

16  times relevant, I was, and am, a Director of GPL.

17     4.   GPL engaged Hannibal Pictures as the exclusive Sales Agent for the

18  Picture to provide licensing and sales of the Picture to the foreign and domestic

19  markets pursuant to a sales agency agreement dated January 15, 2008.  Attached

20  hereto as Exhibit "A" is a true and correct copy of the January 15, 2008, Sales

21  Agency Agreement between GPL and Hannibal Pictures.

22     5.   Dario Argento, an Italian film director, producer and screenwriter who

23  is best known for his work in the horror film genre, which has earned him the

24  international reputation as "The Italian Hitchcock," agreed to direct the Picture.

25  Dario Argento and his brother Claudio Argento are, respectively, the first and

26  second born sons of famed Italian producer Salvatore Argento.

27     6.   Adrien Brody, Elsa Pataky and Emmanuelle Seigner agreed to star in

28  the Picture.  Mr. Brody also agreed to provide Executive Producing services for the

DECLARATION OF RICHARD RIONDA DEL CASTRO IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION

HAMRICK & EVANS, LLP

1   Picture.  Mr. Brody received widespread recognition and acclaim after starring in
2   *The Pianist* for which he won the Academy Award for Best Actor in a Leading
3   Role.  *The Pianist* was directed by Roman Polanski for which he received the
4   Academy Award for Best Director.  Ms. Pataky has enjoyed great success in her
5   home country of Spain with roles in over eighteen (18) films, three (3) television
6   series, national endorsements and celebrity appearances; Ms. Pataky's title role in
7   *Ninette*, directed and produced by Oscar winner José Luis Garci, brought her
8   critical acclaim and established her as a much sought after leading actress. Ms.
9   Seigner is a French actress, former fashion model and singer, best known as the
10  wife of Roman Polanski, and for her roles in *The Diving Bell and the Butterfly* and
11  *Frantic.*

       7.    Throughout my dealings with Mr. Brody and his representatives with
13  respect to the Picture, it was very evident to me that Mr. Brody strongly desired to
14  be involved in the making and production of the Picture, to act and star in the
15  Picture, and to seize the opportunity to work with Dario Argento as well as Mr.
16  Polanski's wife, Emmanuelle Seigner, in the making of the film.  Brody proposed to
17  production to hire Ms. Seigner and his girlfriend at the time Ms. Pataky.  In
18  addition, Mr. Brody sought and received screen credit as a Producer of the Picture.

       8.    The financing of the Picture was secured by GPL and involved several
20  participants.  Hannibal Pictures secured over $3,600,000 in bankable foreign sales,
21  including a license for the Italian Territory in the sum of $2,000,000 to Dario
22  Argento's family distribution and licensing company Sigma Film s.r.l. ("Sigma"), a
23  limited liability company organized and existing under the laws of Italy with its
24  principal place of business located in Italy.  GPL obtained a lender, First California
25  Bank ("FCB"), to bank and finance the foreign sales.  GPL also secured a
26  completion bond company cineFinance Insurance Services, LLC ("cineFinance"),
27  acting on behalf of Houston Casualty Company, to insure the Picture was finished
28  on budget and delivered to the distributors.  Such insurance guarantee was a

HAMRICK & EVANS, LLP

1   condition to the financing from FCB and Footprint investor Ian David Milner-

2   Brown ("Milner"). GPL secured from Milner two loans totaling $3,120,000 that are

3   secured by the World, except the countries presold and discounted by FCB. The

4   budget for the Picture was $6,720,000 and, therefore, the strike price was met.

5       9.   On or about April 17, 2008, Claudio Argento and Dario Argento (the

6   "Argentos"), individually and on behalf of Sigma and Opera Film s.r.l. ("Opera")

7   (another Argento family limited liability company organized and existing under the

8   laws of Italy with its principal place of business located in Italy), offered

9   €1,400,000, in perpetuity, to GPL in exchange for the distribution rights to the

10  Picture in the Italian territory. This offer was to remain open for two months.

11  Thereafter, the Argentos, individually and on behalf of Opera, represented to GPL

12  that they would secure a Letter of Credit in the approximate sum of €1,400,000, or

13  as of said date between $2,000,000-$2,156,000, payable on delivery of the Picture

14  (the "Italian Letter of Credit"), to be issued by Opera. In support of their

15  representations to me on behalf of GPL and Hannibal Pictures and in order to

16  induce reliance on same, the Argentos, individually and on behalf of Sigma and

17  Opera, explained and discussed their then current deals, which were in the works,

18  including a three picture deal with Medusa Film SpA ("Medusa"), the Italian movie

19  production and distribution outfit that is one of Italy's leading purveyors of comedy

20  (the most successful genre for Italian films) and which distributed and financed the

21  last Argento horror films. Medusa is a subsidiary of Italian media firm Mediaset

22  and also distributes foreign films in Italy.

23      10.  GPL vetted the representations by the Argentos, individually and on

24  behalf of Sigma and Opera, as to their ability to obtain the Italian Letter of Credit

25  by verifying their three picture deal with Medusa. Believing that it had secured

26  nearly one-third of its production budget, GPL next began to seek out additional

27  financing in order to fund the remaining portion of the budget. Further, and in

28  reliance on representations by the Argentos, individually and on behalf of Sigma

*(left margin, vertical)* HAMRICK & EVANS, LLP

-- 4 --

1  and Opera, GPL informed potential investors that it had secured nearly one-third of

2  the Picture's production budget.

3      11.  On or about March 31, 2008, SteelBridge Finance, LLC

4  ("SteelBridge") agreed to provide short-term, bridge financing for the production of

5  the Picture.  Pursuant to this agreement and after due diligence, SteelBridge

6  advanced $1,000,000 to GPL for the production of the Picture through production

7  attorney Donald A. Barton's trust account.  On or about May 9, 2008, SteelBridge

8  advanced an additional $300,000 for the production of the Picture.

9      12.  Despite multiple issues that arose with respect to the Italian Letter of

10  Credit, the list of material bondable, the language of the Italian Letter of Credit and

11  the language of a notice of assignment that were being negotiated by the

12  representatives of the various parties involved, the Picture was in full preparation

13  mode and scheduled to start soon. Eventually, filming did begin without the closing

14  having taken place, which is not unusual.

15      13.  Attached hereto as Exhibit "B" is a true and correct copy of the May

16  28, 2008, Interparty Agreement, which controls the allocation of monies from the

17  Picture and establishes the order of payment and recoupment of funds.

18      14.  Attached hereto as Exhibit "C" is a true and correct copy of the April 3,

19  2008, International Multiple Rights Distribution Agreement between Hannibal and

20  Sigma.

21      15.  Hannibal Picture's interest in the Picture is limited to the Sales Agency

22  Agreement by the terms of which Hannibal Pictures is making a non-deferred sales

23  fee of 5%-7.5% and a deferred sales fee of 20%.  Hannibal Pictures also required

24  marketing expenses, which were included in the budget for the Picture. These

25  marketing expenses are an offset of the cost Hannibal Pictures incurred to promote

26  the Picture all over the World.

27      16.  On or about April 9, 2008, GPL and Opera entered into a production

28  services agreement providing that Opera would act as GPL's representative in

-- 5 --

HAMRICK & EVANS, LLP

1  connection with the production of the Picture.  Under this agreement, Opera agreed

2  to indemnify GPL for all claims arising out of the agreement.  A true and correct

3  copy of the production services agreement between GPL and Opera is attached as

4  Exhibit "D."

5      17.  In mid-April 2008, the Argentos, individually and on behalf of Sigma

6  and Opera, made successive, increasing offers of €1,250,000, €1,375,000 and

7  €1,400,000, in perpetuity, to GPL in exchange for the distribution rights to the

8  Picture in the Italian territory.  On or about April 18, 2008, GPL accepted the offer

9  by the Argentos, individually and on behalf of Sigma and Opera, of €1,400,000 in

10  exchange for the distribution rights to the Picture in the Italian territory.  On or

11  about May 27, 2008, Hannibal Pictures, as the exclusive sales agent for GPL, and

12  Sigma entered into a Distribution Agreement granting Sigma the Italian Territories

13  for the purchase price of €1,400,000 or roughly $2,000,000.  The Distribution

14  Agreement required that Sigma issue the Italian Letter of Credit for the purchase

15  price between June 15, 2008, and July 15, 2008, but in no event later than July 15,

16  2008.  A true and correct copy of the Distribution Agreement between Sigma and

17  Hannibal (dated April 3, 2008, and executed on May 27, 2008) is attached hereto as

18  Exhibit "E" and is incorporated by reference as though fully set forth herein.

19      18.  In April and May 2008, GPL negotiated for additional production

20  financing, including a loan from FCB in the amount of $4,434,879, and a loan from

21  investor Milner in the amount of $1,220,000.

22      19.  In early May 2008, the Argentos, individually and on behalf of Sigma

23  and Opera, informed GPL that they would be unable to secure the Italian Letter of

24  Credit until June 15, 2008, at the earliest, but in no event later than July 15, 2008,

25  leaving GPL with a budget gap of $2,000,000.  In reliance on the representations by

26  the Argentos, individually and on behalf of Sigma and Opera, that the Italian Letter

27  of Credit would be issued by the latest on July 15, 2008, GPL devised a new,

28  revised financing plan to close the budget gap until the Italian Letter of Credit was

HAMRICK & EVANS, LLP

-- 6 --

1   issued.

2       20.   The parties agreed to a bank closing in two steps.  The first step was to

3   close the financing for the FCB portion of the contracts, the exception being the

4   Italian Letter of Credit for $2,000,000.  Milner was to fund his investment entirely.

5   With a bonded budget for the Picture, and the Italian Letter of Credit not yet issued,

6   the bond company would issue a completion guarantee for the Picture if holdbacks

7   could be secured for the value of the Italian Letter of Credit.  The second step

8   provided that once Italian Letter of Credit was opened, FCB would cash flow the

9   letter of credit and advance the funds.  In order to accomplish this, SteelBridge

10  agreed to release its first position on the Picture and to be secured by a gross

11  percentage of the Italian Letter of Credit.  As part of this process to secure

12  holdbacks from the producers and financiers of the Picture, Mr. Brody agreed to

13  "hold back" or defer a portion the second and third installments of his fixed

14  compensation.  The consideration for the producers and financiers of the Picture,

15  including Mr. Brody, to agree to the holdbacks was that a film production

16  completion bond would issue with a guaranty that the Picture would be finished

17  and delivered on schedule and within budget.

18      21.   Attached hereto as Exhibit "F" is a true and correct copy of the Acting

19  Services Agreement between GPL as Producer, Three-Seven Entertainment, Inc.

20  ("Three-Seven") as "Lender" and Mr. Brody as "Artist" (the "ASA").  Attached to

21  the ASA as pages 9-10 is an Inducement Attachment to Acting Agreement executed

22  by Mr. Brody personally.  Attached to the ASA as pages 11-17 are Standard terms

23  and Conditions.  Paragraph N of the Standard terms and Conditions concerns the

24  rights and remedies of Lender and Artist in the event of a breach of the Acting

25  Services Agreement.  Pursuant to the terms of the Inducement Attachment to Acting

26  Agreement and the Standard Terms and Conditions, both of which are part of the

27  ASA, Plaintiffs waived any right to equitable or injunctive relief, including

28  rescission and specific performance.  The intent of the Brody Holdback was not to

HAMRICK & EVANS, LLP

-- 7 --

1  amend Plaintiffs' waiver of their rights to injunctive relief, but instead to provide
2  alternate mechanisms for the payment of the Brody Holdback.

3       22.    Attached hereto as Exhibit "G" is a true and correct copy of the May
4  28, 2008, Deferral Payment Agreement between Three-Seven, Mr. Brody and GPL
5  (the "Amendment").

6       23.    Paragraph 2 of the Amendment concerns the payment to Mr. Brody of
7  certain deferred compensation upon the deposit, between the dates of June 15,
8  2008, and July 15, 2008, of the Italian Letter of Credit into the Production Account
9  for the Picture. Paragraph 2 of the Amendment provides in pertinent part:

10              2.  Brody agrees that the Brody Holdback shall
11              be paid to Brody upon a deposit into the
                Production Account (as defined in the
12              Completion Guaranty) in the amount of
13              US$2,006,000, which amount represents the value
                of the Italian Letter of Credit less bank charges
14              to be issued in respect of the Film between June
15              15, 2008 and July 15, 2008 but in no case no
                later than July 15, 2008.  ...  Brody will have
16              the right to withhold consent to the use of his
17              likeness in the picture until the Brody Holdback
                ($640,000) is paid.  ... ."
18

19       24.    Paragraph 3 of the Amendment provides for payment to Mr. Brody of
20  the amount of his deferred compensation from the proceeds of any distribution
21  transaction with respect to the territory of Italy in the event the Italian Letter of
22  Credit in Paragraph 2 of the Agreement is not issued.  Paragraph 3 of the
23  Amendment is written in the alternative and provides:

24              3.  In the event that the event in paragraph 2
25              does not occur, then Brody shall be paid the full
                amount of the Brody Holdback from the
26              proceeds from any distribution transaction with
27              regard to the territory of Italy in first position on
                a simultaneous, pari passu and proportional
28

DECLARATION OF RICHARD RIONDA DEL CASTRO IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION

HAMRICK & EVANS, LLP

> basis (Brody receiving 32% thereof) with other
> Holdback accorded to collectively SteelBridge
> Finance LLC. Rafael Primorac and Richard
> Rionda del Castro (68%). Such parties shall
> hold the percentages stated in the rights and
> proceeds from the territory of Italy in perpetuity
> and the parties will be (sic) have approval over
> any subsequent Italian distribution arrangement
> such approval not to be unreasonably withheld.

25.    At the same time as Three-Seven, Mr. Brody and GPL entered into the Amendment, cineFinance, the completion guarantor, required that the Producers of the Picture, Rafael Primorac, Mr. Brody and I, separately agree to the deferral of portion of the Approved Budget for the Picture that represented an amount payable to each of us as a Producer Fee.  Attached hereto as Exhibit "H" is a true and correct copy of the May 28, 2008, Producer Holdback letter agreement between cineFinance, Mr. Primorac, Mr. Brody and me (the "Producer Holdback").

26.    The Producer Holdback does not contain a right by Mr. Brody to withhold consent to the use of his likeness in the Picture until the holdback is paid. The Producer Holdback, at Paragraph 4, provides as follows:

> "Brody, Rionda and Primorac hereby agree that the
> Deferral [defined in Paragraph 3 as the "Rionda Deferral"
> together with the "Primorac Deferral" and the "Brody
> Deferral"] shall be promptly paid to Brody, Rionda and
> Primorac pro rata pari passu upon the deposit into the
> Production Account (as defined in the Completion
> Guaranty) of the sum of US$2,006,000, which amount
> represents the value of the Italian Letter of Credit to be
> issued in respect of the Film and which will be remitted
> to the Production Account by First California Bank once
> the Italian Letter of Credit is issued."

27.    Also on or about May 28, 2008, FCB executed a Loan and Security Agreement with GPL by the terms of which FCB agreed to lend borrower

DECLARATION OF RICHARD RIONDA DEL CASTRO IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

HAMRICK & EVANS, LLP

1    $4,434,879 to fund production of the Picture. FCB withheld $2,156,000 pending

2    issuance of the Italian Letter of Credit.

3           28.    Throughout June 2008, counsel for Sigma, Opera, GPL, Hannibal

4    Pictures, FCB and cineFinance communicated regarding the drafting and revising of

5    the Italian Letter of Credit, all in an effort to secure a letter of credit acceptable to all

6    parties involved in the financing of the Picture.

7           29.    On or about July 11, 2008, Claudio Argento, individually and on behalf

8    of Sigma and Opera, informed GPL that the Italian Letter of Credit would be

9    secured by July 15, 2008. A true and correct copy the e-mail exchange between

10   Claudio Argento and Hannibal Pictures that contains this representation by Claudio

11   Argento is attached hereto as Exhibit "I."

12          30.    During the period of July 12, 2008, through July 21, 2008, I agreed on

13   behalf GPL to extend the deadline for issuance of the Italian Letter of Credit

14   pursuant to requests by the Argentos, individually and on behalf of Sigma and

15   Opera.

16          31.    On or about July 22, 2008, Claudio Argento, individually and on behalf

17   of Sigma and Opera, informed GPL and Hannibal Pictures that the Italian Letter of

18   Credit had yet to be issued. Further, Claudio Argento informed GPL and Hannibal

19   Pictures that they should attempt to find another buyer for the distribution rights to

20   the Picture in the Italian territory as Sigma, Opera and the Argentos could not, and

21   would not, fulfill their contractual obligations to GPL and Hannibal Pictures.

22          32.    July 30, 2008, on behalf of GPL, I informed Sigma, Opera and the

23   Argentos that they had failed to cure their breach of contract in connection with their

24   failure to timely secure the Italian Letter of Credit and, accordingly, terminated their

25   distribution rights to the Picture in the Italian territory.

26          33.    Due to the timing of the failure to obtain the Italian Letter of Credit and

27   as the global financial crisis began to take hold, GPL and Hannibal Pictures were

28   unable to secure additional financing to replace the financing promised by Sigma,

-- 10 --

HAMRICK & EVANS, LLP

Opera and the Argentos.

34.     Once the Picture was completed, cineFinance agreed to advance funds to GPL to complete the Picture. In so doing, cineFinance moved into second position behind FCB for the amount of the advance.  The production of the Picture was finished on time and close to the budget. In September/October 2008, the Picture was in post production and scheduled for delivery to distributors in late January 2009.

35.     On June 30, 2009, FCB's original loan was fully repaid. GPL successfully negotiated a buyout of the cineFinance advance and its second position lien on the Picture was released. These steps have left Milner, who was formerly in a second and then third position, in first position with respect to World revenues with the exception of Italy, which was carved out officially to reflect the original agreement between the parties as to the $2,000,000 holdback.

36.     The Picture was exhibited at the Cannes Film Festival in May 2010. Thereafter, Maya Entertainment Group, Inc. ("Maya Entertainment") acquired from GPL the distribution rights to the Picture for the United States.  The Picture had a Theatrical Release date of July 23, 2010, with a DVD Release Date of September 2, 2010.  The theatrical release of the Picture as part of a series of seven (7) films in eight (8) cities over eight (8) weeks was a key marketing tool for the larger DVD campaign for these same films.  The DVD of the Picture was originally released on September 2, 2010, throughout the United States.

37.     In or about March 2010, and following the default by the Argentos, Sigma and Opera with respect to the issuance of the Italian Letter of Credit, Hannibal Pictures licensed for GPL the Italian Rights for the Picture for Theatrical and Video Rights only.  The contract is valid for eight (8) years with a minimum guarantee of Two Hundred Thousand Dollars ($200,000).

38.     Pursuant to Paragraph 3 of the Amendment, the funds for the licensing of the Italian Rights for the Picture were deposited with the Collection Agent,

HAMRICK & EVANS, LLP

**ERROR! MAIN DOCUMENT**

1  Freeway Entertainment.  On March 10, 2010, I e-mailed Mr. Brody's manager, Jere

2  Douglass, to advise her of the licensing for GPL of the Italian Rights for the Picture

3  for Theatrical and Video Rights only as well as the availability of that portion of the

4  fees that was payable to Mr. Brody pursuant to Paragraph 3 of the Amendment.  I

5  also instructed counsel for GPL and Hannibal Pictures, Martin J. Barab, to offer to

6  Mr. Brody that portion of the funds deposited with Freeway Entertainment due to

7  Mr. Brody in accordance with the terms and conditions of Paragraph 3 of the

8  Amendment.  I am informed and believe that Mr. Barab contacted counsel for Mr.

9  Brody, Martin D. Singer, sometime in early May 2010 and informed Mr. Singer that

10  the Theatrical and Video rights in Italy had been licensed by Hannibal Pictures for

11  GPL, that the license fee was deposited into a Collection Account at Freeway

12  Entertainment and that the Brody entitlement from the total received for the licensed

13  Italian rights under the pro rata, pari passu holdback agreement in Paragraph 3 of the

14  Amendment was $59,972, which represented 31.9% of the balance less fees.  My

15  understanding is that Mr. Singer refused to accept the payment pursuant to

16  Paragraph 3 on behalf of Mr. Brody.

17      I declare under penalty of perjury under the laws of the United States of

18  America that the foregoing is true and correct, and that this declaration is executed

19  on November 1, 2010, at West Hollywood, California.

20

21

22      Richard Rionda Del Castro

23

24

25

26

27

28

DECLARATION OF RICHARD RIONDA DEL CASTRO IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# EXHIBIT "A"

# SALES AGENCY AGREEMENT

THIS SALES AGENCY AGREEMENT (the "Agreement") is entered into and made effective as of the 15th Day of January 2008 by and between Hannibal Inc. dba Hannibal Pictures located at 8265 Sunset Boulevard, Suite #107 West Hollywood, CA 90046 –Tel: (323) 848-2495 Fax (323) 848-2946 (hereinafter referred to as "Hannibal") and Giallo Productions Limited, Attn: Rafael Primorac (hereinafter referred to as "Owner")

## RECITALS

A.    Owner is the owner of all right, title and interest in and to the motion picture currently titled "GIALLO" written by Jim Agnew and Sean Keller.

B.    Owner desires that Hannibal act as its exclusive and sole sales and licensing agent for the Picture (as hereinafter defined) upon the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual promises and agreements herein contained, and for other good and valuable consideration, the parties hereto do hereby agree as follows:

### 1.    PICTURE

"Picture", as used in the Agreement, shall mean the feature-length, English-language motion picture to be produced by Owner currently titled "GIALO," which shall conform to the specifications as stated in paragraph 7 below, with underlying literary material upon which the Picture are based and all character, plots, themes, and titles contained therein, as well as all rights of whatever kind or nature in and to the Picture (including without limitation, any and all copyrights, and renewals and extensions thereof). The Picture will star Adrien Brody for the lead of Enzo Lavia and Yellow, Asia Argento for the lead of Linda, and Elsa Pataky for the lead of Celine and be directed by Dario Argento or equivalent to be mutually approved with a cash budget no less than US$6,650,000 all in, with budget including deferment no more than US$8,250,000 to be shot in Torino in 30 days of production and shall be based on the screenplay with the same name dated, December 15, 2007.

### 2.    INITIAL AGENCY REPRESENTATION PERIOD/TERM

Unless earlier terminated by mutual agreement or as a result of Hannibal's material uncured breach, bankruptcy or insolvency, "Agency Representation Period", as used in this Agreement shall mean the period commencing with the date hereof and continuing thereafter for 25 years.  Hannibal shall have a thirty (30) business day right of first negotiation and a thirty (30) business day right of last refusal with respect to any renewal of this Agreement after the end of the Agency Representation Period.

3.   **TERRITORY**

"Territory", as used in the Agreement, shall mean the entire Universe -

4.   **DELIVERY OF PICTURE**

Owner shall deliver the Picture to Hannibal ("Delivery") by providing the Delivery Materials essential for delivery of the Picture as set forth on Exhibit "A" attached hereto and incorporated by reference herein.  Owner hereby agrees to deliver the film and video elements to a lab designated by Hannibal in the United States (Advanced Digital Service "ADS" for Video and Audio elements and "Deluxe" or "Technicolor" or "Fotokem" for film elements) as per the requirements on Exhibit "A". Owner shall deliver all other items to Hannibal's address.  Subject to the requirements of the completion guarantor of the Picture, Owner shall assume and pay all costs of Delivery of the Picture, except as stated herein or in the Delivery Schedule (in the event that Owner does not deliver all the Delivery items set forth, then Hannibal shall have the right, but not the obligation, to create any undelivered items and either Owner shall immediately pay for the cost of creation or Hannibal shall recoup the reasonable, customary, actual, direct, out-of-pocket cost of the same, without markup, surcharge or overhead allocations from Owner's share of Gross Receipts prior to any payment to Owner, at Hannibal's sole discretion and election).  Owner shall make Delivery of the Picture to Hannibal promptly after its completion, but, in any case, not later than December 31, 2008, subject to an extension of ninety (90) days resulting from events of force majeure as defined herein.

5.   **RIGHTS**

A.    During the Term and in the Territory, Owner hereby appoints Hannibal as its sole and exclusive agent with the sole and exclusive right to act as Owner's sales and licensing agent and to enter into distribution, license and other agreements, on behalf of Owner in Hannibal's name and to exhibit, distribute, market, reissue, transmit, perform and otherwise deal clips therefrom, in any and all languages and versions, (including dubbed, sub-titled and narrated), and in all sizes and gauges of the film and for all purposes, including but not limited to:

(i)      Theatrical.

(ii)     Non-theatrical, including without limitation, educational, Industrial, merchandising, commercial tie-ins, commercial and trade;

(iii)    Television, in all forms, as defined below;

(iv)    Home Video, including all forms of audio-visual disc and cassettes and similar devices, DVD, VOD and whether now know or hereafter devised;

(v)     Internet Rights;

(vi)    Copyright for music publishing in the Territory;

"Television", as used in the Agreement, shall mean and include (but shall not be limited to) all rights to transmit, broadcast and/or exhibit the Picture by means of free, toll, basic cable, pay cable (whether pay-per-view, subscription or otherwise and including transmission or broadcast by open or closed circuits to any theater or other place where an admission fee is charged to view the broadcast or transmission of the Picture), community antenna systems, telstar-type systems, all other forms of satellite and relay television, and any and all other kinds of open or closed circuit systems now or hereafter known.

Hannibal shall conduct its sales and licensing agency activities in good faith and in such manner as it may deem fit in its best business judgment after meaningful consultation with Owner's designated representatives. Subject to Owner's approval, Hannibal shall have the right to make third party "outright sales" to non-affiliated parties.

B.      Without in any way limiting the generality of the foregoing, Hannibal's rights to sell and license to third parties shall include the following sole and exclusive rights during the Term and in the Territory:

(i)     To use the title(s) by which the Picture is or may be known or identified and to change the title of the Picture;

(ii)    To permit, authorize and license others to exercise and exploit all or any rights and licenses hereunder and subject to any limitations contained in this Agreement to distribute, exhibit, advertise, publicize and exploit the Picture under any terms and in such manner as Hannibal may deem proper or expedient;

(iii)   To make such dubbed and subtitled versions of the Picture and the trailers thereof, including but not limited to, cut-in, synchronized and superimposed versions thereof in any and all languages for use in such parts of the Territory as Hannibal may deem advisable;

(iv)    To permit commercial messages to be exhibited or broadcast before, during and/or after the exhibition of the Picture;

(v)     Subject to any contractual, regulatory or other credit restrictions of which Hannibal is given written notice, to place Hannibal's name, logo and/or trademark on the positive prints of the Picture and in trailers thereof, and in all advertising and publicity relating thereto in such a manner, as a presentation credit. Such presentation credit shall be accorded in the Territory. Hannibal shall also have the right to be indicated on all positive prints of the picture and in trailers thereof to be

manufactured, exhibited and distributed by every means, method and device now or hereafter known within the Territory. Such credit will be on all prints, trailers and in all advertising throughout the Territory.

(vi)     Subject to any contractual or other credit restrictions of which Hannibal is given written notice, to make such changes, additions (including, but not limited to narration), alterations, cuts interpolations and eliminations as Hannibal may require in order to adapt and make the Picture suitable for exhibition in any and all parts of the Territory or to comply with television standards and practices requirements, including without limitation, dubbing, inserting commercial breaks, re-editing, re-mixing, and adding appropriate credits to the Picture.  Owner waives the benefits of any provision of law known as "droit moral" or any similar law which Owner may have in any country of the world and Owner shall not institute, support, maintain, authorize or consent to any action or lawsuit on the ground that the Picture or any version of the Picture in any way constitutes an infringement of Owner's "droit moral". Except as otherwise herein specifically permitted, Hannibal agrees that it will not alter the credits on positive prints of the Picture without Owner's prior written consent;

(vii)     To publicize, advertise, and exploit the Picture and to cause or permit others to do so, including without limitations, the exclusive right in connection with, and for the purpose only of, advertising, publicizing and exploiting the Picture, subject to applicable guild requirements, to (i) publish and to license and authorize other to publish in any language and in such forms as Hannibal may deem advisable, synopses, summaries, resumes and stories of and excerpts from the Picture and from any literary or dramatic material included in the Picture or upon which the Picture are based in book form and in newspapers, magazines, trade periodicals, booklets, press books and any other periodicals and in all other media of advertising and publicity whatsoever; (ii) to broadcast by radio and television and to license and authorize other to so broadcast (in any language) the Picture or any parts or portions thereof, and any literary or dramatic material included in the Picture or upon which the Picture are based, and to use in conjunction therewith any other literary, dramatic or musical material; and (iii) to use, license and authorize others to use the name, physical likeness and voice (and any simulation or reproduction of any thereof including still photographs from or relating to the Picture) of any party rendering services in connection with the Picture for the purpose of advertising, publicizing or exploiting the Picture or Hannibal, subject to contractual restrictions in favor of any third party rendering such services or granting such rights, provided that Owner shall have notified Hannibal of said provision as part of delivery hereunder;

(viii)     To cause the production of trailers of the Picture and prints depicted or portrayed in the Picture and the artwork, scenery, props and objects appearing or portrayed therein, subject to contractual restrictions in favor of any third party rendering services or granting such rights, provided that Owner shall have notified Hannibal in writing of said provisions as part of delivery hereunder;

R.P.

(ix)    To order and procure directly from any laboratory in any part of the world holding pre-print or other material (including any dubbed, titled, narrated or other versions thereof) in respect of the Picture, such number of release prints, sound recording, pre-print material and any part or parts of any such material, as Hannibal may, from time to time, require or desire, in any and all sizes and gauges, and to cause the performance of such laboratory of other work (including, but not limited to, the manufacture of dubbed, re-dubbed, titled, subtitled, narrated and any and all language versions of the Picture). Owner will deliver to Hannibal a statement setting forth details of any and all version (dubbed, titled or other) of the Picture, together with the name of the laboratory having possession thereof. Hannibal shall not have the authority to remove any of Owner's materials from any laboratory; and

(x)    Subject to Owner's prior approval, to assert, prosecute, handle and settle in any and all parts of the Territory, all claims or actions or causes of action against any and all persons for the unauthorized or illegal use, copying, reproduction, release, distribution, exhibition or performance of any of the rights to the Picture to which Hannibal's agency applies or of any part or versions thereof, of the literary, dramatic or musical material upon which it is based or which is used therein, or any part or version thereof, or for the enforcement or protection of all or any rights herein granted or purported to be granted to Hannibal.

D.    In conjunction with its attempts to market, exploit or otherwise distribute the Picture, Hannibal may license or otherwise engage third party sub-distributor(s) or agent(s) as Hannibal may reasonably determine, on an "arms-length basis," who will agree to use reasonable and customary best efforts to distribute the Picture or to act as otherwise deemed prudent by Hannibal, upon terms and conditions reasonably and customarily approved by Hannibal or Hannibal may refrain from releasing and/or distributing the Picture in any territory in its reasonable good faith judgment. Hannibal agrees to disclose to Owner and Owner shall have the right to approve any licenses to Hannibal's affiliated companies.

6.    **DISBURSEMENT OF GROSS RECEIPTS**

Owner and Hannibal hereby agree that they should use the services of Collection Agent Freeway and or equivalent and that all Gross Receipts, as defined in Exhibit "B" attached hereto and incorporated herein by this reference, received in connection with the distribution or other exploitation of the Picture shall be disbursed as follows:

NOTE: Twenty Five (25%) percent of World Gross receipt paid on collection, prior to Bank and or advance, subject to approval of the Bank.

(i)    Collection Agent ( Freeway is approved ) fee of 1% of World Gross.

(ii)    Secondly, to repay bank loan including all bank fees and interest;

(iii)    Thirdly, to repay completion funds advanced by the Bonder, if any;

(iv)    Fourthly, to repay Hannibal its balance of sales agent fee of total 25% of Gross Receipts from Territory. It is acknowledged that Hannibal will pay Arramis Films, Inc 5% ( Five per cent ) and will therefore retain the sale agent fee of 20% of World Gross receipt. Such disbursement will be made by Collection Agent on pari passu basis.

(v)    Fifthly, the balance of Gross Receipts or breakeven will be shared between Hannibal and Arramis Films, Inc and paid to parties, in accordance with the water fall in Exhibit "C" attached hereto and incorporated herein by this reference.

### 7.    OVERHEAD

Hannibal is entitled to the sum of $100,000 as overhead to be paid from budget of the film as overhead / marketing fee.

### 8.    <u>WARRANTIES AND REPRESENTATIONS</u>

Owner warrants, represents and agrees as follows:

A.    The Picture, as delivered, shall conform to the approved elements, have a running time of not less than 95 minutes nor more than 110 minutes, unless otherwise agreed upon between the parties, and shall be photographed in 35mm non-anamorphic with the camera aperture to be in accordance with the American standard; photographed in color, in the English language, of first-class technical quality (as certified by a lab acceptable to Hannibal), completely finished, fully edited and titled and fully synchronized with language, dialogue, sound and music, and in all respects ready and suitable for presentation to the public in first class U.S. theaters that charge general admission;

B.    The Picture will have a stereo (Dolby or Ultrasound) soundtrack and will receive an MPAA rating no more restrictive than "R" shall conform to the requirements of the Production Code of the Motion Picture Association of America, Inc.;

C.    Owner is the sole and absolute owner of, and has the absolute right, power and authority to enter in this Agreement and to grant to or vest in Hannibal, all of the rights, licenses and privileges granted to or vested in Hannibal under this Agreement;

D.    All of the following have been fully paid or discharged or the payment thereof shall be secured in a manner reasonably satisfactory to Hannibal:

(i)     All claims and rights of owners of copyrights in literary, dramatic, musical rights or other property or rights in and to all stories, plays, scripts, scenarios, themes, incidents, plots, characters, dialogues, sound, music, words, and other material of any nature whatsoever appearing, used or recorded in the Picture;

(ii)    All claims and right of owner of inventions and patent rights with respect to the recording of any and all dialogue, music and other sound effects recorded in the Picture and with respect to the use of all equipment, apparatus, appliance and other materials used in the photographing, recording or otherwise in the manufacture of the Picture;

(iii)   All claims and rights with respect to the use, distribution, performance exhibition, and exploitation of the Picture and any music contained therein, excluding so-called small performance fees and television performing rights fees payable to the owners of copyrights to the music contained in the Picture; and

(iv)    All cost of producing and completing the Picture;

E.     There are not now and will not be outstanding at any time liens, claims, charges, encumbrances, restrictions, agreements, commitments, or arrangements whatsoever with any person, firm or corporation, or any obligation (past, present of future), or any defaults under, or breaches of, any contract, license or agreement which will, in any way interfere with, impair, abrogate, or adversely or otherwise affect any of the rights granted to Hannibal pursuant to the terms of this Agreement, and that (except to the extent hereinafter expressly provided) there are not now and will not be any payments of any kind required to be made by Hannibal in respect, or as a result, of any use of the Picture pursuant to the rights and licenses herein granted to Hannibal.  Subject to the customary rights, liens and security interests of any production financier, completion guarantor, union or guild, Owner represents and warrants that any liens of any other third parties which may hereafter attach to the Picture are and will be subordinate in all respects to Hannibal's rights under this Agreement;

F.     Neither the Picture nor any part thereof, nor any material contained therein or synchronized therewith, nor the title thereof, nor the exercise of any right, license or privilege herein granted, violates or will violate, or infringes any trademark, trade name, contract, agreement, copyright (whether common law or statutory), patent or any literary, artistic, dramatic, personal, private, civil or property right of privacy or publicity or "moral rights of authors" or any other right whatsoever or constitutes libel or slander of any person. firm, corporation or association whatsoever;

G.     Neither the Picture nor any part thereof has been released, distributed, or exhibited in the Territory theatrically or non-theatrically or by means of television or home video or in any medium whatsoever, nor has it been banned by the

R.P.

censors of, or refused import permit to entry into any nation or political subdivision thereof;

H.    Owner has not sold, assigned, transferred or conveyed, and will not sell, assign, transfer or convey, to any party, any right, title or interest in and to the Picture or any part thereof, or in and to or derogatory of the rights granted to Hannibal. Owner further represents and warrants that it has not authorized and will not authorize any party to distribute, exhibit, or exploit the Picture in any language, in any location by any method or means, any remake or sequel thereto, any motion picture of any type or kind based in whole or in part on such literary or dramatic material, or any of the characters depicted therein adverse to or derogatory of the rights granted Hannibal and has not authorized and will not authorize any other party to exercise any right to take any action which might tend to derogate from or compete with the rights herein granted or purported to be granted to Hannibal;

I.    Owner owns and controls, without limitations or restrictions whatsoever, all motion picture, performance and all other rights granted hereunder in and to the Picture and all soundtracks thereof, and has obtained all necessary licenses required for the production, synchronization, exhibition, performance, distribution, marketing and exploitation of the Picture hereunder (including the music contained therein, subject only to the payment of such performing fees if any, as are customarily payable by exhibitors to such performing rights society as shall have jurisdiction) throughout the Territory and for the Terms of this Agreement and any third party agreement ("Third Party Agreement") entered into by Hannibal pursuant to the terms of this Agreement for any and all purposes licensed hereunder and by every means, methods and devise now or hereafter known or required for full, complete and unlimited exercise and enjoyment by Hannibal of each and all of the rights herein granted to it; the performing rights to all musical compositions contained in the Picture are (1)controlled by the American Society of Composers, Authors and Publisher, (ASCAP), Broadcast Music, Inc. (BMI), the Performing Rights Society (PRS) or their affiliates or (ii) in the public domain or (iii) controlled by Owner to the extent required for the purpose of this Agreement in which event Owner hereby grants a synchronization license and public performance license to Hannibal with regard to all music contained in the Picture throughout the Territory and in perpetuity without additional consideration;

J.    There are no restrictions which will prevent Hannibal from acting as Owner's sales and licensing agent in the distribution of the Picture by any media or means for which rights are granted to Hannibal hereunder and there are not and will not be any payments (out of any part of any revenues from the distribution or exploitation of the Picture or otherwise) which must be made by Hannibal to any actors, musicians, directors, writers or to other persons who participated in the Picture or to any union, guild or other labor organization for any right to exhibit or for any other use of the Picture or any of the rights therein and thereto granted hereunder and Hannibal shall have no obligation to pay any residuals; Owner is solely responsible for any payment of any and all residuals (including fringes) and third party participations or supplemental

payments arising out of the distribution of the Picture, including, but not limited to, under all collective bargaining agreements including the following unions or guilds:  Writers Guild of America, Directors Guild of America, Screen Actors Guild, American Federation of Musicians and IATSE;

K.     The copyright in the Picture and the literary, dramatic and musical material upon which they are based or which is contained in the Picture will be valid and subsisting for the maximum period of copyright protection available throughout the universe, and no material part of any thereof is in the public domain;

L.     Hannibal will quietly and peacefully enjoy and possess each and all of the rights, licenses and privileges herein granted or purported to be granted to it for the Term and the term of any Third Party Agreement in the Territory without hindrance on the part of any third party; and

M.     Owner agrees to procure, and cause Hannibal (and its distributor's and licensees if requested) to be named as an additional insured, with respect to the Picture an Errors and Omissions policy for a period of Three (3) years from delivery of the Picture, which insurance shall be in an amount not less than US$1 million, with a deductible of not more than US$10,000.  Owner agrees to cause its carrier to assume primary responsibility, not withstanding the fact that Hannibal may also have its own insurance coverage.  Owner's policy must provide that any insurance coverage held by Hannibal is excess insurance not subject to exposure until the coverage of Owner's policy is exhausted.  Owner's policy must provide for thirty (30) days prior written notice to Hannibal prior to any revision, modifications or termination.

8.     **INDEMNIFICATION**

Owner does hereby and shall at all times indemnify and hold harmless Hannibal, its subsidiary and affiliated companies, its officers, directors, and employees and its exhibitors, licensees and assignees and each of them, of and from any and all claims, liabilities, demands and causes of action, or any thereof, arising out of or relating to the Picture, and including without limitation, any infringement of copyright, patent, libel, slander, invasion of privacy, breach of contract, or any other claim concerning the Picture, or connected with or resulting from any breach by Owner of any of its representations, warranties, covenants or undertakings under this Agreement. Upon notice from Hannibal of any such claim, demand or action being advanced or commenced, Owner agrees to adjust, settle, or defend the same at the sole cost of Owner. If Owner shall fail promptly to so do, Hannibal shall have the right and is hereby authorized and empowered by Owner to appear by its attorneys in any such actions, to adjust, settle, compromise, litigate, contest, and/or satisfy judgments and take any other action necessary or desirable for the disposition of such claim, demand or action.  In any such case, Owner within fifteen (15) days after demand therefore by Hannibal, shall fully reimburse Hannibal for all such payments and expenses, including attorneys' fees. If Owner shall fail to reimburse Hannibal then, without waiving its right otherwise to

enforce such reimbursement, Hannibal shall have the right to deduct said amount of any such payments and expenses, or any part thereof, from any sums accruing to or for the account of Owner under this or any other agreement between Owner and Hannibal. Hannibal does hereby and shall at all times indemnify and hold harmless Owner of and from any and all claims, damages, costs, judgments, losses, expenses (including reasonable attorney's fees), liabilities and causes for action arising out of a breach or claim of breach or failure of any of the covenants, agreements, representations or warranties of Hannibal hereunder.

### 9.   CREDITS

Owner additionally warrants and represents that the main and end titles of the negative and pre-print materials of the Picture contain all necessary and proper credits for the actors, directors, writers and all other persons appearing in or connected with the production of the Picture who are entitled to receive the same.  Owner shall deliver to Hannibal a complete statement setting forth said credits as they appear on the screen.  In addition, Owner shall deliver to Hannibal a complete statement setting forth the names of all persons to whom Owner is contractually obligated to accord credit in any advertising, publicity, or exploitation of the Picture and to include in such statements excerpts from any such agreements defining and describing the form and nature of such required credits, and Hannibal shall comply with the minimum requirements so indicated in conformity with applicable agreements.  If Hannibal shall not have complied with the contractual requirements of which it has been so advised in writing, Hannibal shall, upon written notice form Owner, take all reasonable action necessary to cure such failure on a prospective basis.  No casual or inadvertent failure by Hannibal or its licensee to comply with provisions of this paragraph shall constitute breach of the Agreement.

Owner shall place Hannibal's name, logo and/or trademark on the positive prints of the Picture and in trailers thereof, and in all advertising and publicity relating thereto in such a manner, as a presentation credit in the Territory. Hannibal shall also have the right to be indicated on all positive prints of the picture and in trailers thereof to be manufactured, exhibited and distributed by every means, method and device now or hereafter known within the Territory.  Such credit will be on all prints, trailers and in all advertising throughout the world. Patricia Eberle shall receive an Executive Producer credit and Richard Rionda Del Castro shall receive a Producer Credit. Such credits will be on all prints, trailers and in all advertising throughout the territory.

### 10.   COPYRIGHT

Owner shall cause the Picture to be registered or copyrighted in the name of Owner throughout the Territory.  Owner shall include on the film of the Picture, on a card on which the title of the Picture shall appear, the copyright notice as follows: "Copyright GIALLO Productions Limited 2008 (year of publication) All Rights Reserved."

11.   **OWNERSHIP OF PICTURE**

Owner shall remain solely and completely responsible and liable for all executory obligations relating to the Picture. Owner shall furnish Hannibal with a signed copy of all contracts and other documents in connection with the chain of title and of all other agreements relating to the Picture. Hannibal's obligations hereunder with respect to the Picture are subject to Hannibal's written approval of the chain of title for the Picture, director participation, key cast participation and issuance of completion bond.

12.   **ACCOUNTING AUDIT RIGHTS**

Owner's rights with regards to accountings and audits shall be as set forth in exhibit "C" attached hereto and incorporated herein by reference.

13.   **NO PARTNERSHIP; NO THIRD PARTY BENEFICIARIES**

Nothing contained herein shall constitute or be deemed a partnership between or joint venture by the parties hereto. Neither party shall hold itself out contrary to the terms of this Agreement and neither party shall become liable or responsible for any representation, act or omission of the other contrary to the provisions hereof. This Agreement is not for the benefit of any third party and shall not be deemed to give any right or remedy to any such party whether referred to herein or not. Provided that, neither party shall take any action that derogates in any way from the rights of Arramis Films, Inc. hereunder.

14.   **WAIVER**

No waiver by any party hereto of the breach of any term or condition of this Agreement shall be deemed or construed to be a waiver of the breach of such term or condition in the future, or of any preceding or subsequent breach of the same or any other term or condition of this or any other agreement. All remedies, rights, undertakings, obligations, and agreements contained in this Agreement shall be cumulative, and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

15.   **ADDITIONAL DOCUMENTS**

Each party shall execute, acknowledge and deliver to the other party, promptly upon the request of the other party therefore, any other instruments or documents consistent herewith reasonably necessary or desirable to evidence, effectuate, or confirm this Agreement, or any of the terms and conditions hereof.

16.   **MODIFICATIONS**

R.P.                                                                                          M

This Agreement, together with its exhibits, cannot be amended, modified or changed in any way whatsoever except by a written instrument duly executed by authorized officers of the parties hereto.

17.   **ENTIRE AGREEMENT**

This Agreement shall be binding upon the parties hereto and their respective permitted successors, licensees, assigns, and other representatives during the Term, and hereby cancels and supersedes all prior negotiations and understandings between the parties relating to the Picture, and contains all of the terms, covenants, conditions, representations, and warranties of the parties hereto in relation to the subject matter hereof.

18.   **SEVERABILITY**

In the event that any term, condition, covenant, agreement, requirement or provision herein contained shall be held by any Court or arbitration tribunal having jurisdiction to be unenforceable, illegal void or contrary to public policy, such term, condition, covenant, agreement, requirement or provision shall be of no effect whatsoever upon the binding force or effectiveness of any of the others hereof, it being the intention and declaration of the parties hereto that had they or either of them, known of such unenforceability, illegality, invalidity or contrariety to public policy, they would have entered into a contract each with the other, containing all of the other terms, conditions covenants, agreements, requirements and provisions hereof.

19.   **NOTICES**

All notices, statements, or other instruments required or desired to be given hereunder by either party shall be in writing and shall be given at the address set forth at the head of this Agreement, and shall be either deposited in the mails in the country of origin, sent by telecopier (charges prepaid), or personally delivered and shall be deemed given upon the date of such deposit, sending, or delivery. Either party shall have the right to designate other or different addresses for the giving of any notices hereunder by a notice given in accordance with the provisions of this paragraph.

20.   **GOVERNING LAW**

This Agreement shall be deemed made in and is to be construed and interpreted in accordance with and governed by the internal laws of the state of California, applicable to contracts executed and to be performed therein.

21.   **ARBITRATION**

R.P.

Any controversy or claim arising out of, or relating to, this Agreement, the breach thereof, or the validity of this arbitration provision, shall be settled by binding arbitration in Los Angeles, California before one neutral arbitrator in accordance with the IFTA Rules of International Arbitration, and the judgment upon any award rendered by the arbitrator (s) may be entered in any court having jurisdiction thereof.  Nothing contained herein shall prevent any party from (i) seeking and obtaining equitable relief against a third party not a party to this agreement, including but not limited to, prohibitory or mandatory injunctions, specific performance, or extraordinary writs, nor (ii) joining a third party, nor (iii) filing legal action hereunder to effectuate any attachment or garnishment.

22.   **HANNIBAL'S EQUITABLE RELIEF/REMEDIES**

In the event of a failure or omission by Owner constituting a breach of its representations, conditions, or obligations under this Agreement (which failure or omission is not remedied within ten (10) days after receipt of written notice from Hannibal), including the grant or attempted grant of rights to a third party, in derogation hereof, Hannibal shall have the right to recover monetary damages, if any, in an action at law, (or to terminate or rescind this Agreement) and Hannibal shall be entitled to injunctive or other equitable relief, and the right to enjoin or restrain, without bond, the advertising, distribution, exhibition or exploitation of the Picture or any of the rights therein, which would interfere with the rights granted herein to Hannibal.

23.   **OWNER'S REMEDIES/WAIVER OF EQUITABLE RELIEF**

Owner's rights and remedies in the event of a failure or omission by Hannibal constituting a material breach of its obligations under this Agreement (which failure or omission is not remedied within thirty (30) days after receipt of written notice from Owner) shall be limited to Owner's right to recover money damages in an action at law, and in no event shall Owner be entitled for any reason whatsoever, and Owner hereby waives any and all right, if any, to injunctive or other equitable relief, and specifically waives, the right (if any) to terminate or rescind this Agreement or any of the rights granted to Hannibal hereunder, and the right (if any) to enjoin, restrain, or in any way interfere with the advertising, distribution, exhibition or exploitation of the Picture or any of the rights therein.

24.   **GRANT OF SECURITY INTEREST**

Subject to the provisions of paragraph 7.E, above, Owner hereby grants to Hannibal a first position security interest ("Security Interest") in the Picture in the Territory including to the materials as described in Exhibit "A" ("Collateral") to secure the monies to be paid to Hannibal under this Agreement, and the performance of Owner's obligations hereunder.  Owner warrants and represents that it owns all rights in and to the Picture (including all underlying rights necessary to grant the Rights granted hereunder), it has not previously assigned, granted or transferred an interest in the

Collateral to any party which would conflict, interfere or be inconsistent with the Security Interest granted to Hannibal herein. Owner agrees to execute copyright mortgages, laboratory access letters and any such other document as Hannibal may reasonably require to perfect, protect or evidence the foregoing Security Interest. If Owner fails to deliver such security documents within ten (10) days after Hannibal's request therefore, Owner irrevocably appoints Hannibal to execute such security documents as Owner's attorney-in-fact, coupled with an interest.

### 25.   **ASSIGNMENT**

Neither party may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other. Owner might assign this agreement for banking and financing purpose with or without Hannibal consent. Hannibal, in its sole discretion, shall have the right to assign or license any and all of its rights and obligations hereunder to any person or entity into which Hannibal is merged, or which acquires all or substantially all of Hannibal's assets, or any parent, subsidiary or affiliated entity, or for which Richard Rionda Del Castro is an executive or principal.

### 26.   **ATTORNEY'S FEES**

In any action or arbitration between the parties relating to this Agreement, the enforcement of any of its terms or to any other contract relating to the subject matter of this Agreement, the prevailing party shall, in addition to any other award of damage or other remedy, be entitled to reasonable outside attorney's fees, costs, and expenses as may be fixed by the Court or the arbitrator (s).

### 27.   **COUNTERPARTS**

This Agreement may be executed by facsimile and/or in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which, taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed the foregoing agreement as of the date and year first written above.

"OWNER"                                    "HANNIBAL"

GIALLO PRODUCTIONS LIMITED.              HANNIBAL INC

By: _____              By: _____
An Authorized Signatory                Richard Rionda Del Castro
                                       Chairman and Ceo
"OWNER"

"OWNER"

ARRAMIS FILMS INC

By: _____

An Authorized Signatory

# EXHIBIT "B"

**EXECUTED**

## INTERPARTY AGREEMENT

This Interparty Agreement (the "Agreement") is dated as of May 28, 2008, by and between GIALLO PRODUCTIONS LIMITED ("Borrower"), CINEFINANCE INSURANCE SERVICES, LLC ("Guarantor"), IAN DAVID MILNER-BROWN ("Investor"), FIRST CALIFORNIA BANK (the "Bank"), and HANNIBAL INC. ("Agent").

Reference is hereby made to the following:

A.    Borrower is the producer of that certain motion picture currently entitled *Giallo* (the "Picture").

B.    Pursuant to that certain Sales Agency Agreement, dated as of January 15, 2008, by and between Borrower and Agent, as amended herein (the "Sales Agency Agreement"), Borrower appointed Agent as Borrower's worldwide sales agent for purposes of entering into distribution and other license agreements for exploitation of the Picture.

C.    Pursuant to that certain production services agreement, dated as of February 1, 2008, as amended by that certain amendment agreement, dated as of February 15, 2008 (collectively the "Services Agreement"), by and between Borrower and Opera Film s.r.l. (the "Services Company"), Borrower engaged the Services Company's services as the Picture's production services company.

D.    Pursuant to that certain Loan and Security Agreement and attached exhibits, dated as of May 28, 2008 (the "Bank Loan Agreement"), between the Bank and Borrower, the Bank has agreed to make a loan to Borrower (the "Bank Loan") to pay a portion of the cost of production of the Picture. Also, pursuant to the Loan Agreement, the Bank has established a collection account (the "Bank Collection Account") in Borrower's name, but which is controlled by the Bank. Capitalized terms used herein without definition shall have the same meanings as set forth in the Bank Loan Agreement.

E.    Pursuant to that certain Loan and Distribution Agreement, dated as of May 28, 2008 (the "Investor Loan Agreement"), by and between Borrower and Investor, Investor has agreed to make a loan to Borrower (the "Investor Loan"), which shall be used to provide the Bank with additional collateral for the repayment of Borrower's obligations to the Bank pursuant to the Bank Loan Agreement. In addition, pursuant to the Investor Loan Agreement, Borrower granted to the Investor certain distribution rights in and to the Picture (the "Investor Distribution Rights") for exploitation in the Investor Territory (as defined below). In consideration for the grant to Investor of the Investor Distribution Rights, Investor has agreed to pay to Borrower certain monies (the "Advance") which will be used to fund a portion of the cost of production of the Picture. As used herein, (i) the term "Investor Indebtedness" means all amount payable to Investor pursuant to the Investor Loan Agreement except for the Profit Share (as defined in the Investor Loan Agreement), (ii) the term "Investor Territory" means the United States, Belgium, the Netherlands, Luxembourg and the United Kingdom, and (iii) the term "Investor Loan Documents" means the Investor Loan Agreement and each and every document, instrument and agreement required to be delivered thereunder or contemplated thereby.

F.    Pursuant to that certain completion guaranty, dated as of May 28, 2008 (the "Bank Completion Guaranty"), between the Bank and Guarantor, Guarantor has guaranteed to the Bank completion and delivery of the Picture.



E:\WPDOCS\028\FCB\Giallo\Interparty Agreement 9th Draft.wpd



G.      Pursuant to that certain completion guaranty, dated as of May 28, 2008 (the "Investor Completion Guaranty"), between the Investor and Guarantor, Guarantor has guaranteed to the Investor completion and delivery of the Picture. The Bank Completion Guaranty and the Investor Completion Guaranty are collectively referred to herein as the "Completion Guarantees."

H.      Pursuant to that certain completion agreement, dated as of May 28, 2008 (the "Completion Agreement") and related documents, between Borrower, the Services Company and Guarantor with respect to the Picture, Guarantor agreed to issue the Completion Guarantees, and Borrower and the Services Company granted Guarantor a security interest in and to all of Borrower's and the Services Company's right, title and interest in and to the Picture.

I.      Pursuant to that certain Intercreditor Agreement, dated as of May 28, 2008 (the "Intercreditor Agreement") by and between the Bank, the Investor and Guarantor, among other things, the Bank, the Investor and Guarantor have agreed to certain matters regarding their respective security interests in the Picture.

J.      Pursuant to a Collection Account Administration Agreement (the "Collection Agreement") to be entered into between, among others, the Investor, Borrower, Agent, Guarantor and Freeway CAM BV (the "Collection Administrator"), the Collection Administrator will be appointed as the parties' collection administrator for purposes of disbursing the monies deposited into a collection account (the "Freeway Collection Account") to be administered by the Collection Administrator.

       As an inducement to each of the parties hereto to execute the agreements set forth above, it is hereby agreed as follows:

1.      **AMENDMENTS TO SALES AGENCY AGREEMENT.**

       The Sales Agency Agreement is hereby modified and amended as follows:

       1.1.    Notwithstanding anything to the contrary in the Sales Agency Agreement, except with respect to sales agency or other fees which are payable to Agent out of the Picture's budget (if any) and except as provided in the Collection Agreement, Agent shall not be entitled to receive any fees out of any monies derived from the exploitation of the Picture until such time as (i) all of Borrower's Indebtedness to the Bank pursuant to the Bank Loan Agreement has been paid in full, (ii) the Investor Indebtedness has been paid in full, and (iii) Guarantor has recouped all Completion Sums (as defined in paragraph 2.2, below) in full. After all of Borrower's Indebtedness to the Bank pursuant to the Bank Loan Agreement has been paid in full, the Investor Indebtedness has been paid in full and Guarantor has recouped all Completion Sums in full, Agent will be entitled to recoup its deferred fees out of the monies paid to Agent pursuant to the Collection Agreement.

       1.2.    Notwithstanding anything to the contrary in the Sales Agency Agreement, except with respect to distribution expenses or other fees or expenses which are payable to Agent out of the Picture's budget (if any), Agent shall not be entitled to receive any distribution expenses (or other similar expenses) payable out of any monies derived from the exploitation of the Picture until such time as (i) all of Borrower's Indebtedness to the Bank pursuant to the Bank Loan Agreement has been paid in full, (ii) the Investor Indebtedness has been paid in full, and (iii) Guarantor has recouped all Completion Sums in full. After all of Borrower's Indebtedness to the Bank pursuant to the Bank Loan Agreement has been paid in full, the Investor Indebtedness has been paid in full and Guarantor has recouped all Completion Sums in full, Agent will be entitled to recoup its deferred expenses out of the monies paid to Agent pursuant to the Collection Agreement.




1.3.     Notwithstanding anything to the contrary contained in the Sales Agency Agreement, until such time as all of Borrower's Indebtedness to the Bank pursuant to the Bank Loan Agreement has been paid in full and the Investor Indebtedness has been paid in full, Borrower (or Agent on Borrower's behalf) may not enter into any Distribution Agreement with respect to any territory for which Borrower (or Agent on Borrower's behalf) has not entered into a Distribution Agreement as of the date hereof unless (i) the prospective Distributor is approved by the Bank (which approval the Bank may grant or withhold in its sole discretion) prior to Borrower (or Agent on Borrower's behalf) entering into any such Distribution Agreement, (ii) the aggregate amount of the advance or minimum guarantee payment payable by the prospective Distributor with respect to the Picture prior to the Maturity Date is greater than or equal to the applicable minimum for the territory in question agreed to by the Bank (as set forth in Exhibit "A" hereto) and the only precondition to the payment of such advance or minimum guarantee is such Distributor's receipt of a notice of availability of specified delivery materials, the costs of which are to be paid for by the prospective Distributor, unless otherwise approved by the Bank and Guarantor, (iii) the delivery terms contained in such Distribution Agreement and the Notice and Acknowledgment of Assignment entered into in connection therewith (as set forth more fully in paragraph 1.5, below) have been approved in writing by Guarantor, and (iv) the Distribution Agreement does not require delivery of the Picture earlier than the Delivery Date or forty-five (45) days after Guarantor has received a copy of the Distribution Agreement and the Notice and Acknowledgment of Assignment entered into in connection therewith, whichever is later. Any such Distribution Agreement entered into by Borrower (or Agent on Borrower's behalf) must be by way of a long form Distribution Agreement substantially in a form previously approved by the Bank and Guarantor.  Borrower and Agent each acknowledges that a failure to comply with such covenant shall result in such Distribution Agreement failing to qualify as an Acceptable Distribution Agreement which may result in the occurrence of an Event of Default under the Bank Loan Agreement and the termination of the Sales Agency Agreement. Also, to the extent that the Bank requires that the applicable Distributor issue a letter of credit in favor of the Bank, the applicable Distribution Agreement must provide for such a letter of credit, in form and substance acceptable to the Bank and its counsel (and Guarantor if Guarantor is required to issue any letter of credit delivery documentation as a condition of delivery).  In addition, Borrower (or Agent on Borrower's behalf) may not enter into a Distribution Agreement with any Distributor (regardless of whether or not such agreement is entered into in conformity with the requirements of clauses (i) through (iv), above) licensing the Picture to such Distributor along with other motion pictures or in any manner in which the income from exploitation of the Picture may in any way be applied to or attributed to any other motion picture, including, without limitation, any Distribution Agreement in which income from exploitation of the Picture is "cross-collateralized" (as that term is commonly understood in the motion picture industry) with the income from or expenses attributable to any other motion picture or television program. After Borrower's Indebtedness to the Bank has been paid in full, the Investor shall have all rights and approvals accorded to the Bank pursuant to this paragraph 1.3. Nothing contained in this paragraph 1.3 shall apply to the Investor Distribution Rights or any exploitation of the Picture in the Investor Territory.

1.4.     With respect to the exploitation of the Investor Distribution Rights, Agent will submit all offers for the Investor Distribution Rights to Investor for approval.  When the Investor has approved an offer, that offer will be submitted to Guarantor for Guarantor's approval under the Investor Completion Guaranty.  When the offer has been approved by both the Investor and Guarantor, Agent will enter into a distribution agreement, notice of assignment and related documentation in relation to such offer.

1.5.     Notwithstanding anything to the contrary in the Sales Agency Agreement, Borrower (or Agent on Borrower's behalf) shall obtain from each Distributor, concurrently with such Distributor's execution of its Distribution Agreement and as a precondition to such Distributor's exercise of rights



thereunder, an irrevocable authority and instruction to pay (each a "Notice and Acknowledgment of Assignment") (the final version of which shall be subject to the Bank's and Guarantor's prior approval), signed by such Distributor requiring such Distributor to make payments to the Bank as provided therein.

     1.6.    Notwithstanding anything to the contrary in the Sales Agency Agreement, if, (A) as of January 30, 2009, Borrower (or Agent on Borrower's behalf) has not entered into Acceptable Distribution Agreements with respect to the Picture with an Acceptable Pre-Sale Value which, in the aggregate, equals or exceeds Two Million Two Hundred Seventy-Eight Thousand Eight Hundred Seventy-Nine Dollars ($2,278,879.00) (net of any offset provisions and without any deductions whatsoever) or (B) at any time prior to payment in full of the Indebtedness, Agent fails to comply with or to perform any material provision of this Agreement or the Sales Agency Agreement within ten (10) Business Days after Agent's receipt of written notice from Borrower or the Bank specifying such failure to comply, Agent acknowledges and agrees that any such failure shall constitute an Event of Default under the Loan Agreement. In such event, the Bank shall have the right, among other things (i) to enforce the Distribution Agreements on Borrower's and Agent's behalf, (ii) to exercise all of its rights and remedies as a secured party with respect to the Picture, (iii) to exercise all of its rights and remedies under the Power of Sale entered into by Borrower pursuant to the Loan Agreement, which authorizes the Bank to sell any and all rights in and to the Picture which have not been sold by Borrower (or Agent on Borrower's behalf), other than those rights relating to the Investor Territory, and (iv) to terminate the Sales Agency Agreement and all of Agent's rights with respect to the Picture (other than those relating to the Investor Territory) on behalf of Borrower effective immediately upon delivery of written notice by the Bank (on Borrower's behalf) to Agent to the effect that Agent shall no longer be entitled to license rights to the Picture (other than those relating to the Investor Territory) or to receive any sales agency fees or expenses due and payable pursuant to the Sales Agency Agreement, as amended herein (except that, as between Borrower and Agent, notwithstanding any such termination, Agent shall remain entitled to receive any sales agency fees which Agent has earned and recoup any sales agency expenses which Agent has incurred with respect to sales made prior to any such termination. Prior to taking any action pursuant to the prior sentence, the Bank will consult with Investor; provided, however, that until the Indebtedness has been paid if full, the Bank's decision will be final with respect to all such matters. After Borrower's Indebtedness to the Bank has been paid in full, the Investor shall have all rights and approvals accorded to the Bank pursuant to this paragraph 1.6.

     1.7.    Notwithstanding anything to the contrary contained in the Sales Agency Agreement, the Picture as produced and delivered will be based upon the screenplay for the Picture written by Sean Keller and James Agnew, dated December 15, 2007 (the "Screenplay"), which was previously approved by Borrower, Agent and Guarantor (subject to such minor changes or variations as may be necessitated by the exigencies of production, which in no event shall materially alter the story line or the relative significance of the principal characters), and no material changes, modifications or revisions shall be made to the Screenplay (except as provided above) without the express prior written approval of Agent and Guarantor. In addition, the budget for the Picture dated as of April 1, 2008 (the "Budget"), which has been approved by the Bank and Guarantor shall not be increased, decreased or otherwise materially modified without the express prior written approval of Guarantor and the Bank.

     1.8.    Notwithstanding anything to the contrary in the Sales Agency Agreement, as between Agent, on the one hand, and the Bank and Guarantor, on the other hand, Agent is hereby deemed to have approved all elements of the Picture which Agent is entitled to approve pursuant to the Sales Agency Agreement (if any). Nothing in this paragraph 1.5 shall affect Agent's rights with respect to Borrower.



1.9.    Notwithstanding the provisions of paragraph 22 of the Sales Agency Agreement, until such time as (i) all of Borrower's Indebtedness to the Bank pursuant to the Bank Loan Agreement has been paid in full, (ii) the Investor Indebtedness and the Profit Share have been paid in full, and (iii) Guarantor has recouped all Completion Sums in full, Agent shall have no right to enjoin or restrain the advertising, distribution, exhibition or exploitation of the Picture, or any rights therein.

## 2.    NOTICE OF ASSIGNMENT.

2.1.    <u>Assignment to the Bank.</u>  Pursuant to the Bank Loan Agreement, Borrower has irrevocably assigned to the Bank all monies payable to Borrower pursuant to the Sales Agency Agreement and the Distribution Agreements, and has granted the Bank a first priority security interest in and to, among other things, all of Borrower's right, title and interest in and to the Picture, and all amounts which will become payable to Borrower in connection with the Picture, including, without limitation, all amounts payable to Borrower under the Sales Agency Agreement. The proceeds assigned to the Bank pursuant to the Bank Loan Agreement are referred to herein as the "Bank's Assigned Receipts."

2.2.    <u>Assignment to the Investor.</u>  Pursuant to the Investor Loan Documents, Borrower has assigned to the Investor and has granted the Investor a security interest in all of Borrower's right, title and interest in and to the Picture and in and to the Investor's Assigned Receipts, as set forth more fully in the Investor Loan Documents. Except as provided in the Intercreditor Agreement with respect to the Excluded Collateral (as defined in the Intercreditor Agreement), such assignment and security interest are subject and subordinate to the security interest and other rights of the Bank, as set forth in paragraph 2.1, above. As used herein, the term "Investor's Assigned Receipts" means all of the proceeds assigned by Borrower to Investor pursuant to the Investor Loan Agreement.

2.3.    <u>Assignment To Guarantor.</u>  Borrower has assigned to Guarantor and has granted Guarantor a security interest in all of Borrower's right, title and interest in and to the Picture and in and to the Bank's Assigned Receipts, as set forth more fully in the Completion Agreement, which assignment and security interest are subject and subordinate to the security interest and other rights of the Bank, as set forth in paragraph 2.1, above, and the Investor, as set forth in paragraph 2.2, above. As used herein, the term "Guarantor's Assigned Receipts" means all of the proceeds assigned by Borrower to Guarantor in the Completion Agreement. This assignment is made to secure the payment to Guarantor of an amount equal to all sums advanced by Guarantor pursuant to the Completion Agreement or the Completion Guarantees, or expended to cover costs, expenses, claims, demands, losses or liabilities incurred by Guarantor, either in the performance of its obligations under the Completion Guarantees or in the exercise of its rights and powers thereunder or under the Completion Agreement, plus interest on the foregoing amounts calculated at the same rate and on the same basis as interest is calculated pursuant to the Completion Agreement (collectively the "Completion Sums").

2.4.    <u>Notice to Agent.</u>  Borrower hereby:

2.4.1.    notifies Agent of the above-referenced assignments, which Agent hereby unconditionally consents to;

2.4.2.    instructs Agent to furnish to the Bank, the Investor and Guarantor duplicates of all notices and statements from Agent to Borrower under the Sales Agency Agreement; and



2.4.3.   notifies Agent that the authority, instructions and directions contained in this paragraph 2 are coupled with an interest and are in all respects irrevocable and without right of rescission or modification without the written consent of Borrower, the Bank, the Investor and Guarantor.

3.   **ACCEPTANCE AND ACKNOWLEDGMENT.**

Agent and Borrower, as applicable, each hereby agree that:

3.1.   Payment of the Bank's Assigned Receipts. Notwithstanding anything to the contrary in the Sales Agency Agreement or in any Distribution Agreement entered into by Agent pursuant to the Sales Agency Agreement, until such time as all of Borrower's Indebtedness to the Bank has been indefeasibly paid in full, Agent and Borrower shall pay all of the Bank's Assigned Receipts to the Bank. If any Person pays any monies to Borrower or Agent which amounts are required to be paid to the Bank pursuant to this Agreement, Borrower or Agent, as applicable, shall receive such sums as the Bank's trustee and, promptly upon receipt thereof, shall remit such sums (or cause such sums to be remitted) to the Bank as set forth above.

3.2.   Notices to the Bank, Investor and Guarantor.  Agent shall send to the Bank, the Investor and Guarantor duplicates of all notices and statements furnished by Agent to Borrower under the Sales Agency Agreement (provided, however, that Agent's inadvertent failure to send any such duplicate notice or statement which does not adversely affect the Bank's rights to receive the Bank's Assigned Receipts hereunder shall not constitute a breach hereof unless not tendered to the Bank within ten (10) days after Agent's receipt of any written request therefor, or if such inadvertent failure to send any such duplicate notice or statement does adversely affect the Bank's rights to receive the Bank's Assigned Receipts hereunder, such failure shall not be deemed a breach hereof if Agent pays to the Bank an  amount equal to any and all damages or other losses, costs and expenses incurred by the Bank resulting from Agent's failure to give any such notice, within ten (10) days after Agent's receipt of written request therefor) and (notwithstanding anything to the contrary in the Sales Agency Agreement) permit the Bank or its representatives, until payment in full of the Indebtedness (and, after payment in full of the Indebtedness, the Investor or its representatives), in addition to Borrower, to audit, examine and take excerpts from all of Agent's books and records pertaining to the Picture at the times and subject to the terms and conditions of the Sales Agency Agreement, upon reasonable notice.

3.3.   Conflicting Notices. Agent shall notify the Bank, the Investor and Guarantor promptly of any conflicting notice received by Agent or of any claims by any third party that such third party is entitled to receive all or any portion of the Bank's Assigned Receipts or the Investor's Assigned Receipts; provided, however, that Agent's inadvertent failure to do so which does not adversely affect the Bank's, the Investor's or Guarantor's right to receive their respective Assigned Receipts shall not constitute a breach hereof unless not tendered to the Bank, the Investor or Guarantor, as applicable, within ten (10) days after Agent's receipt of written request therefor. If Agent's inadvertent failure to provide any such notice does adversely affect the Bank's, the Investor's or Guarantor's right to receive their respective Assigned Receipts, such failure shall not be deemed a breach hereof if Agent pays to the Bank, the Investor or Guarantor, as applicable, an amount equal to any and all damages or other losses, costs and expenses incurred by the Bank, the Investor or Guarantor, as applicable, resulting from Agent's failure to give any such notice, within ten (10) days after Agent's receipt of written request therefor.



## 4.   APPLICATION OF THE ASSIGNED RECEIPTS.

4.1.   **Collection Agreement.** The Collection Agreement shall provide in relevant part for (i) the payment to the Investor of the Investor's Assigned Receipts, (ii) the payment to Guarantor of the Completion Sums (if any), and (iii) the payment to Agent of Agent's sales agency fees and distribution expenses. Borrower and Agent each hereby acknowledge and agree that, notwithstanding the fact that the Bank, the Investor or Guarantor may have issued a Termination Notice, Borrower and Agent shall nonetheless remain obligated to direct payment of all monies otherwise payable to Agent or Borrower from the exploitation of the Picture (including, without limitation, all monies otherwise payable to Agent or Borrower pursuant to the Distribution Agreements and the Sales Agency Agreement) directly to the Collection Administrator for deposit into the Freeway Collection Account. All such proceeds shall be disbursed in accordance with the provisions of the Collection Agreement.

4.2.   **Payment of Indebtedness; Issuance of Termination Notice.** Upon receipt of the Bank's Assigned Receipts, the Bank shall be entitled to retain the Bank's Assigned Receipts and shall immediately apply the same to repay Borrower's Indebtedness to the Bank as provided in the Bank Loan Agreement. All amounts (if any) by which the sum of the Bank's Assigned Receipts received by the Bank exceeds the amount of the Indebtedness shall be deposited in the Bank Collection Account. Upon repayment in full of the Indebtedness, the Bank shall: (i) notify Agent thereof in writing (a "Termination Notice"), at which time the authority, instructions and directions from Borrower to Agent under paragraph 2 hereof shall terminate and Agent shall thereafter be relieved of its obligations to the Bank under paragraph 3 hereof (provided, however, that the foregoing shall not be deemed to relieve Borrower and Agent of their obligations to pay all monies otherwise payable to Borrower and Agent from the exploitation of the Picture to the Collection Administrator as provided herein and in the Collection Agreement); (ii) promptly transfer control of the Bank Collection Account to the Collection Administrator; and (iii) deliver copies to Borrower, Investor, Agent and Guarantor of termination statements executed by the Bank as the secured party for filing in all jurisdictions where financing statements and mortgages of copyright have been filed by the Bank to perfect the security interest granted under the Bank Loan Agreement; provided, however, that the Bank's inadvertent failure to file or deliver any such termination statement shall not constitute a breach hereof unless the Bank fails to execute and deliver such termination statements within five (5) Business Days after the Bank's receipt of any written request therefor.

4.3.   **Repayment of the Investor Indebtedness; Issuance of Termination Notice.** Upon receipt of the Investor's Assigned Receipts pursuant to the Collection Agreement, the Investor shall be entitled to retain the Investor's Assigned Receipts and shall immediately apply the same to repay the Investor Indebtedness and the Profit Share as provided in the Investor Loan Agreement. Upon repayment in full of the Investor Indebtedness, the Investor shall notify Agent thereof in writing.

4.4.   **Payment of Completion Sums; Issuance of Termination Notice.** Upon receipt of Guarantor's Assigned Receipts pursuant to the Collection Agreement, Guarantor shall be entitled to retain Guarantor's Assigned Receipts and apply the same to repayment in full of the Completion Sums, if any. Upon repayment in full of the Completion Sums (or if no Completion Sums are payable to Guarantor), Guarantor shall: (i) notify Agent thereof in writing (with copies to the Bank and Borrower) by means of a Termination Notice, at which time the authority, instructions and directions from Borrower to Agent under paragraph 2 hereof shall terminate with respect to Guarantor and Agent shall thereafter be relieved of its obligations to Guarantor under paragraph 3 hereof; and (ii) deliver to Borrower (with copies to Agent, Investor and the Bank) termination statements executed by Guarantor as the secured party for filing in all jurisdictions where financing



statements have been filed by Guarantor to perfect the security interest granted hereunder and under the Completion Agreement; provided, however, that Guarantor's inadvertent failure to file or deliver any such termination statement shall not constitute a breach unless Guarantor fails to execute and deliver such termination statements within five (5) Business Days after Guarantor's receipt of any written request therefor.

4.5.    Payments To Investor, Agent and the Collection Administrator.  Notwithstanding anything to the contrary contained herein, including, without limitation, the provisions of paragraph 4.1, above, until such time as Borrower's Indebtedness to the Bank has been repaid in full, if the Bank receives any Secondary Territory Payments (as defined below), then, with respect to each Secondary Territory Payment which the Bank receives, the Bank will pay eighteen and one-half percent (18½%) of such amount if the aggregate amount of the advance or minimum guarantee payment payable by such Distributor is greater than or equal to the applicable minimum for the territory in question set forth in Exhibit "A" hereto or sixteen percent (16%) of such amount if the aggregate amount of the advance or minimum guarantee payment payable by such Distributor is less than the applicable minimum for the territory in question set forth in Exhibit "A" hereto, to the Collection Administrator to be disbursed in accordance with the applicable provisions of the Collection Agreement.  The Bank shall pay such amounts to the Collection Administrator pursuant to this paragraph 4.5 within ten (10) Business Days after the Bank's receipt of any Secondary Territory Payment. If, for any reason, the Bank becomes obligated to refund or repay any Secondary Territory Payment, and the Bank has previously paid a percentage of such monies to the Collection Administrator as provided herein, if the Investor, Agent or the Collection Administrator have received payment of any such amounts pursuant to the Collection Agreement, upon each such party's receipt of written notice from the Bank, each such party shall promptly repay to the Bank the amount specified by the Bank as having been previously paid to such party out of such Secondary Territory Payment. For purposes of this paragraph 4.5, a "Secondary Territory Payment" is a payment received pursuant to a Distribution Agreement for exploitation of the Picture in any portion of the Investor Territory.

4.6.    Italian Distribution Agreement.  The parties acknowledge that Steel Bridge Finance, LLC, Richard Rionda del Castro, Rafael Primorac and Adrien Brody have agreed to defer the payment of certain amounts due them in connection with the Picture (the "Deferments"). Notwithstanding anything to the contrary contained herein, if Borrower (or Agent on Borrower's behalf) enters into a Distribution Agreement for exploitation of the Picture in Italy (the "Italian Distribution Agreement") and if as of the time any payments are made by the Italian Distributor pursuant to the Italian Distribution Agreement, the Bank has not received a letter of credit (in a form and issued by a bank acceptable to the Bank in its sole discretion) issued on behalf of the Italian Distributor securing payment of the minimum guarantee payable pursuant to the Italian Distribution Agreement, then the amounts payable pursuant to the Italian Distribution Agreement shall first be used to pay the Deferments and the amounts used to pay the Deferments shall not be considered Bank's Assigned Receipts, Guarantor's Assigned Receipts or Investor's Assigned Receipts for any purpose hereunder. Any amounts payable pursuant to any such Distribution Agreement in excess of what is required to pay the Deferments in full shall be considered Bank's Assigned Receipts hereunder and shall be paid to the Bank as provided in paragraph 3.1, above.

5.    **ACKNOWLEDGMENT OF PRIORITY.**

Agent hereby acknowledges and confirms that:

5.1.    The Bank - First Priority.  Borrower has assigned to the Bank as security for repayment of the Bank Loan, and has granted to the Bank a first priority security interest in, the Collateral,



-8-





including, without limitation, all of Borrower's right, title and interest in and to the Picture and all of Borrower's right, title and interest under the Sales Agency Agreement and the Distribution Agreements. Agent acknowledges that, notwithstanding the fact that Mandatory Delivery may have been effected, the Bank shall not be obligated to terminate its security interest until such time as all of Borrower's Indebtedness to the Bank has been paid in full. Agent agrees that, notwithstanding any rights it may acquire in and to the Picture, the Bank shall continue to have a first priority security interest in and to the Collateral until such time as the Indebtedness has been paid in full.

    5.2.   <u>The Investor - Second Priority</u>. Borrower has assigned to the Investor as security for repayment of the Investor Indebtedness and the Profit Share, and has granted to the Investor a second priority security interest in, the Collateral, including, without limitation, all of Borrower's right, title and interest in and to the Picture and all of Borrower's right, title and interest under the Sales Agency Agreement and the Distribution Agreements. Agent agrees that, notwithstanding any rights it may acquire in and to the Picture, the Investor shall continue to have a second priority security interest in and to the Collateral (and, after Borrower's Indebtedness to the Bank has been paid in full, a first priority security interest).

    5.3.   <u>Guarantor</u>. Pursuant to the Completion Agreement, Borrower granted Guarantor a security interest in and to the Picture and all of Borrower's right, title and interest under the Sales Agency Agreement, which security interest is subject and subordinate to the Bank's rights hereunder and under the Bank Loan Agreement and to the Investor's rights hereunder and under the Investor Loan Agreement.

**6.    COMPLETION GUARANTY.**

    6.1.   Agent and Borrower each acknowledge that the Bank and the Investor will be relying upon the Completion Guarantees for assurance that the Picture will be completed and delivered to Agent and the Distributors in accordance with the Completion Guarantees (as amended herein) and this Agreement (or that Guarantor will repay the Bank and Investor subject to the terms and conditions of the Completion Guarantees in the event of an abandonment of the Picture or a failure to effect Mandatory Delivery). Borrower and Agent therefore each acknowledge and agree that, as long as Guarantor is performing its obligations hereunder and under the Completion Guarantees, neither of them will take any action to interfere with Guarantor's access to the physical elements of the Picture (pursuant to the Completion Agreement or pursuant to any laboratory agreement executed in connection therewith), nor will any of them take any other action which will interfere with or prejudice Guarantor's ability to complete and deliver the Picture pursuant to the Completion Guarantees or to otherwise discharge its obligations under the Completion Guarantees.

    6.2.   If, pursuant to the Completion Agreement and the Completion Guarantees, Guarantor abandons the Picture and makes payment to the Bank and the Investor as provided in the Completion Guarantees, Guarantor shall be subrogated to all of the Bank's and the Investor's rights and interests in and to the Picture. If Guarantor abandons the Picture and makes payment to the Bank and the Investor as provided in the Completion Guarantees, or if Guarantor makes payment to the Bank and the Investor pursuant to an arbitration as set forth in paragraph 9.9.4 below, within five (5) Business Days after the Bank's receipt of Guarantor's request or the Investor's receipt of Guarantor's request, the Bank or the Investor, as applicable, shall execute and deliver to Guarantor such documents or other instruments as Guarantor may request to effect and evidence the termination of the Bank's or the Investor's rights in and to the Picture. If the Bank or the Investor, as applicable, has not executed and delivered such documents within the five (5) Business Day period provided above, such party agrees that Guarantor shall have the right to act (and the Bank and the Investor each hereby appoints Guarantor to so act) as such party's attorney-in-fact with full authority to execute and





deliver on such party's behalf all such documents and instruments. The Bank and the Investor each acknowledges and agrees that such appointment is coupled with an interest and is irrevocable. Notwithstanding the foregoing, in the event that Guarantor abandons the Picture and makes payment to the Bank and the Investor as provided in the Completion Guarantees, but such payment is insufficient to repay Borrower's Indebtedness to the Bank in full or to repay the Investor Indebtedness in full, then, in such event, the Bank or the Investor, as applicable, shall not be required to terminate its security interest in the Collateral or deliver any such termination documents to Guarantor as provided herein, and Guarantor shall have no right to execute any documents as such party's attorney-in-fact.

6.3.     Borrower and Guarantor each represents and warrants for itself only that, as of the date of execution of this Agreement, no default exists under the Completion Agreement and the Completion Agreement is in full force and effect. Furthermore, Borrower and Guarantor agree that they will not modify, alter, terminate or amend the Completion Agreement or any other agreements executed pursuant thereto in any manner that would adversely affect or lessen any of the rights granted to the Bank under the Bank Loan Documents, without the Bank's prior written consent, or in any manner that would adversely affect or lessen any of the rights granted to the Investor under the Investor Loan Agreement, without the Investor's prior written consent.

7.     **NO PERFORMANCE REQUIRED OF THE BANK, THE INVESTOR OR GUARANTOR.**

It is expressly agreed by the parties hereto that, anything herein to the contrary notwithstanding, Borrower shall remain responsible for the performance of all of its obligations under the Sales Agency Agreement (as amended herein) and Agent shall remain responsible for the performance of all of its obligations under the Distribution Agreements, and neither the Bank, the Investor nor Guarantor shall have any obligations under the Sales Agency Agreement or the Distribution Agreements by reason of or arising out of this Agreement, the Bank Loan Agreement, the Investor Loan Agreement, or otherwise, and neither the Bank, the Investor nor Guarantor shall be required or obligated in any manner to perform any of Borrower's obligations under or pursuant to the Sales Agency Agreement or Agent's obligations under the Distribution Agreements, except, in the case of Guarantor to perform Guarantor's obligations to the Bank and the Investor under the Completion Guarantees. Neither the Bank nor the Investor shall be required to present or file any claim or to take any other action as a condition to collecting or enforcing the payment of the Bank's Assigned Receipts or the Investor's Assigned Receipts, as applicable. Subject to the provisions of the Completion Guarantees and the Completion Agreement, Guarantor shall not be required to present or file any claim or to take any other action as a condition to collecting or enforcing the payment of Guarantor's Assigned Receipts.

8.     **ADDITIONAL AGREEMENTS.**

It is further agreed among the parties hereto as follows:

8.1.     Delivery Date; Mandatory Delivery. The Picture shall be delivered by Borrower or Guarantor making delivery or granting access, as applicable, to Agent of the items (the "Delivery Materials") marked with an asterisk (*) in the delivery schedule (the "Delivery Schedule") attached hereto as Exhibit "B." The Delivery Materials listed in the Delivery Schedule which are marked with a pound sign (#) are referred to herein as the "Physical Materials." All Delivery Materials which are not Physical Materials are referred to herein as the "Additional Delivery Materials." At such time as Borrower or Guarantor delivers all of the Delivery Materials to Agent, Borrower or Guarantor shall give Agent a written notice (a "Delivery Notice")





to such effect (with a copy to the Bank). Borrower and Guarantor shall not give Agent a Delivery Notice unless and until Borrower or Guarantor, as applicable, reasonably believes that they have delivered all of the Delivery Materials to Agent. Borrower or Guarantor must deliver the Delivery Notice to Agent on or before January 30, 2009 (the "Delivery Date"), subject to automatic extension due to (A) any actual delays (not to exceed sixty (60) days in the aggregate) directly caused by Events of Force Majeure (as defined below) or exigencies of production, and (B) any delays (not to exceed sixty (60) days in the aggregate) caused by events of Essential Element Force Majeure (as defined below); provided, however, that the maximum extension of the Delivery Date by any and all delays caused by Events of Force Majeure and Essential Element Force Majeure combined shall not exceed one hundred twenty (120) days in the aggregate. As used herein, "Mandatory Delivery" means (i) delivery to Agent in the manner provided herein (i.e., either by means of physical delivery or laboratory access) of all of the Delivery Materials on or before the Delivery Date (as the same may be extended as provided herein), (ii) delivery to Agent of Physical Materials which are of first class technical quality, and (iii) delivery to Agent of the Delivery Materials in accordance with the Specifications attached hereto as Exhibit "C."

8.2.   Agent's Indemnity of Guarantor. Agent acknowledges that Guarantor is relying on Agent to deliver the Picture to the Distributors following Agent's receipt of the Delivery Materials and that Agent's failure to deliver the Picture to any such Distributor may cause Guarantor to incur liability to the Bank pursuant to the Completion Guarantees. In that regard, Agent agrees to promptly deliver the Picture to the Distributors after Mandatory Delivery of the Picture to Agent has been effected in accordance with the provisions of this Agreement. The parties hereto acknowledge that if Guarantor reasonably believes that Agent may fail to effect delivery of the Picture to any Distributor by the applicable delivery date specified in the Completion Guarantees, then Guarantor may make such delivery on behalf of Agent. Subject to Mandatory Delivery being effected in accordance with the provisions of this Agreement, Agent hereby agrees to indemnify Guarantor with respect to any costs or liability incurred by Guarantor arising out of or relating to Agent's failure to timely deliver the Picture to any Distributor.

8.3.   Sales Agency Agreement and Completion Guarantees Subject to this Agreement. As between the Bank, the Investor, Borrower, Guarantor and Agent, the Sales Agency Agreement and the Completion Guarantees are each subject to this Agreement. Except as expressly provided for in this Agreement, all other terms, covenants and conditions of the Sales Agency Agreement and the Completion Guarantees not inconsistent with the provisions hereof shall remain in full force and effect.

8.4.   Sales Agency Agreement; Amendments. Borrower and Agent each represents that, as of the date of execution of this Agreement, no default exists under the Sales Agency Agreement and the Sales Agency Agreement is in full force and effect. Agent further represents and warrants that it has the full right, power, and authority to enter into this Agreement and to grant the rights agreed to be granted hereunder. Until Agent receives notice in writing (i) from the Bank that Borrower's Indebtedness to the Bank has been repaid in full, (ii) from the Investor that the Investor Indebtedness has been paid in full, and (iii) from Guarantor that all Completion Sums have indefeasibly been paid in full to Guarantor, Borrower and Agent agree that, without the Bank's, the Investor's and Guarantor's prior written consent, they will not modify, alter, terminate or amend the Sales Agency Agreement in a manner which would adversely affect the Bank's, the Investor's or Guarantor's interests.

8.5.   Insurance Claims. Notwithstanding any provisions of the Sales Agency Agreement, the Bank Loan Agreement, the Investor Loan Agreement, the Completion Guarantees or the Completion Agreement to the contrary, if any claim should arise under any of the insurance policies to be provided under

-11-

I:\WPDOCS\028\FCB\Gialla\Interparty Agreement 9th Draft.wpd



such agreements, with respect to which the insurer is to make a payment to Borrower (as distinguished from a case in which payment is to be made to a third party), such payment shall be made to the Picture's production account and shall be disbursed in the following order of priority: First, in case Mandatory Delivery has been effected as of the time such a claim arises or production of the Picture has been abandoned (whether by Guarantor or as a result of any insured abandonment) as of the time a claim arises, such proceeds shall be paid to the Bank (unless Borrower's Indebtedness to the Bank with respect to the Picture has already been paid in full, in which event such proceeds shall be paid to the Investor until the Investor Indebtedness has been paid in full, and then to Guarantor or Borrower as their respective interests may appear) and applied to repayment of Borrower's Indebtedness to the Bank, and the excess, if any, shall be paid to first to the Investor to be applied to repayment of the Investor Indebtedness, and then to Guarantor to the extent of and as reimbursement for any funds advanced by and not previously reimbursed to Guarantor under the Guarantee applicable to the Picture. Second, if Mandatory Delivery has not been effected as of the time such a claim arises and if production of the Picture has not been abandoned, such proceeds, to the extent necessary, shall be used to pay production costs of the Picture; provided, however, that if, as a direct result of an insured event, Guarantor has advanced funds for the production of the Picture prior to the recovery of said insurance loss, then the proceeds of such insurance for such loss shall be paid first to Guarantor up to the amount of said advance or advances directly related to such insurance loss and the balance of such proceeds shall be used to pay production costs of the Picture. Any funds remaining after Mandatory Delivery has been effected shall be disbursed first to the Bank, to be applied in repayment of the Indebtedness, and then to the Investor, to be applied to repay the Investor Indebtedness. Any balance remaining after the payments provided for in the prior sentence shall be paid to Guarantor to the extent of and as reimbursement for any funds advanced by and not previously reimbursed to Guarantor under the Completion Guarantee, and, after Guarantor has been fully reimbursed for all Completion Sums advanced by Guarantor (or if Guarantor has not advanced any Completion Sums) any remaining sums shall be paid to Borrower. Nothing in this paragraph 8.5 shall modify or alter the obligations of Guarantor to the Bank under the Completion Guarantees.

        8.6.    <u>Force Majeure</u>.  As used herein, an "Event of Force Majeure" shall include any accident, illness, incapacity, disability, death unavailability or default (including refusal to perform) of a principal cast member or the director of the Picture, any accident, fire, explosion, casualty, epidemic, act of God, act of terrorism, earthquake, flood, torrential rain, strike, walkout, picketing, labor controversy (including, without limitation, guild arbitration and other disputes), terrorism, civil disturbance, embargo, riot, act of public enemy, war or armed conflict (whether or not there has been an official declaration of war), unavailability of essential materials and supplies, equipment, transportation, power or other commodity, failure or delay of any transportation agency, laboratory or any other furnisher of essential supplies, equipment or other facilities, enactment of any law, any judicial or executive order or decree, the action of any legally constituted authority, or other event or cause of the nature of force majeure beyond Borrower's, Agent's or Guarantor's control, whether similar or dissimilar to any of the foregoing, which causes an interruption or suspension of, or materially hampers, interferes with or delays, the commencement of production, or the production or delivery of the Picture. As used herein, "Essential Element Force Majeure" means an occurrence resulting in the inability of the Essential Element (as defined below) to render services prior to the completion of principal photography of the Picture, whether or not such occurrence is covered under the essential element endorsement to the cast insurance policy for the Picture.

        8.7.    <u>Essential Element</u>.  The Picture shall contain the performance of the "Essential Element" (*i.e.*, Adrien Brody in the roles of "Inspector Enzo Lavia" and "Flavia Volpe," or whatever names such characters are known by in the completed Picture) or a replacement for the Essential Element who has been approved in accordance with the provisions of this paragraph 8.7.  In that regard, notwithstanding

-12-

anything to the contrary contained in the Sales Agency Agreement, the parties acknowledge that, if it becomes necessary to replace the Essential Element as a cast member, the following procedure shall apply:

8.7.1. Borrower (or Guarantor if Guarantor has taken over production of the Picture) shall submit to Agent a list of at least three (3) proposed replacements, each of which shall in Borrower's (or Guarantor's) good faith estimation be of at least equal stature and ability to the originally approved party to be replaced, provided that each such proposed replacement (i) may be engaged at a salary consistent with the allocation of funds in the Budget for the compensation payable to the Essential Element, (ii) is available consistent with the requirements of the approved production schedule, (iii) does not have an established record with Guarantor of causing cost overruns or delays, (iv) is insurable without restriction and without an increase in the amount of the deductible or premium applicable to the production insurance policy for the Picture (collectively, the "Replacement Parameters"). Agent shall have the right to approve any one (1) such replacement, after giving due consideration to the Budget and the approved production schedule or to disapprove all such proposed replacements.

8.7.2. Agent shall notify Borrower and Guarantor in writing of its approval or disapproval of such replacement within one (1) Business Day, if such replacement becomes necessary during pre-production or principal photography of the Picture, or otherwise within five (5) Business Days. If Agent has not notified Borrower and Guarantor of its approval or disapproval of such replacement within the time allowed, no replacement shall be deemed approved. Agent may not approve a replacement for the Essential Element hereunder without Investor's prior written consent.

8.7.3. If Agent disapproves all proposed replacements, concurrently with such disapproval, or if Agent fails to respond to such request, Agent may designate a replacement, provided that such replacement meets the Replacement Parameters. If a replacement selected by Agent is engaged, the parties hereto each acknowledge that neither the Bank nor the Investor shall be responsible for any additional costs incurred in connection with the engagement of such replacement, to the extent that such costs are not provided for in the Budget, and Agent hereby agrees that, to the extent the fixed compensation payable to such replacement is greater than the original fixed compensation payable for the services of the Essential Element and thus increases the final negative cost of the Picture, then (i) such increase shall be Agent's responsibility and, as between Borrower and Agent, shall be deemed a distribution expense under the Sales Agency Agreement and (ii) Agent shall fund such increased amount into the production bank account for the Picture approved by Guarantor no later than the first day such replacement is to report to work or make other funding arrangements satisfactory to Guarantor. If Agent has disapproved of all potential replacements proposed by Borrower or Guarantor and Agent fails or declines to designate a replacement within the time periods and parameters set forth above, any and all rights Agent may have in connection with the Picture, including, without limitation, and all of Agent's rights under the Sales Agency Agreement, shall automatically and immediately terminate, in which event, Guarantor shall be deemed to have failed to effect completion and delivery of the Picture under the Completion Guarantees.

8.7.4. If the Essential Element is replaced pursuant to the provisions of this paragraph 8.7, this Agreement, the Completion Guarantees and the Sales Agency Agreement shall be deemed amended to include the name of such approved replacement as the Essential Element for all purposes hereunder.



L:\WPDOCS\028\FCB\Giallo\Interparty Agreement 9th Draft.wpd



8.8.    SAG Guaranteed Completion Contract.  Borrower represents that, as of the date of execution of this Agreement, Borrower is not in default under that certain 2008 Screen Actors Guild Guaranteed Completion Contract for Independent Producers of Theatrical Motion Pictures (the "SAG Completion Contract") and the SAG Completion Contract is in full force and effect.  Borrower further represents and warrants that, from and after the date of this Agreement, Borrower will not take any act or omit to take any act which would cause Borrower to be in breach of the SAG Completion Contract.

## 9.    DELIVERY PROCEDURE; ARBITRATION.

Agent, Borrower, Guarantor, the Investor and the Bank hereby agree that in the event any dispute arises between any of the parties hereto as to whether Mandatory Delivery has been effected in accordance with the requirements of paragraph 8.1 hereof, the parties hereto hereby shall submit such dispute to binding arbitration in accordance with the provisions hereof, which arbitration shall result in a finding that Mandatory Delivery either has or has not been effected, and shall result in issuance of a final award to such effect.  In connection with any such arbitration, the following procedure shall apply:

9.1.    Verification of Mandatory Delivery.  Notwithstanding anything to the contrary contained in the Sales Agency Agreement, Agent shall have thirty (30) days from and after its receipt of a Delivery Notice within which to verify that all Delivery Materials have been delivered and that the Physical Materials are of first class technical quality and to notify Borrower, Guarantor, the Investor and the Bank in writing that either:

9.1.1.    Mandatory Delivery has been effected (an "Acceptance Notice"); or

9.1.2.    Mandatory Delivery has not been effected (an "Objection Notice"), which notice shall specify (with particularity and in reasonable detail) (i) which Physical Materials (if any) Agent contends are not of first class technical quality (with such notice including the factual basis for such assertion), (ii) which Delivery Materials (if any) were not delivered to Agent as required herein, and (iii) which Additional Delivery Materials (if any) are not in accordance with the Specifications (for avoidance of doubt, any objections which Agent may have with respect to those Delivery Materials, if any, that are not specified in the Objection Notice as requiring delivery, correction or other modifications in order to complete Mandatory Delivery to Agent shall be deemed to be waived by Agent); provided, however, that if, within three (3) Business Days after receiving such Objection Notice, Borrower or Guarantor requests additional information which it believes in good faith is necessary in order to determine whether Mandatory Delivery has been effected notwithstanding such Objection Notice, or how any defect in Mandatory Delivery can be cured, then Agent shall have three (3) Business Days after its receipt of such request to respond in good faith thereto.  If Agent gives an Objection Notice and in such notice Agent contends that some or all of the Physical Materials are not of first class technical quality, to the extent that the Physical Materials which Agent contends are not of first class technical quality have been physically delivered to Agent, within five (5) Business Days after Agent's receipt of Borrower's or Guarantor's written request (which request Borrower or Guarantor shall make (if at all) within three (3) Business Days after receiving the Objection Notice), Agent shall return those Physical Materials requested by Borrower or Guarantor to Borrower or Guarantor, as applicable, at the requesting party's expense, in order to allow Borrower or Guarantor to cure the defects in such Physical Materials.  If Agent gives an Objection Notice, the Delivery Materials, if any, which are not specified in the Objection Notice as not being of first class technical quality, not having been delivered to Agent or not being in accordance with the Specifications shall be



deemed to have either been accepted or waived by Agent, and Agent may not include any such Delivery Materials in any subsequent Objection Notice.

9.2.    Failure to Respond; Acceptance Notice Deemed Given. If (i) Agent fails to give either an Acceptance Notice or an Objection Notice within the time periods set forth in paragraph 9.1, above, (ii) Agent fails to return to Borrower or Guarantor, as applicable, the Physical Materials (if any) requested by Borrower or Guarantor within the time period specified in paragraph 9.1, above, or (iii) after giving an Objection Notice, Agent fails to respond to a request for additional information made by Borrower or Guarantor, then Agent shall be deemed to have given an Acceptance Notice for all purposes hereunder.

9.3.    Objection Notice. If Agent gives an Objection Notice and is not thereafter deemed to have given an Acceptance Notice, then Borrower, Guarantor, the Investor or the Bank shall either:

9.3.1.    deliver to Agent any Delivery Materials that were specified by Agent in the Objection Notice as not having been delivered, cure the defects in the Physical Materials which are specified by Agent in the Objection Notice as not being of first class technical quality, and cure the defects in the Additional Delivery Materials which are specified by Agent in the Objection Notice as not meeting the Specifications, in each case in accordance with the specifications of the Objection Notice and (if applicable) Agent's response (the "Response") to a request for additional information made by Borrower or Guarantor, as soon as reasonably practicable, but in no event later than thirty (30) days after the later of (i) receiving the Objection Notice or the Response, as applicable, or (ii) the return of any Physical Materials which Borrower or Guarantor has requested be returned in order to cure any claimed defects (the "Cure Period"), and give Agent notice thereof (a "Cure Notice") (provided, however, that under no circumstances shall the Investor or the Bank be required to delivery any such Delivery Materials or cure any defects in any of the Delivery Materials); or

9.3.2.    give Agent notice (an "Arbitration Notice") within thirty (30) days after receiving the Objection Notice or (if applicable) the Response, that Mandatory Delivery has been effected notwithstanding the Objection Notice and that Borrower has, or that Guarantor, the Investor or the Bank, as applicable, has, elected to submit the issue of whether Mandatory Delivery has been effected (and such issue only) for expedited arbitration in accordance with paragraph 9.9, below (provided, however, that neither the Investor nor the Bank may give Agent an Arbitration Notice pursuant to this paragraph 9.3.2 unless the Cure Period has expired and Borrower has not or Guarantor has not given Agent a Cure Notice).

9.4.    Failure to Respond - Mandatory Delivery Deemed Not to Have Occurred. If Borrower or Guarantor fail to (i) deliver to Agent any Delivery Materials that were specified by Agent in the Objection Notice as not having been delivered, cure the defects in the Physical Materials which are specified by Agent in the Objection Notice as not being of first class technical quality, and cure the defects in the Delivery Materials which are specified by Agent in the Objection Notice as not meeting the Specifications, in each case in accordance with the specifications of the Objection Notice and (if applicable) the Response within the time specified in paragraph 9.3.1, above, or (ii) give Agent an Arbitration Notice within the time specified in paragraph 9.3.2, above, and if, within three (3) Business Days after Borrower's and Guarantor's receipt of a reminder notice from Agent stating that Borrower and Guarantor have failed to comply with the provisions of clause (i) of this paragraph or give Agent an Arbitration Notice, Borrower and Guarantor again fail to comply with the provisions of clause (i) of this paragraph or give Agent an Arbitration Notice, then Mandatory



Delivery shall be deemed to have not been timely effected and Guarantor shall make payment to the Bank and the Investor subject to the terms and conditions of the Completion Guarantees.

9.5.     Cure Notice.  If a Cure Notice is given, Agent shall have ten (10) Business Days from and after its receipt of such notice within which to verify that (i) the Delivery Materials that were specified by Agent in the Objection Notice as not having been delivered have now been delivered and (ii) the defects in the Delivery Materials which were the subject of the Objection Notice have been cured and that such Physical Materials are or are not of first class technical quality and to notify Guarantor, Borrower, the Investor and the Bank that either:

9.5.1.   Mandatory Delivery has been effected (with such notice constituting an Acceptance Notice for all purposes hereunder); or

9.5.2.   Mandatory Delivery has not been effected (an "Additional Objection Notice"), which notice shall specify (with particularity and in reasonable detail) (i) which Physical Materials (if any) Agent contends are not of first class technical quality (with such notice including the factual basis for such assertion), (ii) which Delivery Materials (if any) were not delivered as required herein, and (iii) which Delivery Materials (if any) are not in accordance with the Specifications; provided, however, that, in any such Additional Objection Notice, Agent may not object to the sufficiency of any Delivery Materials which were not identified in Agent's original Objection Notice as either not having been delivered or as not being of first class technical quality; and provided further that if, within two (2) Business Days after receiving such Additional Objection Notice, Borrower or Guarantor requests additional information which it believes in good faith is necessary in order to determine whether Mandatory Delivery has been effected notwithstanding such Additional Objection Notice, or how any defect in Mandatory Delivery can be cured, then Agent shall have two (2) Business Days after its receipt of such request to respond in good faith thereto.  If Agent gives an Additional Objection Notice and in such notice Agent contends that some or all of the Physical Materials are not of first class technical quality, to the extent that the Physical Materials which Agent contends are not of first class technical quality have been physically delivered to Agent, within three (3) Business Days after Agent's receipt of Borrower's or Guarantor's written request (which request Borrower or Guarantor shall make (if at all) within five (5) Business Days after receiving the Objection Notice), Agent shall return those Physical Materials requested by Borrower or Guarantor to Borrower or Guarantor, as applicable, at the requesting party's expense, in order to allow Borrower or Guarantor to cure the defects in such Physical Materials.

9.6.     Additional Objection Notice.  If Agent gives an Additional Objection Notice and is not thereafter deemed to have given an Acceptance Notice, then Borrower, Guarantor, the Investor or the Bank, as appropriate, shall either:

9.6.1.   deliver to Agent any Delivery Materials that were specified by Agent in the Additional Objection Notice as not having been delivered, cure the defects in the Physical Materials which are specified by Agent in the Additional Objection Notice as not being of first class technical quality, and cure the defects in the Delivery Materials which are specified by Agent in the Additional Objection Notice as not meeting the Specifications, in each case in accordance with the specifications of the Additional Objection Notice and (if applicable) Agent's response (the "Second Response") to a request for additional information made by Borrower or Guarantor, as soon as reasonably practicable, but in no event later than fifteen (15) Business Days after the later of (i) receiving the



Additional Objection Notice or the Second Response, as applicable, or (ii) return of the Physical Materials requested by Borrower or Guarantor, as applicable (the "Additional Cure Period"), and give Agent notice thereof (an "Additional Cure Notice") (provided, however, that under no circumstances shall the Bank or the Investor be required to deliver any such Delivery Materials or cure any defects in any of the Delivery Materials); or

9.6.2. give Agent notice (an "Arbitration Notice") within two (2) Business Days after receiving the Additional Objection Notice or (if applicable) the Second Response, that Mandatory Delivery has been effected notwithstanding the Additional Objection Notice and that Borrower, Guarantor, the Investor or the Bank, as applicable, has elected to submit the issue of whether Mandatory Delivery has been effected (and such issue only) for expedited arbitration in accordance with paragraph 9.9, below (provided, however, that neither the Investor nor the Bank may give Agent an Arbitration Notice pursuant to this paragraph 9.6.2 unless the Additional Cure Period has expired and Borrower or Guarantor has not given Agent an Additional Cure Notice).

9.7. __Additional Cure Notice.__ If an Additional Cure Notice is given, Agent shall have ten (10) Business Days from and after its receipt of such notice within which to verify that (i) the Delivery Materials that were specified by Agent in the Additional Objection Notice as not having been delivered have now been delivered, and (ii) the defects in the Delivery Materials which were the subject of the Additional Objection Notice have been cured, that there are no new defects in the Delivery Materials which were the subject of the Additional Objection Notice and that the Physical Materials which were the subject of the Additional Objection Notice are or are not of first class technical quality and to notify Guarantor, Borrower, the Investor and the Bank that either:

9.7.1. Mandatory Delivery has been effected (with such notice constituting an Acceptance Notice for all purposes hereunder); or

9.7.2. Mandatory Delivery has not been effected (an "Arbitration Notice") and Agent has elected to submit the issue of whether Mandatory Delivery has been effected (and such issue only) for expedited arbitration in accordance with paragraph 9.9, below.

9.8. __Failure to Respond - Acceptance Notice Deemed Given.__ If (i) Agent fails to give any of the notices described in paragraphs 9.5.1, 9.5.2, 9.7.1 or 9.7.2, above, or (ii) Agent fails to return to Borrower or Guarantor, as applicable, the Physical Materials (if any) requested by Borrower or Guarantor within the time period specified in paragraph 9.6.1, above, then Mandatory Delivery shall be deemed to have been effected, and Agent shall be deemed to have issued an Acceptance Notice.

9.9. __Arbitration Procedure.__ In the event that either Borrower, Guarantor, the Bank, the Investor or Agent elects to submit the issue of whether Mandatory Delivery has been effected to expedited binding arbitration pursuant to this paragraph 9, the following procedure shall apply:

9.9.1. The arbitration shall be submitted to one (1) arbitrator (the "Arbitrator") who shall be selected as follows: Agent and Guarantor shall each appoint one (1) arbitrator (who shall be a person not affiliated with Agent or Guarantor, or any principal of Agent or Guarantor, and who shall have knowledge and experience in the motion picture industry with respect to the technical quality delivery issues relating to motion pictures) within three (3) Business Day after the issuance of an Arbitration Notice, and those arbitrators shall then appoint the Arbitrator (who shall have knowledge



and experience in the motion picture industry with respect to the technical delivery issues relating to motion pictures) within two (2) Business Days after the issuance of an Arbitration Notice and shall concurrently give written notice of such appointment to the Bank, the Investor, Guarantor, Agent and Borrower; provided, however, that if either Agent or Guarantor fails to appoint its respective arbitrator within the time allowed, then the arbitrator appointed by the other party shall have full authority to act as the sole Arbitrator of the arbitration. If neither Agent nor Guarantor appoints an arbitrator within the time allowed, or if the arbitrators appointed by Agent and Guarantor do not appoint the Arbitrator within the time allowed, then the Bank shall appoint an arbitrator who shall have full authority to act as the sole Arbitrator of the arbitration.

9.9.2.  The arbitration shall commence at a location in Los Angeles, California, to be chosen by the Arbitrator within seven (7) Business Days after the date of appointment of the Arbitrator (or at such later time as may be determined by the Arbitrator for good cause). Except as expressly provided, herein, such arbitration shall be conducted under the rules of the Independent Film & Television Alliance and its rules in effect as of the date the request for arbitration is filed (the "Rules") and, to the extent not otherwise covered by the Rules, the arbitration shall be conducted in accordance with Title 9 of the U.S. Code. The arbitration shall continue on each consecutive Business Day until finally concluded, unless continued by the Arbitrator for good cause shown, provided, however, that the Arbitrator shall use all reasonable efforts to conclude the arbitration within (10) Business Days after the commencement thereof.

9.9.3.  The parties and their representatives shall make available to the Arbitrator all relevant documents and materials.  During the seven (7) Business Day period prior to the commencement of the arbitration, the parties shall participate in an exchange of information. In this regard, the parties to the arbitration shall be entitled to reasonable discovery for the purposes of such arbitration, including, without limitation, document production and the taking of depositions. If any such discovery is not voluntarily conducted by the parties, the party desiring such discovery may apply to the Arbitrator at the outset of the arbitration for particular discovery requests. The Arbitrator may deny only such discovery as is unreasonable or is intended to unduly delay the prompt conclusion of the arbitration. In that regard, the parties agree that, upon such application, the Arbitrator shall have the authority to order any non-complying party to produce any relevant documents or to make any of its employees or representatives available for deposition. The Arbitrator shall also have the authority to impose appropriate sanctions upon any party who fails to comply with a discovery order issued by the Arbitrator. Such sanctions may include entry of a final arbitration award against a non-complying party.

9.9.4.  The only issues that may be determined in the arbitration proceeding are (i) whether all Delivery Materials were originally tendered to Agent prior to the expiration of the Additional Cure Period, (ii) whether all of the Physical Materials are of first class technical quality, and (iii) whether the Delivery Materials are in accordance with the Specifications. No party to the arbitration may assert in such proceeding any counter-claim or cross-claim.  The arbitration must result in a finding that Mandatory Delivery either has been effected or that Mandatory Delivery has not been effected and the Arbitrator shall promptly notify Agent, Borrower, Guarantor, the Investor and the Bank in writing of the finding made. In connection with the foregoing, if the Arbitrator finds that (A) not all of the Delivery Materials were delivered to Agent prior to the expiration of the Additional Cure Period, (B) some or all of the Physical Materials were not of first class technical quality, or (C) the Delivery Materials are not in accordance with the Specifications, then the Arbitrator

-18-




must find that Mandatory Delivery was not effected. The Arbitrator shall issue a final award in accordance with the provisions hereof not later than one (1) day after the conclusion of the arbitration, which award shall be non-appealable. If the Arbitrator finds that Mandatory Delivery has been effected, the Arbitrator shall issue a final award to such effect. If, on the other hand, the Arbitrator finds that Mandatory Delivery has not been effected, the Arbitrator shall issue a final award against Guarantor which award shall direct Guarantor to make payment in full to the Bank of the full amount of Borrower's then-outstanding Indebtedness to the Bank, and to the Investor of the full amount of the then-outstanding Investor Indebtedness, subject in each case to the terms and provisions of the Completion Guarantees, which payments to the Bank and the Investor shall be made within five (5) Business Days after the date of issuance of the award. Upon Guarantor making such payment to the Bank and the Investor, any and all rights of Agent in connection with the Picture, including, without limitation, all rights of Agent under the Sales Agency Agreement, shall automatically and immediately terminate, and Agent shall promptly return to Guarantor all Delivery Materials previously delivered to Agent. In such event, Guarantor shall be subrogated to all of the Bank's, the Investor's, Borrower's and Agent's rights and interests in and to the Investor Distribution Rights and the Collateral, including, without limitation, the Picture.

9.10.   Costs and Expenses of Arbitration. The Arbitrator's final award shall provide for payment by the losing party (*i.e.*, either Agent or Guarantor) of the Arbitrator's and any court reporter's fees, as well as the reasonable outside attorneys' fees incurred by the prevailing parties in the arbitration (*i.e.*, all parties to the arbitration other than the losing party), and such award shall require the losing party to pay any such additional interest or premium as may be incurred by Borrower under the Bank Loan Agreement or the Investor Loan Agreement resulting from any delay in the repayment of the Indebtedness due the Bank thereunder or from any delay in the repayment of the Investor Indebtedness; the Bank hereby acknowledges, however, that such interest shall accrue at the Interest Rate (as distinguished from the Overdue Rate) specified in the Bank Loan Agreement during the time such arbitration proceeding is taking place.

9.11.   Binding Nature of Arbitration: Confirmation of Award. The parties agree to be bound by any arbitration brought pursuant to this paragraph 9. and any of its subparagraphs, and the results thereof shall be final, binding and non-appealable with respect to the subject matter thereof. The award issued by the Arbitrator may be enforced in the Superior Court for the County of Los Angeles or the United States District Court for the Central District of California and the parties waive any and all objections to personal jurisdiction in such case which they may otherwise have; provided, however, that service of process is made in the same manner that a notice is given under paragraph 10 hereof.

10.   **NOTICES.**

For the purposes of this Agreement, all notices and copies thereof required to be given must be in writing and delivered by hand, overnight messenger (*e.g.*, Federal Express) or by telecopy (with a copy by priority mail (or the equivalent thereof in the country of origin)), and shall be deemed to have been given when received by the party to which sent. The address for notices to Agent, Borrower, Guarantor, the Investor and the Bank shall be as follows:





To the Bank:

    First California Bank
    1880 Century Park East
    Suite 800
    Los Angeles, California  90067
    Attention: Mr. Arthur F. Stribley III

With a copy to:

    Gipson Hoffman & Pancione
    1901 Avenue of the Stars, Suite 1100
    Los Angeles, California  90067
    Attention: G. Raymond F. Gross, Esq.

To Agent:

    Hannibal Inc.
    8265 Sunset Boulevard
    Suite 107
    West Hollywood, California 90046
    Attention: Mr. Richard Rionda del Castro

To Borrower:

    Giallo Productions Limited
    8265 Sunset Boulevard
    Suite 107
    West Hollywood, California 90046
    Attention: Mr. Richard Rionda del Castro

To Guarantor:

    cineFinance Insurance Services, LLC
    1875 Century Park East
    Suite 1970
    Los Angeles, California 90067
    Attention:  Mr. Fred Milstein

To the Investor:

    Ian David Milner-Brown
    Via Municipio 1
    Carrabia-Lugano CH 6913
    Switzerland







With a copies to:

> Reed Smith Richards Butler LLP
> Beaufort House
> 15 St. Botolph Street
> London EC3A 7EE
> Attention: Richard Philipps, Esq.

and

> Route Group
> Third Floor
> Barber Surgeons' Hall
> Monkwell Square
> London EC2Y 5BL
> Attention: Mr. Mark Worrall

## 11. SUCCESSORS AND ASSIGNS.

This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.

## 12. COUNTERPARTS.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and which taken together shall constitute one and the same instrument. A signed and delivered facsimile copy of this Agreement, or a signed copy transmitted electronically in either a tagged image format file (TIFF) or a portable document format (PDF), shall be binding on the party signing the facsimile or electronically transmitted copy, and such copy shall have the same effect as the original. Any party who delivers such a signature page agrees to later deliver an original counterpart to any party which requests it.

## 13. MISCELLANEOUS.

13.1.  This Agreement shall be construed in accordance with the internal laws (*i.e.*, excluding any conflict of laws provisions) of the State of California. No amendment to this Agreement shall be effective unless in writing and signed by each party hereto.

13.2.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other governmental authority to be invalid, void or unenforceable, (i) the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and (ii) to the fullest extent possible, the provisions of this Agreement (including, without limitation, all portions of any section of this Agreement containing such provision held to be invalid, illegal or unenforceable that are not themselves invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.




13.3.    This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.

13.4.    Section or other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation thereof.

13.5.    No breach of any provision of this Agreement may be waived unless in writing and the waiver of any one breach shall not be deemed to be a wavier of any other breach of the same or any other provision hereof.

13.6.    This Agreement may be amended only by a written agreement executed by all parties thereto.

13.7.    This Agreement embodies the entire understanding and agreement of the parties with respect to the subject matter hereof, and there are no further or other agreements or understandings, written or oral, in effect between the parties hereto relating to the subject matter hereof which are in conflict with the provisions hereof unless expressly referred to herein or executed concurrently herewith.

[Signatures follow on next page.]



**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first written above.

GIALLO PRODUCTIONS LIMITED
("Borrower")

By: _____

Its: _____
(Authorized Signatory)


FIRST CALIFORNIA BANK
(the "Bank")

By: _____

Its: _____
(Authorized Signatory)


HANNIBAL INC.
("Agent")

By: _____

Its: _____
(Authorized Signatory)


CINEFINANCE INSURANCE SERVICES, LLC
("Guarantor")

By: _____

Its: _____
(Authorized Signatory)


_____
IAN DAVID MILNER-BROWN

-23-

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first written above.

GIALLO PRODUCTIONS LIMITED
   ("Borrower")

By: _____

Its: _____
       (Authorized Signatory)

FIRST CALIFORNIA BANK
   (the "Bank")

By: _____

Its: _____
       (Authorized Signatory)

HANNIBAL INC.
   ("Agent")

By: _____

Its: _____
       (Authorized Signatory)

CINEFINANCE INSURANCE SERVICES, LLC
   ("Guarantor")

By: _____

Its: _____
       (Authorized Signatory)

_____
   IAN DAVID MILNER-BROWN

-23-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

GIALLO PRODUCTIONS LIMITED
("Borrower")

By: _____

Its: _____
      (Authorized Signatory)


FIRST CALIFORNIA BANK
(the "Bank")

By: _____

Its: _____
      (Authorized Signatory)


HANNIBAL INC.
("Agent")

By: _____

Its: _____
      (Authorized Signatory)


CINEFINANCE INSURANCE SERVICES, LLC
("Guarantor")

By: _____

Its: _____
      (Authorized Signatory)


IAN DAVID MILNER-BROWN

-22-

**EXHIBIT "A"**

**MINIMUM ADVANCES**



**DARIO ARGENTO**   Adrien Brody - Emanuelle Seigner - Elsa Pataky - Thriller   Hardware 6/16/2008 12,0

| Territories | Buyer | Rights | Actual | Take | High | Remaining |
|---|---|---|---|---|---|---|
| **NORTH AMERICA** | | | | | | |
| | | | | 1,300,000 | 1,755,000 | 1,300,000 |
| USA Video | | | | 700,000 | 945,000 | 700,000 |
| USA TV | | | | | | |
| TOTAL North America | | | 0 | 2,000,000 | 2,700,000 | 2,000,000 |
| **EUROPE** | | | | | | |
| | | | | 250,000 | 375,000 | 250,000 |
| Benelux | | | | 700,000 | 1,050,000 | 700,000 |
| France | | | | 850,000 | 1,275,000 | 850,000 |
| Germany | | | | 160,000 | 240,000 | 160,000 |
| Scandinavia | | | | 350,000 | 525,000 | 350,000 |
| UK | | | | | | |
| TOTAL EUROPE | | | 0 | 2,310,000 | 3,465,000 | 2,310,000 |
| **EASTERN EUROPE** | | | | | | |
| | | | | 15,000 | 22,500 | 15,000 |
| Czech Republic and Slovakia | | | | 15,000 | 22,500 | 15,000 |
| TOTAL EASTERN EUROPE | | | 0 | | | |
| **MIDDLE EAST** | | | | | | |
| | | | | 25,000 | 37,500 | 25,000 |
| Israel | | | | | | |
| TOTAL MIDDLE EAST | | | 0 | 25,000 | 37,500 | 25,000 |
| **AFRICA** | | | | | | |
| | | | | 10,000 | 15,000 | 10,000 |
| East and West Africa | | | | 40,000 | 60,000 | 40,000 |
| South Africa | | | | | | |
| TOTAL AFRICA | | | 0 | 50,000 | 75,000 | 50,000 |
| **OCEANIA** | | | | | | |
| | | | | 250,000 | 375,000 | 250,000 |
| Australia and New Zealand | | | | | | |
| TOTAL OCEANIA | | | 0 | 250,000 | 375,000 | 250,000 |
| **ASIA** | | | | | | |
| | | | | 15,000 | 22,500 | 15,000 |
| China | | | | 15,000 | 22,500 | 15,000 |
| Hong Kong | | | | 25,000 | 37,500 | 25,000 |
| India | | | | 30,000 | 45,000 | 30,000 |
| Indonesia | | | | 600,000 | 900,000 | 600,000 |
| Japan | | | | 120,000 | 180,000 | 120,000 |
| Korea | | | | 20,000 | 30,000 | 20,000 |
| Malaysia | | | | 50,000 | 75,000 | 50,000 |
| PAY PAN TV | | | | 15,000 | 22,500 | 15,000 |
| Philippines | | | | 20,000 | 30,000 | 20,000 |
| Singapore | | | | 35,000 | 52,500 | 35,000 |
| Taiwan | | | | 35,000 | 52,500 | 35,000 |
| Thailand | | | | | | |
| TOTAL ASIA | | | 0 | 980,000 | 1,470,000 | 980,000 |
| **ANCILLARY** | | | | | | |
| | | | | 80,000 | 120,000 | 80,000 |
| Airlines | | | | | | |
| TOTAL ANCILLARY | | | 0 | 80,000 | 120,000 | 80,000 |
| **TOTAL WORLD** | | | 0 | 5,710,000 | 8,265,000 | 5,710,000 |

## EXHIBIT "B"

## DELIVERY SCHEDULE

*All bonded delivery items are Marked with a ✳*
*All bonded physical delivery is Marked with a #*

**EXHIBIT "A"**
**DELIVERY SCHEDULE**

Unless otherwise directed, Hannibal will have access to all film, audio, and video elements through Laboratory Access Letters and all documentation should be delivered to the following address:

Hannibal Pictures
8265 Sunset Boulevard, Suite 107
West Hollywood, CA 90046

**Section A:**

**ORIGINAL LANGUAGE FILM ELEMENTS – IF AVAILABLE**

**1. 35MM INTERNEGATIVE**
Access to one (1) 35MM INTERNEGATIVE manufactured from the Interpositive conformed in all respects to the original negative, including complete titles at head and tail, suitable for the manufacture of first quality release prints. With alt. reels containing superimposed subtitles in English, Credit adjustments; cover shots and etc. where appropriate. Medium: Estar base 35mm.

**2. 35MM INTERPOSITIVE**
Access to one (1) 35MM INTERPOSITIVE manufactured from the Original Edited Negative conformed in all respects to the final Production, including complete titles at head and tail. Medium: Estar base 35mm.

**3. 35MM OPTICAL NEGATIVE**
Access to one (1) 35mm OPTICAL SOUND TRACK NEGATIVE of the final approved sound track in stereo (where appropriate), in synch with the final Production, suitable for the manufacture of first quality release prints.

**4. 35MM RELEASE PRINT**
One (1) 35mm composite RELEASE PRINT (or check print) printed from the Internegative and English Language Optical Negative.

**5. 35MM TEXTLESS INTERPOSITIVE**
Access to one (1) 35mm TEXTLESS INTERPOSITIVE of the head and tail credits, or equivalent, and any subtitled portion of the Production.

**6. 35MM ALTERNATIVE VERSION INTERPOSITIVE**
If available, access to one (1) 35mm INTERPOSITIVE of cover shots or ALTERNATIVE shots for any excessive violence or nudity in the Production.

**7. 35MM TITLE INTERNEGATIVE**
If applicable, access to one (1) 35mm INTERNEGATIVE or, as appropriate, a computer file of the MAIN TITLE WORK of each language version on a neutral background.

**Section B:**

**VIDEO ELEMENTS**

*GENERAL GUIDELINES*

**PRODUCER'S LOGO**
All Master videotapes delivered to Distributor must include the Producer's Logo (picture and audio) at the beginning of the tape.  A digital betacam copy of the Producer's Logo is available upon request.

**CLOSED BLACKS**
There should not be any formatted commercials blacks in the body of the Production (CLOSED BLACKS).  Where commercial breaks have been included in the formatted master, the commercial breaks should be pulled up so that the Production runs continuously, ensuring that no Production audio or video is deleted in the process.  Any BUMPERS in the Production are to be deleted from the CLOSED BLACK MASTER, but should be included with the TEXTLESS ELEMENTS at the end of the tape or on a separate Master Tape.

**DROP FRAME TIMECODE**
All Video Masters must have continuous Drop Frame Timecode with the Production starting at 1:00:00:00. If possible, the Textless segments (Head & Tail Credits and Titled sections) should be placed at the end of the Production after thirty (:30) seconds of black (If not, they must be supplied on a separate Digital Betacam NTSC cassette).

All Master video tapes must have one (1) minute of Color Bars and 1000 Hz Tone, Ten (10) seconds of slate indicating the name and date of the Production, the running length and whether the Textless elements are included at the end of the Production.  Technically, the Production must adhere to SMPTE specifications.

The MASTER VIDEO TAPES should not use Dolby or any comparative noise reduction. Surround Sound encoding is acceptable.

**1.HIGH DEFINITION**
One (1) High Def master in Pal and NTSC with the Final Approved Mix on Channels 1 & 2 and the M & E on Channels 3 & 4.

**2.INTERNATIONAL VIDEO MASTER – NTSC and PAL**
One (1) Full Frame Component Digital Betacam (or D1) NTSC and PAL video tape transferred and recorded entirely in the component stream fully Color Corrected and Titled with a Full English Mix in Stereo and Stereo M & E configured as follows:

| | |
|---|---|
| Channel 1: | FULL MIX LEFT (LT) |
| Channel 2: | FULL MIX RIGHT (RT) |
| Channel 3: | M & E LEFT (LT) |
| Channel 4: | M & E RIGHT (RT) |

**3.CLOSED CAPTIONED MASTER – NTSC and PAL**
One (1) Digital Betacam (or D2 on small size cassette) NTSC and PAL videotape of the Closed Captioned Broadcast Master suitable for broadcast on Network television.  Mix on Channels 1 & 2.

**4.ALTERNATIVE OR EDITED FOR TELEVISION MASTER – NTSC and PAL**
If available, one (1) Digital Betacam NTSC and PAL videotape of the Master without nudity, swearing or excessive violence.  Fully Mixed with the configuration matching the International Master above.  Note: This Master is to be Close Captioned.

**5.16 x 9 ANAMORPHIC VIDEO MASTER – NTSC –and PAL, if available**
One (1) Digital Betacam videotape of the Anamorphic Master (16 x 9) with the Final Approved Mix on Channels 1 & 2 and the M & E on Channels 3 & 4 in NSTC.and PAL

**6.TEXTLESS ELEMENTS**
One (1) Digital Betacam NTSC and PAL videotape of any scenes in the final Production that contain Written English or other language (i.e.; Head & Tail Credits).  This includes any BUMPERS created for the Production.  TEXTLES versions of the BUMPERS should be included in the TEXTLESS elements.  NOTE: This can be included at the end of the International Master Tape if there is space.

**7.TRAILER VIDEO MASTER – NTSC and PAL**
If available, one (1) Digital Betacam full frame NTSC and PAL INTERNATIONAL VIDEO MASTER of the final approved Trailer, with the configuration as follows:

| | |
|---|---|
| Track 1: | Full Mix Left (LT) |
| Track 2: | Full Mix Right (RT) |
| Track 3: | M & E Left (LT) |
| Track 4: | M & E Right (RT) |

And if available, on the same cassette, after 30 seconds of black, the Trailer should be repeated with the following split track configuration:

| | |
|---|---|
| Track 1: | Narration |
| Track 2: | Sync Dialogue |
| Track 3: | Mono Sound Effects |
| Track 4: | Mono Music |

**Section C:**

**AUDIO ELEMENTS**

**1. DA-88 M & E TRACK**
Access to one (1) Da88 6-track International MUSIC & EFFECTS SOUNDTRACK in stereo, in synch with the final Production.  Note:  there must be no discernible English or other language on the M & E (this includes Crowd Walla and Radio Background).
Configuration:

| | |
|---|---|
| Track 1: | M & E Left |
| Track 2: | M & E Center |
| Track 3: | M & E Right |

Track 4:      M & E Surround Left
Track 5:      M & E Surround Right
Track 6:      M & E Subwoofer
Track 7:      Extra Dialogue, Radio, etc.
Track 8:      Dialogue guide

## 2. MUSIC DUB

Access to one (1) copy of the FINAL MUSIC on D.A.T. or DA88 tape suitable for dubbing.  The D.A.T. or DA88 should be a clone of the music as supplied by the composer before mixed with the dialogue and sound effects.

## 3. AUDIO PROTECTION COPY

Access to one (1) Protection copy of the FINAL ENGLISH LANGUAGE MIX on DA88 with timecode matching the International Master with the configuration as follows:

Track 1:      Dialogue Left
Track 2:      Dialogue Right
Track 3:      Sound Effects & Foley Left
Track 4:      Sound Effects & Foley Left
Track 5:      Music (mixed) Left
Track 6:      Music (mixed) Right
Track 7:      Additional Dialogue (including Walla) elements Left
Track 8:      Additional Dialogue (including Walla) elements Right

Note: When Tracks 1-6 are combined, they should reflect the complete Stereo mix.

Section E:

Documentation Material

## 1. MUSIC CUE LIST

Two (2) copies of the final MUSIC CUE LIST, indicating title, composer, publisher, copyright owner(s), usage, performing rights society, as well as film footage and running time, for each composition of the Production, indicating background, feature, instrumental and vocal usage.

## 2. AS PRODUCED ACTION & DIALOGUE CONTINUITY

One (1) AS PROCUED ACTION & DIALGOUE CONTINUITY LIST, containing all final dialogue and scene descriptions of the final Production.

## 3. TRAILER AS PRODUCED ACTION & DIALOGUE CONTINUITY

One (1) AS PRODUCED SCRIPT ACTION & DIALOGUE CONTINUITY LIST, containing all final dialogue and scene descriptions of the final Production.

## 4. FINAL HEAD & TAIL CREDITS

One (1) typewritten copy of the HEAD & TAIL SCREEN CREDITS as they appear in the final Production.

Or, if created through a computer, one (1) CD-Rom of the Title treatment.

*For Bond Purposes, confirmation letters with proof of payment*

**※ #**

### 5. MUSIC LICENSES

Two (2) fully-executed copies of all synchronizations, master recording & performing LICENSES for all music, incidental songs and instrumental music used inn the Production. All synchronization and master recording license shall be for all rights, including in-context use, in perpetuity and shall include an option with a pre-negotiated price for the out-of-contest use of the music in trailers and ads.

### 6. SUMMARY OF MUSIC RIGHTS AND OPTION

A list of all the songs used in the Production against which the rights granted, terms of license, media to which rights apply, details of the options for extending or exercising certain rights or terms, where Distributor's standard contract has not been used – shortfalls in the rights granted, etc. should be show . NOTE: The minimum license for any music license is World Wide Free & Pay TV, All Video and Theatrical in perpetuity. Any reduced license must be accepted by the Distributor prior to execution.

### 7. E & O INSURANCE

E & O INSURANCE shall be US $1 million per claim, US $3 million in aggregate; deductible of $10,000, for a term of three (3) years commencing of the first day of principal photography of the Production naming Distributor and its respective officers, directors, and employees as an additional insure. The policy must have no exclusions and shall included coverage for the title and music.

**※ #**

### 8. LABORATORY ACCESS LETTERS

The Laboratory Access letters should be set out in a manner that give the distributor unrestricted access to all the relevant elements.

**※ #**

### 9. CREDIT STATEMENT

A signed STATEMENT of contractual screen credits paid advertising credits, names/likeness obligations and talent approvals applicable to the Production. The statement should include each credit in one column and summaries of the credit obligation in the adjacent columns for: on-screen and paid ad obligations, including form, placement, type size and exclusions; and names/likeness obligations and approval obligations, indicating any contractual approval entitlements or other names/likeness obligations. If there is no obligation to accord a certain credit, which has been accorded on screen or is included in the billing block or the Head Credits, the "obligation" should be stated as "Producer's Discretion." The Distributor msut be informed as soon as possible of any significant approvals required on Key-Art, Photography, etc.

**※ #**

### 10. BILLING BLOCK

Final BILLING BLCOKS for posters, video packaging, paid advertising, sales materials and trailers, approved by all parties (including Distributor), as well as, if available, camera-ready black & white stats of all the logos Producer requires be included in the billing block. The final billing block must be signed off by Producer.

### 11. CHAIN OF TITLE

A summary page outlining all Chain of Title documents, in chronological order, as well as all documents evidencing proof of ownership and all documents evidencing proof of payment in connection with any transfer of rights, including but no limited to:
A filed Unites States COPYRIGHT REGISTRATION FORM for the screenplay
A filed Unites States COPYRIGHT REGISTRATION FORM for the Production
One (1) copy of COPYRIGHT SEARCH (if applicable)
One (1) copy of TITLE SEARCH

**12. CERTIFICATE OF ORIGIN**
One (1) Original Certificate of Origin duly notarized.

**13. CERTIFICATE OF NATIONALITY**
One (1) Original Certificate of Nationality duly notarized.

**14. DOLBY OR ANALOGOUS LICENSE**
A copy of the executed LICENSE AGREEMENT in full force and effect between the Producer and Dolby laboratories, Inc. in connection with the Production, if applicable.

**Section F:**

**PUBLICITY MATERIALS**

**GENERAL GUIDELINES**

All photographic materials are to be no less than first generation reproducible and high quality. Prints are to be 8 x 10 in size.  No less than 50% of the key set is to be "action-oriented" photography.

All photographic selections must include corresponding photo credits and cut lines.

All original photography including negatives an contact sheets for review and/or duping purposes will be available to Distributor.

**1. PHOTOGRAPHY**
A minimum of 100 color transparencies including ensemble cast, relevant groupings and production shots as well as individual shots of each key cast member, plus a minimum of 6 gallery shots, if available, of each key cast member, director, and director with cast and/or crew.  A captions sheets identifying cast/crew member and a short description of the scene involved.  Access to contact sheets and original negatives.

**2. PRESS KIT MATERIAL**
Two (2) copies as well as CD-Rom of the approved Press Kit.  The Press Kit must include:

    1) short synopsis
    2) long form synopsis
    3) detailed production notes
    4) complete biographies of key cast and production personnel

     5)  cast and production credits

     6)  cover page identifying the name of the production & the Distributor Logo

## 3.  PRESS CLIPPINGS if available

Access to Electronic Press Kits, Clips, Promo, Trailer, if available.

## 4.  KEY ART – TEXTLESS

KEY ART that has been selected or used during production, then a textless copy of it is to be supplied.  This includes any artwork used to create the title, or any promotional packaging.  Also, if available, a copy of the video box key art.



# EXHIBIT "C"

## PICTURE SPECIFICATIONS

The Picture shall conform to the following specifications:

1.    Screenplay.  The Picture shall be based on the Screenplay (subject to such minor changes or variations as may be necessitated by the exigencies of production, which in no event shall materially alter the story line or the relative significance of the principal characters), and no material changes, modifications or revisions shall be made to the Screenplay (except as provided above) without the express prior written approval of Agent and Guarantor.

2.    Technical Specifications.  The Picture shall be (i) a feature-length theatrical motion picture with a running time of no less than ninety-five (95) minutes and no more than one hundred ten (110) minutes (inclusive of main and end titles); (ii) produced, recorded (not dubbed) and delivered in the English language, in black and white, (iii) starring the Essential Element, and (iv) fully scored, with all music cleared.  Except to the extent required to meet these Technical Specifications or the technical specifications set forth in the Delivery Schedule, Guarantor does not make any representation or warranty, express or implied, as to the aesthetic quality of the Picture, including the photographic exposure, editing, cutting, sound mixing, color correction, or other artistic or creative vision.

3.    Rating.  The Picture shall be capable of qualifying for an MPAA/CARA rating not more restrictive than "R."



E:\WPDOCS\028\FCB\Giallo\Interparty Agreement 9th Draft.wpd

# EXHIBIT "C"

# IFTA® INTERNATIONAL
## MULTIPLE RIGHTS ASSIGNMENT AGREEMENT

This International Multiple Rights Distribution Agreement is made as of April 3, 2008 between;

**HANNIBAL PICTURES**                                     ("Assignor")
8265 Sunset Boulevard, Suite 107
West Hollywood, CA 90046
Telephone: 323-848-2945                                  Telefax:  323-848-2946
Email: ⸻⸻⸻⸻

and

**SIGMA FILM Srl**                                       ("Assignee")
Via Archimede n. 25/a
Rome 00197 ITALY
Telephone: 39-06-806-91277                               Telefax:  39-06-807-9231
Email: ⸻⸻⸻⸻

For reference purposes this Agreement is identified as follows:

### GIALLO

This Agreement is: [X] a new agreement; [X] a long form agreement replaces the deal memo between Assignor and Assignee regarding the Picture;   [  ] an amendment to an existing agreement between Assignor and Assignee with the same Reference Code.

Subject to timely payment of all monies due Assignor and Assignee's full performance under this Agreement, Assignor licenses exclusively to Assignee, and Assignee accepts from Assignor, the Licensed Rights in the Picture throughout the Territory for the Agreement Term in the Authorized Languages subject to the Holdback as identified below on all the terms and conditions of this Agreement.

This Agreement consists of the following parts: the Cover Page; Table of Contents; Deal Terms; and the following attached Schedules "A" ( Delivery Materials), "B" ( E&O Protocol ), "C" (Lab Access Letter and "D" short form Assignment) and "E" ( Form Letter of Credit ): and All parts of this Agreement will be interpreted together to form one Agreement.  If not defined where they first appear, words used in this Agreement are defined in the Standard Terms and Conditions or in the Schedule of Licensing definitions or; if not otherwise defined in this Agreement, in accordance with industry custom and practice.

**IN WITNESS WHEREOF,** Assignor and Assignee have executed this Agreement as of the date first written above to constitute a binding contract between them.

**HANNIBAL PICTURES**                          **SIGMA FILM srl**
Assignor                                       Assignee

By: Richard Rionda Del Castro                  By: Claudio Argento
Its: Chairman & CEO                            Its: Authorized Signatory

# TABLE OF CONTENTS

|                          | *Paragraph* |
|--------------------------|-------------|
| *Section*                |             |
| **Deal Terms**           | I.          |
| Basic License Terms      | II.         |
| Rights Terms             | III.        |
| Financial Terms          | IV.         |
| Delivery Terms           | V.          |
| Additional Terms         |             |

IFTA® INTERNATIONAL
## MULTIPLE RIGHTS ASSIGNMENT AGREEMENT

### DEAL TERMS

*Mention in these Deal Terms of any right not specifically licensed to Assignee in the Licensed Rights Terms does not grant to Assignee expressly or by implication any right not specifically licensed to Assignee in the Licensed Terms.*

### I.
### BASIC LICENSE TERMS

A.   **Picture(s):   GIALLO**
Star: Adrien Brody

If said star shall not be able to assume their duties on the film, then Assignee shall be notified immediately in writing and in advance by Assignor with replacement names. If Assignee does not agree to the replacement then it shall be to its sole discretion to cancel the agreement within 48 hours of the confirmed receipt by Assignee of notification or renegotiate terms.

B.   **Territory(ies):** ITALY and Italian speaking European Countries.

C.   **Term:** Starting on execution and in perpetuity from Acceptance of Essential Delivery of the Picture(s).

D.   **Authorized Language(s):**
[X] Original Language; [X] Official Language(s) in Territory.
All Rights may be exploited: [X]Dubbed  [X]Subtitled

E.   **Authorized Video Use(s):** PAL/NTSC cassette, DVD and videogram

F.   **Authorized Television Runs:** Unlimited

Assignee is hereby granted unlimited runs per title for the Picture(s) for On-Demand, Pay-Per-View, Pay TV and Free TV, whether broadcast via terrestrial, cable or satellite transmission is at Assignee's discretion. Assignee agrees, however, all On-Demand and satellite transmissions are to be of a dubbed and encrypted version.

G.   **Release Dates:**

Assignee will cause the First Release of the Picture(s) throughout Territory ("First Release") to take place no later than six (6) months after Delivery of the Initial Materials. Assignee cannot exploit any Licensed Right before the end of its applicable Holdback period. Once determined, Assignee will also provide Assignor with all release dates for the Picture in the Territory.

See Additional Terms, Paragraph C.9.

### II.
### RIGHTS TERMS

*A Right is licensed to Assignee only if the "Yes" box is marked. A Right not marked or marked in the "No" box is Reserved Right of Assignor. All Holdbacks are subject to Holdback coordination and adjustment within the Holdback Region in accordance with Paragraph 6.7 of the Standard Terms and Conditions.*

| A. | **Cinematic Rights:** | | |
|---|---|---|---|
| | **Licensed** | **Holdback** | |
| | Theatrical | [X]Yes [ ]No | <u>See Additional Terms Paragraph C. 9.</u> |
| | Non-Theatrical | [X]Yes [ ]No | <u>See Additional Terms Paragraph C. 9.</u> |
| | Public Video | [X]Yes [ ]No | <u>See Additional Terms Paragraph C. 9.</u> |

| B. | **Ancillary Rights:** | | * if no theatrical release in the US, no ancillary holdbacks apply |
|---|---|---|---|
| | | **Licensed** | **Holdback** |
| | Airline | [X]Yes [ ]No | Until <u>N/A</u> months from First U.S. Theatrical Release |
| | Ship | [X]Yes [ ]No | Until <u>N/A</u> months from First U.S. Theatrical Release |
| | Hotel | [X]Yes [ ]No | Until <u>N/A</u> months from First U.S. Theatrical Release |

| C. | **Video Rights:** | | |
|---|---|---|---|
| | | **Licensed** | **Holdback** |
| | Home Video | [X]Yes [ ]No | Until <u>N/A</u> months from First Theatrical Release |
| | Commercial Video | [X]Yes [ ]No | Until <u>N/A</u> months from First Theatrical Release |
| | Sell-thru | [X]Yes [ ]No | Until <u>N/A</u> months from First Theatrical Release |

| D. | **Television Rights:** | | |
|---|---|---|---|
| | | **Licensed** | **Holdback** |
| | <u>Pay-per-View TV, including On-Demand</u> | | |
| | Terrestrial | [X]Yes [ ]No | Until <u>N/A</u> months from Holdback Date |
| | Cable | [X]Yes [ ]No | Until <u>N/A</u> months from Holdback Date |
| | Satellite | [X]Yes [ ]No | Until <u>N/A</u> months from Holdback Date |
| | <u>Pay TV</u> | | |
| | Terrestrial | [X]Yes [ ]No | Until <u>N/A</u> months from Holdback Date |
| | Cable | [X]Yes [ ]No | Until <u>N/A</u> months from Holdback Date |
| | Satellite | [X]Yes [ ]No | Until <u>N/A</u> months from Holdback Date |
| | <u>Free TV</u> | | |
| | Terrestrial | [X]Yes [ ]No | Until <u>N/A</u> months from Holdback Date |
| | Cable | [X]Yes [ ]No | Until <u>N/A</u> months from Holdback Date |
| | Satellite | [X]Yes [ ]No | Until <u>N/A</u> months from Holdback Date |

| E. | **Internet Rights:** | | |
|---|---|---|---|
| | | **Licensed** | |
| | Video on Demand - Internet | [X]Yes [ ]No | **See Additional Terms, paragraph C.10.** |
| | Pay-per-view - Internet | [X]Yes [ ]No | **See Additional Terms, paragraph C.10.** |
| | Pay TV - Internet | [X]Yes [ ]No | **See Additional Terms, paragraph C.10.** |
| | Free TV - Internet | [X]Yes [ ]No | **See Additional Terms, paragraph C.10.** |

**Holdback Date:** See Additional Terms, paragraph C.9.

## III.
## FINANCIAL TERMS

**Acquisition Price:**

1.    **Amount:** ONE MILLION FOUR HUNDRED THOUSAND EUROS (1,400,000.00□) net of Taxes. The minimum guarantee is a minimum net sum and no taxes or charges may be deducted therefrom. The payment is as follows:

**Payment Method**

**Installment**

100% (1,400,000.00□) upon technical acceptance of Essential Delivery and irrevocable lab access letter executed with Italian lab and parties.                    [ ] WT    [ X ] LC

The irrevocable and confirmed Letter of Credit as per Schedule E will be opened by Assignee in favor of the Assignor between June 15 and July 15,08 but in no even later than July 15,08.

2.    **Default:** In the event Assignee does not pay any portion of the Acquisition Price in respect of any Picture upon the Due Date, then Assignor shall be entitled in its sole and unfettered discretion to elect to:

2.1    cancel this agreement in respect of such Picture only, whereupon Assignor shall be entitled to retain any and all amounts previously paid by Assignee to Assignor in respect of such Picture by way of liquidated damages, (which the parties agree is a reasonable estimate of Assignor's damages based on Assignee's failure to perform), the rights licensed hereunder in respect of such Picture shall not pass to Assignee and Assignor shall be entitled to re-license the Picture and the Licensed Rights in respect thereof in such manner and to such parties as it may in its sole discretion deem fit; and/or

2.2    cancel this Agreement in respect of all Pictures licensed hereunder, whereupon Assignor shall be entitled to retain any and all amounts previously paid by Assignee to Assignor hereunder by way of liquidated damages, (which the parties agree is a reasonable estimate of Assignor's damages based on Assignee's failure to perform) none of the rights licensed hereunder shall pass to Assignee, any such rights which have passed to Assignee shall be deemed to have been automatically reassigned to Assignor and Assignor shall be entitled to re-license any or all of the Pictures and the Licensed Rights in such manner and to such parties as it may deem necessary to mitigate its damages hereunder; and/or

2.3    enforce this Agreement and demand payment of all amounts due hereunder.

Notwithstanding the foregoing, Assignor reserves the right to bring a cause of action, suit or claim, at law or in equity, against Assignee for any breach, default or failure by Assignee to pay any portion of the Guarantee hereunder.

3.    **Allocation:**
If no allocation is indicated below, then the entire Acquisition Price will be deemed allocated to the Theatrical Rights. Otherwise, the Acquisition Price will be allocated among the Licensed Rights as follows:

a. "Cinematic Acquisition Price":___% (US$_____)
   To the Theatrical, Non-Theatrical or Public Video Rights, as licensed.

b. "Video Acquisition Price":      ___% (US$_____)
   To the Home Video or Commercial Video Rights, as licensed.

c. "Ancillary Acquisition Price":__N/A__% (US$_____)
   To the Airline, Ship, or Hotel Rights, as licensed.

d. "Television Acquisition Price":___% (US$_____)
   To the Free TV or Pay TV Rights, as licensed.

B.   **Payment Requirements:**
     Timely payment of all amounts due Assignor is of the essence of this Agreement and an express condition precedent to Assignee's right to exercise or exploit any of the Licensed Rights. Except as otherwise provided herein, Assignee will make payments of the installments of the Guarantee indicated in Paragraph A.1 due Assignor as follows:

   1. **WT - Wire transfer:**                Other Payments: _____
      [X] License Fee Installments
      Assignee will pay the indicated installments of the License Fee or other payments by wire transfer of unencumbered funds, free of any transmission charges, to the following account:

                           AS PER INVOICE.

C.   **Disposition of Gross Receipts: N/A – Flat Agreement**

## IV.
## DELIVERY TERMS

   1. **Physical Materials:**
      [X] To be specified in Assignor's Notice of Initial Delivery per Paragraph 8; or
      [ ] The following items delivered per Paragraph 8 of the Standard Terms And Conditions:
Delivery will be made through irrevocable lab access letter between Assignor and Assignee with Italian lab.

   2. **Support Materials:**
      [X] To be specified in Assignor's Notice of Initial Delivery per Paragraph 8; or
      [ ] The following items delivered per Paragraph 8 of the Standard Terms And Conditions:
      Flyers, Posters, Dialogue Book, Music Cue Sheet, Key art, slides.

   3. **Date for Notice of Initial Delivery:**
      Assignor will give Assignee a Notice of Initial Delivery no later than: March 31, 2009.

[X] Promptly after the Picture is ready for Delivery.

4. **Materials Payment Instructions:**
Assignee will pay for all Materials:
[ ] To be specified in Assignor's Notice of Initial Delivery per Paragraph 8; or
[X] As follows: Assignee will pay lab directly for all material ordered and or will pay Assignor for all material upon Notice of Delivery.

5. **Materials Shipping Instructions:**
Assignor will ship all Materials to Assignee:
[ ] To be specified in Assignor's Notice of Initial Delivery per Paragraph 8; or
[X] As follows: At Assignee sole cost.  Using Assignee's Express Courier Account.

## V.
## ADDITIONAL TERMS

A.   **Governing Law:**  Italy

B.   **Forum:**  Court of Rome

C.   **Additional Deal Terms:**

1.   Assignor and/or its designees will at all times have unimpeded and free access to all foreign language tracks (regardless of format), all dubbed versions (whether on film or videotape), all subtitled versions (whether on film or videotape), all masters, all advertising and promotional materials, all artwork, and all other materials created by Assignee pursuant to this Agreement.

2.   Assignee has the obligation to display visibly and prominently Assignor's trademark and/or logo which shall never be smaller nor less visible than any other trademark and/or logo appearing at the beginning or end of the program, in any display, stills, posters, jackets, and any other marketing material related to the Program.  Failure to comply with this obligation shall be deemed as a breach of this Agreement.

3.   If the Picture is to be released theatrically in the Territory, then Assignor shall have the right to consult on the legal credit obligations.

4.   Assignee agrees to sign a Notice of Assignment in a mutually agreed form for the Picture

5.   The right to receive all monies collected by any collecting society, author's rights organization, performing rights society or governmental agency that are payable to authors, producers, performers or other persons and that arise from royalties, compulsory licenses, cable retransmission income, music performance royalties, tax rebates, exhibition surcharges, levies on blank videograms or hardware, rental or lending royalties, or the like, are specifically reserved to Assignor,  and will, as between Assignor and Assignee, be the sole property of Assignor, and will not be included in or credited to any Gross Receipts.  Assignor has the sole right to collect any and all such amounts, and if any such amounts are paid to Assignee, then Assignee shall immediately remit same to Assignor with a statement identifying the payment.

1.   This Agreement (and each of the Schedules and Exhibits attached hereto, if any) is entered

into pursuant to the laws of the Italy and shall be interpreted in accordance with the laws applicable to agreements entered into and wholly performed therein. Each of the parties hereto agree that any dispute arising under this Agreement, including, without limitation, any dispute relating to Delivery or Assignee's obligation to make payment hereunder, or the Assignment referred to in the Deal Terms or any Schedule or Exhibit hereto shall be resolved by mandatory binding arbitration under the Rules of International Chamber of Commerce in effect as of the date the request for arbitration is filed (the "Rules"). Any of Assignor, Assignee, or Designated Bank may initiate such an arbitration pursuant to the Rules and such arbitration will be held in Rome, Italy (the "Forum"). The parties agree to abide by the decision rendered in such arbitration and that any court having jurisdiction may enforce such decision. The parties hereby submit to the exclusive jurisdiction of the courts of the Forum in all matters relating to such arbitration. The parties agree to accept service of process for all proceedings in accordance with the Rules and to accept service of process for any judicial or other process by registered mail. Assignee hereby expressly waives application of the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. The prevailing party in any such action shall be entitled to prompt payment of costs and fees including reasonable attorney's fees.

7.   **Assignment:** Assignor shall have the right, exercisable at any time, to freely assign, transfer or sublicense any of its rights, or delegate any of its obligations or duties, under this Agreement to any person, company or entity. Notwithstanding the foregoing, Assignor shall remain secondarily liable with respect to its obligations and liabilities to Assignee hereunder unless such assignment or transfer is (a) to an entity with which Assignor merges or consolidates, or which acquires all or substantially all of the assets of Assignor; or (b) to Assignor's predecessor-in-interest with respect to the Film, in which case, such assignment or transfer shall relieve Assignor from its obligations and liabilities to Assignee under this Agreement and Assignee shall look solely to such assignee or transferee with respect to the performance and satisfaction of all such obligations and liabilities. Any assignment or transfer of the type described in clauses (a) or (b) above shall be effective immediately upon receipt of written notice from Assignor.

8.   **Security Interest :** Concurrent with the execution hereof, Assignee hereby grants to and in favor or Assignor a security interest in and to all Licensed Rights hereunder and the proceeds derived from the exploitation thereof. Assignee shall provide any and all documentation reasonably required by Assignor in order to give effect hereto and in the event.provided that such security interest shall automatically be released upon payment in full of the Acquisition Price by Assugnee

10.   **Internet Rights:** If Internet Rights are granted, Assignee may exploit the Picture using the IP Protocol for broadband transmission provided, however that any such method of exploitation conforms to the following conditions:
   (i)      Assignee shall provide and maintain exclusive access to the Picture to individuals in private homes ("Users") for the purposes of viewing the Picture on a computer screen, terminal or TV via broadband transmission following either: (a) payment of a fee for such access, or (b) verification of previous payment for services where such access to the Picture is inclusive in the User's contract with Assignee (i.e., Satellite or Cable TV account);
   (ii)     The date file containing the Picture must be encrypted using the latest and most secure form of encryption technology available for online media access;
   (iii)    Assignee shall restrict User's access to the most current and secure encrypted "streaming-only" technology or, if the Picture is made available for download, Assignee

shall ensure that the Picture is encoded with the most current and most secure encryption technology available in the Territory and the Users shall only be provided access to view the Picture via a proprietary software viewer or viewer with security of the highest and most current industry-accepted levels of security and resistance to "pirating", "hacking", "cracking" or any other form of security circumvention now known or hereafter devised;

(iv)    Assignee shall ensure that such delivery shall be limited to Users located within the Territory;

(v)    The Picture shall be in the Authorized Languages only;

(vi)    Assignee shall ensure that once a Picture is viewed by a User, said Picture shall not be in such a format on the User's computer, set-top box or terminal as to allow the User to share, trade, upload, burn, copy or otherwise move or transfer any of said Picture to another location so that said Picture can be viewed by any other individual or User with no previous access to the specific Picture in question;

(vii)    Assignor and Assignee shall share the Gross Receipts derived from the exploitation of the TV and Demand View Rights in the same manner as traditionally delivered TV and Demand View.

## SCHEDULE "A" – DELIVERY SCHEDULE

All materials must be delivered at Assignee's cost and must be cleared for Assignee's use.

**Access to all elements will be at Cinecittalab or Technicolor in Rome, Italy and/or Fotokem Los Angeles or Advanced Digital Services in Los Angeles and or any other lab that parties mutually approve**

Unless otherwise directed, all elements and documents should be shipped to:

**SIGMA FILM Srl**
Via Archimede n. 25/a
Rome 00197 ITALY
Telephone: 39-06-806-91277                    Telefax:  39-06-807-9231
Attention : Claudio Argento
Email: ............................

## ESSENTIAL ITEMS

### SECTION I – FEATURE FILM ELEMENTS

1.   Access to Work Print 35mm Original Version (SR/SRD) for Dubbing purpose
2.   Dialogue List Original Version/Spotting List Original Version combined with work print (including titles, subtitles, narrative titles, exploitation titles)
3.   Main and End Titles list (credits) - proof also via fax
4.   Subtitles list - Narrative Titles list -(proof also via fax showing the font, size etc.)
5 .   Access to 35mm Original Version (Internegative of the full and final Picture
1.   Access to Textless (Inter)negative or interpositive of all the main/end titles, subtitles, narrative titles sections(in order to manufacture locally the Italian titles) , to be manufactured by Distributor at its sole discretion provided that the relevant costs will be deducted in accordance with  paragraph III A above.
7 .    Access to Reference Print 35mm for local printing purpose
8.   Access to Music and effect soundtrack on DA88 or 35mm magnetic (analog and digital - 254ft/s film speed) for dubbing purpose, to be manufactured by Assignee, at its sole discretion.
9.   Access to Dialogue stems including Optional dialogue - Vocal stems - Lyrics Stems on DA88 or 35mm magnetic
10.   Access to Print Master soundtrack on DA88 or 35mm magnetic (Analog and digital - film speed 254 ft/s - No Dolby) Combined with work print
11.   Access to Original soundtrack of the movie on cd or dat stereo (within all the music recorded for and mixed into the movie)
1.   Access to Digital Beta 16:9 format (including at the end of the tape the textless background for Titles) - ch. 1 and 2 mix o.v
13 .   Certificate of Origin(Authorship) for Censorship purpose
14 .   One(1) original notarised Certificate of Nationality
15 .   One (1) original notarised Producer's Attestation/Chain of Title
16.   Error and Omissions Insurance Certificate
17 .   Laboratory access Letter in the form to be agreed between the Parties

18. Two(2) original notarised Certificates of Residence for Double Tax Exemption
19. Statement of dubbing restrictions
20. Music Cue sheet(giving details of all music contained in the picture with title, composer/arranger, publisher, pre-recorded source of reference, usage category and duration);
21. A complete list of all contributors identifying, where appropriate, their union or guild;
22. Dubbing, Translation, adaptation guidelines/Theatrical Dubbing Letter
23. Technical Data Sheet (general information, length, sound format, screening format, o.v. audio configuration)

## NON ESSENTIAL ITEMS

## SECTION II - PUBLICITY MATERIALS

(i)   **EPK'S - Back Stage - Interviews**

1.   If available, on digital beta or beta sp (ch. 1 and 2 mix)

(ii)   **PUBLICITY MATERIALS AND ARTWORK**

1.   Any artwork or logo material available (the Licensor shall ensure that fully cleared rights to reproduce have been secured)
2.   At least 20 stills in digital high resolution format (still Photographs, actors, director etc)
3.   If a poster exists, one sample plus access to key elements such as poster art transparency and P.M.T. of poster and block
4.   A complete statement of all screen and paid advertising credit obligations together with a layout of the proposed screen and advertising credits and a statement of all contractual restrictions as to the use of name and likeness or otherwise of any contributor together with excerpts from any agreement agreeing to give screen and/or paid advertising credit
5.   Long form synopsis(3 pages) and short synopsis(2 paragraphs)
6.   Pressbook (with technical and artistic cast, director and production notes or comments, director and principal actor curriculum, interviews).

**C.   Materials Shipping instructions:**  Assignor shall deliver to Assignee all material necessary for dubbing and adaptation to Italian cinema and television, free from any third-party lien.

**D.   Suitability:**  It is of the essence to this Agreement that the Picture will on delivery be in all respects completely finished and that the Delivery Materials will be of first class technical quality and in accordance with Assignee's standards, fully edited, titled, synchronised with Original language dialogue, music and effects and suitable for exploitation by means of the rights herein specified by first class broadcasters, exhibitors and Videogram distributors in the Territory. Assignee shall examine all materials received from Assignor for technical suitability of transmission within thirty (30) days of receipt of the materials. All the materials shall be considered to meet technical requirements and to be accepted by Assignee unless Assignee provides Assignor with written notification which fully details all technical defects within thirty (30) days of receipt of the materials. In the event of the receipt of such notification, Assignor may either choose to eliminate all defects and make the corrected materials available to Assignee or to substitute the technically unsuitable materials with technically flawless materials within thirty (30) days of receiving Assignee's written notification.

## SCHEDULE "B" – E&O PROTOCOL

### Protocol for Adding SIGMA FILMS Srl on E&O

Use the following language to add our company as an additional insured:

"SIGMA FILMS Srl, its parent, its subsidiaries and all associated, affiliated and related entities, its successors, licensees, sub-distributors, sub-licensees and assigns and the officers, directors, shareholders, attorneys, agents and employees of each of the foregoing."

Please include the following language on the certificate:

1. Coverage is primary and not contributing to or in excess of any such insurance maintained by Sigma Films Srl
2. Policy does not contain any non-standard endorsements, exclusions or restrictions in coverage. (We need this on the certificate, and if it's not stated on the certificate, then we require a copy of the entire policy.)
3. Certificate should provide thirty (30) days prior written notice via registered mail of any cancellation or material change in coverage.

The insurance policy must be in place for at least three (3) years from the first day of the license period.

With limits of no less than US$1,000,000 per claim and US$3,000,000 in the aggregate with a deductible of no more than US$10,000

Policy must include and certificate must state:

1. coverage for the title (and any aka name, if applicable)
2. coverage for the music
3. coverage for the Bonus Materials
4. coverage for Films Clips and images
5. coverage for all media

## SCHEDULE "C" – LAB ACCESS LETTER

## LABORATORY ACCESS LETTER

date

(lab)
(address)

Gentlemen:                          RE: ""

    You acknowledge that you now have or will have in your possession, in the name of the undersigned, the print, pre-print and sound materials and the videotape materials, as applicable ("Materials") of the motion picture presently entitled * (the "Film") and of the trailer ("Trailer") of the Film as set out in Schedule 1 hereto.  Please be advised that the undersigned and SIGMA FILMS Srl ("Sigma") have entered into an agreement ("Agreement") whereby certain rights in the Film have been granted to Sigma and Sigma will require access to the Materials and Trailer and may request all or some of said Materials and Trailer to be removed from your premises.  Accordingly:

1.  You are hereby instructed and directed upon your receipt of this letter (and subject to the making of credit arrangements satisfactory to you) to honor all instructions and orders of Sigma and such others as Sigma may designate to you in writing in relation to the Film, regardless of any protest, objection or contrary instructions or orders of the undersigned.

2.  All services and materials ordered shall be at the expense of the person or company ordering such services or material, and you agree to look solely to such person or company for payment of such charges as such person or company may incur.

3.  You will not refuse to honor any of the orders of Sigma or its designees by reason of any unpaid charges incurred by the undersigned or by anyone else other than Sigma or its designees.

4.  Neither the undersigned nor anyone else shall have the right to remove the Materials from your premises without the written consent of Sigma.

5.  The instructions contained herein are irrevocable and may not be modified except in a writing signed by the undersigned and Sigma.

Please confirm your understanding of and agreement to the foregoing by signing in the space provided below.

Yours very truly
*

Per: _____

AGREED TO:

(lab) Per: _____

Sigma Films Srl  Per: _____

## SCHEDULE "D" – SHORT FORM ASSIGNMENT

For good and valuable consideration, receipt of which is hereby acknowledged, HANNIBAL PICTURES ("Assignor") hereby irrevocably grants, transfers, assigns and licenses to SigmaFilms Srl. ("Sigma") the sole and exclusive "Rights" in and to the "Picture" as further specified in that certain agreement, dated April 3, 2008, between Assignor and Sigma (the "Acquisition Agreement") for exploitation in the "Territory" during the "Term" (as such terms are defined below).

PICTURE:                 **GIALLO**

RIGHTS:                  "Rights" means the sole and exclusive right under copyright to exhibit, distribute, market, display, project, transmit, broadcast, rebroadcast, perform, advertise, publicize, license, exploit, sell copies of and otherwise communicate the Picture in all media, by all means and methods now known or hereafter devised including, without limitation, by means of Cinematic, Ancillary, Video (Rental and Sell Thru), Electronic Rental, Electronic SellThru and all manners of home viewing, Pay-Per-View, VOD, SVOD, NVOD, Pay TV, Free TV and all forms of television now know or hereafter devised, Wireless, Internet, any New Exploitation Methods developed during the Term of this Agreement, and all Allied and Incidental Rights in and to the Picture in the Territory, but expressly excluding airline and music publishing rights.

TERRITORY:               **ITALY and Italian speaking European Countries.**

TERM:                    Commencing April 3, 2008 and ending in perpetuity.

Subject to the aforesaid, Sigma is empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any nature, concerning any copyright in and to the Picture, or any infringement of such copyright or violation of any of the rights granted it under the Acquisition Agreement. Any recovery of damages, penalties, costs or otherwise arising by reason of infringement of any such copyright(s) or violation of the rights transferred to Sigma under the Acquisition Agreement has been assigned, and shall be paid, to Sigma.

This Short Form Assignment is executed pursuant to and is expressly subject to all the terms and conditions of the Acquisition Agreement.
IN WITNESS WHEREOF, Assignor hereby caused this Short Form Assignment to be duly executed and delivered as of April 3, 2008.

HANNIBAL PICTURES

By:_____

Its:_____

On _____, 2008, before me, _____, a Notary Public, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.              SEAL
Signature:     _____

## SCHEDULE "E" LETTER OF CREDIT

### LETTER OF CREDIT

To be mutually agreed in good faith between Assignor 's bank and Assignee' s bank.
Assignee will provide Assignor with the draft by May 22, 08 which will taken into account the proposed
language submitted by Assignor's bank and completion bond.

# IFTA™ INTERNATIONAL STANDARD TERMS
## FOR OUTRIGHT DEALS

**1. DEFINITIONS AND USAGE**

**1.1. Definitions:** Words and phrases with initial letters capitalized are Defined Terms. If not defined where they first appear, they are defined in the attached Schedule of Definitions which is incorporated by reference and is part of this Agreement. The reference in any provision herein to rights not specifically licensed in the Deal Terms is for convenience only and does not grant Licensee any such rights.

**1.2. Usage:** If more than one Picture is licensed to Licensee in the Deal Terms, then all provisions of this Agreement apply to each Picture individually unless specifically provided otherwise in this Agreement.

**2. PICTURE AND VERSION**

**2.1. Picture:** The Picture is the Motion Picture currently identified in the Deal Terms. Licensor may change the title of the Picture.

**2.1.1. Version:** The Picture is only licensed in linear form for viewing from beginning to end. Licensor reserves all rights in all Versions of the Picture other than its original linear form as Delivered to Licensee and the authorized dubbed, subtitled or edited Versions made by Licensee. If during the Agreement Term Licensor elects to exploit another Version of the Picture in the Territory that incorporates a substantial portion of the linear form of the Picture licensed to Licensee, then Licensor will accord Licensee a right of First Negotiation to acquire any affected Licensed Rights in such Version for the remainder of the License Period for such Licensed Rights. If Licensee does not acquire the affected Licensed Rights in such new Version, then Licensor may exploit such new Version(s) in the Territory starting six (6) months after the end of any Holdback for the affected Licensed Rights.

**3. LICENSED RIGHTS AND RESERVED RIGHTS**

**3.1. License:** Subject to the terms of this Agreement, Licensor exclusively licenses to Licensee the Licensed Rights in the Picture for their respective License Periods throughout the Territory for exploitation only by the Authorized Language Use(s), for the Authorized Format(s), on the Licensed Channel(s), for no more than the Licensed Telecast(s), and subject to all Use Restrictions set forth in the Deal Terms.

**3.2. Vesting:** Each Licensed Right will only vest in Licensee after the following is met in accordance with the Deal Terms: (i) Licensee accepts Initial Delivery of the Picture; and (ii) Licensee pays Licensor the entire License Fee.

**3.3. Reservation:** All rights not expressly licensed to Licensee in the Deal Terms are Reserved Rights. Licensor may exploit all Reserved Rights without restriction except as expressly provided in this Agreement.

**3.4. Reversion:** Each Licensed Right will immediately revert to Licensor free of any claim by Licensee or other Person on the earlier of the end of the License Period for the Licensed Right, the end of the Agreement Term under Paragraph 6.1., or cancellation under Paragraph 12.2.

**3.5. Exclusivity Limitations:**

**3.5.1. Broadcast Overspill:** Licensor does not grant exclusivity protection against reception in the Territory of a broadcast or Simultaneous Retransmission of the Picture originating outside the Territory, whether terrestrial, cable or satellite. Licensor only agrees, subject to Paragraph 3.5.4. that during the License Period for any PayPerView, Pay TV or Free TV Licensed Rights it will not broadcast or authorize broadcast of the Picture in any Authorized Language within the Region where the broadcast is intended for primary reception within the Territory.

**3.5.2. Parallel Imports:** Licensor does not grant exclusivity protection against sale or rental in the Territory of Videograms embodying the Picture imported from outside the Territory. Licensor only agrees, subject to Paragraph 3.5.4., that during the License Period for any Video Licensed Right it will not sell or authorize sale of Videograms embodying the Picture in any Authorized Language within the Region where those Videograms are intended for primary consumer sale or rental within the Territory.

**3.5.3. Internet Availability:** Licensor does not grant exclusivity protection against the availability of the Picture on the Internet within the Territory. Licensor only agrees, subject to Paragraph 3.5.4., that until the end of the Holdback for any Video Licensed Rights, Licensor will not authorize making the Picture available on the Internet in any Authorized Language for Downloading at reasonably identifiable locations in the Territory.

**3.5.4. Original Version:** Unless English is an official language in the Territory, Licensor's agreement in the second sentence of each of the previous three subparagraphs does not apply to the original, unsubtitled English language version of the Picture even if English is an Authorized Language.

**4. ALLIED RIGHTS**

**4.1. Credit And Advertising:** When exploiting the Picture, Licensee will comply at all times after their receipt with all required screen credits, paid advertising, publicity and promotional requirements, name and likeness restrictions, and Videogram packaging credit requirements (if needed) as supplied by Notice from Licensor. Upon Licensor's request, Licensee will promptly submit to Licensor all advertising materials used by Licensee so that Licensor can determine whether its requirements are being met.

**4.2. Dubbing, Subtitling And Editing:** Licensee may not create dubbed, subtitled or parallel track versions of the Picture unless they are Authorized Language Uses in the Deal Terms. When creating any authorized dubbed, subtitled or edited version of the Picture or its trailers, Licensee will comply, at all times after their receipt, with all dubbing, subtitling or editing requirements for the Picture or its trailers, which are supplied by Notice from Licensor. *Except* as expressly provided in this Agreement, the Picture and its trailers must be exhibited at all times in their original continuity, without alteration, interpolation, cut or elimination.

**4.3. Exercise Of Allied Rights:** Subject to Licensor's requirements under Paragraphs 4.1. and 4.2. and the provisions of this Agreement, Licensee will have the non-exclusive right at its sole expense:

**4.3.1.** To advertise, publicize, and promote the exploitation of the Licensed Rights in the Picture in the Territory, and in so doing to use the title of the Picture, the advertising and promotion materials supplied by Licensor or created by Licensee under this Agreement, and the name, voice and likeness of any Person rendering materials or services on the Picture but not as an endorsement for any product or service other than the Picture;

**4.3.2.** To include before the beginning or after the end of the Picture the credit or logo of Licensee;

LF639; LF640

4.3.3. To change the title of the Picture after first obtaining Licensor's Notice of approval;

4.3.4. To dub or subtitle the Picture but only in the Authorized Language(s); and

4.3.5. In exploiting any Free TV Licensed Rights, to agree to a broadcaster's insertion of commercial announcements in the Picture but only at those points reasonably designated by Licensor.

4.4. Limitations: In exercising the Allied Rights, Licensee may not: (i) alter or delete any credit, logo, or copyright, patent or trademark notice appearing on the Picture; (ii) include any advertisements or other material before, during or after the Picture other than the credit or logo of Licensee, an approved anti-piracy warning, or commercials as authorized in this Agreement; or (iii) alter or delete any Rights Management Information appearing on any Copy of the Picture supplied by Licensor without prior Notice of Licensor's approval, or (iv) alter, substitute, dub or delete any music or lyrics without prior Notice of Licensor's approval.

4.5. No Inadvertent Failure: An inadvertent failure on behalf of Licensee to comply with any requirements provided under Paragraphs 4.1. and 4.2. will not be a material breach of this Agreement *provided that* Licensee takes all reasonable efforts to cure prospectively such failure after Notice from Licensor.

## 5. TERRITORY AND REGION

5.1. **Territory**: The Territory means the countries or territories listed in the Deal Terms, as further defined in the IFTA™ International Schedule of Suggested Territories and Regions, and as their political borders exist on the Effective Date of this Agreement.

5.2. **Non-Contiguous Areas**: Non-Contiguous Areas mean embassies, military and government installations, oil rigs and marine drilling sites, airlines-in-flight and ships-at-sea flying the flag of a country but not located within its contiguous geographic borders. The Territory does not include the Non-Contiguous Areas of other foreign countries located within the Territory. However, for the Non-Theatrical, Commercial Video, Airline and Ship Licensed Rights, the Territory includes the Non-Contiguous Areas of each country in the Territory as necessary for exploiting such Rights.

5.3. **Changes in Borders**: If during the Agreement Term an area separates from a country in the Territory then the Territory will include the entire area which formed one political entity as of the Effective Date of this Agreement. If during the Term an area is annexed to a country in the Territory, then Licensor grants Licensee a right of First Negotiation to acquire the Licensed Rights in the Picture through the end of the Agreement Term in the newly annexed area to the extent said rights are then or become available.

5.4. **Region**: The Region is the part of the world in which the Territory is located. The Region is defined either in the Deal Terms or as otherwise in the IFTA™ International Schedule of Suggested Territories and Regions current as of the Effective Date of this Agreement.

5.5. **Regionalization**: The Picture is only licensed for exploitation using the technological methods in customary commercial use in the Territory during the Agreement Term. For example, if PAL is the customary commercial format for Videograms in the Region, then in exercising any Video Licensed Rights Licensee may only exploit Videograms of the Picture in the PAL format. If the Video Licensed Rights include DVD as an Authorized Format, then Licensee may only exploit Videograms of the Picture in the local encoded DVD regional format.

5.6. **Changes in Licensed Channel**: Licensee may only telecast or authorize telecast of the Picture over the originating transmitting facilities of the Licensed Channel designated in the Deal Terms as it exists on the Effective Date of this Agreement. If there is a physical change in the facilities of the Licensed Channel that materially affects the number or kind of household televisions capable of receiving it (*e.g.* signal boost, new transponder, satellite orbital drift), then Licensee will promptly give Licensor Notice of such change. Licensor grants Licensee a right of First Negotiation regarding exploitation of any affected Licensed Rights over such new facilities, taking into account rights previously granted to other Persons and an adjustment in the License Fee. If no agreement is reached in the First Negotiation period, Licensor may withdraw the Picture under Paragraph 11.

## 6. AGREEMENT TERM, LICENSE PERIOD AND HOLDBACKS

6.1. **Agreement Term**: The Agreement Term starts and ends on the dates set forth in the Deal Terms *except* in case of extension per Paragraph 11. or early termination per Paragraphs 11. or 12.

6.2. **License Period**: The License Period is the maximum time period in the Deal Terms during which Licensee may exploit or authorize the exploitation of each Licensed Right. The License Period for any Pay TV or Free TV Licensed Rights ends on the *earlier* of the end of the License or the conclusion of the last Licensed Telecast. Failure to use all Licensed Telecasts will not extend the License Period. Licensee may not exploit or authorize exploitation of any Licensed Right after the end of the Agreement Term.

6.3. **First Release**: First Release means the earliest of: (i) the Outside Release Date designated in the Deal Terms, if any; or (ii) the date on which the Picture is actually first made generally available to the paying public in the Territory, either through exhibition in cinemas, sale of Videograms, or telecast; or (iii) six (6) months after Notice of Initial Delivery.

6.4. **Licensee Holdbacks**: Licensee may not exploit or authorize exploitation of any Licensed Right until the end of its Holdback. However, Licensee may enter into agreements at any time to exploit a Licensed Right starting after the end of its Holdback.

6.5. **Licensor Holdbacks**: Licensor may not exploit or authorize exploitation in the Territory of any Reserved Right until the end of its Holdback. However, Licensor may enter into agreements at any time to exploit a Reserved Right in the Territory starting after the end of its Holdback.

6.6. **Holdback Coordination**: Licensor may extend any Holdback by up to three (3) months *provided that* Licensor gives Licensee prompt Notice of any adjusted Holdback period no later than three (3) months before the end of the original Holdback period.

6.7. **Use Restrictions**: Licensee may not exploit or authorize exploitation of any Licensed Right contrary to any Use Restriction in the Deal Terms. If DVD is an Authorized Format, then Licensee may not to the extent permitted by Law, sell or authorize sale of DVDs incorporating the Original Language Version of the Picture Parallel Tracked with any other Authorized Language Version until three (3) months after Original Language DVD Versions are made available for sale to the public in any country in the Region where the Original Language of the Picture is a primary language or, if there is no such country in the Region, in the country of origin of the Picture.

## 7. PAYMENT REQUIREMENTS

V: 2005
D: 15-Apr-08

LF639; LF640

**7.1. Timely Payment:** Timely payment is of the essence of this Agreement. Payment will only be considered made when Licensor has immediate and unencumbered use of funds in the required currency in the full amount due. Licensee will use diligent efforts to obtain promptly all permits necessary to make all payments to Licensor.

**7.2. License Fee:** Licensee will pay each installment of the License Fee to Licensor in the time and manner specified in the Deal Terms. Where an installment is payable on events within Licensor's control, *e.g.* the start of Principal Photography, Licensor will give Licensee timely Notice of such event. Where an installment is payable on events within Licensee's control, *e.g.* First Release, Licensee will give Licensor timely Notice of such event.

**7.3. Limits on Deductions:** There will be no deductions from any payments due Licensor because of any bank charges, conversion costs, sales use or VAT taxes, "contingents", quotas or any other taxes, levies or charges unless separately agreed to in a Notice from Licensor.

**7.4. Blocked Funds:** If any Law prohibits remittance from the Territory of any amounts to Licensor, then Licensee will give Licensor prompt Notice of such Law. Licensee will deposit such amounts in Licensor's name for Licensor's unencumbered use in a suitable depository designated by Licensor without any deductions for so doing.

**7.5. Finance Charge On Late Payments:** Any payment not made when due will, in addition to any other right or remedy of Licensor, incur a finance charge at the lesser of three base points over the 3-month London Inter Bank Offered Rate ("LIBOR+3") on the date payment was due or the highest applicable legal contract rate. This finance charge will accrue from the date the payment was due until it is paid in full.

**7.6. Exchange Rate Provisions:** For a late payment Licensor will be entitled to the most favorable exchange rate between the due date and the payment date. The risk of devaluation of the Base Currency designated by Licensor is Licensor's sole risk; the risk of the devaluation of the currency of the Territory is Licensee's sole risk.

**7.7. Royalty Income:** All amounts collected by any collecting society, authors' rights organization, performing rights society or governmental agency arising from compulsory licenses, cable retransmission income, music performance royalties, tax rebates, exhibition surcharges, levies on blank Videograms or hardware, rental or lending royalties, or the like, will as between Licensor and Licensee be the sole property of Licensor. Licensor has the sole right to apply for and collect all these amounts. If any of such amounts are paid to or collected by Licensee, then Licensee will immediately remit them to Licensor with an appropriate statement identifying the source.

**7.8. No Cross-Collateralization:** No payment for the Picture may be cross-collateralized with or set-off against any amounts for any other Motion Picture licensed to Licensee.

## 8. DELIVERY AND RETURN

**8.1. Terminology:** "Delivery" of a Picture means delivery to Licensee of the Delivery Materials, consisting of the Initial Materials and the Additional Materials, by means of the Delivery Methods, as provided in the Deal Terms and this Paragraph 8. Initial Delivery means delivery of the Initial Materials. Additional Delivery means delivery of the Additional Materials.

**8.2. Initial Delivery:** Licensor will make Initial Delivery as follows:

**8.2.1.** Notice of Initial Delivery: Licensor will commence the Delivery process by giving Licensee a Notice of Initial Delivery stating the date on which Licensor is prepared to make Initial Delivery. Such date must be no later than the

Delivery Date in the Deal Terms, unless the Delivery Date is extended due to Force Majeure, but in any case no later than the Outside Delivery Date in the Deal Terms.

**8.2.2.** Identified Initial Materials: If the Initial Materials are identified on the Delivery Manifest or in the Delivery Deal Terms, then the Notice of Initial Delivery must also specify: (i) any Material Charges for the Initial Materials; (ii) the carrier making delivery; (iii) any delivery costs; and (iv) the method of payment. Licensee will immediately pay all amounts required. Upon receipt of payment, Licensor will immediately make Initial Delivery to Licensee of all Initial Materials by the required Delivery Method.

**8.2.3.** Non-Identified Initial Materials: If the Initial Materials are not identified on the Delivery Manifest or in the Delivery Deal Terms, then Licensor's Notice of Initial Delivery will identify the available Initial Materials. Within ten (10) days of receipt of Licensor's Notice Licensee will inform Licensor of the pre-print items, prints, trailers, advertising and promotional accessories, support items and other Initial Materials relating to the Picture that Licensee reasonably requires. Licensor will then give Licensee Notice of: (i) any Material Charges; (ii) the carrier making delivery; (iii) any delivery costs; and (iv) the method of payment. Licensee will immediately pay all amounts required. Upon receipt of payment, Licensor will immediately make Initial Delivery to Licensee of all Initial Materials by the required Delivery Method.

**8.2.4.** Licensee Acceptance: Licensee will respond promptly to Licensor's Notice of Initial Delivery so as not to delay the delivery process. In all cases, Licensee must accept Initial Delivery of all Initial Materials pursuant to the Delivery Manifest and no later than two (2) months after receipt of Licensor's Notice of Initial Delivery.

**8.3. Additional Delivery:** After completion of Initial Delivery, Licensor will give Licensee Notice that Licensor is prepared to make Additional Delivery. If the Additional Materials are identified in the Deal Terms or on the Delivery Manifest, Licensor's Notice will identify them; otherwise, Licensee will inform Licensor of the Additional Materials Licensee reasonably requires. Once the Additional Materials are identified, Licensor will inform Licensee of: (i) any Material Charges for the Additional Materials; (ii) the carrier making delivery; (iii) any delivery costs; and (iv) the method of payment. Licensee will immediately pay for such Additional Materials upon receipt of Licensor's Notice. Upon receipt of payment, Licensor will make prompt Delivery of the Additional Materials to Licensee as specified in the Deal Terms or Licensor's Notice.

**8.4. Delivery Methods:** Licensor will make Delivery of physical materials by one of the following methods specified in the Deal Terms or Licensor's Notice of Initial Delivery or Additional Delivery:

**8.4.1.** Physical Delivery: Where *Physical Delivery* is specified, Licensor will deliver to the delivery location specified in Paragraph IV.D. of the Deal Terms, the physical materials suitable for use as or for the manufacture of necessary exploitation materials listed on the Delivery Manifest. Unless otherwise specified in the Deal Terms, the physical materials will be shipped to Licensee by air transport.

**8.4.2.** Laboratory Access: Where *Laboratory Access* is specified, Licensor will provide Licensee with access to the physical materials suitable for use as or for the manufacture of necessary exploitation materials listed on the Delivery Manifest. Access will be on the terms of the IFTA™ International Access Letter or if specified by Licensor, another mutually approved access letter. The physical materials will always be held in a recognized laboratory or

LF839; LF840

facility in Licensor's name and subject to the requirements of the IFTA™ International Access Letter or another mutually approved letter. Licensee may order prints and other exploitation materials for the Picture to be manufactured from the accessible physical materials at Licensee's sole expense.

**8.4.3. Loan of Materials:** Where *Loan Of Materials* is specified Licensor will deliver on loan to the delivery location specified in Paragraph IV.D. of the Deal Terms or on the Delivery Manifest the physical materials suitable for manufacture of necessary preprint materials. Unless otherwise specified in the Deal Terms, the physical materials will be shipped to Licensee by air transport. These physical materials will only be used to make new preprint materials, at Licensee's sole expense, from which necessary exploitation materials can be made. These physical materials will always be held in a laboratory or facility subject to Licensor's reasonable approval and will be returned to Licensor within a reasonable time designated by Licensor.

**8.4.4. Satellite Delivery:** Where *Satellite Delivery* is specified, Licensor will deliver the physical materials listed in the Deal Terms or on the Delivery Manifest to Licensee by satellite transmission consistent with available materials and Licensee's equipment. Licensor will be responsible for all uplinking transmission costs; Licensee will be responsible for arranging to receive the satellite reception and for all downlinking reception costs. Licensee's failure to make suitable downlinking receiving arrangements, or failure to receive a transmission of the Picture due to technical downlink or reception failure, will not affect Licensee's obligations under this Agreement. If Licensee experiences a technical failure of transmission or reception, Licensor upon receipt of timely Notice will attempt to assist Licensee to receive a new transmission. Licensee will pay for each missed satellite feed a charge equal to Licensor's actual cost of the uplinking transmission.

**8.4.5. Electronic Delivery:** Where *Electronic Delivery* is specified Licensor will deliver the physical materials listed in the Deal Terms or on the Delivery Manifest to Licensee by electronic transmission over the Internet or comparable service consistent with available materials and Licensee's equipment. When using Electronic Delivery Licensor may require Licensee to obtain and use reasonable and commercially available Rights Management Information software and anti- piracy protection as a condition for making any electronic delivery.

**8.5. Delivery Of Support Material:** Licensor will also provide, at Licensee's request and expense, the advertising, promotional and other support materials as specified on the Delivery Manifest or Licensor's Notice of Initial Delivery. Unless otherwise specified in the Deal Terms, all such materials will be shipped to Licensee by air transport. If Licensee elects not to use materials supplied by Licensor or a portion thereof, then Licensee will obtain prior Notice of Licensor's approval before using any of its own servicing, advertising, promotional or other support material.

**8.6. Evaluation And Acceptance:** Licensee will evaluate all Delivery Materials for technical acceptance promptly after their receipt. All Delivery Materials will be considered technically satisfactory and accepted by Licensee unless within fifteen (15) days after receipt Licensee gives Licensor Notice specifying any technical defect. If Licensee's Notice is accurate, then Licensor will, at its election, either: (i) promptly correct the defect and redeliver the affected Delivery Materials; or (ii) promptly deliver replacement Delivery Materials; or (iii) exercise its rights of suspension or withdrawal pursuant to Paragraph 11. In case of a redelivery, the procedures in this Paragraph will continue

until Delivery is deemed made or the Picture is withdrawn. If Licensee has undertaken a First Release of the Picture then any alleged defect will be deemed waived by Licensee.

**8.7. Ownership Of Delivery Materials:** Legal ownership of and title to all Delivery Materials will remain with Licensor subject to Licensee's right to use such Delivery Materials under this Agreement. Licensee will exercise due care in safe-guarding all Delivery Materials and will assume all risk for their theft or damage while they are in Licensee's possession.

**8.8. Payment For Delivery Materials:** Licensee will pay for all Delivery Materials as indicated in the Deal Terms or otherwise by Notice from Licensor. All costs of Delivery and return (including shipping charges, import fees, duties, brokerage fees, storage charges and related charges) will be Licensee's sole responsibility *unless* otherwise specified in the Deal Terms.

**8.9. Licensee Created Materials:** Licensee will provide Licensor and its designees with immediate unrestricted free access to all alternate language tracks, subtitled tracks and dubbed versions, masters, advertising and promotional materials, artwork and other materials created or authorized by Licensee to exploit the Picture ("Licensee Created Materials") for use by Licensor and/or its designees. Licensee will promptly give Licensor Notice of each Person who prepares any Licensee Created Materials and each laboratory or facility where they are located. Licensor will pay Licensee promptly on request for the actual cost of duplication and shipping to Licensor of any Licensee Created Materials and any reuse fees applicable to their use. Licensee assigns to Licensor, and Licensor will immediately become the owner of, the worldwide copyright in all Licensee Created Materials, subject to a non-exclusive free license in favor of Licensee to use them during the Agreement Term solely for exploitation of the Licensed Rights. If such ownership is ·not allowed under a Law in the Territory then Licensee grants Licensor a non-exclusive free license to use all Licensee Created Materials worldwide in perpetuity without restriction.

**8.10. Return Of Materials:** When the Agreement Term ends, Licensee will at Licensor's election either: (i) return all Delivery Materials and Licensee Created Materials to Licensor at Licensee's expense; or (ii) destroy all Delivery Materials and Licensee Created Materials and provide Licensor with a customary certificate of destruction.

## 9. EXPLOITATION OBLIGATIONS

**9.1. Video Format Approval:** Licensee at its cost will provide Licensor for its reasonable approval one (1) prototype copy of each authorized type of Videogram and its packaging promptly after their manufacture and before their sale or disposition. Licensor's approval will be deemed given if Licensor does not give Licensee Notice of an objection within one (1) month of receipt of these items. The Videograms manufactured by Licensee will meet quality standards at least comparable to other Videograms commercially available through legitimate outlets in the Territory. Licensee will not advertise or authorize advertising of the availability of Videograms of the Picture to the public until two (2) months before the end of the applicable Video Holdback.

**9.2. Video Sell-Off Period:** During the last six (6) months of the License Period for the Video Licensed Rights, Licensee will not manufacture Videograms in excess of those reasonably anticipated to meet normal customer requirements. During the three (3) month period following the end of the License Period for the Home Video Licensed Rights, and provided this Agreement has not been terminated under Paragraphs 11. or 12., Licensee will have the non-exclusive right to sell off its then existing inventory of

LF639; LF640

Videograms for Home Video exploitation only. At the end of this three (3) month period, Licensee will at Licensor's election either sell its remaining Videograms and their packaging to Licensor at cost or destroy them and provide Licensor with a customary certificate of destruction.

**9.3. Television Exploitation:** Licensee will not broadcast or authorize broadcast of the Picture by any form of Pay TV other than an encrypted form, and Licensee will not sell, rent or export or authorize the sale, rental or export of decoders for such encryption outside the Territory. Licensee will not broadcast or authorize broadcast of the Picture by any means from within the Territory where the broadcast is primarily intended for reception outside the Territory or is capable of reception by more than an insubstantial number of home televisions outside the Territory.

**9.4. Simultaneous Retransmissions:** If during the Agreement Term, Simultaneous Retransmissions are subject to Compulsory Administration in a country in the Territory, then Licensor reserves the right to collect all royalties for Simultaneous Retransmissions of the Picture in such country regardless of where the primary broadcast originated.

**9.5. Digital Broadcasts:** If during the Agreement Term, broadcasters in the Territory are required by Law to make simultaneous digital broadcasts of their analog broadcasts, then Licensee may authorize such simultaneous digital broadcasts, *provided that* both the analog and digital signal originate with the same broadcaster and duplicate the same content.

**9.6. Internet Broadcasts:** If during the Agreement Term, broadcasters in the Territory make their broadcasts simultaneously available on the Internet, then Licensor will give good faith consideration to authorizing such practice for the Picture subject to rights previously granted to others, *provided that* Licensee gives reasonable written assurances that Internet availability will only occur simultaneously with a broadcast of the Picture, will be only for the Authorized Language Use(s), will reasonably limit access to users within the Territory, and will incorporate technological safeguards that restrict copying or downloading of the Picture while on the Internet.

**10. MUSIC**

**10.1. Cue Sheets:** To the extent required and available, Licensor will supply Licensee promptly after Delivery of the Motion Picture with available music cue sheets listing the composer, lyricist and publisher of all music embodied in the Picture. Licensee will as necessary promptly file with the appropriate governmental agency or music rights society in the Territory the music cue sheets supplied by Licensor without change.

**10.2. Synchronization:** Licensor represents and warrants to Licensee that Licensor controls all rights necessary to synchronize the music contained in the Picture on all Copies exploited by Licensee throughout the Territory for the Agreement Term. Licensor authorizes Licensee to exploit such synchronization rights without charge in conjunction with its exploitation of the Picture. Licensor will be solely responsible for paying all royalties or charges necessary to obtain and control such synchronization rights for the Agreement Term, and Licensor will hold Licensee harmless from any payments in this regard.

**10.3. Mechanical:** Licensor represents and warrants to Licensee that Licensor controls all rights necessary to make mechanical reproductions of the music contained in the Picture on all Copies exploited by Licensee throughout the Territory for the Agreement Term. Licensor authorizes Licensee to exploit such mechanical rights without charge in conjunction with its exploitation of the Picture. Licensor

will be solely responsible for paying all royalties or charges necessary to obtain and control such mechanical rights for the Agreement Term, and Licensor will hold Licensee harmless from any payments in this regard, *provided that* if a mechanical or authors' rights society in the Territory refuses to honor the authorization obtained by Licensor in the country of origin of the Picture, then Licensee will be solely responsible for such royalties or charges.

**10.4. Performance:** Licensor represents and warrants to Licensee that the non-dramatic ("small") performing rights in each musical composition embodied in the Picture are: either (i) in the public domain in the Territory; or (ii) controlled by Licensor sufficient to allow Licensee to exploit the Licensed Rights without additional payment for such rights; or (iii) available by license from the local music performing rights society(ies) in the Territory affiliated with the International Confederation of Authors and Composers Societies (CISAC). With regard to music in category (iii), Licensee will be solely responsible for obtaining a license to exploit such performance rights from the local music performing rights society(ies).

**10.5. Publishing:** As between Licensor and Licensee, Licensor will be solely entitled to collect and retain the publisher's share of any music royalties arising from Licensee's exploitation of any Licensed Rights in the Picture.

**11. SUSPENSION AND WITHDRAWAL**

**11.1. Licensor's Right:** Licensor may suspend Delivery or withdraw the Picture by Notice to such effect at any time: (i) if Licensor determines in good faith that its exploitation might infringe the rights of others or violate any Law; (ii) if Licensor determines in good faith that its Materials are unsuitable for the manufacture of first class commercial quality exploitation materials; or (iii) due to Force Majeure.

**11.2. Effect Of Suspension:** The Agreement Term will be extended for the length of each suspension. Suspension will not be a material breach of this Agreement, and Licensee will only be entitled to incidental damages, but not direct or consequential damages (such as "lost profits") for any suspension. If any suspension extends Initial Delivery of the Picture beyond the Outside Delivery Date in the Deal Terms, if any, then the Picture will be treated as immediately withdrawn on such Outside Delivery Date without the necessity of any Notice. Otherwise, if any suspension lasts more than three (3) consecutive months, then either Party may cancel this Agreement on ten (10) days' Notice, in which case the Picture will be withdrawn.

**11.3. Effect Of Withdrawal:** If the Picture is withdrawn, then Licensor must promptly offer to substitute a Motion Picture of like quality mutually satisfactory to Licensor and Licensee without additional charge. If the Parties cannot timely agree on such a substitute, then Licensor must promptly refund to Licensee an equitable portion of the License fee paid to Licensor. Licensee's sole remedy will be to receive this substitute or refund. In no case may Licensee collect any consequential damages (including "lost profits"). If during the three (3) years after the date of Licensor' Notice of withdrawal or the date the Picture is deemed withdrawn Licensor elects to again release the Picture within the Territory, Licensee will have an exclusive right of First Negotiation to the extent the Agreement Term is still in effect to reacquire any of the Licensed Rights in the Picture within the Territory.

**11.4. Force Majeure:** Force Majeure means any fire, flood, earthquake, or public disaster; strike, labor dispute or unrest; unavoidable accident; breakdown of electrical or sound equipment; failure to perform or delay by any laboratory or

supplier; delay or lack of transportation; embargo, riot, war, insurrection or civil unrest; any Act of God including severe inclement weather; any act of legally constituted authority; inability to obtain sufficient material, labor, transportation, power or other essential commodity or service required for the conduct of either Party's business or any other cause beyond the reasonable control of either Party.

**12. DEFAULT AND CANCELLATION**

**12.1. Licensee's Default:** Licensee will be in default if: (i) Licensee fails to pay any installment of the License Fee when due; (ii) Licensee becomes insolvent or fails to pay its debts when due; (iii) Licensee makes an assignment for the benefit of creditors, seeks relief under any bankruptcy Law or similar Law for the protection of debtors, or allows a petition of bankruptcy to be filed against it or a receiver or trustee to be appointed for substantially all of its assets that is not removed within thirty (30) days; (iv) Licensee breaches any material term, covenant or condition of this Agreement or any other agreement with Licensor executed within eighteen (18) months before or after the Effective Date of this Agreement; (v) this Agreement applies to more than one Picture and Licensee breaches any material term, covenant or condition of this Agreement with respect to any Picture or all Pictures; (vi) a Licensee affiliate breaches any material term, covenant or condition of any other agreement with Licensor executed within eighteen (18) months before or after the Effective Date of this Agreement; or (vii) Licensee attempts to make any assignment, transfer, sublicense or appointment of an agent without first obtaining Licensor's approval under Paragraph 17. of the Standard Terms.

**12.2. Notice To Licensee:** Licensor will give Licensee Notice of any claimed default. If the default is capable of cure, then Licensee will have fourteen (14) days after receipt of Licensor's Notice to cure a monetary default, and twenty-one (21) days after receipt to cure a non-monetary default. If the default is incapable of cure, or if Licensee fails to cure within the time provided, then Licensor may proceed against Licensee for available relief, including canceling this Agreement retroactive to the date of default, suspending Delivery of the affected Picture (or for all Pictures), and declaring all unpaid amounts due Licensor under this Agreement immediately due and payable.

**12.3. Licensor's Default:** Licensor will be in default if: (i) Licensor fails to give Licensee a Notice of Initial Delivery before the Outside Delivery Date, if any, or otherwise fails to complete Initial Delivery as required; (ii) Licensor becomes insolvent or fails to pay its debts when due; (iii) Licensor makes an assignment for the benefit of creditors, or seeks relief under any bankruptcy Law or similar Law for the protection of debtors, or allows a petition of bankruptcy to be filed against it or a receiver or trustee appointed for substantially all of its assets that is not removed within thirty (30) days; or (iv) Licensor breaches any material term, covenant, or condition of this Agreement. Any default by Licensor is limited to the particular Picture affected, and no default by Licensor as to any one Picture or agreement with Licensee will be a default as to any other Picture or agreement with Licensee.

**12.4. Notice To Licensor:** Licensee will give Licensor Notice of any claimed default. Licensor will have fourteen (14) days after receipt of Licensee's Notice to cure a monetary default, and twentyone (21) days after receipt to cure a non-monetary default. If Licensor fails to cure within the times provided, then Licensee may proceed against Licensor for all available relief, including canceling this Agreement for the affected Picture retroactive to the date of default, *provided that,*

however in no case may Licensee collect any consequential damages including "lost profits".

**12.5. Arbitration:** Any dispute under this Agreement will be resolved by final and binding arbitration under the IFTA™ Rules For International Arbitration in effect as of the Effective Date of this Agreement ("IFTA™ Rules"). Each Party waives any right to adjudicate any dispute in any other court or forum, *except* that a Party may seek interim relief before the start of arbitration as allowed by the AFMA® Rules. The arbitration will be held in the Forum and under the Governing Law designated in this Agreement, or, if none is designated, as determined by the IFTA™ Rules. The Parties will abide by any decision in the arbitration and any court having jurisdiction may enforce it. The Parties submit to the jurisdiction of the courts in the Forum, with respect to interim relief, to compel arbitration or to confirm an arbitration award. The Parties agree to accept service of process in accordance with the IFTA™ Rules and agree that service in accordance with the IFTA Rules satisfies all requirements to establish personal jurisdiction over the Parties. Both Parties waive application of the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. Both Parties acknowledge that for an unsatisfied arbitration award that is confirmed by a court of competent jurisdiction, the prevailing Party may request that the other Party be barred from attendance at the American Film Market® in accordance with the arbitration and barring provisions of the most current AFM® Guidelines which are referred to as the "Market Rules."

**13. ANTI-PIRACY PROVISIONS**

**13.1. Copyright Notice Requirements:** Licensee will include on each Copy of the Picture distributed under its authority any copyright notice, work identifier and anti-piracy warning supplied by Licensor.

**13.2. Anti-Piracy Warning:** The anti-piracy warning must read substantially as follows:

WARNING

THIS MOTION PICTURE IS PROTECTED BY LAW.

Any unauthorized copying, distribution, performance, renting, lending, exporting, importing, dissemination or exhibition is prohibited by Law. Violators will be subject to criminal prosecution and civil penalties.

THIS MOTION PICTURE IS REGISTERED WITH THE IFTA™ ANTI-PIRACY PROGRAM

**13.3. Enforcement:** Licensee will take all reasonable steps to prevent piracy of the Picture in the Territory. Licensor may participate in any anti-piracy action using counsel of its choice. Licensor's expenses will be reimbursed from any recovery in equal proportion with Licensee's. If Licensee fails to take anti-piracy action, Licensor may do so in Licensor's or Licensee's name, with all recoveries belonging to Licensor.

**13.4. New Technology:** If during the Agreement Term new technology in use in the Territory inhibits the unauthorized duplication of Copies of the Picture, interferes with the reception of broadcast signals without use of an authorized decoding device, or otherwise provides protection against unauthorized exploitation of the Picture, then Licensee will use such technology in a reasonable manner in exploiting the Picture.

**13.5. No Warranty Against Piracy:** The Parties acknowledge that it is in their mutual interest to prevent piracy of the Picture in the Territory. Licensor has informed Licensee of any act of piracy of the Picture in the Territory of which Licensor is aware, and such information has been considered in determining the License Fee along with the other terms of

LF639; LF640

this Agreement. Licensee has also taken all necessary steps to inform itself of any piracy of the Picture in the Territory before executing this Agreement. No piracy of the Picture, whether occurring before or after execution of this Agreement, will allow Licensee to terminate this Agreement, or reduce any amounts due to Licensor or alter the terms of exploitation including any Holdbacks. Licensor will cooperate with Licensee to prevent or remedy any such act of piracy.

## 14. LICENSOR'S WARRANTIES

14.1. As Principal: If the Cover Page indicates Licensor is a principal, then Licensor represents and warrants to Licensee that the following are true and correct as of the Effective Date of this Agreement:

14.1.1. Licensor has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

14.1.2. There are no existing or threatened claims or litigation which would adversely affect or impair any of the Licensed Rights in the Territory during the Agreement Term;

14.1.3. Licensor has not licensed, encumbered or assigned any Licensed Right to any other Person in the Territory, in a manner that would interfere with any Licensed Right, and will not do so during its applicable License Period;

14.1.4. Licensor will not exploit or authorize exploitation of any Reserved Right in the Territory before the end of the applicable Licensor Holdback period;

14.1.5. The Picture was produced by authors who are nationals of or have their habitual residence in, or was first published or simultaneously first published in, a country which at the time of such production or publication was a signatory to the Berne Convention for the Protection of Literary and Artistic Works or the Universal Copyright Convention or the Buenos Aires Convention, and Licensor has not done any act or omitted to do any act which would impair the copyright in the Picture within the Territory during the Agreement Term; and

14.1.6. Neither the Picture nor the exercise of any Licensed Rights does or will during the applicable License Period: (i) defame, or hold in a false light, or infringe any privacy or publicity orother personal right of any Person; or (ii) infringe any copyright, trademark, trade secret, right of ideas, or similar property right of any Person. To the best of Licensor's knowledge as of the Effective Date of this Agreement, no use of any of the Delivery Materials does or will infringe any patent rights of any Person.

14.1.7. Licensor has undertaken reasonable efforts to ensure that its suppliers of essential special effects and other digital information embodied in the Delivery Materials have not included any electronic self-help instructions that will cause such digital information to cease operation of its own accord in such a manner as to materially impair Licensee's use of such Delivery Materials. This does not apply to electronic Rights Management Information that prevents unauthorized use of the Delivery Materials.

14.2. As Agent: If the Cover Page indicates Licensor is acting as an agent, Licensor represents and warrants to Licensee that the following are true and correct and will remain so throughout the Agreement Term:

14.2.1. Licensor has full authority from its principal designated on the Cover Page to enter into this Agreement on behalf of its principal and Licensor's principal will be bound by this Agreement;

14.2.2. Licensor's principal has made to Licensor each of the representations and warranties in Paragraph 14.1., and has authorized Licensor to make those representations and warranties directly from the principal to Licensee on the principal's behalf, and to the best of Licensor's knowledge they are all true and correct. In case of a breach of any representation or warranty in Paragraph 14.1., Licensee agrees to look directly to the principal and not to Licensor for any remedies Licensee might have.

## 15. LICENSEE'S WARRANTIES

15.1. As Principal: Licensee represents and warrants to Licensor that the following are true and correct and will remain so throughout the Agreement Term:

15.1.1. Licensee has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

15.1.2. There are no existing or threatened claims or litigation which would adversely affect or impair Licensee's ability to perform under this Agreement;

15.1.3. Licensee is the type of entity and is domiciled as indicated on the Cover Page.

15.1.4. Licensee will honor all restrictions on the exercise of the Licensed Rights and the Allied Rights under this Agreement and will not exploit any Licensed Right outside the Territory, before the end of its Holdback, or after its License Period.

15.1.5. No authorized dubbed or subtitled version of the Picture created by Licensee does or will: (i) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any Person; or (ii) infringe any copyright, trademark, trade secret, right of ideas, or similar property right of any Person; or (iii) to the best of Licensee's knowledge at the time of its creation, infringe any patent rights of any Person.

15.2. As Assigner: In case of any assignment of this Agreement pursuant to Paragraph 17. of the Standard Terms, Licensee makes the following additional representations and warranties to Licensor:

15.2.1. As a condition to the effectiveness of such assignment, the assignee can and will make all of the representations and warranties set forth above in Paragraph 15.1. directly to Licensor; and

15.2.2. If the assignee breaches any of those representations and warranties, then Licensor, in addition to any other right or remedy, may proceed directly against Licensee for such breach without first proceeding against such assignee or exhausting any right or remedies against such assignee.

## 16. INDEMNITIES

16.1. By Licensor: Licensor will indemnify and hold harmless Licensee, its officers, directors, partners, owners, shareholders, employees, attorneys and agents, from all claims, loss, liability, damages or expenses, including, without limitation, reasonable outside attorneys' fees and legal costs, but not including lost profits, due to breach of any of Licensor's representations or warranties. Licensor will honor this indemnity despite any assignment of this Agreement. If Licensor is acting as an agent, these indemnities are also made directly by Licensor's principal to Licensee, but Licensee will look only to Licensor's principal to honor them.

16.2. By Licensee: Licensee will indemnify and hold harmless Licensor, its officers, directors, partners, owners, shareholders, employees, attorneys and agents, from all claims, loss, liability, damages or expenses, including, without limitation, reasonable outside attorneys' fees and legal costs, but not including lost profits, due to breach of any of Licensee's representations or warranties. Licensee will honor this indemnity despite any assignment, transfer, sublicense or appointment of an agent.

## 17. ASSIGNMENT AND SUBLICENSING

**17.1. Licensee's Limitations:** Before payment in full of the License Fee, Licensee may not assign this Agreement or delegate its obligations in whole or in part, or sublicense or use an agent to exploit any Licensed Rights, whether voluntarily or involuntarily, without Notice of Licensor's prior approval in Licensor's sole discretion, and any attempted assignment in breach of this provision will be void. A transfer of a controlling interest in Licensee's capital stock or other evidence of ownership will be a transfer requiring Licensor's approval. This Agreement will be binding on any assignee, transferee, sublicensee or agent approved by Licensor but will not release Licensee from its obligations under this Agreement.

**17.2. Licensor's Rights:** Licensor may freely assign or transfer this Agreement or any of its rights under this Agreement, but no such assignment or transfer will relieve Licensor of its obligations under this Agreement, *unless* it is to a company which acquires all or substantially all of Licensor's assets and fully assumes all of the obligations hereunder.

## 18. MISCELLANEOUS PROVISIONS

**18.1. Separability:** In a conflict between this Agreement and any material Law, the latter prevails. If any provision herein is held to be unenforceable, the remaining provisions shall be in full force and effect.

**18.2. Approvals:** Where either Party may exercise any approval, it will do so promptly and in good faith, but in so doing a Party need not place the other Party's interests ahead of its own.

**18.3. No Waiver:** No waiver of a breach will waive any other breach. No waiver is effective unless it is contained in a record authenticated by the Party making the waiver. The exercise of any right will not waive any other right or remedy.

**18.4. Remedies Cumulative:** All remedies are cumulative, and resorting to one will not preclude resorting to any other at any time.

**18.5. Notices:** All Notices must be in a record authenticated by the sending Party and sent to the receiving Party at its address on the Cover Page by personal delivery, fax, courier or first class mail. Such Notice will be effective when received or deemed received pursuant to applicable Law. Notice may also be sent by e-mail, but then will not be effective until the recipient acknowledges receipt. Either Party may change its place for Notice by Notice duly given.

**18.6. Entire Agreement:** This Agreement contains the entire understanding of the Parties regarding its subject matter. It supersedes all previous written or oral negotiations, deal memos, understandings or representations between the Parties, if any. Each Party expressly waives any right to rely on such negotiations, understandings or representations, if any.

**18.7. Modification:** No modification of this Agreement is effective unless signed by both Parties.

**18.8. Terminology:** In this Agreement "and" means all possibilities, "or" means any or all possibilities in any combination, and "either...or" means only one possibility. "Including" means "including without limitation." "Must" or "will" means a Party has the obligation to act or refrain from acting; "may" means a Party has the right but not the obligation to act or refrain from acting.

**18.9. Additional Documents:** Upon reasonable request, each Party will execute and deliver such additional documents or instruments as are necessary to evidence, effectuate or confirm this Agreement.

**18.10. Governing Law:** This Agreement will be governed by and interpreted under the laws of the jurisdiction designated in Paragraph V.A. of the Deal Terms.

**18.11. Forum:** The Parties consent to the Forum designated in Paragraph V.C. of the Deal Terms as the exclusive place for resolving all disputes under this Agreement.

IFTA™ INTERNATIONAL
SCHEDULE OF DEFINITIONS

**A. Cinematic Rights Definitions:**

*Cinematic* means *Theatrical*, *NonTheatrical* and *Public Video* exploitation of a Motion Picture.

*Theatrical* means exploitation of a Motion Picture Copy only for direct exhibition in conventional or drive-in theaters, licensed as such in the place where the exhibition occurs, that are open to the general public on a regularly scheduled basis and that charge an admission fee to view the Motion Picture.

*NonTheatrical* means exploitation of a Motion Picture Copy only for direct exhibition before an audience by and at the facilities of either organizations not primarily engaged in the business of exhibiting Motion Pictures, such as in educational organizations, churches, restaurants, bars, clubs, trains, libraries, Red Cross facilities, oil rigs and oil fields, or governmental bodies such as in embassies, military bases, military vessels and other governmental facilities flying the flag of the licensed territory. NonTheatrical does not include Commercial Video, Public Video, Airline, Ship or Hotel exploitation.

*Public Video* means exploitation of a Motion Picture Copy embodied in a Videogram only for direct exhibition before an audience in a "mini-theater", an "MTV theater" or like establishment that charges an admission to use the viewing facility or to view the Videogram, and that is not licensed as a traditional motion picture theater in the place where the viewing occurs.

**B. PayPerView Rights Definitions**

*PayPerView* means *NonResidential PayPerView*, *Residential PayPerView* and *Demand View* exploitation of a Motion Picture. *PayPerView* does not include any form of *Pay TV* or *Free TV*, nor any form of making the Picture available over the Internet.

*Residential PayPerView* means the broadcast of a Motion Picture Copy by means of an encoded signal for television reception in homes or similar permanent living places where a charge is made to the viewer for the right to use a decoding device to view the broadcast of the Motion Picture at a time designated by the broadcaster for each viewing.

*NonResidential PayPerView* means the broadcast of a Motion Picture Copy by means of an encoded signal for television reception in hotels or similar temporary living places where a charge is made to the viewer for the right to use a decoding device to view the broadcast of the Motion Picture at a time designated by the broadcaster for each viewing.

*Demand View* means the transmission of a Motion Picture Copy by means of an encoded signal for television reception in homes and similar permanent living places where a charge is made to the viewer for the right to use a decoding device to view the Motion Picture at a time selected by the viewer for each viewing.

**C. Ancillary Rights Definitions:**

*Ancillary* means *Airline*, *Ship* and *Hotel* exploitation of a Motion Picture.

*Airline* means exploitation of a Motion Picture Copy only for direct exhibition in airplanes that are operated by an airline flying the flag of any country in the licensed

territory for which Airline exploitation is granted, but excluding airlines that are customarily licensed from a location outside the licensed territory or that are only serviced in but do not fly the flag of a country in the licensed territory.

*Ship* means exploitation of a Motion Picture Copy only for direct exhibition in sea or ocean going vessels that are operated by a shipping line flying the flag of any country in the licensed territory for which Ship exploitation is granted, but excluding shipping lines that are customarily licensed from a location outside the licensed territory or that are only serviced in but do not fly the flag of a country in the licensed territory.

*Hotel* means exploitation of a Motion Picture Copy only for direct exhibition in temporary or permanent living places, such as hotels, motels, apartment complexes, co-operatives or condominium projects, by means of closed-circuit television systems where the telecast originates within or in the immediate vicinity of such living places.

**D. Video Rights Definitions:**

*Video* means *Home Video* and *Commercial Video* exploitation of a Motion Picture, but does not include any form of making the Motion Picture available over the Internet.

*Home Video* means *Home Video Rental* and *Home Video SellThru* exploitation of a Motion Picture.

*Home Video Rental* means exploitation of a Videogram embodying a Motion Picture that is rented to the viewer only for non-public viewing of the embodied Motion Picture in a linear form within a private living place where no admission fee is charged for such viewing.

*Home Video SellThru* means exploitation of a Videogram embodying a Motion Picture that is sold to the viewer only for non-public viewing of the embodied Motion Picture in a linear form within a private living place where no admission fee is charged for such viewing.

*Commercial Video* means direct linear exhibition before an audience of a Videogram embodying a Motion Picture at the facilities of either organizations not primarily engaged in the business of exhibiting Motion Pictures, such as in educational organizations, churches, restaurants, bars, clubs, trains, libraries, Red Cross facilities, oil rigs and oil fields, or governmental bodies such as in embassies, military bases, military vessels and other governmental facilities flying the flag of the licensed territory, but only to the extent that such exploitation is not otherwise utilized in the licensed Territory as a form of NonTheatrical exploitation. Commercial Video does not include NonTheatrical, Public Video, Airline, Ship or Hotel exploitation, nor any form of making the Picture available over the Internet.

**E. Pay TV Rights Definitions**

*Pay TV* means *Terrestrial Pay TV*, *Cable Pay TV* and *Satellite Pay TV* exploitation of a Motion Picture. *Pay TV* does not include any form of *PayPerView* nor any form of making the Picture available over the Internet.

*Terrestrial Pay TV* means over-the-air broadcast of a Motion Picture Copy by means of encoded Hertzian waves for television reception where a charge is made: (i) to viewers in private living places for use of a decoding device to view a

LF639; LF640

channel that broadcasts the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Cable Pay TV* means an originating transmission of a Motion Picture Copy by means of an encoded signal over cable for television reception where a charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that transmits the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Satellite Pay TV* means the uplink broadcast of a Motion Picture Copy by means of an encoded signal to a satellite and its downlink broadcast to terrestrial satellite reception dishes for television viewing located in the immediate vicinity of the reception dishes where a charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that broadcasts the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

**F.   Free TV Rights Definitions:**

*Free TV* means *Terrestrial Free TV, Cable Free TV*, and *Satellite Free TV* exploitation of a Motion Picture. *Free TV* does not include any form of *PayPerView*, nor any form of making the Picture available over the Internet.

*Terrestrial Free TV* means over-the-air broadcast by Hertzian waves of a Motion Picture Copy for television reception in private living places without a charge to the viewer for the privilege of viewing the Motion Picture, *provided that* for this purpose government television assessments or taxes (but not a charge for PayPerView or Pay TV) will not be deemed a charge to the viewer.

*Cable Free TV* means the originating transmission by coaxial or fiber-optic cable of a Motion Picture Copy for television reception in private living places without a charge to the viewer for the privilege of viewing the Motion Picture, *provided that* for this purpose neither government television assessments or taxes nor the regular periodic service charges (but not a charge for PayPerView or Pay TV) paid by a subscriber to a cable television system will be deemed a charge to the viewer.

*Satellite Free TV* means the uplink broadcast to a satellite and its downlink broadcast to terrestrial satellite reception dishes of a Motion Picture Copy for television viewing in private living places located in the immediate vicinity of a viewer's reception dish without a charge to the viewer for the privilege of viewing the Motion Picture, *provided that* for this purpose government satellite dish or television assessments or taxes (but not a charge for PayPerView or Pay TV) will not be deemed a charge to the viewer.

**G.   Internet Rights Definitions:**

*Internet Rights* means *Internet Downloading* or *Internet Streaming* exploitation of a Motion Picture. *Internet Rights* do not include any form of *PayPerView*, *Video, Pay TV* or *Free TV* exploitation of a Motion Picture.

*Internet Downloading* means exploitation of a digital Motion Picture Copy by making it available on the World Wide Web portion of the Internet in a manner that allows its transmission to a Computer for making another exact digital copy of the Motion Picture Copy and retaining the new digital copy for use for more than a transient period of time after completion of the initial continuous period of transmission. *Internet Downloading* does not include any form of *Internet Streaming*.

*Internet Streaming* means exploitation of a digital Motion Picture Copy by making it available on the World Wide Web portion of the Internet in a manner that allows continuous viewing of the Motion Picture Copy on a Computer in a substantially linear form substantially simultaneously with the transmission of such Motion Picture Copy over the Internet but which does not allow making another digital copy except for a transient period of time necessary to facilitate such viewing. *Internet Streaming* does not include any form of *Internet Downloading*.

*Internet Streaming/Downloading* means exploitation of a digital Motion Picture Copy by making it available on the World Wide Web portion of the Internet for both *Internet Downloading* and *Internet Streaming* at substantially the same time.

**H.   Video Use Definitions:**

*Cassette* means the same as VideoCassette.

*CD* means a Compact Disc.

*Compact Disc* means a combined optical and electronic analog storage device designed to be used in conjunction with an electronic device that causes a Motion Picture to be visible on the screen of a computer monitor or television for private viewing in a substantially linear manner. A Compact Disc does not include any type of VideoDisc or DVD.

*Disc* means an electronic storage device designed to be used in conjunction with an electronic device or a computer that causes a Motion Picture to be visible on the screen of a television or computer monitor for private viewing in a substantially linear manner. A Disc includes a VideoDisc, Compact Disc or a DVD, but not a VideoCassette.

*DVD* means a digitally encoded electronic storage device that conforms to one of the following: (1) the DVD Specification for Read-Only Disc, version 1 (August 1996) or its successor, (2) the DVD Multi Specification for Read-Only Disc, version 1 (June 2001) or its successor, or (3) the HD DVD Specification for Read-Only Disc, version 1 (September 2005) or its successor, and that is designed for use in conjunction with an electronic device or computer in a way that causes a Motion Picture to be visible for private viewing on the screen of a computer monitor or television. DVD includes Digital Versatile Discs, High Definition DVDs, and related DVD enabled peripherals such as DVD-ROM devices and DVD-RAM devices, but does not include any type of Compact Disc or VideoDisc.

*Laser Disc* is a type of VideoDisc.

*VCD* means Video Compact Disc.

*Video Compact Disc* means a type of compressed analog VideoDisc designed to be used solely on a special purpose electronic device that is solely dedicated for private viewing

LF639; LF640

of a Motion Picture on the screen of a television in a substantially linear manner.

*VideoCassette* means a VHS or Beta cassette or comparable analog magnetic storage device designed to be used with a reproduction apparatus that causes a Motion Picture to be visible on a television screen for private viewing in a substantially linear manner. A VideoCassette does not include any type of VideoDisc or Compact Disc or DVD.

*Videogram* means any type of VideoCassette, Compact Disc, Disc, DVD or VideoDisc, but only to the extent use of the specific type of electronic storage device is authorized in the Agreement by the Parties.

*VideoDisc* means a laser or capacitance disc or comparable analog optical or mechanical storage device designed to be used with a reproduction apparatus that causes a Motion Picture to be visible on a television screen for private viewing in a substantially linear manner. A VideoDisc does not include any type of Compact Disc or DVD.

I.   **Internet Use Definitions:**

*Advertiser Supported* means making a Motion Picture Copy available on the World Wide Web portion of the Internet for accessing, downloading or streaming, by either: (i) including trailers, commercials or other advertising before, after, or within the continuity of the Motion Picture Copy; or (ii) including banners, logos, icons, text, hyper-text, meta-tags, symbols or other identifying information of a product or service or a supplier of such product or service provider on the same web page as the Motion Picture Copy or any of its elements or identifying information.

*Limited Use* means authorizing accessing, streaming or downloading, as applicable, of a Motion Picture Copy on the World Wide Web portion of the Internet by a user who is required to pay a separate fee to obtain a limited right to use a new digital copy of a Motion Picture Copy that may be accessed and viewed, but not further copied, subject to express limitations as to either the number of accesses or viewings, the period of access or viewing, or both (e.g. unlimited viewing for x days, or x viewings maximum, or x viewings within y days).

*Permanent Use* means authorizing downloading of a Motion Picture Copy on the World Wide Web portion of the Internet by a user who is required to pay a separate fee to obtain ownership of new digital copy of the Motion Picture Copy which new copy may be used and viewed, but not further copied, without express limitations as to the number of uses and viewings and the time period of so doing.

*Single Use* means authorizing accessing, streaming or downloading, as applicable, of a Motion Picture Copy on the World Wide Web portion of the Internet by a user who is required to pay a separate fee for each single act of accessing, streaming or downloading the Motion Picture Copy in whole or in part.

*Subscription Use* means authorizing accessing, streaming or downloading, as applicable, of a Motion Picture Copy on the World Wide Web portion of the Internet by a user who is required to pay a set fee for a specified period to access, stream or download, as applicable, the embodied Motion Picture along with other Motion Pictures available in the same manner on the same web site.

J.   **Other Rights Definitions:**

*Compact Disc Interactive* when used as a Right is a type of Interactive Multimedia Right and when used to describe a Work is a type of Interactive Multimedia Work.

*CDI* means the same as Compact Disc Interactive.

*Dubbed* means a Version of the Motion Picture in which the voices of performers on the original soundtrack are replaced with the voices of other performers speaking dialogue in an Authorized Language.

*Interactive Multimedia* means exploitation of an Interactive Multimedia Work by means of a computing device that allows the Interactive Multimedia Work to be directly perceived and manipulated by the user of the computing device and that either stores the Interactive Multimedia Work on the user's computing device or accesses a Copy of the Interactive Multimedia Work by electronic means from another computing device interconnected with and located in the immediate vicinity of the user's computing device.

*Interactive Networked Multimedia* means exploitation of an Interactive Multimedia Work over the facilities of a communications system that allows the user of a computing device to engage in two-way transmissions over the system to access the Interactive Multimedia Work, irrespective of the operator of the system or the means by which signals are carried, and that stores a Copy of the Interactive Multimedia Work for transmission over the system at a place distant from the place where the user's computing device is located.

*Interactive Multimedia Work* means a Work consisting primarily of a presentation communicated to a user through the combination of two or more media of expression, whether textual, audio, pictorial, graphical or audiovisual, where a significant characteristic of the presentation is the ability of the user to manipulate the content of the presentation by means of a computing device in real time and in a nonlinear fashion.

*Live Performance* means performance of a Motion Picture or its Underlying Material by live players, whether by reading, performance, musico-dramatic rendition or pantomime, where the performance occurs directly before a live audience or is broadcast live and without prerecorded material directly to the public, but excluding performances less than fifteen (15) minutes in length done for the purpose of advertising or publicizing the Motion Picture.

*Mail Order* means Home Video Video SellThru exploitation in which the sale occurs by placing an order for and receiving delivery of the Videogram through use of the postal service or other shipping service and not at a retail establishment. Ordering a Videogram over the telephone or through the Internet is not Mail Order.

*Merchandising* means distribution and sale of tangible goods, other than Copies of a Motion Picture or any of its Versions, that are based on or utilize the title of the Picture, the names, likenesses or characteristics of artists in their roles in a Motion Picture, or physical materials appearing in or used for a Motion Picture and that are made for sale to the general public. Merchandising does not include Interactive Multimedia, Interactive Networked Multimedia, Internet or Publishing rights.

*Near-Demand View* means multiple regularly scheduled transmissions in a short time period of a Motion Picture Copy by means of an encoded signal for television reception in homes and similar permanent living places where a charge is made to the viewer for the right to use a decoding device to view the Motion Picture at one of the scheduled transmission times selected by the viewer for each viewing.

*Near Video-On-Demand* means Near-Demand View

LF839; LF840

*NVOD* means Near Video-On-Demand or Near-Demand View.

*Parallel Tracked* means embodying a Copy of the Original Language Version of the Picture in a Compact Disc or DVD that also contains a Dubbed or Subtitled Version of the Picture in the Authorized Language Uses.

*Pay-Cable TV* means the same as Cable Pay TV.

*Publishing* means exploitation of hard cover or soft cover printed publications of a novelization of a Motion Picture or artwork, logos or photographic stills created for use in the Motion Picture that are included in such novelization.

*Subtitled* means a Version of the Picture in which a translation of the original dialogue appears on the bottom of the screen.

*VOD* means Video-On-Demand

*Video-on-Demand* means the same as *Demand View.*

K. **Additional Definitions:**

*Affiliate* means any Person, including any officer, director, employee or partner of a Person controlled by, controlling or under common control with a Party.

*Authorized Format* means the formats for which the Licensor has authorized the Motion Picture to be exploited.

*Availability Date* means the first day after the end of the Holdback Period for a Licensed Right.  If the Availability Date refers to a category of Licensed Rights, it refers to the first date on which Licensee may exploit any Licensed Right in the category.  For example, the Pay TV Availability Date is the first date on which Licensee may exploit the Pay TV Terrestrial, Pay TV Cable or Pay TV Satellite Right.

*Broadcast* means the communication to the public of a Motion Picture by means of wire, cable, wireless diffusion or radio waves, terrestrially or by satellite, that allows the Motion Picture to be viewed on a television.  Broadcast means the same as telecast or diffusion.

*Compulsory Administration* means any Law under which: (i) Simultaneous Retransmissions are subject to compulsory license; (ii) systems or other Persons may simultaneously retransmit such Simultaneous Retransmissions without first obtaining direct authorization from rightsholders or Persons making originating broadcasts; or (iii) rightsholders may only grant or withhold authorization for Simultaneous Retransmissions remunerated through collective management societies, collective contractual agreements or local Law.

*Copy* means the embodiment of a Motion Picture in any form, including film, tape, cassette, disc or digital file.  Where a specific Licensed Right is limited to exploitation in an Authorized Format (for example, to Videograms), then Copy with respect to such Licensed Right is limited to such Authorized Format.  *Exhibition* means the same as public performance.

*First English Release* means, with respect to each Licensed Right, the date on which a Motion Picture is first made available to the public through the exercise of such Licensed Right in the major country within the Region whose recognized official language is English or, if there is no such country in the Region, in the United States

*First Release* means the earliest of: (i) the date on which the Motion Picture must be released as designated in the Deal Terms; or (ii) the date on which the Picture is first made generally available to the paying public in the Territory, either through exhibition in cinemas, sale of Videograms, or

telecast; or (iii) six (6) months after Notice of Initial Delivery.

*First Theatrical Release* means the date on which the Motion Picture is first made generally available to the paying public in cinemas in the Territory, excluding festival and awards screenings.

*First Video Release* means the date on which Videograms embodying the Motion Picture is first made generally available for sale to or rental by the paying public in the Territory.

*First Negotiation* means, *provided that* Licensee is then actively engaged in the distribution business on a financially secure basis, Licensor will negotiate exclusively with Licensee in good faith for a period of ten (10) days after receipt of Notice by Licensor regarding the matter for which Licensee has a First Negotiation right before entering into negotiations regarding the matter with any other Person.  If no agreement is reached within this time period, then Licensor will be free to stop negotiations with Licensee and then to negotiate and conclude an agreement regarding the proposed matter with any other Person on any terms.

*Licensed Channel* means a specific television channel transmitting as an identified broadcast service and designated in the Deal Terms.

*Licensed Telecasts* means the total number of Authorized Runs and Playdates specified in the Deal Terms.

*Law* means any statute or ordinance, whether municipal, state, national or territorial, any executive, administrative or judicial regulation, order, judgment or decree, any treaty or international convention, or any rule, custom or practice with force of law.

*Local Language(s)* mean the primary language(s) spoken in each country of the Territory.

*Motion Picture* means an audiovisual work consisting of a series of related images that, when shown in succession, impart an impression of motion, with accompanying sounds, if any.

*Original Language* means the primary language spoken in the dialogue of a Motion Picture in its original version.

*Outside Release Date* means the date on which Licensee must release the Picture in the First Release Medium, if so specified in the Deal Terms.

*Party* means either Licensor or Licensee.

*Person* means any natural person or legal entity.

*Playdate* means one or more telecasts of the Picture during a twenty-four (24) hour period over the non-overlapping telecast facilities of an authorized telecaster such that the Picture is only capable of reception on televisions within the reception zone of such telecaster during such period.

*Principal Photography* means the actual photographing of a Motion Picture, excluding second-unit photography or special effects photography, requiring the participation of the director and the on-camera participation of a featured member of the principal cast.

*MultiPlexing* means transmission of a Motion Picture over related broadcast channels supplied by the same broadcaster or pay service.

*Remake* means a new Motion Picture derived from an existing Motion Picture or its Underlying Material in which substantially the same characters and events as shown in the existing Motion Picture are depicted.

*Rights* means rights, licenses and privileges under copyright, trademark, neighboring rights or other

LF639; LF640

intellectual property rights with regard to any type of exploitation of a Motion Picture or its Underlying Material, including the rights to duplicate, adapt, distribute, perform, display and make available in accordance with the customary requirements of each specific licensed media.

*Rights Management Information* means any information embodied, attached, related or appearing in or on a Motion Picture Copy that may include a copyright notice or other identifier, that identifies the copyright owner, producer, author, writer, director, performers or other Persons who have contributed to the making of the Motion Picture, or that describes any authorized terms and conditions for licensing or use of the Motion Picture or the Motion Picture Copy.

*Run* means one (1) telecast of the Motion Picture during a twenty-four (24) hour period over the non-overlapping telecast facilities of an authorized telecaster such that the Picture is only capable of television reception within the reception zone of such telecaster once during such period. A simultaneous telecast over several interconnected local stations (*i.e.* on a network) constitutes one (1) telecast; a telecast over non-interconnected local stations whose signal reception areas do not overlap constitutes a telecast in each station's local broadcast area.

*Sequel* means a new Motion Picture derived from an existing Motion Picture or its Underlying Material in which a character, event or locale depicted in the existing Motion Picture or its Underlying Material is shown engaged in or as the subject of substantially new and different events than those depicted in the existing Motion Picture.

*Simultaneous Retransmission* means the simultaneous, unaltered and unabridged retransmission by an operator other than the licensed broadcaster of a Motion Picture by cable, microwave or telephone system for reception by the public of an initial transmission..

*Underlying Material* means the literary and other material from which a Motion Picture is derived or on which it is based, including all versions of the screenplay, all notes, memos, direction, comments, ideas, stage business and other material incorporated in any version of the Motion Picture, and, to the extent necessary rights and licenses have been duly obtained, all existing novels, stories, plays, songs, events, characters, ideas, or other works from which any version of the Motion Picture is derived or on which it is based.

*Version* means an adaptation of a Motion Picture that is not accomplished by merely mechanical reproduction or use of minimal originality but instead uses original artistic or intellectual expression to create a new Work in its own right which contains materials or expressions of authorship not found in the original Motion Picture.

*Work* means an original expression of authorship in the literary, scientific or artistic domain whatever may be the mode or form of its expression.

L.   Additional Internet Rights Terminology

*Access (access)* means to make available a Motion Picture Copy on the Internet in a manner that allows a user to copy, view, stream, download or use, or to obtain data or information about or related to, the Motion Picture Copy or its embodied Motion Picture. *Access* includes *accessing*.

*Computer* means an electronic device that accepts a Motion Picture Copy in digital form and allows its viewing or manipulation in response to a sequence of instructions where the type and order of the instructions can be defined, selected and entered by the user of the Computer. A

Computer includes desktops, notebooks and laptops and excludes VCR, DVR, DVD, set top box players or recorders and Handheld Devices.

*Digital Rights Management* means a sequence of software or hardware instructions embodied in, related to or activated by a Motion Picture Copy that controls or manages copying, viewing, altering, or accessing the Motion Picture, its content or elements or associated Rights Management Information.

*Download (download)* means to make available a Motion Picture Copy on the Internet in a manner that allows its transmission to a Computer for making another exact digital copy of the Motion Picture Copy and retaining such copy for use for more than a transient period of time after completion of the initial continuous period of transmission. *Download* includes *downloading*.

*DRM* means Digital Rights Management.

*Handheld Device* means a mobile electronic device a substantial purpose of which is facilitating telephonic or text communication, digital photography or data storage and which customarily fits in a human hand, and which incorporates functionality that allows viewing of a Motion Picture Copy. Handheld Device includes personal mobile phones, personal digital assistants and other similar devices, but does not include a Computer.

*Internet* means the interconnected facilities of a publicly available packet-switching communications system that allows the user of a computing device to engage in two-way transmissions over the system through which the user obtains access to a Motion Picture Copy stored in digital form at a place distant from the place where the user's computing device is located.

*Stream (stream)* means to make available a Motion Picture Copy on the Internet in a manner that allows continuous viewing of the Motion Picture Copy in substantially linear form on a Computer simultaneously with the transmission of such Motion Picture Copy over the Internet but which does not allow making another digital copy except for a transient period of time necessary to facilitate such viewing. *Stream* includes *streaming*.

# EXHIBIT "D"

April 9, 2008

FROM:      **GIALLO PRODUCTIONS LIMITED**
           Office 404
           4th Floor
           324 Regent Street
           London, England
           W18 3HH

TO:        OPERA FILM s.r.l.
           Via Archimede n 25/a
           00197 Roma Italy

RE:     "GIALLO" – Production Services Agreement

THIS DEAL MEMO AGREEMENT is dated as of April 9, 2008, by and between GIALLO
PRODUCTIONS, LIMITED (herein "GPL," which expression shall include its successors in
title, licensees and assigns) and OPERA FILM s.r.l. (herein "Production Company") to
confirm the essential and basic terms of the agreement between the parties regarding the
production of the Picture.

1.    **PRODUCTION OF PICTURE:**  Production Company agrees to act as GPL's
representative and attorney in connection with the production of a feature-length motion
picture tentatively entitled "GIALLO" ("Picture") in accordance with the final shooting script
(dated December 15, 2007, which for purposes herein has been pre-approved by GPL and
Production Company) with modifications which have been approved by the director and the
parties hereto, and final approved budget (in the amount of 1,462,668 Euros) which is
attached hereto as Exhibit A ("Budget") and final approved cashflow proposed by Production
Company which is attached hereto as Exhibit B ("Cashflow").  The text of the power of
attorney is attached as Exhibit C hereto ("POA").  GPL shall cash flow pre-production and
production expenses pursuant to the Cashflow, according to the procedures set out in
paragraph 3, below.  Pre-production is to begin four weeks prior to the principal photography
start date of approximately May 12, 2008, or within two weeks thereof, for five weeks
thereafter.  The exact schedule shall be agreed by the parties as soon as possible after
signature hereon.

2. GPL'S RIGHTS and OBLIGATIONS: GPL shall have sole and complete creative control
of the Picture.  In exercising such control, GPL shall conduct itself reasonably, in good faith
and within the general parameters of the motion picture industry and after consultation with
Production Company.  Notwithstanding any grant or power contained in the POA, Production
Company shall make no substitution with respect to any element which has been approved by
GPL hereunder unless GPL shall first approve such substitution in writing.  However, in the
event of production exigencies that make it impracticable for written approval as set forth
herein to be given by an Authorized Individual on behalf of GPL, oral approval shall be
deemed effective, with written confirmation to follow as soon as practicable. As part of the
above, GPL shall designate the following (and any replacements thereof): the director (Dario
Argento), shooting script, Budget (as stated in paragraph 1), principle members of cast.  Any
increase in the Budget shall result in a corresponding increase in the Cashflow.
Notwithstanding the foregoing, the Production Company shall be entitled to readjust the
individual line item costs in the Budget at its sole discretion, provided that the overall budget
is not exceeded.  It is understood that GPL may provide camera equipment and stock and lab




developing from a designated party or outside of Italy, in which case VAT would be paid to the applicable party.

## 1. FINANCING AND PRODUCTION ACCOUNT MANAGEMENT

3.1    Production of the Italian shoot of the Picture will be funded in accordance with the Budget, the Cashflow and schedule

3.2    GPL shall provide to Production Company on a weekly basis the sums set out in the Cashflow, as modified, in accordance with the following procedure:

3.2.1    The weekly payments to Production Company set out in the Cashflow shall be made by wire transfer from GPL to the Production Account.

3.2.2    The funds referred to in clause 3.2.1 above shall be wired (or otherwise provided) to arrive on Friday of the week preceding each week indicated in the Cashflow.  GPL undertakes to wire the final two installments (i.e. for week 5 of production and the wrap week) to arrive on the Friday at the end of week 4.

3.2.3    Production Company will provide to GPL and the completion guarantor a proper weekly cost report on Monday of each week for the preceding week of, respectively, pre-production, production and wrap.

3.2.4    If the weekly cost report shows that some savings have been generated, then such savings will be used for the following weekly payment and/or returned to GPL at GPL's discretion.

3.2.5    If Production Company manages to save money from the approved Budget of 1,462,668 Euros, exclusive of any savings provided by Product Placement Company as described in paragraph 4, then Production Company and GPL shall each be entitled to half of the savings generated.  Notwithstanding such, though, the parties agree that the first €20,000 of such savings, if any, shall be kept by the Production Company and that Euro 15,000 thereof will be payable to Claudio Argent as a bonus and additional Executive Producer.

3.3    All payments made in connection with the Picture, the provision of the Production Services by Production Company, and this Agreement, shall be made directly out of a Production Account to be opened in the name of GPL by Production Company in its capacity as GPL's attorney, except for the first payment relating to the Production Fee which shall be directly transferred to Production Company's Corporate Account. Any delay in GPL's tendering payment following the expiry of five (5) working days from receipt by GPL from Opera Film srl (for clarity, not by Production Company in its capacity as attorney for GPL) of written notice specifying a default in payment shall be deemed a material default by GPL .



3.4    GPL may amend the Budget and/or the Cashflow (save and except for the obligation to make payment of the final two instalments in advance as foreseen by art. 3.2.2 above) at any time it sees fit prior to the start of principal photography of the Picture, PROVIDED



THAT any such amendment must first be agreed upon in writing between GPL, its bond and Production Company.

3.6    Both Production Company and GPL hereby confirm that they have approved the Budget and the Cashflow and Production Company hereby agrees to provide the Production Services in accordance with the Budget and the Cashflow.

4.    <u>PRODUCTION COMPANY OBLIGATIONS:</u>  Production Company, as GPL's attorney, shall enter into all agreements in the name of GPL, required to furnish all of the materials, services, facilities, locations, equipment, personnel and other elements necessary to produce the Picture through principal photography of the Picture, as provided in the Budget, and shall have control of the Picture within the Budget, it being understood and agreed to that in the event Production Company incurs costs, i.e., rents, buys or otherwise procures equipment, etc. for an amount greater than that set forth in the approved Budget GPL shall not be responsible and charged more than the specific budgeted amount for same unless such increase is the result of any amendment to the Screenplay and/or Production Schedule and/or any other change requested by GPL.  All services and facilities furnished by Production Company hereunder shall be of first-class quality and shall not be of lesser quality than similar services and facilities furnished by other suppliers in the European Motion Picture industry. In the event of a deviation or change from the Budget or items to be provided by Production Company, Production Company shall be responsible for obtaining a written Change Order signed by one of the authorized individuals for GPL.

Subject to GPL's right of supervision provided for herein, Production Company shall be responsible for making all determinations and arrangements concerning the production of the Picture, which determination shall be in accordance with the Budget and Cashflow. Notwithstanding any indication to the contrary in the preceding sentence, GPL, shall, after having given proper and due consideration to Production Company's recommendations, have the final determination in relation to the heads of all key departments relating to the production of the Picture.  Production Company shall keep GPL informed of the status of the Picture and shall, commencing with the start of pre-production of the Picture, furnish to GPL daily and weekly production reports and such other additional information as GPL may reasonably request from time to time.  All of the above determinations by Production Company shall be subject to review by GPL.  Production Company's services shall continue until completion of all production services of the Picture in Italy.  PROVIDED THAT, the parties will negotiate an additional production fee, to be agreed in good faith, in respect of additional services rendered by Production Company as a result of any change to the Screenplay, Production Plan and/or any other change required by GPL. Although it is contemplated by the parties that GPL will apply for any VAT Refund, if necessary and reasonable, and requested by GPL, Production Company shall, in consideration for the payment of an additional fee  in the amount of 6% of the refunded VAT amount but not to exceed Euro 10.000 : 1. Directly contact local Fiscal Authorities and communicate status of all VAT Refund efforts and developments to GPL; 2.  Monitor, check, assemble, and accumulate all required documents (original and copies) for submission; 3.  Contact suppliers for and procure any modifications on invoices; 4.  Provide advice to optimize further refund claims; 5. Completing appropriate forms in the local language; 6.  Submit the claim to the appropriate departments; 7. Monitor the claim until the final decision; 8. Check the recovered amount; 9. Follow up and contest at the competent fiscal office for any rejected claim or amount and remedy any deficiency.





Production Company will *not enter into any contract for the* giving of credit of any sort (i.e., on screen, paid ads, artwork, etc.) without GPL's prior written approval of the form and extent of such credits.  Further, other than as stated herein, GPL shall not be obligated to give any person who provides service in connection with the Picture any credit in any form unless pre-approved by GPL in writing.  Any agreement entered into by Production Company which Production Company has had pre-approved in writing by GPL and in which Production *Company has the obligation to accord credit* shall provide that no casual or inadvertent failure of either Production Company or GPL to comply with such credit obligations and no failure of third parties to comply with such credit obligations shall constitute a breach of such agreement by either the Production Company or GPL.  Any such agreement shall also provide that the rights and remedies of any person or entity to whom such credit must be accorded upon breach of such credit obligation shall be limited to a recovery of money damages in an action at law, and such person or entity shall not be entitled by reason of any such breach to terminate such agreement or to enjoin or restrain the distribution or exhibition of the Picture.  GPL shall not be responsible if Production Company provides any form of contract to GPL not containing such clauses.

Production Company shall not enter into any commercial tie-in or publicity agreement in which the Picture is to be advertised or publicized in connection with any advertisement or publicity relating to any product, commodity or service, without GPL's prior written consent. Production Company further agrees that it shall not photograph the name, trade name, or labels of any product, commodity or service manufactured, distributed or offered by any person, firm or corporation in such manner that such name, trade name or label can be readily seen by an audience viewing the Picture, unless Production Company obtains GPL's prior written approval.

The Parties acknowledge that GPL is entering in a Product Placement Marketing Agreement with OSCAR GENERALE PRODUCTIONS for the following Budget items and such others as may be agreed upon at a later date:

1- Hotel accommodation for principal cast and Director and Producers.
2- Certain locations such as Discotheque. Opera house, restaurant etc..
3- Clothing for principal cast.
4- Props vehicles such as cars.
5- Accessories for the lead cast.

GPL will confirm to Production Company one week prior to commencement or use of such items.  Use of such items shall be in GPL's sole discretion.  In case GPL provides such services, the amount for such provided items will be deducted from the approved budget and cash flow, in the manner set forth in paragraph 3, above.

For clarity, notwithstanding any grant or power contained in the POA, when required herein, the consent or approval of, or notice to, or receipt by, GPL shall mean an authorized GPL representative not Production Company acting under the grant or power contained in the POA.



5.    COMPENSATION TO PRODUCTION COMPANY:  In consideration of the representations, warranties and agreements made by Production Company and all rights granted and agreed to be granted to GPL and the performance by Production Company of its obligations hereunder, including, without limitation, providing production services and for all rights therein and thereto, Production Company shall receive the fee as specified in the



Budget (Euros 60,000 as executive producer fee fro Mr. Claudio Argento and Euros 30,000 as overhead for Production Company), plus living expenses equal to Euros 3,500 for Production Company's designee, to be paid pursuant to the approved cash flow schedule during the course of production. For the avoidance of doubt, GPL shall pay 10% of the Executive Producer Fee within ten business days of signature hereof. The balance of payment will be made according to cash flow on weekly basis, pursuant to the provisions of paragraph 3, above. Any delay in payments following the expiry of more than five (5) working days from receipt by GPL of written notice detailing the same shall be deemed a serious default and Producer shall consequently be entitled to suspend the Production Services.

No other sums shall be payable to Production Company under this Agreement, unless said sum(s) shall be pre-approved in writing by one (1) of the Authorized Individuals on behalf of GPL pursuant with the terms of this Agreement.

6. INCENTIVES, TAX SUBSIDIES OR GRANTS. In the event the Picture qualifies as a beneficiary of any subsidies from the Province of Piedmont or City of Torino or Italian Government or other entity, public or private, then the parties will cooperate to the fullest extent in seeking such funds. Any revenues and/or non-monetary benefits received shall be divided upon receipt as follows:

50% to Production Company;
50% to GPL.

7. CREDIT: GPL agrees and shall accord, and Production Company shall be allowed to designate, for the Picture, (a) one logo credit on screen above the title in the main titles and a "bug" logo in the billing block of paid ads and all other materials containing a billing block (b) one "in association with" credit (which would be in the main titles immediately after the production credit) in the form of "in association with Opera Films" plus (c) one executive producer credit (hereby designates Claudio Argento) to appear on positive prints, etc., of the Picture in the main titles and in paid ads. in same position as on-screen; such credits shall be no less favorable in size, placement, etc., to any other executive producer credit and shall appear wherever and whenever any other executive producer credit appears. Size, style and duration and all other terms of the credits shall be in GPL's discretion.

8. SUPERVISION OF PRODUCTION: Production of the Picture shall be directly supervised by Claudio Argento on behalf of Production Company. subject to the terms hereof and supervision of Production Company by GPL.

9. DEFAULT BY PRODUCTION COMPANY: Production Company will at all times exert its reasonable efforts to provide production services in a timely manner. Production Company understands and agrees that time is of the essence and that all services hereunder, including delivery of the elements of the Picture in accordance with the approved shooting script and Budget attached hereto is a material element of this Agreement. If Production Company fails to exert its reasonable efforts hereunder, or fails to perform the conditions hereof, or fails to pay (as stated herein) or arrange for payment of such parties employed by GPL pursuant to the power of attorney granted by GPL to Production Services Company or to arrange payment for such services, materials and/or equipment when such payments are due, or shall become insolvent, or shall make an assignment for the benefit of creditors, or shall commence any proceeding in bankruptcy (or the equivalent thereof in the local jurisdiction), or if any such proceedings are commenced against it and PROVIDED THAT one or more of the foregoing circumstances results in a delay to the production schedule,





GPL may, if it so elects and without prejudice to any other rights it may have, by giving forty-eight (48) hours written notice to cure such default and of its election, if not cured within such time, to take over all work, or any part thereof, and all services, equipment and materials and finish the production of the Picture by whatever method it deems expedient. In such event, Production Company shall be entitled only to the actual direct costs expended in production, but no more than the contract price less any and all: (i) reductions in the fixed price payable to Production Company pursuant to Change Orders signed by GPL; or (ii) costs expended by GPL to complete the production services of the Picture. GPL's expense of completion shall be established as the actual cost of completing production services of the Picture. In addition to its other remedies, GPL may elect, during the continuance of any material breach or default by Production Company, to exercise its takeover right or to declare this agreement terminated as to any future obligations of GPL.

10. <u>REPRESENTATIONS AND WARRANTIES:</u>  Both parties hereto represent and warrant that: (i) it has the right to enter into this Agreement; (ii) Each party is duly organized under applicable law and is qualified, or, prior to the commencement of principal photography of the Picture, will be qualified, to do business in any state or country in which principal photography of the Picture occurs; that it has taken all necessary actions to authorize the execution and delivery of this Agreement: and that this Agreement does not and will not violate any provisions of the articles of incorporation or by-laws of each party or any contract or any other agreement to which each party is a party.

11. <u>INDEMNIFICATION:</u>  Each party hereto shall at all times indemnify and hold the other party hereto, its licensees, assignees, and affiliated companies, and the officers, directors, employees and agents of all the foregoing, harmless against and from any and all claims, damages, liabilities, cost and expenses, including reasonable attorneys' fees, herein collectively called "claims," arising out of its breach of any representation, warranty or other provision hereof or out of its rendition of services hereunder, including non-payment of any party. GPL (including its representatives and employees) shall have no liability for claims of any nature by any of the workers provided by Production Company or for any claims for any claims of damage or loss to material, equipment, studios and other facilities provided under this Agreement and Production Company waives any such claims of damage or loss and agrees to indemnify GPL for any such claims or damage or loss. Provided a claim does not arise from the act or failure to act of Production Company, its representatives and employees, Production Company (including its representatives and employees) shall have no liability for claims of any nature by any of the workers provided by GPL in connection with the Film or for any claims of damage or loss to material, equipment. studios and other facilities provided by GPL under this Agreement and GPL waives any such claims of damage or loss and agrees to indemnify Production Company for any such claims or damage or loss.

12. <u>INSURANCE:</u>  Production Company shall acquire all insurance required by law as specified in the Budget. Any additional insurance shall be acquired by GPL

13. <u>GPL OWNERSHIP OF PICTURE:</u>  As between Production Company and GPL, ownership of the Picture and all elements thereof and pertaining thereto shall be owned at all times and held one hundred percent (100%) by GPL. Production Company shall have no right, title or interest therein or in the results and proceeds derived therefrom, it being agreed that Production Company, and each employee and agent thereof, is acting as a worker for hire of GPL.





For clarity and not for limitation, Production Company acknowledges and confirms that Production Company does not have or claim any right to the Picture, and that, as between Production Company and GPL, GPL shall be the sole and exclusive owner of the copyright in the Picture, and all its elements, throughout the universe and, as such owner, shall have all rights therein and thereto, including, without limitation, the sole and exclusive distribution, exhibition, performance and reproduction rights. Production Company further acknowledges and confirms that its work on the Picture shall constitute a "work made for hire" within the meaning of the United States copyright law, as a work specially ordered or commissioned for use as a part of a motion picture and that GPL shall, for copyright purposes under United States law, be deemed the author of the Picture and the owner of copyright therein. Production Company agrees to execute, acknowledge and deliver to GPL such further assignment(s), instrument(s) and other document(s) as may be reasonably necessary or appropriate to evidence GPL's rights in the Picture.

As further clarification of the foregoing, Production Company acknowledges and warrants that all contracts entered into by it on behalf of GPL for production of the Picture (including but not limited to contracts with directors, writers, composers, actors, musicians, cinematographers, choreographers, record producers, crew, editors) shall be in a form customary in the film industry and shall be consistent with this Agreement and with the requirements of the completion guarantor and any third party financial participants. Such contracts shall contain a grant of rights to permit the widest legally permissible exploitation of the Picture. Such grant of rights shall specifically include the unrestricted authorization of exploitation of the Picture by means of rental and lending and the contracts shall include an acknowledgement that the payment provided in the contracts includes an element representing equitable remuneration for the authorization of rental and lending. Further, any such contract shall include a waiver of moral rights, to the extent (if any) that such waiver is legally permissible.

14.  **POSSESSION OF PICTURE:** GPL, or another third party as one of the Authorized Individuals on behalf of GPL may designate from time to time, shall at have the sole and exclusive right to possession and custody of the following:

    a.    All negatives, duplicate negatives, still negatives, positive prints, fine grains, master positives, separation protection masters, interpositives and all other film and tape material (whether negative, positive or magnetic) with accompanying soundtracks, and all parts and replacements thereof, with respect to the Picture;

    b.    All negatives and positive prints of scenes photographed for or used in the process of preparing the Picture, whether or not incorporated in the finally edited Picture;

    c.    All magnetic film and positive and negative soundtracks recorded for or used in the process of preparing the Picture, whether or not incorporated in the finally edited soundtrack;

    d.    All documents regarding or pertaining to the Picture.



15.  **ADDITIONAL DOCUMENTS:** Each of the parties recognizes that this is a short form deal memo to memorialize their agreement. Each agrees to execute any additional documents which may be required or be desirable to fully effectuate the purposes and intents of this Agreement or to carry out the obligations of the parties hereunder, provided that they are not inconsistent with provisions of this Agreement.

"Giallo" Production Services Agreement



16. **RELATIONSHIP OF PARTIES:**  This Agreement does not constitute a partnership or joint venture between GPL and Production Company.  Production Company is not the representative or agent of GPL and GPL is not the representative or agent of Production Company and neither shall so hold itself out publicly or to any third party or incur any liability for the other.

17. **ENTIRE AGREEMENT:**  Except as provided herein, each party acknowledges that no representation or warranty not expressly set forth in this Agreement has been made to the other party, it being agreed that this Agreement (and any exhibits and attachments) constitutes the entire agreement of the parties regarding the subject matter hereof and supersedes all prior agreements with respect thereto.

18. **GOVERNING LAW:**  The parties choose the law of California as applicable law, with exclusive venue in Rome, Italy.  This Agreement is entered into without reference to any collective bargaining agreement and none is applicable hereto or to the services rendered.

19. **BOOKS AND RECORDS:**  Production Company shall keep and maintain accurate books of account and records of all its business transactions under this Agreement.  These books and records shall be kept in Production Company's place of business and, at all times during normal business hours GPL's duly Authorized Individual shall have access to such books and records and may copy or may cause to be copied such extracts as may be deemed necessary by GPL.  At the end of principal photography of the Picture, Production Company shall deliver at least one true and correct, complete set of such books of account and records of its business transactions hereunder.

20. **PRODUCTION COMPANY'S REMEDIES:**  In the event of any material breach by GPL of this Agreement, Production Company shall be limited to its remedies at law for damages. if any.  In any event, Production Company shall not have the right hereunder to in any way enjoin or restrain the distribution, advertising, telecast. exhibition or other exploitation of the Picture, or any element thereof.

21. **ASSIGNMENT:**  GPL may assign this Agreement in its sole discretion, at which point GPL shall be released and discharged of and from any and all of its duties, obligations and liabilities arising under this Agreement.  Production Company shall not assign its rights or obligations hereunder without the express written consent of GPL.

IN WITNESS WHEREOF, the parties have executed this agreement on the day hereinabove set forth.

OPERA FILM s.r.l.                         GIALLO PRODUCTIONS LIMITED
("Production Company")                    ("GPL")

        OPERA      SRL

By:                                       By:
Its:                                      Its:

# EXHIBIT "E"

## IFTA® INTERNATIONAL
## MULTIPLE RIGHTS ASSIGNMENT AGREEMENT

This International Multiple Rights Distribution Agreement is made as of April 3, 2008 between;

**HANNIBAL PICTURES**                                       ("Assignor")
8265 Sunset Boulevard, Suite 107
West Hollywood, CA 90046
Telephone: 323-848-2945                          Telefax: 323-848-2946
Email:

and

**SIGMA FILM Srl**                                         ("Assignee")
Via Archimede n. 25/a
Rome 00197 ITALY
Telephone: 39-06-806-91277                       Telefax: 39-06-807-9231
Email:

For reference purposes this Agreement is identified as follows:

## GIALLO

This Agreement is: [X] a new agreement; [X] a long form agreement replaces the deal memo between Assignor and Assignee regarding the Picture;  [  ] an amendment to an existing agreement between Assignor and Assignee with the same Reference Code.

Subject to timely payment of all monies due Assignor and Assignee's full performance under this Agreement, Assignor licenses exclusively to Assignee, and Assignee accepts from Assignor, the Licensed Rights in the Picture throughout the Territory for the Agreement Term in the Authorized Languages subject to the Holdback as identified below on all the terms and conditions of this Agreement.

This Agreement consists of the following parts: the Cover Page; Table of Contents; Deal Terms; and the following attached Schedules "A" ( Delivery Materials), "B" ( E&O Protocol ), "C" (Lab Access Letter and "D" short form Assignment) and "E" ( Form Letter of Credit ): and All parts of this Agreement will be interpreted together to form one Agreement.  If not defined where they first appear, words used in this Agreement are defined in the Standard Terms and Conditions or in the Schedule of Licensing definitions or; if not otherwise defined in this Agreement, in accordance with industry custom and practice.

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Agreement as of the date first written above to constitute a binding contract between them.

**HANNIBAL PICTURES**                           **SIGMA FILM srl**
Assignor                                        Assignee


By:  Richard Rionda Del Castro                  By:  Claudio Argento
Its:  Chairman & CEO                            Its:  Authorized Signatory

# TABLE OF CONTENTS

*Section*                                                                        *Paragraph*
**Deal Terms**

    Basic License Terms                                                  I.
    Rights Terms                                                            II.
    Financial Terms                                                       III.
    Delivery Terms                                                        IV.
    Additional Terms                                                      V.

IFTA® INTERNATIONAL
## MULTIPLE RIGHTS ASSIGNMENT AGREEMENT

**DEAL TERMS**

*Mention in these Deal Terms of any right not specifically licensed to Assignee in the Licensed Rights Terms does not grant to Assignee expressly or by implication any right not specifically licensed to Assignee in the Licensed Terms.*

**I.**
**BASIC LICENSE TERMS**

A.   **Picture(s):   GIALLO**
          Star: Adrien Brody

   If said star shall not be able to assume their duties on the film, then Assignee shall be notified immediately in writing and in advance by Assignor with replacement names. If Assignee does not agree to the replacement then it shall be to its sole discretion to cancel the agreement within 48 hours of the confirmed receipt by Assignee of notification or renegotiate terms.

B.   **Territory(ies):** ITALY and Italian speaking European Countries.

C.   **Term:** Starting on execution and in perpetuity from Acceptance of Essential Delivery of the Picture(s).

D.   **Authorized Language(s):**
      [X] Original Language; [X] Official Language(s) in Territory.
      All Rights may be exploited: [X]Dubbed  [X]Subtitled

E.   **Authorized Video Use(s):** PAL/NTSC cassette, DVD and videogram

F.   **Authorized Television Runs:** Unlimited

   Assignee is hereby granted unlimited runs per title for the Picture(s) for On-Demand, Pay-Per-View, Pay TV and Free TV, whether broadcast via terrestrial, cable or satellite transmission is at Assignee's discretion. Assignee agrees, however, all On-Demand and satellite transmissions are to be of a dubbed and encrypted version.

G.   **Release Dates:**

   Assignee will cause the First Release of the Picture(s) throughout Territory ("First Release") to take place no later than six (6) months after Delivery of the Initial Materials. Assignee cannot exploit any Licensed Right before the end of its applicable Holdback period. Once determined, Assignee will also provide Assignor with all release dates for the Picture in the Territory.

   See Additional Terms, Paragraph C.9.

**II.**
**RIGHTS TERMS**

*A Right is licensed to Assignee only if the "Yes" box is marked.   A Right not marked or marked in the
"No" box is Reserved Right of Assignor.   All Holdbacks are subject to Holdback coordination and
adjustment within the Holdback Region in accordance with Paragraph 6.7 of the Standard Terms and
Conditions.*

A.   **Cinematic Rights**:

| | Licensed | Holdback |
|---|---|---|
| Theatrical | [X]Yes [ ]No | **See Additional Terms Paragraph C. 9.** |
| Non-Theatrical | [X]Yes [ ]No | **See Additional Terms Paragraph C. 9.** |
| Public Video | [X]Yes [ ]No | **See Additional Terms Paragraph C. 9.** |

B.   **Ancillary Rights**:        * if no theatrical release in the US, no ancillary holdbacks apply

| | Licensed | Holdback |
|---|---|---|
| Airline | [X]Yes [ ]No | Until N/A months from First U.S. Theatrical Release |
| Ship | [X]Yes [ ]No | Until N/A months from First U.S. Theatrical Release |
| Hotel | [X]Yes [ ]No | Until N/A months from First U.S. Theatrical Release |

C.   **Video Rights**:

| | Licensed | Holdback |
|---|---|---|
| Home Video | [X]Yes [ ]No | Until N/A months from First Theatrical Release |
| Commercial Video | [X]Yes [ ]No | Until N/A months from First Theatrical Release |
| Sell-thru | [X]Yes [ ]No | Until N/A months from First Theatrical Release |

D.   **Television Rights**:

| | Licensed | Holdback |
|---|---|---|
| **Pay-per-View TV, including On-Demand** | | |
| Terrestrial | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Cable | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Satellite | [X]Yes [ ]No | Until N/A months from Holdback Date |
| **Pay TV** | | |
| Terrestrial | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Cable | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Satellite | [X]Yes [ ]No | Until N/A months from Holdback Date |
| **Free TV** | | |
| Terrestrial | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Cable | [X]Yes [ ]No | Until N/A months from Holdback Date |
| Satellite | [X]Yes [ ]No | Until N/A months from Holdback Date |

E.   **Internet Rights**:

| | Licensed | |
|---|---|---|
| Video on Demand - Internet | [X]Yes [ ]No | **See Additional Terms, paragraph C.10.** |
| Pay-per-view - Internet | [X]Yes [ ]No | **See Additional Terms, paragraph C.10.** |
| Pay TV - Internet | [X]Yes [ ]No | **See Additional Terms, paragraph C.10.** |
| Free TV - Internet | [X]Yes [ ]No | **See Additional Terms, paragraph C.10.** |

**Holdback Date:  See Additional Terms, paragraph C.9.**

**III.**
**FINANCIAL TERMS**

.   **Acquisition Price:**

1.       **Amount:** ONE MILLION FOUR HUNDRED THOUSAND EUROS (1,400,000.00□) net of Taxes. The minimum guarantee is a minimum net sum and no taxes or charges may be deducted therefrom. The payment is as follows:

**Installment**                                                                                    **Payment Method**

    100% (1,400,000.00□) upon technical acceptance of Essential Delivery and irrevocable lab access letter executed with Italian lab and parties.                     [ ] WT   [ X ] LC

The irrevocable and confirmed Letter of Credit as per Schedule E will be opened by Assignee in favor of the Assignor between June 15 and July 15,08 but in no even later than July 15,08.

2.       **Default:** In the event Assignee does not pay any portion of the Acquisition Price in respect of any Picture upon the Due Date, then Assignor shall be entitled in its sole and unfettered discretion to elect to:

2.1      cancel this agreement in respect of such Picture only, whereupon Assignor shall be entitled to retain any and all amounts previously paid by Assignee to Assignor in respect of such Picture by way of liquidated damages, (which the parties agree is a reasonable estimate of Assignor's damages based on Assignee's failure to perform), the rights licensed hereunder in respect of such Picture shall not pass to Assignee and Assignor shall be entitled to re-license the Picture and the Licensed Rights in respect thereof in such manner and to such parties as it may in its sole discretion deem fit; and/or

2.2      cancel this Agreement in respect of all Pictures licensed hereunder, whereupon Assignor shall be entitled to retain any and all amounts previously paid by Assignee to Assignor hereunder by way of liquidated damages, (which the parties agree is a reasonable estimate of Assignor's damages based on Assignee's failure to perform) none of the rights licensed hereunder shall pass to Assignee, any such rights which have passed to Assignee shall be deemed to have been automatically reassigned to Assignor and Assignor shall be entitled to re-license any or all of the Pictures and the Licensed Rights in such manner and to such parties as it may deem necessary to mitigate its damages hereunder; and/or

2.3      enforce this Agreement and demand payment of all amounts due hereunder.

Notwithstanding the foregoing, Assignor reserves the right to bring a cause of action, suit or claim, at law or in equity, against Assignee for any breach, default or failure by Assignee to pay any portion of the Guarantee hereunder.

3.       **Allocation:**
         If no allocation is indicated below, then the entire Acquisition Price will be deemed allocated to the Theatrical Rights.  Otherwise, the Acquisition Price will be allocated among the Licensed Rights as follows:

    a. "Cinematic Acquisition Price":___% (US$_____)
      To the Theatrical, Non-Theatrical or Public Video Rights, as licensed.

    b. "Video Acquisition Price":   ___% (US$_____)
      To the Home Video or Commercial Video Rights, as licensed.

    c. "Ancillary Acquisition Price":___N/A__% (US$_____)
      To the Airline, Ship, or Hotel Rights, as licensed.

    d. "Television Acquisition Price":___% (US$_____)
      To the Free TV or Pay TV Rights, as licensed.

**B.**  **Payment Requirements:**
Timely payment of all amounts due Assignor is of the essence of this Agreement and an express condition precedent to Assignee's right to exercise or exploit any of the Licensed Rights. Except as otherwise provided herein, Assignee will make payments of the installments of the Guarantee indicated in Paragraph A.1 due Assignor as follows:

  1.  **WT - Wire transfer:**
    [X] License Fee Installments    Other Payments: _____
    Assignee will pay the indicated installments of the License Fee or other payments by wire transfer of unencumbered funds, free of any transmission charges, to the following account:

AS PER INVOICE.

**C.**  **Disposition of Gross Receipts: N/A – Flat Agreement**

IV.<br/>DELIVERY TERMS

  1.  **Physical Materials:**
    [X] To be specified in Assignor's Notice of Initial Delivery per Paragraph 8; or
    [ ] The following items delivered per Paragraph 8 of the Standard Terms And Conditions:
Delivery will be made through irrevocable lab access letter between Assignor and Assignee with Italian lab.

  2.  **Support Materials:**
    [X] To be specified in Assignor's Notice of Initial Delivery per Paragraph 8; or
    [ ] The following items delivered per Paragraph 8 of the Standard Terms And Conditions:
Flyers, Posters, Dialogue Book, Music Cue Sheet, Key art, slides.

  3.  **Date for Notice of Initial Delivery:**
    Assignor will give Assignee a Notice of Initial Delivery no later than: March 31, 2009.

[X] Promptly after the Picture is ready for Delivery.

4. **Materials Payment Instructions**:
Assignee will pay for all Materials:
[ ] To be specified in Assignor's Notice of Initial Delivery per Paragraph 8; or
[X] As follows: Assignee will pay lab directly for all material ordered and or will pay Assignor for all material upon Notice of Delivery.

5. **Materials Shipping Instructions**:
Assignor will ship all Materials to Assignee:
[ ] To be specified in Assignor's Notice of Initial Delivery per Paragraph 8; or
[X] As follows: At Assignee sole cost. Using Assignee's Express Courier Account.

## V.
## ADDITIONAL TERMS

A. **Governing Law**: Italy

B. **Forum**: Court of Rome

C. **Additional Deal Terms**:

1. Assignor and/or its designees will at all times have unimpeded and free access to all foreign language tracks (regardless of format), all dubbed versions (whether on film or videotape), all subtitled versions (whether on film or videotape), all masters, all advertising and promotional materials, all artwork, and all other materials created by Assignee pursuant to this Agreement.

2. Assignee has the obligation to display visibly and prominently Assignor's trademark and/or logo which shall never be smaller nor less visible than any other trademark and/or logo appearing at the beginning or end of the program, in any display, stills, posters, jackets, and any other marketing material related to the Program. Failure to comply with this obligation shall be deemed as a breach of this Agreement.

3. If the Picture is to be released theatrically in the Territory, then Assignor shall have the right to consult on the legal credit obligations.

4. Assignee agrees to sign a Notice of Assignment in a mutually agreed form for the Picture.

5. The right to receive all monies collected by any collecting society, author's rights organization, performing rights society or governmental agency that are payable to authors, producers, performers or other persons and that arise from royalties, compulsory licenses, cable retransmission income, music performance royalties, tax rebates, exhibition surcharges, levies on blank videograms or hardware, rental or lending royalties, or the like, are specifically reserved to Assignor, and will, as between Assignor and Assignee, be the sole property of Assignor, and will not be included in or credited to any Gross Receipts. Assignor has the sole right to collect any and all such amounts, and if any such amounts are paid to Assignee, then Assignee shall immediately remit same to Assignor with a statement identifying the payment.

1. This Agreement (and each of the Schedules and Exhibits attached hereto, if any) is entered

into pursuant to the laws of the Italy and shall be interpreted in accordance with the laws applicable to agreements entered into and wholly performed therein.  Each of the parties hereto agree that any dispute arising under this Agreement, including, without limitation, any dispute relating to Delivery or Assignee's obligation to make payment hereunder, or the Assignment referred to in the Deal Terms or any Schedule or Exhibit hereto shall be resolved by mandatory binding arbitration under the Rules of International Chamber of Commerce in effect as of the date the request for arbitration is filed (the "Rules").  Any of Assignor, Assignee, or Designated Bank may initiate such an arbitration pursuant to the Rules and such arbitration will be held in Rome, Italy (the "Forum"). The parties agree to abide by the decision rendered in such arbitration and that any court having jurisdiction may enforce such decision.  The parties hereby submit to the exclusive jurisdiction of the courts of the Forum in all matters relating to such arbitration.  The parties agree to accept service of process for all proceedings in accordance with the Rules and to accept service of process for any judicial or other process by registered mail. Assignee hereby expressly waives application of the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.  The prevailing party in any such action shall be entitled to prompt payment of costs and fees including reasonable attorney's fees.

7.    **Assignment:** Assignor shall have the right, exercisable at any time, to freely assign, transfer or sublicense any of its rights, or delegate any of its obligations or duties, under this Agreement to any person, company or entity.  Notwithstanding the foregoing, Assignor shall remain secondarily liable with respect to its obligations and liabilities to Assignee hereunder unless such assignment or transfer is (a) to an entity with which Assignor merges or consolidates, or which acquires all or substantially all of the assets of Assignor; or (b) to Assignor's predecessor-in-interest with respect to the Film, in which case, such assignment or transfer shall relieve Assignor from its obligations and liabilities to Assignee under this Agreement and Assignee shall look solely to such assignee or transferee with respect to the performance and satisfaction of all such obligations and liabilities. Any assignment or transfer of the type described in clauses (a) or (b) above shall be effective immediately upon receipt of written notice from Assignor.

8.    **Security Interest :** Concurrent with the execution hereof, Assignee hereby grants to and in favor or Assignor a security interest in and to all Licensed Rights hereunder and the proceeds derived from the exploitation thereof.  Assignee shall provide any and all documentation reasonably required by Assignor in order to give effect hereto and in the event.provided that such security interest shall automatically be released upon payment in full of the Acquisition Price by Assugnee

10.   **Internet Rights:** If Internet Rights are granted, Assignee may exploit the Picture using the IP Protocol for broadband transmission provided, however that any such method of exploitation conforms to the following conditions:
      (i)     Assignee shall provide and maintain exclusive access to the Picture to individuals in private homes ("Users") for the purposes of viewing the Picture on a computer screen, terminal or TV via broadband transmission following either: (a) payment of a fee for such access, or (b) verification of previous payment for services where such access to the Picture is inclusive in the User's contract with Assignee (i.e., Satellite or Cable TV account);
      (ii)    The date file containing the Picture must be encrypted using the latest and most secure form of encryption technology available for online media access;
      (iii)   Assignee shall restrict User's access to the most current and secure encrypted "streaming-only" technology or, if the Picture is made available for download, Assignee

shall ensure that the Picture is encoded with the most current and most secure encryption technology available in the Territory and the Users shall only be provided access to view the Picture via a proprietary software viewer or viewer with security of the highest and most current industry-accepted levels of security and resistance to "pirating", "hacking", "cracking" or any other form of security circumvention now known or hereafter devised;

(iv)    Assignee shall ensure that such delivery shall be limited to Users located within the Territory;

(v)    The Picture shall be in the Authorized Languages only;

(vi)    Assignee shall ensure that once a Picture is viewed by a User, said Picture shall not be in such a format on the User's computer, set-top box or terminal as to allow the User to share, trade, upload, burn, copy or otherwise move or transfer any of said Picture to another location so that said Picture can be viewed by any other individual or User with no previous access to the specific Picture in question;

(vii)    Assignor and Assignee shall share the Gross Receipts derived from the exploitation of the TV and Demand View Rights in the same manner as traditionally delivered TV and Demand View.

## SCHEDULE "A" – DELIVERY SCHEDULE

All materials must be delivered at Assignee's cost and must be cleared for Assignee's use.

**Access to all elements will be at Cinecittalab or Technicolor in Rome, Italy and/or Fotokem Los Angeles or Advanced Digital Services in Los Angeles and or any other lab that parties mutually approve**

Unless otherwise directed, all elements and documents should be shipped to:

**SIGMA FILM Srl**
Via Archimede n. 25/a
Rome 00197 ITALY
Telephone: 39-06-806-91277                    Telefax: 39-06-807-9231
Attention : Claudio Argento
Email:

## ESSENTIAL ITEMS

### SECTION I – FEATURE FILM ELEMENTS

1.   Access to Work Print 35mm Original Version (SR/SRD) for Dubbing purpose
2.   Dialogue List Original Version/Spotting List Original Version combined with work print (including titles, subtitles, narrative titles, exploitation titles)
3.   Main and End Titles list (credits) - proof also via fax
4.   Subtitles list - Narrative Titles list -(proof also via fax showing the font, size etc.)
5 .   Access to 35mm Original Version (Internegative of the full and final Picture
1.   Access to Textless (Inter)negative or interpositive of all the main/end titles, subtitles, narrative titles sections(in order to manufacture locally the Italian titles) , to be manufactured by Distributor at its sole discretion provided that the relevant costs will be deducted in accordance with paragraph III A above.
7 .   Access to Reference Print 35mm for local printing purpose
8.   Access to Music and effect soundtrack on DA88 or 35mm magnetic (analog and digital - 254ft/s film speed) for dubbing purpose, to be manufactured by Assignee, at its sole discretion.
9.   Access to Dialogue stems including Optional dialogue - Vocal stems - Lyrics Stems on DA88 or 35mm magnetic
10.   Access to Print Master soundtrack on DA88 or 35mm magnetic (Analog and digital - film speed 254 ft/s - No Dolby) Combined with work print
11.   Access to Original soundtrack of the movie on cd or dat stereo (within all the music recorded for and mixed into the movie)
1.   Access to Digital Beta 16:9 format (including at the end of the tape the textless background for Titles) - ch. 1 and 2 mix o.v
13 .   Certificate of Origin(Authorship) for Censorship purpose
14 .   One(1) original notarised Certificate of Nationality
15 .   One (1) original notarised Producer's Attestation/Chain of Title
16.   Error and Omissions Insurance Certificate
17 .   Laboratory access Letter in the form to be agreed between the Parties

18 .    Two(2) original notarised Certificates of Residence for Double Tax Exemption
19.     Statement of dubbing restrictions
20.     Music Cue sheet(giving details of all music contained in the picture with title, composer/arranger, publisher, pre-recorded source of reference, usage category and duration);
21.     A complete list of all contributors identifying, where appropriate, their union or guild;
22.     Dubbing, Translation, adaptation guidelines/Theatrical Dubbing Letter
23.     Technical Data Sheet (general information, length, sound format, screening format, o.v. audio configuration)

## NON ESSENTIAL ITEMS

## SECTION II - PUBLICITY MATERIALS

**(i)     EPK'S - Back Stage - Interviews**

1.     If available, on digital beta or beta sp (ch. 1 and 2 mix)

**(ii)    PUBLICITY MATERIALS AND ARTWORK**

1 .    Any artwork or logo material available (the Licensor shall ensure that fully cleared rights to reproduce have been secured)
2 .    At least 20 stills in digital high resolution format (still Photographs, actors, director etc)
3.     If a poster exists, one sample plus access to key elements such as poster art transparency and P.M.T. of poster and block
4.     A complete statement of all screen and paid advertising credit obligations together with a layout of the proposed screen and advertising credits and a statement of all contractual restrictions as to the use of name and likeness or otherwise of any contributor together with excerpts from any agreement agreeing to give screen and/or paid advertising credit
5.     Long form synopsis(3 pages) and short synopsis(2 paragraphs)
6.     Pressbook (with technical and artistic cast, director and production notes or comments, director and principal actor curriculum, interviews).

**C.     Materials Shipping instructions:**  Assignor shall deliver to Assignee all material necessary for dubbing and adaptation to Italian cinema and television, free from any third-party lien.

**D.     Suitability:**  It is of the essence to this Agreement that the Picture will on delivery be in all respects completely finished and that the Delivery Materials will be of first class technical quality and in accordance with Assignee's standards, fully edited, titled, synchronised with Original language dialogue, music and effects and suitable for exploitation by means of the rights herein specified by first class broadcasters, exhibitors and Videogram distributors in the Territory.  Assignee shall examine all materials received from Assignor for technical suitability of transmission within thirty (30) days of receipt of the materials.  All the materials shall be considered to meet technical requirements and to be accepted by Assignee unless Assignee provides Assignor with written notification which fully details all technical defects within thirty (30) days of receipt of the materials.  In the event of the receipt of such notification, Assignor may either choose to eliminate all defects and make the corrected materials available to Assignee or to substitute the technically unsuitable materials with technically flawless materials within thirty (30) days of receiving Assignee's written notification.

## SCHEDULE "B" – E&O PROTOCOL

Protocol for Adding SIGMA FILMS Srl on E&O

Use the following language to add our company as an additional insured:

"SIGMA FILMS Srl, its parent, its subsidiaries and all associated, affiliated and related entities, its successors, licensees, sub-distributors, sub-licensees and assigns and the officers, directors, shareholders, attorneys, agents and employees of each of the foregoing."

Please include the following language on the certificate:

1    Coverage is primary and not contributing to or in excess of any such insurance maintained by Sigma Films Srl
2    Policy does not contain any non-standard endorsements, exclusions or restrictions in coverage. (We need this on the certificate, and if it's not stated on the certificate, then we require a copy of the entire policy.)
3    Certificate should provide thirty (30) days prior written notice via registered mail of any cancellation or material change in coverage.

The insurance policy must be in place for at least three (3) years from the first day of the license period.

With limits of no less than US$1,000,000 per claim and US$3,000,000 in the aggregate with a deductible of no more than US$10,000

Policy must include and certificate must state:

1    coverage for the title (and any aka name, if applicable)
2    coverage for the music
3    coverage for the Bonus Materials
4    coverage for Films Clips and images
5    coverage for all media

## SCHEDULE "C" – LAB ACCESS LETTER

### LABORATORY ACCESS LETTER

date

(lab)
(address)

Gentlemen:                    RE: ""

You acknowledge that you now have or will have in your possession, in the name of the undersigned, the print, pre-print and sound materials and the videotape materials, as applicable ("Materials") of the motion picture presently entitled * (the "Film") and of the trailer ("Trailer") of the Film as set out in Schedule 1 hereto.  Please be advised that the undersigned and SIGMA FILMS Srl ("Sigma") have entered into an agreement ("Agreement") whereby certain rights in the Film have been granted to Sigma and Sigma will require access to the Materials and Trailer and may request all or some of said Materials and Trailer to be removed from your premises.  Accordingly:

1. You are hereby instructed and directed upon your receipt of this letter (and subject to the making of credit arrangements satisfactory to you) to honor all instructions and orders of Sigma and such others as Sigma may designate to you in writing in relation to the Film, regardless of any protest, objection or contrary instructions or orders of the undersigned.

2. All services and materials ordered shall be at the expense of the person or company ordering such services or material, and you agree to look solely to such person or company for payment of such charges as such person or company may incur.

3. You will not refuse to honor any of the orders of Sigma or its designees by reason of any unpaid charges incurred by the undersigned or by anyone else other than Sigma or its designees.

4. Neither the undersigned nor anyone else shall have the right to remove the Materials from your premises without the written consent of Sigma.

5. The instructions contained herein are irrevocable and may not be modified except in a writing signed by the undersigned and Sigma.

Please confirm your understanding of and agreement to the foregoing by signing in the space provided below.

Yours very truly
*

Per: _____

AGREED TO:

(lab) Per: _____

Sigma Films Srl  Per: _____

## <u>SCHEDULE "D" – SHORT FORM ASSIGNMENT</u>

For good and valuable consideration, receipt of which is hereby acknowledged, HANNIBAL PICTURES ("Assignor") hereby irrevocably grants, transfers, assigns and licenses to SigmaFilms Srl. ("Sigma") the sole and exclusive "Rights" in and to the "Picture" as further specified in that certain agreement, dated April 3, 2008, between Assignor and Sigma (the "Acquisition Agreement") for exploitation in the "Territory" during the "Term" (as such terms are defined below).

PICTURE:            **GIALLO**

RIGHTS:             "Rights" means the sole and exclusive right under copyright to exhibit, distribute, market, display, project, transmit, broadcast, rebroadcast, perform, advertise, publicize, license, exploit, sell copies of and otherwise communicate the Picture in all media, by all means and methods now known or hereafter devised including, without limitation, by means of Cinematic, Ancillary, Video (Rental and Sell Thru), Electronic Rental, Electronic SellThru and all manners of home viewing, Pay-Per-View, VOD, SVOD, NVOD, Pay TV, Free TV and all forms of television now know or hereafter devised, Wireless, Internet, any New Exploitation Methods developed during the Term of this Agreement, and all Allied and Incidental Rights in and to the Picture in the Territory, but expressly excluding airline and music publishing rights.

TERRITORY:          ITALY and Italian speaking European Countries.

TERM:               Commencing April 3, 2008 and ending in perpetuity.

Subject to the aforesaid, Sigma is empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any nature, concerning any copyright in and to the Picture, or any infringement of such copyright or violation of any of the rights granted it under the Acquisition Agreement. Any recovery of damages, penalties, costs or otherwise arising by reason of infringement of any such copyright(s) or violation of the rights transferred to Sigma under the Acquisition Agreement has been assigned, and shall be paid, to Sigma.

This Short Form Assignment is executed pursuant to and is expressly subject to all the terms and conditions of the Acquisition Agreement.
IN WITNESS WHEREOF, Assignor hereby caused this Short Form Assignment to be duly executed and delivered as of April 3, 2008.

                    HANNIBAL PICTURES

                    By:_____

                    Its:_____

On _____, 2008, before me, _____, a Notary
Public, personally appeared _____, personally
known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.            SEAL
Signature:    _____

### SCHEDULE "E" LETTER OF CREDIT

### LETTER OF CREDIT

To be mutually agreed in good faith between Assignor 's bank and Assignee' s bank.
Assignee will provide Assignor with the draft by May 22, 08 which will taken into account the proposed language submitted by Assignor's bank and completion bond.

# EXHIBIT "D"

EXHIBIT "F"

## ACTING SERVICES AGREEMENT
### "GIALLO"
### ADRIEN BRODY

The following agreement ("Agreement"), dated to be effective as of March 26, 2008, shall constitute the terms and conditions of the agreement between GIALLO PRODUCTIONS LIMITED, a United Kingdom limited company, ("Producer") and THREE-SEVEN ENTERTAINMENT, INC., a Nevada, USA, corporation, ("Lender") for the services of ADRIEN BRODY ("Artist") with respect to Artist's services as an actor in the motion picture tentatively entitled "GIALLO" (the "Picture").

1.    **CONDITIONS PRECEDENT:** This Agreement shall be subject to and expressly conditioned upon Producer's receipt of this Agreement originally executed by Lender and Artist and of all documents which may be required by any governmental agency or otherwise for Artist to render services hereunder, including, without limitation, visas, work permits and/or other documents or instruments required to establish Artist's employment eligibility in all jurisdictions in which Artist shall be required to perform services hereunder; it being agreed that Producer will use good faith efforts to secure such documents on Artist's behalf and will pay all actual costs in connection therewith (the "Conditions Precedent").

2.    **ENGAGEMENT:** Subject to fulfillment of the Conditions Precedent, Producer engages the services of Artist from Lender and Lender hereby agrees to furnish Artist to perform in the Picture on such basis as the actor in both the roles presently referred to as "INSPECTOR ENZO LAVIA" and "FLAVIO VOLPE" (aka "YELLOW") and as otherwise as provided in this Agreement. Artist's services hereunder shall be exclusive during the consecutive period of principal photography, as defined below, and shall be rendered at such locations, presently scheduled for the Torino, Italy area ("Location") as may be reasonably designated by Producer from time to time.

3.    **TERM OF ENGAGEMENT:** Artist's principal photography services hereunder are to commence at the Location approximately May 12, 2008, or within two weeks thereof, to be designated by Producer; Artist's services shall consist of at least three free pre-production days for rehearsal/wardrobe fittings/acclimation immediately prior thereto and five six day principal photography weeks, plus up to three free days for post production activities such as re-shoots, ADR, pick-ups, dubbing and/or looping services (which days may or may not be consecutive to one another or to Artist's services in connection with principal photography, but which shall be subject to Artist's professional availability if not so consecutive to principal photography) plus free travel days to and from the Locations plus reasonable non-consecutive days for publicity subject to Artist's professional availability ("Guaranteed Period"). It is understood that Artist tentatively may need time off to attend the Cannes Film Festival for unrelated events during the dates of May 19-May 21, 2008: Producer and Lender and Artist will work together in good faith to schedule such dates and accommodate Artist's schedule so that it does not unduly effect such events and/or the production of the Picture. Artist is performing services with regard to a different motion picture and may be available earlier than set forth herein and in which case, Artist will work in good faith to make himself available earlier than set forth herein.

4.    **FIXED COMPENSATION:** Provided additionally that neither Lender nor Artist is in default of any material obligations hereunder, as full and complete consideration for Lender's and Artist's services and all other obligations and promises from Lender and Artist, Producer shall pay to Lender the following fixed compensation: US$ REDACTED on a pay or play basis, for all services rendered during the Guaranteed Period to be paid weekly in relatively equal installments over the course of principal photography, less appropriate withholdings ("Fixed Compensation"). The Fixed Compensation payable to Lender pursuant to this paragraph shall be "pay or play" pursuant to the terms hereof. The Fixed Compensation shall be deliverable to a mutually agreed escrow account as follows: 20% within 48 hours after Producer's receipt of this Agreement executed by Lender and Artist and the remaining amount at least one week prior to Artist's required departure for the Location.

ACTOR INITIALS: _AB Bar_

5.    CONTINGENT BONUS: Provided Lender and Artist executes this Agreement and appears recognizably in the finished Picture and is entitled to receive Lender's Fixed Compensation for Artist's acting services with regard to the Picture, Lender shall also be entitled to receive contingent compensation as follows:

5.1 Box Office Bonus: At such time, if ever, that the United States gross box office receipts of the Picture ("DBO") reach US$25,000,000, as reported in US Daily Variety, Lender shall be entitled to receive a "Box Office Bonus" equal to five percent (5%) of the DBO in excess of US$25,000,000, which shall be an advance against Lender's/Artist's Participation (as such term is defined below).

5.2 Gross Performance Profit Participation: An amount equal to 25% of the "Adjusted Gross Receipts" of the Gross Receipts, if any, derived from exploitation of the Picture, commencing at "Cash Breakeven" ("Lender's/Artist's Participation") which shall be applicable against any SAG residuals paid to Lender or Artist and Producer shall be permitted to deduct any SAG residuals paid to Lender or Artist from Lender's/Artist's Participation.

"Gross Receipts," for purposes herein, means amounts actually and indefeasibly received by Producer due to distribution and exploitation of the Picture (after any third party distribution and/or sales agent fees, costs, and expenses are deducted if not previously deducted or retained) from licenses of distribution rights to third parties, including advances, minimum guarantees, and overages.

"Cash Breakeven," for purposes herein, means the first point at which Gross Receipts equal the total of the distribution and/or sales fees and distribution and marketing/sales costs relating to the Picture (if not previously deducted prior to Producer's receipt) (with sales expenses (but not distribution costs/expenses) capped at US$500,000, exclusive of delivery costs), all residuals paid/accrued pursuant to union/guild labor agreements, collection fees and costs, taxes levied on gross receipts (other than corporate or other net income taxes with respect to the Producer or its successors, assigns or licensees), box office bonuses and deferments, other payments to Lender/Artist, the production and negative cost of the Picture (including overhead charges to the extent included in the budget), interest and financing fees and costs (including any so called "premium" on investment or financing if applicable), and costs of creation and delivery of all items to effect delivery of the Picture to distributors, exhibitors or sales agents.

"Adjusted Gross Receipts," for purposes herein, means Gross Receipts in excess of the level of Gross Receipts necessary to reach Cash Breakeven, less on an ongoing basis the distribution/sales agency fees and distribution and marketing/sales costs.

5.4 Audit/accounting Rights: Producer shall report, in the English language, to Lender in connection with any contingent compensation due Lender under this Paragraph hereunder on a quarterly basis for the first three (3) years commencing with the quarter in which the Picture is first released anywhere; semi-annually for two years thereafter; and then annually. Producer shall have no obligation to report if there is no activity to report. Accountings shall be rendered within 90 days after the end of the applicable accounting period. Lender shall have the right to audit the books and records of Producer only insofar as they pertain to the Picture only, in connection with Lender's share of Compensation, as set forth above. Any such audit shall be conducted at Producer's regular place of business during normal business hours and shall be conducted by a Certified Public Accountant nominated by Lender or Artist. No such audit shall be allowed more frequently than once in any twelve (12) month period. All of the records and reports shall be considered Producer's confidential records and trade secrets and shall be treated as such by Lender and Artist and their representative(s). Statements not objected to in writing within 36 months after rendition shall be deemed final and shall not be subject to later objection or audit, i.e., there shall be no right to audit statements more than 36 months after tendering same to Lender or Artist.

6.    WORK CONDITIONS: The work week shall be six days with a standard work day of 12 hours.

ACTOR INITIALS: AB Ron

No increased or additional compensation shall accrue or be payable to Lender or Artist by reason of the fact that any of Artist's services are rendered at night or on weekends or holidays. The Fixed Compensation shall be inclusive of, without limitation, fees due to Artist for Artist's pre-production, production, and post-production services, and payments for travel days, rehearsals, overtime, and vacation, holiday, and any other applicable SAG premiums to the extent permitted under the SAG Codified Basic Agreement. Producer shall have the benefit of the maximum waivers obtainable under Schedule "F" of the SAG Basic Agreement.

7.   CREDIT: On condition that Artist appears recognizably in the Picture as released. Producer shall accord to Artist credit as follows:

(a)   On Screen: On prints, Artist will receive credit in first position of cast on a separate card, in the main titles, on-screen in a size of type which is not less than fifty percent (50%) of the average size of type used to display the "Title" of the Picture but in no event smaller than the average size of type used to display the name of any other individual. All other remaining terms shall be in Producer's discretion (including whether main title credits shall be at the beginning or end of the Picture) provided that Producer will consult with Artist with regard to the actual credit provided Artist's two roles.

(b)   Paid Advertising: In Paid Advertising, except for ads where no individual is given credit and subject to customary exclusions (but in excluded uses, including teaser ads, on the terms set forth herein, in which any individual is accorded credit other than nomination, award or congratulatory advertising relating to the person nominated, awarded or congratulated in which only such person is credited): Artist's billing block credit shall be first position of cast, not less than the size of the regular (i.e. billing block) title and any other individual receiving credit thereon; Producer shall also have the right use Artist's name above or in the artwork for the Picture, in Producer's discretion, except that in the event that any other individual is accorded an artwork credit. Artist shall also receive credit where artwork is used, in first position above the artwork title in a size of type not less than 35% of the size of type used to set forth the artwork title and 100% of the size of any other individual receiving credit thereon. Producer shall also have the right to utilize Artist's approved likeness in connection with any advertising/promotion for the Picture; it being understood that Producer shall have no obligation to do so, except that if another cast member's likeness is shown in paid advertisements, including excluded advertising, issued or controlled by Producer, then Artist shall have likeness parity with such other actor and no other cast member likeness is to be larger or more prominent therein. As used herein, size includes height, duration, prominence, thickness and width. All other remaining terms shall be in Producer's discretion.

Producer shall also have the right to utilize Artist's name above or before the Picture title on screen or in the billing block for the Picture; it being understood that Producer shall have no obligation to do so, except that if another cast member credit is above or before the title, then Artist's credit shall also be above or before the title.

No casual or inadvertent failure to comply with the provisions of the paragraph shall constitute a breach of the Agreement; provided that upon receipt of written notice from Lender specifying a failure to accord Artist credit properly in accordance with the Agreement, Producer shall use best efforts as practicable to promptly cure prospectively such material failure with regard to ads issued and/or prints created after the date of such notice and, to the extent possible, versions of any other medium whose masters were not created prior to the receipt of such notice. Producer's obligation hereunder is to provide the distributor with the credit obligations as set forth herein and cause distributor to assume said obligations in writing and failure by distributor to so accord credit shall not be deemed to be a breach of this Agreement by Producer if Producer has so obtained such written assumption from the distributor. In the event of a failure or omission by Producer or any third party constituting a breach of the obligations of Producer under this Agreement, including, without limitation, under this paragraph, Lender and Artist recognize that the damage caused Lender or Artist by Producer by such breach is not irreparable or sufficient to

"GIALLO"-ACTING SERVICES AGREEMENT-ADRIEN BRODY                     3                     ACTOR INITIALS: _AB_ _Ron_

Case 2:10-cv-07705-DSF-CW   Document 9-2   Filed 10/25/10   Page 15 of 28   Page ID #:294

entitle Lender or Artist to injunctive or other equitable relief and Lender and Artist therefore agree that Lender and Artist's rights and remedies hereunder shall be limited to the right, if any, to obtain damages at law. Consequently, Lender and Artist shall have no right in such event to injunctive relief or to terminate or rescind the Agreement or any of the rights granted or assigned to Producer hereunder.

8.     TRAILER: While on Location, Artist shall provide with a single stand alone first-class "star" trailer if available [Luxury Tricamper] for Artist's exclusive use with the following first-class amenities if available: air conditioning, satellite TV, heating, kitchen (equipped with stove, microwave and refrigerator), private bathroom (with sink, toilet and shower), separate bedroom containing a bed, living room with couch, make-up area, stereo with CD player, VHS or DVD player and access to phone/fax and computer with internet (if desired by Artist). In any event, Artist's dressing facilities are to be no less favorable than those accorded to any other actor.

9.     APPROVALS / CONSULTATION: Artist shall have the following approval or consultation rights (i.e., consultation means meaningful consultation but Producer's decision shall be final and controlling):

9.1 Co-star: Approval of the performer to play the roles of "Linda" (Emmanuelle Seigner is pre-approved) and "Celine" (Elsa Pataky is pre-approved) and replacements therefor provided that such personnel approval right shall change to a consultation right on a date four weeks prior to scheduled start of principal photography and the Producer and/or completion guarantor for the Picture shall have the sole discretion to cast the role with a performer appropriate to the as determined in its reasonable good faith business judgment following such consultation with Artist and such other persons as may be consulted.

9.2 Director: Approval of the director (Dario Argento is pre-approved) and replacement therefor provided that such personnel approval right shall change to a consultation right on a date four weeks prior to scheduled start of principal photography and the Producer and/or completion guarantor for the Picture shall have the sole discretion to cast the role with a performer appropriate to the as determined in its reasonable good faith business judgment following such consultation with Artist and such other persons as may be consulted.

9.3 Script Changes: The parties recognize and agree that modifications may need to be made to the script; Artist shall have meaningful consultation over material changes in the script and approval over changes materially affecting Artist's role, in conjunction with the Producer and director, not to be unreasonably withheld or delayed, and shall be exercised in good faith in accordance with the screenplay requirements, production schedule and budget for the Picture.

9.4 Other Personnel: Approval over the hairdresser, makeup person rendering services to Artist, Artist's stand-in (it is acknowledged that Artist has requested that Patrick Oldani be his stand-in and is pre-approved) and stunt double, it is acknowledged that any replacement of the named foregoing personnel and any others: (a) will be Italian resident or Italian nationals or landed immigrants; and (b) must be available to work at the budgeted rates, plus crew per diem plus local hotel, provided that all of the foregoing personnel approval rights shall change to a consultation right instead with respect to any of these positions that remain unfilled by an approved person on or after seven (7) days before the scheduled start of principal photography of the Picture or in respect of any replacements of the foregoing personnel.

9.5 Security: In the event that Artist believes such to be a concern once arriving at the Location, Artist shall have approval within reason of general on set security. Artist's approval and discussion regarding same is not to be unreasonably withheld or delayed, and shall be exercised in good faith in accordance with the production requirements and budget for the Picture.

9.6 Still Photographs: Artist shall have the right to approve publicity stills of Artist issued by or under

the control of Producer in connection with the advertising, publicizing and exploitation of the Picture; provided, however, that Artist shall be required to approve no less than fifty percent (50%) of the total number of stills submitted by Producer in which Artist appears alone or with actors who do not have approval rights or fifty percent (50%) in which Artist appears with any other actor who has approval rights. Artist shall have re-approval (with 50% limit on disapproval) with respect to any and all photos intended for use on magazine covers, key art or key sets. Stills shall be submitted in batches in a reasonable number and may be in the form of so-called contact sheets. Artist shall be given seven (7) business days to respond which time period shall be reducible to five (5) business days upon written notice or shorter in the event of distribution exigencies. In the event of any failure by Artist to approve the requisite percentage of Stills within the Approval Period, Producer shall have the right to deem the appropriate number of Stills in the batch submitted as approved and in order to make up the requisite percentage. If Artist is unavailable, Artist's personal manager shall have the right to exercise these approval rights on Artist's behalf. Producer will not grant the photographer for stills ownership or the right to retain any negative or print or any syndication rights with any photographs containing Artist's likeness. Negatives and copies of disapproved stills are to be destroyed or rendered unusable. Producer will not provide stills to tabloids.

9.7 Non-Photographic Likeness: Artist shall have the right to approve all non-photographic likenesses to be utilized by Producer in connection with advertising, publicity and exploitation of the Picture or otherwise. Artist shall have three (3) passes for comments on likenesses submitted. Artist shall respond to each submittal within five (5) business days from Artist's receipt of a particular submittal, reducible to three (3) business days or shorter in the event of distribution exigencies, provided Producer notifies Artist in writing of such need at the time of the request. Artist shall cooperate in good faith in connection with the redrawing of any likeness disapproved by Artist, and all likenesses submitted for Artist's approval shall be deemed approved if not disapproved during the required period. If Artist is unavailable, Artist's personal manager shall have the right to exercise these approval rights on Artist's behalf. When any likeness (and/or constituent elements thereof) has been redrawn to meet Artist's objections after the third submission of such likeness to Artist, such likeness shall be deemed approved by Artist. Artist shall have the separate right of absolute approval for non-photographic caricatures, models and statues.

9.8 Biography: Approval over Artist's biography (Artist to provide or approve at least one up-to-date biography to Producer at all times).

9.9 Artist's Publicity Services: Subject to Artist's approval, not to be unreasonably withheld, and professional availability, Artist shall perform reasonable publicity, interviews and personal appearances upon first release in each territory as may be requested by Producer and/or the Picture's distributor(s). If requested by the Producer, the Producer shall provide the following and if requested by the Picture's distributor(s), the Producer shall apply best efforts to procure that the distributor shall provide the following: In the event Artist is required to travel in connection with the rendition of publicity services, Artist will be provided first-class round-trip airfare for Artist plus, both on an if used and required basis, one (1) additional first-class round-trip airfare for Artist's companion and one (1) additional business class ticket for Artist's publicist, plus first-class hotel accommodations, expenses and ground transportation. In the event that publicity services are for Artist's personal appearance, Producer will exert good faith efforts to provide a reasonable budget for clothes, stylist, make-up and hair. Immediately after execution hereof, the parties agree to issue a press release regarding Artist's involvement in the Picture and shall work together in good faith to mutually prepare such press release.

9.10 Merchandising/Commercial Tie-Ins: No merchandising or commercial tie-ins utilizing Artist's name, voice or likeness, and no use of a look-alike or sound-alike, without Artist's prior written consent and will be subject to the following royalty if such use is not for promotional, purposes and generates income in excess of the costs incurred in connection therewith. The royalty for any such use shall be a sum equal to seven and one half percent (7.5%) of Producer's net receipts (gross receipts actually received by Producer

less a distribution fee of thirty-five percent (35%) and less merchandising expenses directly derived from such merchandising reducible by the amount of royalty payable to any other person whose name or likeness is used in connection with such merchandising who is entitled to a royalty to a floor of five percent (5%) of Producer's net receipts therefrom. Any use with regard to soundtrack shall be governed by separate agreement. For clarification, Producer shall always have the right to use Artist's name, voice and/or likeness (subject to the likeness approval paragraphs herein) in connection with the marketing, distribution, and other exploitation of the Picture without payment of a merchandising royalty, including but not limited to the following uses and the following shall not be deemed merchandising or a commercial tie-in: (a) items for promotional purposes of the Picture (e.g., customary promotional items such as one sheets, lobby cards, posters, photos, lobby stand ups, as well as hats, pins, T-shirts, mugs and other customary promotional trinkets), (b) Artist's name as part of the Picture's publicity and billing block.

9.11 Specific Product Uses: In addition to other paragraphs herein, Artist has approval of use of his name, voice and/or likeness in an interactive game making reference to or utilizing elements from the Picture. Artist will be provided a seven (7) business day approval period after receipt by Artist or Artist's representative. Further, Artist shall have approval with respect to Artist appearing in a scene containing a prominent commercial product (if such was specially arranged and does not appear as part of normal shooting environment) or product placement. Any proceeds paid for any commercial product placement involving Artist directly shall be paid to Artist exclusively.

Producer agrees not to enable downloading any clips or stills containing Artist's likeness except in connection with internet usage in connection with the marketing, distribution, and other exploitation of the Picture or its marketing materials. Notwithstanding same, Producer agrees that it will not have the Picture's website enabled to download screen "wall-paper" containing Artist's likeness. There shall be no use, including sale of any items (e.g., Ebay, etc.) of screen or make-up tests, or molds, models or other replications of Artist's face or body without Artist's prior written approval.

9.11 On Set Press: Artist is to be provided at least twenty-four (24) hours prior notice of Artist's meeting with any press on set. Artist shall have the right to approve any interview and if Artist consents to a magazine interview intended for cover treatment, he shall have the right to approve the cover photo.

9.12 Reasonableness of consents: Notwithstanding any other provision, all of Artist's approvals and consultations as provided in this Agreement shall be administered and provided by Artist reasonably, in good faith and expeditiously in order not to delay, frustrate, infringe, or interfere with production and/or distribution, or any aspect, of the Picture. Unless otherwise provided herein, if Lender or Artist, as applicable, does not disapprove any item within five (5) days, then such will be deemed approved.

10.    NAME AND LIKENESS USAGE; MAKING OF FILMS, ETC: In the event that Artist's commentary is requested for the DVD, Artist agrees to reasonably cooperate with providing same, subject to Artist's professional availability.

Artist will have the right to prior approval and consultation (included in the Fixed Compensation) over the use of behind the scenes footage, bloopers and outtakes (however Artist agrees to approve a reasonable amount of behind the scenes footage and such material (not including bloopers or embarrassing outtakes) for said uses commensurate with his role as the lead actor. There shall be no behind the scenes photography, publicity interviews or other publicity activities involving Artist on set without Artist's approval.

Artist shall be consulted with respect to any film clips from the Picture containing his performance intended for use in connection with music videos of a song from the Picture.

11.   <u>DUBBING</u>:  Subject to Artist's availability, Artist shall have the first opportunity to "dub" Artist's voice in the English language as long as Lender makes Artist available for the dubbing dates. Producer will make good faith best efforts to schedule dubbing in accordance with Artist's availability provided Artist so informs Producer and shall give at least ten (10) business days prior written notice of such dubbing, unless the exigencies are such that a shorter notice period is necessary, but not less than seven business days prior notice. Producer and any applicable distributor shall not be required to travel Player unless dubbing can be arranged at a location within a reasonable distance to where Artist is at the time in which case Artist and Producer will work together in good faith for such travel, or otherwise incur any additional expense, in order for Player to exercise these first opportunity rights.

12.   <u>TRAVEL EXPENSES, ETC</u>:  While on location, Artist will be afforded a suite at a first class hotel (with a gym work out area) approved by Artist plus a non-accountable per diem of Euro100 per day, to be used by Artist to defray Artist's living expenses (including without limitation all expenses incurred by Artist and Artist's invitees, all of which expenses are Artist's sole responsibility, although Producer and Artist will cooperate with regard to reasonable and minor incidental/food expenses for a limited number of invitees such as Artist's parents). Artist shall be furnished with one (1) first-class round-trip, plus one business class round trip on an if used basis, air transportation to the Location. While required to be on Location, Artist shall be provided with a first class rental sport utility vehicle (or other full-size vehicle as available). Artist shall be provided an exclusive car and driver to and from the set and to and from airports (including for departure and arrival from domestic US airport). All travel and related arrangements will be made by Producer in its sole discretion.

13.   <u>ASSISTANT/FITNESS CENTER/TRAINER</u>:  While required to be on Location, upon Artist's request, Producer will provide Artist with a local-hire exclusive assistant subject to Artist's reasonable approval (Simona Politi is pre-approved). While required to be on Location, Producer shall provide Artist with a membership to a local fitness center (if there is not a gym at Artist's hotel) and, if requested, a personal trainer (as needed) (if the fitness center is at Artist's hotel then trainer must come to the hotel).

14.   <u>PREMIERES/FESTIVALS</u>:  Artist shall be invited with his companion, plus his publicist, to any celebrity premiere held for the Picture, or major film festival (such as Cannes, Venice, New York, London) in which the Picture is in official competition, if any, occurring within two years from the start of principal photography of the Picture, along with being provided no less than ten (10) additional invitations/seats if Artist attends.  In the event that Producer is in control of the premiere, if such services are performed outside of where Artist is located at the time, Producer shall provide the following:  In the event Artist is required to travel, Artist will be provided first-class round-trip airfare for Artist plus, both on an if used and required basis, one (1) additional first-class round-trip airfare for Artist's companion and one (1) additional business class ticket for Artist's publicist, plus first-class hotel accommodations, expenses and ground transportation. Producer shall use best efforts to arrange for Artist's similar travel, accommodation and per diem for non-controlled premieres or festivals.  In any event, no other actor shall be provided with more favorable terms with respect to premiere(s)/film festivals.

15.   <u>DVD/CD</u>:  Artist shall be provided with one free DVD and CD copy of the soundtrack, if any, upon the applicable DVD CD commercial availability date of the in the United States, but failure to do shall not be deemed a breach of this Agreement.

16.   <u>WARDROBE</u>:  Following delivery of the answer print of the Picture, Artist shall have the right to retain, free of charge, any costumes or apparel purchased by Producer worn by Artist in the portrayal of Artist's role (except for costumes or apparel which are so unique as to be required be retained by Producer).

17.   <u>NUDITY/HEATH CONCERNS</u>:  Artist shall not be required to perform any nudity or simulated sex scenes. In the event Artist is scheduled to appear in any scene that involves physical intimacy with

ACTOR INITIALS: AB DB

another Performer, who at the time exhibits, in Artist's good faith opinion, symptoms indicative of one or more health issues of a contagious nature (such as, for illustrative purposes only, flu symptoms), Artist reserves the right to postpone his performance in such scene until Performer is healthy.

18.     **FURTHER REPRESENTATIONS AND WARRANTIES:** Lender hereby represents and warrants that neither Lender nor Artist is under any obligations or disability, created by law or otherwise, which would in any manner or to any extent prevent or restrict Lender or Artist from entering in to and fully performing this Agreement; that Lender nor Artist has entered into any agreement or commitment that would prevent Artist's fulfilling Artist's commitments with Producer hereunder and that Lender and Artist will not enter into any such agreement or commitment without Producer's specific approval; and Lender and Artist hereby accept the obligations hereunder and agree that Artist shall, during the period of Artist's exclusive services hereunder, devote Artist's entire time and attention and best talents and abilities exclusively to Producer as specified herein, and to observe and to be governed by the reasonable rules of conduct established by Producer for the conduct of its employees.

19.     **ENTIRE AGREEMENT:** This Agreement, plus the Inducement and Standard Terms and Conditions attached hereto, constitutes the entire agreement between the parties and supersedes any and all prior written or oral agreements relating to the subject matter hereof and all previous agreements if any, are merged herein and cannot be modified or amended except by written instrument signed by Lender and by Producer. Lender and Artist acknowledges that Lender and Artist have not executed the Agreement in reliance on any representation or promise made by Producer or any of its representatives other than those expressly contained in the Agreement. Lender/Artist may not make any representations or agreements on the behalf of Producer. Producer shall have ten business days to cure any alleged breach hereof after Lender provides written notice of such to Producer.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement to be effective the day and year first above written.

"PRODUCER"                                      "Lender"

GIALLO PRODUCTIONS LIMITED              THREE-SEVEN ENTERTAINMENT, INC.
a United Kingdom limited company          a Nevada, USA, corporation

By: _____                  BY: ADRIEN BRODY
Its Authorized Signatory                   Its: Authorized Signatory

## INDUCEMENT ATTACHMENT TO ACTING AGREEMENT

As a material inducement to Company to enter into the Acting Service Agreement between GIALLO PRODUCTIONS LIMITED, a United Kingdom limited company, ("Company") and THREE-SEVEN ENTERTAINMENT, INC., a Nevada, USA, corporation, ("Lender") for the services of the undersigned as the Artist referred to therein, and as a material part of the consideration to Company for so doing, the undersigned hereby represents, warrants and agrees as follows:

I have read and am familiar with the above Agreement. I represent and warrant that Lender has entered into an employment agreement with me and is authorized to furnish my services as aforesaid and to grant all rights as set forth above. I agree to be bound to the foregoing as if I were a party thereto and I agree that the Lender stated above has the right to enter into the above Agreement and provide my exclusive services for the time period stated and grant rights in the product of my services as provided in the above Agreement.

In the event that Lender is unwilling or unable to fulfill its obligations pursuant to the Agreement, the undersigned will agree to be and will be bound by and will duly observe, perform and comply with each and all of the terms, covenants and conditions of the Agreement on the part of the Lender or the Artist to be performed or complied with, even if the Agreement should expire, be terminated or in any manner suspended; and shall render to Company all of the services and grant all of the rights which are to be rendered and/or granted by Lender or Artist pursuant to the Agreement even if Lender shall be dissolved, suspended or should otherwise cease to exist. The undersigned is under no known obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Agreement on the part of the Lender or the undersigned to be performed or complied with.

Provided the compensation is paid by Company to Lender, I agree to look solely to Lender for any compensation and other remuneration for any and all services and rights due to me in connection with the Picture. I further agree that Company shall be entitled to seek equitable relief against the undersigned by injunction or otherwise to restrain, enjoin and/or prevent the violation or breach by the undersigned of any material obligation of the undersigned to be performed as provided in the Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument, without bond. If Lender fails to fulfill its obligations under the Agreement, Company shall have all rights and remedies against the undersigned which Company would have if the undersigned were Company's direct employee under the Agreement and Company shall not be required to first resort to or exhaust any rights or remedies which Company may have against the Lender before exercising Company's rights and remedies against the undersigned.

The undersigned will indemnify and hold Company, Company's officers, employees, representatives and assigns harmless from and against any and all taxes which Company may have to pay and any and all liabilities (including judgments, penalties, interest, damages, costs and expenses, including reasonable outside attorneys' fees, whether or not litigation is commenced) which may be obtained against, imposed or suffered by Company or which Company may incur by reason of Company's failure to deduct and withhold from the compensation payable under the Agreement any amounts required to be deducted and withheld from the compensation of an employee under the provisions of any income tax laws of any local, state or nation and any other statutes or regulations heretofore or hereafter enacted requiring the withholding of any amount from the compensation of an employee and any similar statutes or regulations of any territories and countries.

ACTOR INITIALS: _AB_ _Bm_

I further agree that under no circumstances shall I be entitled to amend, modify or terminate the Agreement (except for Lender's rights to amend, modify or terminate as provided in such Agreement), rescind any rights granted, or act in any manner to prevent or interfere with the performance of the undersigned's services or the use and ownership of the results and proceeds thereof, or to obtain or seek any form of equitable or injunctive relief, specific performance or otherwise, or to seek to enjoin or otherwise interfere with the development, production, distribution or exploitation of the Picture or any element thereof, any and all rights to which I expressly waive. These agreements by me and indemnifications shall survive termination of said Agreement.

ADRIEN BRODY

"GIALLO"-ACTING SERVICE AGREEMENT-ADRIEN BRODY

10

ACTOR INITIALS:

Case 2:10-cv-07705-DSF-CW   Document 16-5   Filed 11/01/10   Page 132 of 151   Page ID
#:654
Case 2:10-cv-07705-DSF -CW   Document 9-2   Filed 10/25/10   Page 22 of 28   Page ID
#:301

## STANDARD TERMS AND CONDITIONS

Following are the Standard Terms and Conditions of this Agreement between Producer and Lender for Artist's services in connection with the Picture. All defined terms set forth in these Standard Terms and Conditions shall be deemed to be defined as set forth in the main portion of this Agreement. In the event of any conflict between the Standard Terms and Conditions and the main portion of this Agreement, the provisions of the main portion of this Agreement shall control.

A.    CONFIDENTIALITY: Lender and Artist shall keep confidential all matters relating to the Picture (including, without limitation, the script, the plot, or any elements thereof, any set design, props or effects, or activities of the cast and crew) and Producer's business or production activities, and shall not furnish or authorize any dissemination of any information or publicity of any form relating to the Picture, Lender's engagement, Artist's services or Producer (or its operations or personnel); provided that incidental non-derogatory references to Artist's engagement hereunder shall not be deemed a breach of this provision.

B. RIGHTS:
(1) Results and Proceeds.

All results and proceeds of Artist's services hereunder, including, without limitation, all literary and musical material, designs and inventions of Artist, shall be deemed a work made for hire for Producer within the meaning of the copyright laws of the U.S. or any similar or analogous law or statute of any other jurisdiction. With regard to copyright law, the parties agree that the copyright laws of the United States shall govern this Agreement, without regard to conflict of laws. Accordingly, Producer shall be the sole and exclusive owner thereof for all purposes, including, without limitation, in connection with the distribution, exhibition, advertising and exploitation of the Picture and any part thereof and the allied and ancillary rights therein, in each case, in all media and by all means now known or hereafter devised and in all languages, throughout the universe in perpetuity. Any services including, without limitation, writing and/or acting services, rendered by Artist in connection with the Picture shall be covered by the preceding sentences, and sums otherwise payable under this Agreement shall be deemed full payment for such services. If for any reason Artist's services are not deemed a work-for-hire for Producer, then Lender and Artist hereby irrevocably assign, grant and set over unto

Producer, in perpetuity and throughout the Universe, all of Lender's and Artist's rights of every kind and nature, including all rights of copyright, in and to the Picture and all of the results and proceeds of Lender's engagement and Artist's services hereunder. Lender and Artist acknowledge and agree that (i) Producer will be the sole and exclusive owner of all rights in the Role or character portrayed by Artist, including the name, voice, likeness and/or distinctive characterizations thereof, and the right to merchandise, enter into commercial tie-ins and exploit such Role or character and the right to use Artist's name, voice and likeness in connection therewith, and (ii) neither Lender nor Artist shall have the right at any time to portray, exploit, merchandise or make any use of such Role or character portrayed by Artist.

(2) Droit Moral; EC Rental and Lending Rights. Lender and Artist hereby waive the benefit of any provision of law known as "droit moral" or moral rights of authors or any similar or analogous law or decision in any country of the world. Lender and Artist, on Lender's and Artist's own behalf and on behalf of Lender's and Artist's successors in interest, heirs, executors, administrators and assigns hereby assign to Producer in perpetuity all rental and lending rights under national laws (whether implemented pursuant to the EC Rental and Lending Rights Directive or otherwise) to which Lender or Artist may now be or hereafter may become entitled therefrom. Lender and Artist agree, on Lender's and Artist's own behalf and on behalf of Lender's and Artist's successors-in-interest, heirs, executors, administrators and assigns, not to institute, support, maintain or permit directly or indirectly any litigation or proceedings instituted or maintained on the ground that Producer's (or its designee's) exercise of the right granted to Producer in the Picture in any way constitutes an infringement or violation of any such rental or lending right as aforesaid. Lender and Artist hereby acknowledge that the Fixed Consideration to which Lender and/or Artist are entitled pursuant to this

ACTOR INITIALS: _AB ꟼꞀꝈ_

Agreement includes consideration for the assignment of rental and lending rights provided for in this Paragraph and that the said consideration is an equitable and adequate part of the revenues derived or to be derived by Producer from the said rights. Lender and Artist hereby waive pursuant to Section 87 of the Copyright Designs and Patents Act 1988 ("the Act") (or any statutory modification or re-enactment thereof for the time being in force), unconditionally, irrevocably and in perpetuity, in favor of the Producer, all rights under Sections 77 to 85 inclusive of the Act in respect of the products and all other moral and author's rights and rights of a similar nature whether now existing or hereafter conferred under the laws of any jurisdiction. Lender and Artist hereby grant to Producer throughout the world all necessary consents whether under the Act or otherwise to enable the Producer to make the fullest use of the Artist's services in all media whether now known or hereafter invented.

(3) Vesting.   All rights granted or agreed to be granted to Producer under this Agreement shall vest in Producer immediately and shall remain vested whether this Agreement expires in normal course or is terminated for any cause or reason.

C.   NAME AND LIKENESS:   Producer shall have the right to use and permit others to use Artist's name, photograph, likeness, voice and biography in connection with the production, exhibition, advertising, publicity, merchandising, commercial tie-ins, promotion and/or other exploitation of the Picture, and/or subsidiary, allied and ancillary rights of any nature relating to the Picture or the results and proceeds of Artist's services hereunder, in perpetuity throughout the Universe in any and all media and means now known or hereafter devised (including, without limitation, on web sites); provided that Producer shall not use Artist's name, voice or likeness as an endorsement of any product without Lender's or Artist's prior written approval (provided that the Picture, soundtrack albums, commercial tie ups, novelizations, printed or souvenir programs and other publications relating to the Picture and the exhibition of a "trailer" or promotional film for the Picture on a sponsored television program shall not be deemed to constitute an endorsement). Producer shall have the right to use and to authorize others to use, in perpetuity throughout the Universe in any and all media and means now known or hereafter devised, film clips

and excerpts from the results and proceeds of Artist's services hereunder, and the Picture and behind the scenes footage in which Artist appears recognizably without any additional consideration to Lender or Artist. Producer contemplates filming and/or exploiting films, including, without limitation, music videos relating to the Picture, "behind the scenes" or "making of" productions about the Picture or similar documentary-type promotional films, in each case, in connection with advertising, publicizing and exploiting the Picture (each, a "Promotional Film"). Lender and Artist hereby agree and consent to such filming and exploitation (including, without limitation, use of any film clip footage from the Picture and behind the scenes photography and filmed interviews with Artist) and hereby grant to Producer the right to use and authorize others to use Artist's name, voice and likeness in connection with such Promotional Films (and the exploitation thereof in perpetuity throughout the universe via any and all media, now known or hereafter devised) for no additional consideration. For the avoidance of doubt, Lender and Artist hereby agree and consent to the use and exploitation by Producer and its licensees and assigns (in each case, for no additional consideration) of outtakes and behind the scenes photography in which Artist appears in connection with (i) the end credits of the Picture; (ii) any "compilations" or "special editions" of the Picture or so-called "bonus materials" relating to the Picture for inclusion on DVD's and/or other devices now known or hereafter devised, or in connection with VOD or other "on-demand" exploitation; and (iii) any "compilation" or "special edition" types of motion pictures issued or controlled by Producer. For sake of clarification, exhibition, advertising, publicizing or exploiting the Picture by or in any media, even though a part of or in connection with a product or a commercially sponsored program, shall be deemed in connection with the Picture and this paragraph includes use of footage, or scenes not otherwise part of the final cut, in uses related to the Picture, such as dvds, a program regarding the Picture or the underlying material or promotional material. Artist agrees to perform customary EPK interviews and activities services. Artist agrees to perform such activities and approve such footage, including "behind the scenes" footage, as reasonably necessary for Producer to create electronic publicity kits and/or DVD extras, without further compensation hereunder.

ACTOR INITIALS: _AB_ _DM_

**D.   NO OBLIGATION TO USE:** Producer shall have no obligation actually to use Artist's services or use any of the results and proceeds thereof, or to exercise any of the rights granted to Producer hereunder, or to produce, or exploit the Picture, or to continue production, or exploitation, if commenced. If Producer elects not to utilize Artist's services hereunder, Producer shall have no further obligation to Lender or Artist hereunder; provided, however, that if Lender has been made "pay-or-play" for the Fixed Compensation, all of Producer's obligations to Lender and Artist hereunder shall be satisfied by payment to Lender of the Fixed Compensation (subject to Producer's rights of suspension and termination).

**E.   PUBLICITY AND PROMOTIONAL SERVICES:** Artist agrees to render promotional and publicity services, as, where and if reasonably required by Producer, in connection with the publicity and promotion of the Picture (including the home entertainment release thereof), including, without limitation, attending domestic and international press junket(s) and premiere(s) of the Picture, appearing on late night and daytime television talk shows, and being available for radio and magazine interviews, subject only to Artist's then prior professional contractual commitments (provided that Artist shall use reasonable good faith efforts to be available to render such services as and when reasonably required by Producer).

**F.   W A R R A N T I E S   A N D INDEMNIFICATION:**

**(1)** Lender's and Artist's Warranties: Lender and Artist represent and warrant that: (i) it and he/she have the full right and authority to enter into this Agreement and to grant the rights herein granted; (ii) Lender and Artist have not entered into nor will Lender or Artist enter into any commitment which will conflict in any way with the rendition of services hereunder or conflict in any way with Lender's and Artist's contractual obligations under any of the provisions hereunder; (iii) except to the extent that it is based upon material provided to Artist by Producer to be used as the basis therefor, all material created by Artist hereunder or otherwise in connection with the Picture is or shall be original with Artist or in the public domain and does not and shall not violate the copyright or any other right of any third party and is not the subject of any litigation or of any claim that might give rise to litigation; and (iv) Artist is for the purposes of this Picture a member in good standing of the Screen Actors Guild of America.

**(2)** Lender's and Artist's Indemnification: Lender and Artist agree to indemnify Producer, and all distributor(s) and broadcaster(s) of the Picture, and each of their officers, employees, directors, successors, agents, licensees and assigns (the "Producer Indemnitees") against and hold the Producer Indemnitees harmless from any damages, liabilities, losses, actual costs, actual expenses, obligations or claims (including, without limitation, reasonable outside attorneys' fees and costs) (collectively "Claims") arising out of the breach of Lender's and/or Artist's agreements, obligations, representations and warranties hereunder.

**(3)** Producer's Representations and Warranties: Producer represents and warrants that it is or will become for the purposes of this Picture a signatory to the applicable SAG agreement.

**(4)** Producer's Indemnification: Producer agrees that Producer shall indemnify and defend Lender and Artist and hold Lender and Artist harmless from any Claims arising with respect to the development, production or exploitation of the Picture, except to the extent arising out of Lender's and/or Artist's breach, negligence and/or intentional misconduct; provided, however, that the foregoing indemnity is conditioned upon and subject to the following: (i) Lender and Artist shall cooperate fully with Producer and follow Producer's reasonable instructions in the defense of any such Claim at no cost or charge to Producer other than the reimbursement to Lender and/or Artist of reasonable out-of-pocket costs and expenses incurred in connection with the defense of any such Claim excluding legal fees; (ii) Producer shall have the right to select and retain any legal counsel in connection with the defense of any such Claim and shall pay the attorneys' fees associated therewith; and (iii) Producer, in its sole discretion, shall have the right to defend, compromise and/or settle any such Claim.

**G.   SUSPENSION AND TERMINATION:** Producer shall have the right to suspend Artist's employment and Lender's compensation hereunder

ACTOR INITIALS: _AB Dar_

during all periods: (i) that Artist does not render services hereunder because of illness, incapacity, default or similar matters, or that Lender and/or Artist are in breach hereof; (ii) that development and/or production of the Picture is prevented or interrupted or delayed because of an event of force majeure or any other event which so prevents or interferes with the development and/or production of the Picture, including, without limitation, any labor dispute or strike, fire, war or governmental action, or any disruptive event beyond Producer's control; or (iii) that production of the Picture is prevented, interrupted or delayed by reason of the death, illness or incapacity of the Director, Director of Photography or a principal member of the cast. Unless this Agreement is terminated, the Guaranteed Period shall be deemed extended by a period equivalent to all such periods of suspension. If any matter referred to in (i) above, other than default, continues for longer than five (5) consecutive days or an aggregate of eight (8) days, or if any matter referred to in (ii) above continues for more than eight (8) weeks, or if any matter referred to in (iii) above continues for more than two (2) weeks, or in the event of any material default on the part of Artist, Producer may terminate this Agreement. If Lender does not receive compensation for a consecutive period of eight (8) weeks as a result of suspension under (ii) above or for a consecutive period of two (2) weeks as a result of suspension under (iii) above, Lender may terminate this Agreement unless compensation is resumed within one (1) week after Lender gives Producer written notice requiring such resumption.

H.     LOANOUT:   Lender shall furnish the services of Artist to Producer in accordance with all of the terms of this Agreement. Lender is, and has been for more than thirty (30) days prior to the date hereof, a corporation duly organized and existing under the laws of Lender's state or country of incorporation. Lender is a bona fide corporation business entity established for a valid business purpose within the meaning of the tax laws of the United States and not a mere sham, conduit, or agent for Artist. Artist is under a written contract of employment with Lender for a term extending at least until the completion of all services required of Artist hereunder, which contract gives Lender the exclusive right to direct Artist as to when and how Artist performs Artist's services and to lend or furnish the services of Artist to Producer, as herein

provided.     As Artist's employer, Lender shall discharge all obligations of an employer including, but not limited to, the withholding and reporting of contributions, insurance deductions and applicable taxes required by law, including payroll taxes and unemployment insurance.

I.     SCREEN AND ADVERTISING CREDIT. Artist shall be accorded credit in accordance with the provisions of Credit paragraph above only if Artist has performed substantially all services called for hereunder and appears recognizably in the role in the Picture. The obligation to accord Artist credit in advertisements shall apply only to paid advertisements issued by Producer or under its direct control relating primarily to the Picture and shall in no event apply to so-called "teaser" and "special" advertising, publicity and/or exploitation relating to the Picture or screenplay upon which the Picture is based, any members of the cast, the authors, directors, producers or similar matters; to so-called "trailers" or other advertising (including promotional films), on the screen or by radio or television; to institutional, group or list advertising; to other advertising not relating primarily to the Picture; to narrative form; to credits on the screen at the end of the Picture; to newspaper or other periodical advertisements of 1200 lines or less; to by-products, record album jackets and similar packaging, merchandising productions or commercial tie-ups; or to advertising of such nature that Artist has not granted consent to the use of Artist's name in connection therewith. With respect to any obligation to accord credit in paid advertising, if the title of the Picture or the title and the name(s) of one or more other persons is used more than once in such paid advertising i.e., a so-called "regular" use and a so-called "artwork" use (such as, for example, the weaving of the title and/or the name(s) of any person as part of the background of the advertisement, or a display use or a fanciful use), the references herein to the title of the Picture and/or the names(s) of any person shall be to the so-called "regular" use of the title or the name(s) of such person(s) as distinguished from the "artwork" use of the title or the name(s) of such person(s); and with respect to any obligation to accord screen credit, in the event of an "artwork" use of the title or the name(s) of any person(s), Artist shall receive credit in accordance with such obligation, if any, as to size, subject to reasonable adjustment if such size of credit is not feasible. All

references to "size" however stated, whether as a percentage or otherwise, shall mean height. Except as specified in the Credit paragraph, all matters relating to Artist's credit, such as size, style of type, placement, color, etc., shall be at Producer's sole discretion and notwithstanding anything to the contrary in said Paragraph or elsewhere in this Agreement, there shall be no obligation whatsoever to accord Artist credit of any kind in any so-called "Award Ads" (including consideration, nominations or congratulations for an award) relating to any other person involved with the Picture. No casual or inadvertent failure to comply with the provisions of this Paragraph and/or the Credit Paragraph of this Agreement shall constitute a breach of this Agreement. Upon receipt of written notice from Lender specifying a failure to accord Artist credit properly in accordance with the Agreement, Company shall use best efforts as practicable to promptly cure prospectively such material failure with regard to ads issued and/or prints created after the date of such notice and, to the extent possible, versions of any other medium whose masters were not created prior to the receipt of such notice. In the event of a failure or omission by Company or any third party constituting a breach of the obligations of Company under this Agreement, including without limitation under this Paragraph, Lender and Artist recognize that the damage caused Lender and/or Artist by Company by such breach is not irreparable or sufficient to entitle Lender or Artist to injunctive or other equitable relief and Lender and Artist therefore agree that Lender's and Artist's rights and remedies hereunder shall be limited to the right, if any, to obtain damages at law. Consequently, neither Lender or Artist shall have any right to injunctive relief or to terminate or rescind the Agreement or any of the rights granted or assigned to Company hereunder.

J.       DOUBLING. Producer shall have the right to simulate Artist's voice and/or appearance in and in connection with the Picture or any part thereof or in any advertising, publicizing or exploitation thereof: (i) when necessary to expeditiously meet the requirements of exhibition; or (ii) when necessary to expeditiously meet censorship requirements, both foreign and domestic; or (iii) when, in the opinion of Producer, the failure to use a double for the performance of hazardous acts might result in physical injury to Artist; or (iv) when Artist is not available; or (v) when Artist fails

or is unable to meet certain requirements of the role, such as, singing or the rendition of instrumental music or other similar services requiring special talent or ability other than that possessed by Artist.

K.       ASSIGNMENT: Producer shall have the right to assign this Agreement and all or any part of Producer's rights hereunder, provided that no such assignments shall relieve Producer of its obligations hereunder unless such an assignment is in writing to a U.S. television network or a major motion picture studio, or any entity acquiring all or substantially all of Producer's assets, which studio, network or entity assumes all of Producer's executory obligations hereunder in writing. Lender and Artist shall not have the right to assign their rights and/or obligations hereunder and any purported assignment shall be null and void.

L.       INSURANCE:

(1)       E & O and Liability Insurance. Lender and Artist shall be covered under the errors and omissions and general liability insurance policies with respect to the Picture, if any, subject to the terms and conditions and restrictions of said policies, including any deductible or policy limits; provided, however, that the inclusion of Lender and Artist on such policies will not relieve Lender or Artist in any. way whatsoever from Lender's and Artist's representations, warranties and indemnities contained herein and no such policy will cover any claims or demands to which Lender's and Artist's indemnification of Producer applies.

(2)       Other Coverage:       Producer may (in Producer's sole discretion) secure in Producer's own name or otherwise at Producer's own expense, life, accident, health, cast, pre-production and other insurance covering Artist independently or together with others, and Artist shall not have any right, title or interest in and to such insurance. It is acknowledged and agreed that Artist's insurability pursuant to customary essential element cast insurance subject to a customary deductible with no material exclusion shall be a condition to Producer's obligations hereunder. Artist shall assist Producer in procuring such insurance by timely submitting to the usual and customary medical examinations and by signing such applications and other instruments in writing as may be required by the insurance company involved. Artist may have Artist's own

physician or other person present at any examination or test required pursuant to this Paragraph at Artist's own expense. If Producer is unable to obtain such insurance on Artist at ordinary rates, with not more than normal deductions, subject only to the usual exclusions and without requirement of compliance with extraordinary conditions, Producer shall have the right to terminate this Agreement without liability by giving Lender or Artist written notice of termination.

M.   WORKERS' COMPENSATION: Lender and Artist acknowledge that Lender shall provide all insurance coverage for Artist required by any workers' compensation statutes, laws, or regulations ("Workers' Compensation") and that Lender shall maintain such insurance coverage throughout the term of my services under this Agreement. For purposes of any and all Workers' Compensation, an employment relationship exists between Producer and Artist, Producer being Artist's "special employer" under this Agreement. Accordingly, in the event of Artist's injury, illness, disability, or death falling within the purview of Workers' Compensation, Artist's rights and remedies (and those of Artist's heirs, executors, administrators, successors, and assigns) against Producer and Producer's affiliates and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Producer's or any affiliate of Producer the services of any such other special employee) shall be governed by and limited to those provided by Workers' Compensation.

N.   REMEDIES: The rights and remedies of Lender and Artist in the event of a breach of this Agreement by Producer shall be limited to Lender's and Artist's right to recover damages, if any, in an action at law and in no event shall Lender or Artist be entitled to terminate or rescind this Agreement or any of the rights granted hereunder or enjoin or restrain the distribution or other exploitation of the Picture and the rights therein, or the use, publication or dissemination of any advertising issued in connection therewith, and Lender and Artist irrevocably waive any right to equitable or injunctive relief.

O.   SERVICES UNIQUE. It is mutually agreed that Artist's services are special, unique, unusual,

extraordinary, and of an intellectual character giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law and that Producer, in the event of any breach by Lender or Artist, shall be entitled to equitable relief by injunction or otherwise.

P.   NOTICES: All notices which one party is required or may desire to serve upon the other under or in connection with the Agreement may be served personally or in lieu of delivering them personally to such party by mail or telegraph or facsimile addressed to the last address or facsimile number provided by said party in writing from time to time. Notice shall be deemed served upon personal delivery or upon the second day after sending via mail or facsimile. Courtesy copies of notices to Lender/Artist shall be sent to Lender's designated representatives (agent, manager and attorney) at their facsimile number last provided.

Q.   MORALS. If Artist should, prior to or during the term hereof or thereafter, fail, refuse or neglect to govern Artist's conduct with due regard to social conventions and public morals and decency, or commit any act which brings Artist into public disrepute, scandal, contempt or ridicule or which shocks, insults or offends a substantial portion or group of the community or reflects unfavorably on Artist or Producer, then Producer may, in addition to and without prejudice to any other remedy of any kind or nature set forth herein, terminate this Agreement at any time after the occurrence of any such event, and, further, Producer may, with or without terminating this Agreement, delete any credit theretofore given Artist in connection with the Picture and may thereafter disregard any credit obligations of this Agreement.

R.   ADDITIONAL DOCUMENTS: Lender and Artist shall execute any documents and do any other acts consistent herewith as may be reasonably required by Producer or its assignees or licensees to further evidence or effectuate Producer's rights as set forth in this Agreement. Upon Lender's and/or Artist's failure promptly to do so after reasonable notice, Lender and Artist hereby appoint Producer as Lender's and Artist's attorney-in-fact for such purposes (it being acknowledged that such appointment is irrevocable and coupled with interest) with full power of substitution and delegation. Copies of all such documents executed

ACTOR INITIALS: AB Dou

Case 2:10-cv-07705-DSF-CW   Document 16-5   Filed 11/01/10   Page 138 of 151   Page ID
#:660
r 03  10  04:59a          Case 2:10-cv-07705-DSF -CW   Document 9-2    Filed 10/25/10   Page 28 of 28   Page ID
#:307

by Producer pursuant to Producer's rights hereunder
shall be sent Lender or Artist, provided that failure
to do so shall not constitute a breach hereunder.

S.    MISCELLANEOUS: THIS AGREEMENT
IS GOVERNED BY THE LAWS OF THE
UNITED STATES AND OF THE STATE OF
CALIFORNIA, AND BOTH PARTIES CONSENT
TO THE JURISDICTION OF THE STATE AND
FEDERAL COURTS RESIDING IN THE
COUNTY OF LOS ANGELES TO ADJUDICATE
ANY DISPUTES WITH RESPECT HERETO.

ACTOR INITIALS: AB

EXHIBIT "G"

Case 2:10-cv-07705-DSF-CW   Document 16-5   Filed 11/01/10   Page 140 of 151   Page ID
#:662
Case 2:10-cv-07705-DSF -CW   Document 9-2   Filed 10/25/10   Page 8 of 28   Page ID #:287

## GIALLO PRODUCTIONS LIMITED

May 28, 2008

Three-Seven Entertainment, Inc.
fso Adrien Brody
("Brody")

     Re:    "*Giallo*" (the "Film")

Dear Sir:

     Reference is hereby made to that certain ACTING SERVICE AGREEMENT dated effective March 26, 2008, and accompanying documents, by and between Three Seven Entertainment, Inc. fso Adrien Brody and Giallo Productions Limited in connection with the Film.

     The parties hereto agree that said Agreements shall be and are amended and, for the benefit to each of the undersigned and, in consideration thereof, agree as follows:

1.    The parties acknowledge that the first payment due to Brody has been paid and received. The parties agree that the second and third payments equaling US$640,000 of the Fixed Compensation to Brody shall be paid to Brody on or before Friday, May 30, 2008. In the event the wire transfer in said amount is not sent by end of business Friday, May 30, 2008, it is acknowledged that Brody will not return to the production set the following business day. Brody hereby acknowledges and agrees that US$640,000 of the Fixed Compensation to Brody payable on June 6 and June 13, 2008 shall be held in accordance with Paragraph 2 below (the "Brody Holdback");

2.    Brody agrees that the Brody Holdback shall be paid to Brody upon a deposit into the Production Account (as defined in the Completion Guaranty) in the amount of US$2,006,000, which amount represents the value of the Italian Letter of Credit less bank charges to be issued in respect of the Film between June 15, 2008 and July 15, 2008 but in no case no later than July 15, 2008. Brody is accorded the right, which he may exercise at any time prior to final cut of the picture, to exchange his executive producer credit for a producer credit (the compensation structure in terms of which fees fall under his acting services agreement and his exec producer/producer agreement will remain as-is) (such would be shared with the other producers Primorac and Rionda), subject to GPL and the Picture still qualifying for treatment as an "European" film; in the event that Brody exercises this option, GPL will exert all best efforts and good faith to provide same. Brody will have the right to withhold consent to the use of his likeness in the picture until the Brody Holdback ($640,000) is paid. Furthermore, in the event that the Letter of Credit is issued by the dates specified in this Paragraph 2, but the production nonetheless fails to release to Brody the Brody Holdback, in addition to

Brody-GPL Deferral Payment Agmt

P.P.

Brody's other rights and remedies that may be available, the $640,000 will accrue 5% per annum rate of interest from July 15, 2008 until payment.

3.  In the event that the event in paragraph 2 does not occur, then Brody shall be paid the full amount of the Brody Holdback from the proceeds from any distribution transaction with regard to the territory of Italy in first position on a simultaneous, pari passu and proportional basis (Brody receiving 32% thereof) with other Holdback accorded to collectively Steel Bridge Finance LLC, Rafael Primorac and Richard Rionda del Castro (68%). Such parties shall hold the percentages stated in the rights and proceeds from the territory of Italy in perpetuity and the parties will be have approval over any subsequent Italian distribution arrangement such approval not to be unreasonably withheld.

4.  This letter agreement (a) shall be governed by the laws of the state of California, without regard to its conflict of laws principles, (b) represents the entire agreement of the parties with respect to the subject matter set forth herein, supersedes all prior written and/or oral agreements with regard to such subject matter, and may not be amended except by a written instrument executed by all parties hereto, and (c) may be executed in any number of counterparts, each such counterpart shall constitute an original and all such counterparts, taken together shall constitute one and the same instrument. The facsimile signatures of the parties shall be accepted and shall be as effective as original signatures.

5.  Notwithstanding anything to the contrary contained herein, the parties agree to enter into such further documents consistent herewith as are reasonably necessary to effectuate the intent of this Letter.

Sincerely,

GIALLO PRODUCTIONS LIMITED

By: Richard Rionda del Castro

By: Rafael Primorac

ACCEPTED AND AGREED:

Three-Seven Entertainment, Inc. fso Adrien Brody
By: Adrien Brody

Brody-GPL Deferral Payment Agmt

Case 2:10-cv-07705-DSF-CW   Document 16-5   Filed 11/01/10   Page 142 of 151   Page ID
#:664
Case 2:10-cv-07705-DSF -CW   Document 9-2   Filed 10/25/10   Page 10 of 28   Page ID
#:289

Brody's other rights and remedies that may be available, the $640,000 will accrue 5% per annum rate of interest from July 15, 2008 until payment.

3.    In the event that the event in paragraph 2 does not occur, then Brody shall be paid the full amount of the Brody Holdback from the proceeds from any distribution transaction with regard to the territory of Italy in first position on a simultaneous, pari passu and proportional basis (Brody receiving 32% thereof) with other Holdback accorded to collectively Steel Bridge Finance LLC, Rafael Primorac and Richard Rionda del Castro (68%).   Such parties shall hold the percentages stated in the rights and proceeds from the territory of Italy in perpetuity and the parties will be have approval over any subsequent Italian distribution arrangement such approval not to be unreasonably withheld.

4.    This letter agreement (a) shall be governed by the laws of the state of California, without regard to its conflict of laws principles, (b) represents the entire agreement of the parties with respect to the subject matter set forth herein, supersedes all prior written and/or oral agreements with regard to such subject matter, and may not be amended except by a written instrument executed by all parties hereto, and (c) may be executed in any number of counterparts, each such counterpart shall constitute an original and all such counterparts, taken together shall constitute one and the same instrument. The facsimile signatures of the parties shall be accepted and shall be as effective as original signatures.

5.    Notwithstanding anything to the contrary contained herein, the parties agree to enter into such further documents consistent herewith as are reasonably necessary to effectuate the intent of this Letter.

Sincerely,

GIALLO PRODUCTIONS LIMITED


By: Richard Rionda del Castro


By: Rafael Primorac


ACCEPTED AND AGREED:


Three-Seven Entertainment, Inc. f/s/o Adrien Brody
By: Adrien Brody


Brody-GPL Deferral Payment Agmt

Case 2:10-cv-07705-DSF-CW   Document 16-5   Filed 11/01/10   Page 143 of 151   Page ID
#:665
Case 2:10-cv-07705-DSF -CW   Document 9-2    Filed 10/25/10   Page 11 of 28   Page ID
#:290

EXHIBIT B

EXHIBIT "H"

May 29 08 12:51p   Greg Steensen                          818-623-4443        p3
MAY-29-2008 20:38   GOLDEN PALACE                          NR.472   P. 5
818 623 4443

May ___, 2008

From: cineFinance Insurance Services LLC
1875 Century Park East, Suite 1970
Los Angeles, CA 90067
Attn: Fred Milstein

To:   Richard Rionda del Castro ("Rionda")
c/o HANNIBAL PICTURES
8265 Sunset Blvd, Suite 107
West Hollywood, CA 90046

And:  Rafael Primorac ("Primorac")
c/o HANNIBAL PICTURES
8265 Sunset Blvd, Suite 107
West Hollywood, CA 90046

And:  Adrien Brody ("Brody")
c/o Three-Seven Entertainment, Inc.
Address:_____
Address:_____

Re:   Giallo (the "Film")

Ladies and Gentlemen:

Reference is hereby made to those certain Completion Guaranty Agreements
dated on or about the date hereof made by and between: (1) Ian David Milner-Brown, on
the one hand, and cineFinance Insurance Services, LLC, a California limited liability
company, for and on behalf of Houston Casualty Company (collectively referred to as
"Guarantor"), on the other hand; and (2) First California Bank, on the one hand, and
Guarantor, on the other hand (collectively, the "Completion Guaranty"), pursuant to
which Guarantor guaranteed to effect "Completion and Delivery of the Film" (as defined
in the Completion Guaranty) subject to, and in accordance with, the terms and
conditions contained therein.

Reference is hereby further made to that certain Producer's Completion
Agreement dated on or about the date hereof made by and between Giallo Productions
Limited ("Producer"), Opera Films s.r.l. and Guarantor (the "Producer's Completion
Agreement", and together with the Completion Guaranty, the "Completion
Documents"), in connection with the Film.

The parties hereto agree that the execution and delivery of the Completion
Documents and the Completion and Delivery of the Film are of benefit to each of the
undersigned and, in consideration thereof, agree as follows:

1.    Primorac hereby acknowledges and agrees that US$26,000 of the
amount payable to Primorac as a producer fee in Section 04.10 of the
Approved Budget shall be deferred in accordance with Paragraph 4 below
(the "Primorac Deferral");

Producer Holdback Letter #2 (Giallo Prima)

AB   RP   [signature]

May 29 08 12:52p    Greg Steenser        818-623-4443        p.4

818-623-44NR 472    P. 4.3

818 623 4443

2.    Brody hereby acknowledges and agrees that US$840,000 of the amount payable to Brody as a producer fee in Section 05.01 of the Approved Budget shall be deferred in accordance with Paragraph 4 below (the "Brody Deferral");

3.    Rionda hereby acknowledges and agrees that US$40,000 of the amount payable to Rionda as a producer fee in Section 04.10 of the Approved Budget shall be deferred in accordance with Paragraph 4 below (the "Rionda Deferral" and together with the Primorac Deferral and the Brody Deferral, the "Deferral");

4.    Brody, Rionda and Primorac hereby agree that the Deferral shall be promptly paid to Brody, Rionda and Primorac pro rata pari passu upon the deposit into the Production Account (as defined in the Completion Guaranty) of the sum of US$2,006,000, which amount represents the value of the Italian Letter of Credit to be issued in respect of the Film and which will be remitted to the Production Account by First California Bank once the Italian Letter of Credit is issued.

5.    This letter agreement (a) shall be governed by the laws of the state of California, without regard to its conflict of laws principles, (b) represents the entire agreement of the parties with respect to the subject matter set forth herein, supersedes all prior written and/or oral agreement with regard to such subject matter, and may not be amended except by a written instrument executed by all parties hereto, and (c) may be executed in any number of counterparts, each such counterpart shall constitute an original and all such counterparts, taken together shall constitute one and the same instrument. The facsimile signatures of the parties shall be accepted and shall be as effective as original signatures.

6.    Notwithstanding anything to the contrary contained herein, the parties agree to enter into such further documents consistent herewith as are reasonably necessary to effectuate the intent of this Holdback Letter, including without limitation (if necessary) amending the Completion Documents.

*Signatures on next page*

AB

R.P    PM

Producer Holdback Letter 82 (Strike Price)

May 39 08 12:52p    Greg Steensen                                    818-623-4443          p.5
                                                                    818-623-444NR. 472    P. 34
                                      818 623 4443

Sincerely,
**CINEFINANCE INSURANCE SERVICES, LLC,**
for and on behalf of Houston Casualty Company

By:_____
                    Fred Milstein, President

**ACCEPTED AND AGREED:**

Richard Rionda del Castro

_____

Rafael Primorac

_____

Adrien Brody

EXHIBIT "I"

**From:** Richard Rionda <richard@hannibalpictures.com>
**Date:** July 13, 2008 2:58:51 AM GMT+02:00
**To:** Opera Film srl <opera@mail.nexus.it>
**Cc:** <rafaelprimorac@gmail.com>
**Subject: Re: R: Items pending**

Claudio

Thank you for this.

1- Push hard for LC early next week. It is crucial.
2- We have not received the 360 euros.
3- Ok Thank you.
4- Ok. Thank you
5- Dan Voltz will contact Irma directly for this.


Thank you


Richard Rionda del Castro
Chairman & CEO
HANNIBAL PICTURES
8265 Sunset Blvd, Suite 107
West Hollywood, CA  90046
Phone:  (323) 848-2945
Fax:  (323) 848-2946



On Jul 11, 2008, at 8:13 AM, Opera Film srl wrote:



Dear Richard,



1) For what concern the Italian Distribution, I'm having many difficulties, but my last word and
an offer I will have it Tuesday next week. 1 minute later I will call you.



2) The euros 360 Emanuela was supposed to make the wiring this week. For what concern the
euros 3481 we will transfer to you this amount as soon as we understand if the Residence Sacchi
has been paid by you. (It is very urgent).

3) As you can see in the Final Report (Marcello has send it to you) three invoices are missing we are waiting their news.  As soon as we receive the invoices we will let you know

4)As you know Cinecitta' has been paid already as per your instruction.

Neverthanless,  the investigation from your insurance could be done in Los Angeles as soon as you will received the negative and when the edited. sequence will be definitive.

If Cinecitta' will result responsible on this damage I'm sure they will  answer,  if the damage would not be cover by insurance.

5) The shipment of the negative will be collect, consequently let me know who will be the shipment company you decide.  All the sound material and video has been sent to you as you know to be given to Mr. Roberto Silvi  (please give this notice to Dan Voltz).

Best

Claudio Argento

---

**Da:** Richard Rionda [mailto:richard@hannibalpictures.com]
**Inviato:** giovedì 10 luglio 2008 19.41
**A:** Opera Film srl
**Cc:** Marcello Lanza; Rafael Primorac; Maxwell Meltzer; John Hicks
**Oggetto:** Items pending

Claudio

I hope you are fine.

The list below is the items left open.

1- What is status of LC ? Time is up in a few days and you are very silent.

Filomena is not answering. This is costing production $13,000 a week in interest.

2- Reimbursment of the 3,481 euros plus the 360 euros = 3,841 euros to our production account.

You received our invoices.

3- Marcello final cost report not inclusive or Opera overages.

We do need to receive this now. Rafael and my fees are held up until this is done.

4- We would like you not to pay the Italian lab in full as we still have an issue of damages film that point them as responsible for this.

We are expecting insurance investigation on this but in any case ( except if Italian pays for it ) a deductible will be charged and this deductible if any involvement of insurance need to be paid by Italian lab not by us.

5- We will want to have the negative shipped in Los Angeles and we will forward you the address and shipping information.

Thank you

best


Richard Rionda del Castro

Chairman & CEO

HANNIBAL PICTURES

8265 Sunset Blvd, Suite 107

West Hollywood, CA 90046

Phone: (323) 848-2945

Fax: (323) 848-2946